~~EXHIBIT D~~

~~PROPOSED~~ [STIPULATED] BIO-RAD v. 10X E-DISCOVERY AGREEMENT

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BIO-RAD LABORATORIES, INC. and PRESIDENT AND FELLOWS OF HARVARD COLLEGE<br><br>        Plaintiffs,<br><br>v.<br><br>10X GENOMICS, INC.,<br><br>        Defendant. | Civil Action No. 1:19-cv-12533-WGY<br><br>DEMAND FOR JURY TRIAL |
| 10X GENOMICS, INC.,<br><br>        Counterclaim Plaintiff,<br><br>v.<br><br>BIO-RAD LABS., INC.,<br><br>        Counterclaim Defendant,<br><br>and<br><br>PRESIDENT AND FELLOWS OF HARVARD COLLEGE,<br><br>        Nominal Counterclaim Defendant. | |

Plaintiff and Counterclaim Defendant Bio-Rad Laboratories, Inc. ("Bio-Rad") and Plaintiff, Counterclaim Defendant, and nominal Counterclaim Defendant President and Fellows of Harvard College ("Harvard University") (collectively "Plaintiffs"), and Defendant and Counterclaim Plaintiff 10X Genomics, Inc. ("10X" or "Defendant") agree that this proposed

Document Production Order ("Production Order") shall govern the Parties in the above-captioned case (the "Litigation").

## I.   GENERAL PROVISIONS

**A.**   This Production Order supplements all other discovery rules and orders.   It streamlines Electronically Stored Information ("ESI") production to promote a "just, speedy, and inexpensive determination" of this action, as required by Federal Rule of Civil Procedure 1.

**B.**   The Parties will make reasonable efforts to prepare responsive and non-privileged data for production in accordance with the agreed-upon specifications set forth below.   These specifications apply to hard copy documents or ESI which are to be produced in this Litigation.

**C.   SECURITY.**   The Parties will make reasonable efforts to ensure that any productions made are free from viruses and may be provided on encrypted media.

**D.   CONFIDENTIALITY DESIGNATION.**   Responsive documents in TIFF format will be stamped with the appropriate confidentiality designations in accordance with the Stipulated Protective Order in this matter.   Each responsive document produced in native format will have its confidentiality designation identified in the filename of the native file.

**E.   PRODUCTION MEDIA.**   Documents shall be produced on secure file transfer programs, such as ShareFile and SFTP, that are mutually agreeable to the Parties.   As an alternative to producing documents on secure file transfer programs, the production may be produced on readily accessible external hard drives, DVD, or CD disks ("Production Media").   When reasonably feasible, each piece of Production Media shall be labeled with (1) the producing Party's name; (2) the production date; and (3) the Bates Number range of the materials contained on the Production Media.

**F.   PRIVILEGE LOGGING.**   The producing party shall provide the requesting party with a log of the documents withheld or redacted for privilege containing information sufficient to enable the requesting party to evaluate the claims made, including the following information: Custodian(s), From, To, CC, BCC, Date, Email Subject/Filename, Basis for Withholding (e.g., Attorney-Client Communication), Nature of the Privilege (e.g., Providing Legal Advice), and

Privilege Subject Matter. In-house attorney names shall be designated with an asterisk; outside counsel attorney names will be designated with a double asterisk. The producing party shall provide such a privilege log within two weeks (14 days) of service of any production from which privileged documents were redacted or withheld. Communications involving trial counsel that post-date the filing of the complaint need not be placed on a privilege log unless a Party makes a showing of good cause for why a log should be provided as to some subset of such communications. This privilege logging provision also does not apply to already-produced documents deemed produced from previously filed proceedings as covered in Section VII.

      **G.**    **NON-WAIVER.** Any document, native file, email, or custodial ESI that contains privileged matter or attorney work product shall be handled in accordance with the provisions set forth in Section 12 of the Stipulated Protective Order.

**II.**    **DATA PROCESSING**

      **A.**    **DEDUPLICATION.**  To the extent feasible, the Parties will de-duplicate responsive ESI across Custodians.  For each de-duplicated document, to the extent feasible, the names of all custodians that possessed the document and the filepaths for each copy of the document shall be produced.  De-duplication may be done automatically via standard techniques such as those based on MD5 or SHA-1 hash values. Documents are considered exact duplicates if a document family or stand-alone file has a matching MD5 or SHA-1 hash value as compared against the same document type (i.e., family or stand-alone file).  Near-duplicate documents shall not be removed.  Standalone documents shall not be deduplicated against email attachments.

**III.**    **GENERAL PRODUCTION SPECIFICATIONS**

      **A.**    **FORMAT.**  To the extent feasible, documents (whether originating in electronic or hard copy format) shall be produced as single page, Group IV TIFF files in black and white format.  To the extent feasible, documents originating in hard copy format shall be converted to TIFF images by scanning with at least 300 dots per inch (dpi).  Each image shall be named according to the corresponding Bates number associated with the document.  Each image shall be branded according to the Bates number and given a confidentiality designation, if applicable.  Each

image shall show all text and images that could be visible to a user of the documents, including any tracked changes, comment fields in the document, or presenter notes. Finally, each document that is produced in native form shall also be accompanied with a Bates-stamped slipsheet image, including any confidentiality designations.

For any black and white document that a Party has received from the other Party and believes it necessary to have that document in color, that Party shall notify the other Party of the identity of such documents by Bates number and the other Party shall produce such document as JPEG files in color within a reasonable period of time after receipt of the Party's request (to the extent that the document is available in color). Each Party shall keep such requests for color documents to a reasonable number it believes necessary to advance its case.

**B.     TEXT TO BE PROVIDED WITH IMAGE FILES.** For each document, extracted or optical character recognition ("OCR") text in UTF-8 format shall be provided. To the extent possible, the text of native files should be extracted directly from the native file. If a document has been redacted, OCR of the redacted document will suffice in lieu of extracted text. Extracted or OCR text shall be included as one separate file per document, so long as it is provided in such a manner that it can be loaded into commercially acceptable production software (*e.g.*, Relativity, Concordance, Summation, Ipro).

**C.     DATABASE LOAD FILES/CROSS-REFERENCE FILES.** Production shall include a DAT data load file and an OPT (Opticon) image load file in a reasonable format specified by the requesting party, or, if no request is made in a format that can be loaded into commercially acceptable production software (*e.g.*, Relativity, Concordance, Summation, Ipro).

**D.     BATES NUMBERING.** All images must be assigned a unique Bates number that is sequential within a given document and across the production sets.

**E.     REDACTION OF INFORMATION.** If documents are produced containing redacted information, the producing Party shall supply a list of the documents for any such claim(s) of redaction, indicating the grounds for the redaction and the nature of the redacted material. During the course of the Litigation, an electronic copy of the original, unredacted data shall be

4

securely preserved in such a manner so as to preserve without modification, alteration, or addition the content of such data including any metadata therewith. This Production Order, the Stipulated Protective Order, and the rules of the Court in this case set forth the basis for the redaction of information.

F.      **UNITIZING OF DOCUMENTS.** Distinct documents should not be merged into a single record, and single documents should not be split into multiple records (*i.e.*, documents should be unitized as kept in the ordinary course of business). The Parties will use reasonable efforts to unitize documents correctly. To the extent a Party believes that it is necessary to split a single document into multiple records due to the size of such document, such multiple records shall be identified as being related through the use of the BEGATTACH and ENDATTACH metadata fields.

IV.     **PRODUCTION OF ELECTRONICALLY STORED INFORMATION**

A.      **METADATA FIELDS AND PROCESSING.** E-discovery production requests under Federal Rules of Civil Procedure 34 and 45 shall not require metadata, other than as specified on Exhibit A attached. However, if a Party believes in good faith that additional metadata are necessary for providing substantive context to a specific produced document or native file, then the producing party and the receiving party shall meet and confer in good faith to determine the extent to which additional metadata should be produced. Any Metadata that is produced shall be formatted into a .dat file with delimiters appropriate for use with commercially acceptable review software (*i.e.*, a load file). Parties may request other native files be produced as described in Section IV.D. below.

B.      **NATIVE FILES.** Spreadsheets, Access files, audio files, and videos must be produced in native format.

C.      **PROPRIETARY FILES.** To the extent a response to discovery requires production of ESI accessible only through proprietary software, the Parties should continue to preserve each version of such information. The Parties shall meet and confer to finalize the appropriate production format.

**D.**     **REQUEST(S) FOR ADDITIONAL NATIVE FILES.**  If good cause exists to request production of specified files, other than those specifically set forth above, in native format, the Party shall request such production and provide an explanation of the need for native file review.  The Parties shall work together to provide documents in reasonable useful format.

## V.     PROCESSING OF THIRD-PARTY DOCUMENTS

**A.**     A Party that issues a subpoena requesting the production of documents ("Issuing Party") shall include a copy of this Production Order with the subpoena and state that the Parties to the Litigation have requested that third parties produce documents in accordance with the specifications set forth herein.

**B.**     The Issuing Party shall ensure that any documents it obtains pursuant to a subpoena are produced to all Parties as soon as reasonably possible.

**C.**     If the third-party production is not Bates-stamped, the Issuing Party will endorse the third-party production with unique prefixes and Bates numbers prior to producing them to other Parties.

**D.**     Nothing in this stipulation is intended to or should be interpreted as narrowing, expanding, or otherwise affecting the rights of the Parties or third parties to object to a subpoena.

## VI.     SEARCHING AND SCOPE OF PRODUCTION

[The Parties dispute what language should be adopted for subsections A-D below]

| Plaintiffs' Proposed Section VI. Language | 10X's Proposed Section VI. Language |
|---|---|
| **A. SOURCES.**<br><br>In responding to general requests under Federal Rules of Civil Procedure 34 and 45 that may implicate the production of ESI, the Parties will search central repositories, such as shared network drives, document databases, and if necessary other locations where shared documents and files may be held by individuals who are designated as being responsible for the maintenance and safekeeping of such documents on behalf of the Party (or Parties).  In general, the Parties | **A. SOURCES.**<br><br>The Parties will meet and confer and exchange information regarding the following: (a) the identity and role of custodians from which documents and ESI will be obtained for production; (b) the identity, scope and format of custodial and non-custodial sources from which documents and ESI will be obtained for production; (c) the identity and scope of sources of documents and ESI to be produced without the use of technology assisted review or |

| | |
|---|---|
| shall not be required to search email, other forms of electronic correspondence, or custodial ESI in responding to such requests.<br><br>As used herein, "custodial ESI" refers to ESI that is in the possession of an individual custodian, rather than in central repositories, and for which such individual custodian is not designated as being responsible for the maintenance and safekeeping of such documents on behalf of the Party (or Parties). | search terms; (d) applicable timeframe(s) for collection and review of documents and ESI. |
| **B. SOURCES THAT NEED NOT BE SEARCHED.**<br><br>The following locations will not be searched under any circumstances, and as such need not be preserved, absent a Court order upon showing of good cause: deleted or fragmented data accessible only by forensics; Web browser data such as temporary Internet files, history, cache, and cookies; server, system, or network logs; personal digital assistants; mobile phones and tablets; voicemail systems; instant messaging applications, and similar communications that are not printed and/or maintained by a Party; company employee internal social media profiles; data remaining from systems no longer in use that are not readily accessible on systems currently in use; and automated disaster recovery backup systems and/or disaster recovery backup tapes.  In addition, the Parties agree that with respect to documents that automatically "autosave," only the most recent version of such documents need be searched. | **B. SOURCES THAT NEED NOT BE SEARCHED**<br><br>The following locations will not be searched in the first instance, and as such need not be preserved beyond their preservation in the ordinary course, absent a Court order upon showing of good cause and unless agreed to be produced pursuant to Section VI.D below: deleted or fragmented data accessible only by forensics; Web browser data such as temporary Internet files, history, cache, and cookies; server, system or network logs; voicemail systems; data remaining from systems no longer in use that are not readily accessible on systems currently in use; and automated disaster recovery backup systems and/or disaster recovery backup tapes.  In addition, the Parties agree that with respect to documents that automatically "autosave," only the most recent version of such documents need be searched. Parties may request information in these categories upon a showing of good cause, and the parties shall meet and confer in good faith. If the parties cannot reach an agreement, they will follow the provisions for resolving discovery and Protective Order disputes outlined in Section VIII of this Order. |
| **C. EMAIL AND CUSTODIAL ESI REQUESTS.**<br><br>To obtain email or custodial ESI beyond that stated in section VI(A) above, a Party must propound specific requests for the production | **C. EMAIL AND CUSTODIAL ESI REQUESTS.**<br><br>The parties agree that they will cooperate in good faith regarding the disclosure and formulation of appropriate search terms or |

of email or custodial ESI. Such requests shall be propounded for specific issues (rather than general discovery of a product or business) and shall identify the requested custodian, search terms/phrases, and time frame. The Parties shall cooperate to identify the proper custodians subject to these requests and proper search terms/phrases.

Email and custodial ESI production shall be limited to a total of no more than five custodians for the Defendant and Plaintiff Bio-Rad. Email and custodial production for Plaintiff Harvard University shall be limited as is reasonable according to the needs of the parties, but shall not exceed two custodians. The no more than two Harvard custodian(s) and the five Bio-Rad custodian(s) identified by 10X must be custodians also identified by Stilla. These limitations may be modified upon a showing of good cause. The email and custodial ESI production from such custodians shall be limited to a total of no more than five ESI search terms/phrases per custodian. Stilla and 10X must select the same (no more than five) ESI search terms/phrases for custodians that are common between Stilla and 10X. The Parties may jointly agree to modify the limits on search terms/phrases without the Court's leave. The Court shall consider contested requests for up to five additional search terms/phrases per custodian, upon showing a distinct need based on the size, complexity, and issues of this specific case. Cost-shifting may be considered as part of any such request. Search terms/phrases shall be narrowly tailored to the particular issues addressed by the specific requests for production of email or custodial ESI. Indiscriminate terms/phrases, such as the producing Party's name or its product name, are inappropriate unless combined with narrowing search criteria that sufficiently reduce the risk of overproduction. Search terms/phrases unrelated to a specific request for production

other filtering methodology (including TAR), custodians, and potentially relevant noncustodial sources and methodologies in advance of any search for email or custodial ESI beyond that stated in section VI(A) above. With the objective of limiting the scope of review and production, and thereby reducing discovery burdens, the parties agree to meet and confer as early as possible, and in advance of any search or filtering that results in the elimination of documents from review for production, with a view to facilitating production in accordance with the deadlines established by the Court while minimizing the need for motions practice. Notwithstanding the foregoing, the parties may approach the Court with disputes concerning search methodologies, search term selection and testing, and search validation if any, pursuant to the provisions for resolving discovery and Protective Order disputes outlined in Section VIII of this Order.

This provision does not prevent any party from undertaking searches of its own ESI for its own purposes at any time.

Documents or ESI known to a party's counsel or custodian to be responsive to a discovery request or relevant to the subject matter of this action shall be produced without regard to whether it was responsive to any search methodology described herein or developed in accordance with this Order, unless Counsel specifically identifies the documents being withheld pursuant to a specific objection.

| | |
|---|---|
| of email or custodial ESI are prohibited. A conjunctive combination of multiple words or phrases narrows the search and shall count as a single search term/phrase. A disjunctive combination of multiple words or phrases broadens the search, and thus each word or phrase shall count as a separate search term unless they are variants of the same word. Use of narrowing search criteria (*e.g.*, "and," "but not," "w/x") is encouraged to limit the production and shall be considered when determining whether to shift costs for disproportionate discovery.<br><br>Email and custodial ESI production requests shall be phased to occur after the Parties have exchanged initial disclosures and basic documentation about the patents, the prior art, the accused instrumentalities, and the relevant finances. | |
| **D. DISCOVERY OF OTHER FORMS OF COMMUNICATION.**<br><br>[Plaintiffs propose that TOX's subsection D. should be omitted] | **D. DISCOVERY OF OTHER FORMS OF COMMUNICATION.**<br><br>The parties will disclose by February 25, 2020 the forms of electronic communication other than email that are used by the parties or by their employees in the course of their employment, including but not limited to text messaging; messaging applications on computers, servers, or other devices; collaboration sites including but not limited to Slack or Microsoft Teams, company blogs, bulletin boards, or wikis; and the like. The parties will meet and confer in good faith on February 27, 2020, on the approach to the searching and production of such documents. If there are disputes, the parties will follow the provisions for resolving discovery and Protective Order disputes outlined in Section VIII of this Order. |

**[Plaintiffs' Statement Re: Section VI. Disputes]**

### A. 10x's Demand for Unlimited Discovery is Unjustified and Inefficient (Subsection A and C)

Despite the layers of protection and broad discovery parameters Plaintiffs have already agreed to, 10x requests discovery that goes above and beyond what is necessary and usual.

Most important, 10x refuses to agree to any limits on the number of document custodians and search terms. Bio-Rad has proposed a reasonable limit of 5 Bio-Rad custodians and 2 Harvard custodians.[1] 10x, for its part, has refused to make any counterproposal as to a reasonable number of ESI custodians and search terms. While Bio-Rad is open to compromise, the trouble with 10x's position is that 10x has made clear in meet and confer that it actually wants *unlimited* discovery from an *unlimited* number of document custodians.

Such a demand is disproportionate and unjustified under any circumstances. Indeed, in the co-pending *Stilla* litigation that involves four different patents from four different entities (Bio-Rad, Harvard, Lawrence Livermore National Laboratory, and the University of Chicago), the parties had no trouble agreeing to reasonable limits on the number of email custodians that are in line with what Bio-Rad proposes here. Nothing about the 10x case is so complicated and unusual as to warrant unlimited email discovery.

If anything, the circumstances here make 10x's demand for unlimited discovery unusually unwarranted. The parties have been engaged in six prior and ongoing litigations. As set forth in Section VII.A below, the parties have agreed that the discovery from these cases may be used in

---

[1] 10x also does not accept Plaintiffs' proposal of Bio-Rad's five custodians apparently because it is fewer than the eight custodians that Bio-Rad agreed to use in related *Stilla* case. But, the *Stilla* case involves more patents and more parties. And on the flipside, 10x argues there is no basis to apply the Stilla approach to this case because 10x has asserted antitrust claims, while Stilla has not. Again, 10x forgets that it has access to discovery spanning six prior litigations, including extensive discovery of Bio-Rad's acquisition of Raindance—the exact same issue underlying the current antitrust counterclaims against Bio-Rad.

this case. This discovery encompasses *3,516,288* pages of material across *625,132* documents relating to virtually every aspect of the companies' businesses. In this light, 10x's assertion that it now needs unlimited additional email discovery makes no sense.

10x contends that it requires unlimited discovery—so much so, that it hints at needing up to 35 custodians—because it has asserted antitrust counterclaims against Bio-Rad. Yet, all of 10x's antitrust counterclaims relate solely to an alleged unlawful acquisition by Bio-Rad of RainDance more than *three years ago*. When that acquisition completed, 10x and RainDance were engaged in patent litigation. At the time, 10x took extensive discovery of both Bio-Rad's and RainDance's acquisition due diligence files and deposed all of the key witnesses related to this transaction. Thus, 10x should already have nearly everything it needs for its antitrust counterclaims. Indeed, in the three years since Bio-Rad's acquisition of RainDance, 10x has never before suggested that the acquisition was "illegal." If this acquisition were truly important enough to justify the unbounded discovery 10x now seeks, 10x would have said something long ago.

Below, 10x cites a number of cases allegedly standing for the proposition that, in general, there should not be limits on ESI custodians. Yet, 10x's cases merely represent situations where parties *agreed* that there should not be presumptive limits. Just as often, the parties agree otherwise and adopt reasonable limits consistent with Bio-Rad's proposal. *See, e.g., Koninklijke Philips NV et al. v. Troy-CSL Lighting, Inc.,* 1:15-cv-11053-WGY, D.I. 31 ("Each requesting party (Plaintiffs, collectively, or Defendant) shall limit its email production requests to *five custodians* per producing party (Plaintiffs, collectively, or Defendant) for all such requests...."); *TM Patents, LP et al v. LSI Corporation,* 1:12-cv-11416-WGY, D.I. 37 ("Each requesting party shall limit its e-mail production requests to a total of five (5) custodians per producing party for all such requests."); *Hypertronics Corporation v. Lemo USA, Inc., et al.,* 1:12-cv-11085-WGY, D.I. 34

("Each requesting party shall limit its email production requests to a total of five custodians per producing party for all such requests.").

Regardless, none of the cases 10x cites involve a situation where, as here, the parties had been engaged in years of prior litigation such that there was a readily available massive volume of 3.5 million pages of discovery directed to every key issue in the case. It cannot be that in such a situation unlimited additional discovery is warranted, as it would only lead to excess and abuse.

As an example, 10x states below that it opposes Bio-Rad's proposal of 5 custodians because the number of people who were "aware" of Bio-Rad's acquisition plans exceeds 5. 10x's suggestion that it will require discovery from every individual who was merely "aware" of Bio-Rad's acquisition plan underscores the need for limits and the risks that 10x will pursue abusive and overbroad discovery. In this regard, the Court already rejected 10x's requests for excessive numbers of interrogatories and depositions. *See* D.I. 27 at 2-3.[2]

This case is scheduled for trial in April. The parties have already exchanged over 3.5 million pages of documents. Rather than engaging in never-ending and disproportionate dragnet discovery of unlimited email custodians, the parties should focus on getting the additional discovery they truly need and getting this case ready for trial.

## B. 10x's Demand for Discovery from Ephemeral Communications is Unwarranted

In addition to seeking additional discovery from unlimited custodians, 10x demands discovery from scores of ephemeral sources that are traditionally not searched, "including but not limited to text messaging; messaging applications on computers, servers, or other devices;

---

[2] 10x also resists 2 Harvard custodians because it is less than the number of named inventors who have been at Harvard. But, only one inventor is still affiliated with Harvard. It is unclear why 10x could ever require discovery from more than 2 Stilla custodians. Indeed, in the co-pending case against Stilla, the parties agreed that only 2 Harvard custodians would be necessary.

collaboration sites including but not limited to Slack or Microsoft Teams, company blogs, bulletin boards, or wikis; and the like."

Such discovery is unnecessary and disproportionate. Indeed, one judge in this district has entered an agreed ESI order rejecting such broad discovery. *MedIdea, L.L.C. v. DePuy Orthopaedics, Inc.*, No. 1:17-CV-11172-GAO, 2017 WL 9289450, at \*5 (D. Mass. Oct. 20, 2017) ("Absent a Party's specific written notice for good cause, (a) the following categories of ESI are presumed to be inaccessible and not discoverable: . . . (iii) Deleted, 'slac,' fragmented, or unallocated data only accessible by forensics; . . . (ix) Text messages and instant messages that are not retained in the ordinary course of business; . . .").

Consistent with this, the District of Delaware's Default Discovery Rules have contemplated and rejected discovery of these exact types of ephemeral communications. *See* District of Delaware's Electronic Discovery Default Standard ("Absent a showing of good cause by the requesting party," the following categories of ESI need not be preserved: "Deleted, slack, fragmented, or other data only accessible by forensics"; "[o]nline access data such as temporary internet files, history, cache, cookies, and the like"; "[i]nstant messages that are not ordinarily printed or maintained in a server dedicated to instant messaging"; "[e]lectronic mail or pin-to-pin messages sent to or from mobile devices (e.g., iPhone and Blackberry devices), provided that a copy of such mail is routinely saved elsewhere."). In fact, one of 10x's own cited Orders rejects discovery of such sources. *See Shire LLC v. Abhai, LLC*, No. 1:15-cv-13909-WGY (D. Mass. May 16, 2016), Stipulation and Order on Electronic Discovery ("In addition, the parties do not presently contemplate that it will be necessary for a party to search for information from the following sources: Smart phones, tablet computers, or other similar portable devices; PDAs;

cellular phones; voicemail systems; legacy computer systems; backup tapes; and disaster recovery systems or materials.").

And indeed, most courts consider the categories of ephemeral communications sought by 10x to be presumptively not discoverable. *See also Shotwell v. Zillow Grp. Inc.*, No. C17-1387-JCC, 2019 WL 5802656, at *1 (W.D. Wash. Nov. 7, 2019) ("Absent a showing of good cause by the requesting party, the following categories of ESI need not be preserved: a. Deleted, slack, fragmented, or other data only accessible by forensics. B. Random access memory (RAM), temporary files, or other ephemeral data that are difficult to reserve without disabling the operating system."); *Martinelli v. Johnson & Johnson*, No. 215CV01733MCEEFB, 2016 WL 1458109, at *2 (E.D. Cal. Apr. 13, 2016) ("Consistent with the proportionality standard set forth in the FRCP, absent a party's specific written notice for good cause, the following categories of ESI are presumed to be inaccessible and not discoverable: . . . iii.  Deleted, 'slac,' fragmented, or unallocated data only accessible by forensics;  . . vii. Electronic data (e.g., call logs, email, calendars, contact data, notes, and text messages) sent to or from mobile devices), . . ."). *Robinson v. Gateway Tech. Coll.*, No. 15-C-1214, 2016 WL 344959, at *6 (E.D. Wis. Jan. 26, 2016) ("The following categories of ESI generally are not discoverable in most cases, and if any party intends to request the preservation or production of these categories, then that intention should be discussed at the meet and confer or as soon thereafter as practicable: (1) 'deleted,' 'slack,' 'fragmented,' or 'unallocated' data on hard drives; . . ."); *Travelers Prop. Cas. Co. of Am. v. Cannon & Dunphy, S.C.*, 997 F. Supp. 2d 937, 946 (E.D. Wis. 2014); *Krentz v. Carew Trucking, Inc.*, No. 13-C-1373, 2014 WL 2110022, at *7 (E.D. Wis. May 20, 2014); *Perez v. Mueller*, No. 13-C-1302, 2014 WL 2050606, at *9 (E.D. Wis. May 19, 2014).

Again, rather than engaging in dragnet discovery, the parties should focus on the key information that is needed and getting this case ready for trial. 10x's strange desire to amp up the discovery burdens on the parties serves no purpose and should be rejected.

**[10X's Statement Re: Section VI. Disputes]**

Bio-Rad's insistence that 10X is seeking "unlimited" discovery is simply not correct. Quite the contrary, 10X merely requests the reasonable, standard approach where parties meet and confer early in the case to discuss appropriate limits based on upfront disclosures that allow the parties to identify custodians and ESI search terms fairly and in an informed way. This makes good sense in this particular case where Bio-Rad has accused 10X of infringing three patents, 10X has accused Bio-Rad of infringing two other patents, and 10X has filed antitrust and unfair competition claims against Bio-Rad challenging its illegal acquisition of RainDance. *See* 10X's Partial Am. Answer and Am. Counterclaims, ECF No. 53 at 19-58.

10X proposes an approach to e-discovery that is at once necessary given the breadth and variety of issues in this case and also typical in antitrust cases and in civil litigation generally. Bio-Rad ignores the complex nature of this case and the breadth of the claims against it and instead proposes an approach to e-discovery that would already be inadequate even if this were only a single-plaintiff patent infringement case, which it is not. The limits Bio-Rad seeks to impose are facially insufficient here: they would arbitrarily limit the number of custodians of discoverable electronic information that 10X can pursue to substantially fewer than the number of people already known to possess discoverable information. Bio-Rad's asymmetric proposal would also require 10X to select custodians and search terms that match those selected by Stilla—a party over

whom 10X has no control that is litigating a case that involves very different issues than those raised here.

The rule in civil litigation is that parties can obtain "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b). The Supreme Court has instructed that Rule 26 must be "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). In antitrust cases, the need for liberal discovery is even greater than in civil litigation more generally. *See, e.g.*, Manual for Complex Litigation, Fourth, § 30, p. 519 (2004) (describing extensive scope of discovery in antitrust cases); 6 James Wm. Moore, MOORE'S FEDERAL PRACTICE, s. 26.46[1], at 26-116 (3d ed. 1998) ("The scope of discovery in antitrust actions is at least as broad, if not broader than, the scope of discovery in other actions because of the public importance of the decision, and the need to define the issues."); *Callahan v. AEV INC.*, 947 F. Supp. 175 (W.D. Penn. 1996) ("Discovery in an antitrust case is necessarily broad because allegations involve improper business conduct. Such conduct is generally covert and must be gleaned from records, conduct, and business relationships."); *Kellam Energy, Inc. v. Duncan*, 616 F. Supp. 215, 217 (D. Del. 1985) ("[T]here is a general policy of allowing liberal discovery in antitrust cases."); *FTC v. Lukens Steel Co.*, 444 F. Supp. 803, 805 (D.D.C. 1977) ("The discovery rules should normally be liberally construed to permit discovery in antitrust cases.").

In antitrust challenges to mergers, extensive discovery is the norm. The Federal Trade Commission has announced a default policy of 35 custodians per merging party and so at least 70 custodians per merger. *See* Reforms to the Merger Review Process, Announcement by Deborah Platt Majoras, Chairman, Federal Trade Commission (Feb. 16, 2006) at 1, 9 (quoting 15 U.S.C.

§ 18). Often merger reviews involve much more discovery. In the Department of Justice's recent investigation of the T-Mobile-Sprint merger, there were 97 custodians and 23 depositions. *State of NY v. Deutsche Telekom*, Case 1:19-cv-05434-VM-RWL (S.D.N.Y. 2020), ECF No. 148 (Letter to Court, July 30, 2019). 10X is not suggesting that it will need 97 or even 70 custodians in this case and is providing this information merely for perspective on how unreasonable the limits Bio-Rad seeks to impose truly are. 10X will be efficient and reasonable in discovery but will certainly need more than five custodians. It is premature to set an arbitrary limit now before the parties have met and conferred about the individuals who are actually likely to have relevant information. Indeed, all of the cases Plaintiffs cite agreeing to low custodial limits are cases where one side asserted patent infringement and no one asserted antitrust violations.

10X's e-discovery proposal is straightforward. The parties will meet and confer on the scope of ESI discovery that is reasonable and appropriate for this complex case, including custodians, search terms, and sources of information. Unlike Bio-Rad's proposal, 10X's proposal does not impose *arbitrary* limits on the number of custodians, the number of search terms, or the sources of information. Under 10X's proposal the discovery will fit the needs of the case, as is just and proper under the Rules.

This Court and other courts in this district routinely adopt e-discovery orders that are almost identical to 10X's proposal and that do not impose arbitrary limits and do not exclude instant messaging and other forms of communication that are kept in the ordinary course of business.[3] For example:

---

[3] Plaintiffs position statement quotes multiple cases regarding "slac" and "slack" files in the context of hard drive fragmentation files that are only recoverable by forensic experts—which 10X is not requesting. The "Slack" referred to in 10X's proposal refers instead to a workplace collaboration and instant messaging program ("collaboration sites including but not limited to

- *Professional Drug Co. v. AstraZeneca AB*, No. 12-cv-11609-WGY (D. Mass. Jan. 4, 2013), Amended Protocol on Electronically Stored Information (ECF No. 119): Not limiting the sources of discovery, number of custodians, or search terms, and instead stating that the parties will "cooperate in good faith regarding the disclosure and formulation of appropriate search terms, custodians, and potentially relevant noncustodial sources and methodologies in advance of any ESI search."

- *Shire LLC v. Abhai, LLC*, No. 1:15-cv-13909-WGY (D. Mass. May 16, 2016), Stipulation and Order on Electronic Discovery (ECF No. 52): Not limiting the sources of discovery, number of custodians, or number of search terms, and instead stating that the parties will "in good faith determine which of their electronic systems contain relevant, responsive ESI and are reasonably accessible."

- *Resorba Medical GmbH v. Organogenesis, Inc.*, No. 1:16-cv-12173-GAO (D. Mass. June 12, 2017), Stipulated ESI Protocol Order (ECF No. 37): Not limiting the types of information discoverable, the number of custodians, or the number of search terms, and instead stating that "[t]he parties will meet and confer to identify their respective custodians and the production priority for them;" and "[t]he parties will meet and confer regarding the search terms to be applied to limit documents and the appropriate number of such search terms."

- *In re Intuniv Antitrust Litigation*, No. 1:16-cv-12396-ADB (D. Mass. Oct. 20, 2017), Joint Stipulated Protocol for the Discovery of ESI and Hard Copy Documents (ECF No. 97): Not limiting the sources of discovery, number of custodians, or number of search terms and instead stating that "[t]he parties [] agree to the use of reasonable search terms and date ranges as one means to identify relevant ESI for review and production;"

- *In re: Prograf Antitrust Litig.*, No. 1:11-md-2242-RWZ (D. Mass. Apr. 5, 2012), ESI Protocol (ECF No. 61-2): Not limiting the number of custodians, number of search terms, or sources of discovery, specifically including "voice mail, instant messaging," "temporary internet files, history, cookies," and "backup and archival files," and having "[t]he parties agree that they will cooperate in good faith regarding the disclosure and formulation of appropriate search terms, custodians, and potentially relevant noncustodial sources and methodologies."

In contrast to 10X's standard approach, Bio-Rad's radical proposal would arbitrarily and prejudicially limit the discovery that 10X can take in this complex case. Bio-Rad's proposed limitations are so extreme that the Court should reject them as an improper attempt to shield

---

Slack or Microsoft Teams, company blogs, bulletin boards, or wikis; and the like") that has become popular at many companies for instant business communications (sometimes in lieu of email) and slack contains built in tools for storing and exporting messages. *See* https://slack.com/; https://slack.com/intl/en-gb/help/articles/360002079527-A-guide-to-Slack%E2%80%99s-Discovery-APIs.

relevant evidence from discovery and block litigation on the merits of this complex case. First, Bio-Rad proposes that in general there be *no searches of e-mail or other custodial documents*. Second, Bio-Rad proposes a limit of *just five Bio-Rad custodians*. That is *fewer* than the eight custodians that Bio-Rad agreed to use in the patent case it brought against Stilla, a much narrower case that does not involve any antitrust claims and that involves fewer total patents asserted and where Stilla has not asserted patents against Bio-Rad. *Bio-Rad Labs., Inc. v. Stilla Tech., Inc.*, Civil Action No. 1:19-cv-11587 (D. Mass), ECF No. 44 ("Stipulated ESI Order") at 7. Moreover, Bio-Rad would force 10X to select these five custodians from among the custodians already selected by Stilla in the much smaller and simpler Stilla case. Third, Bio-Rad proposes allowing *just five search terms* to be run on these custodial files. Again, Bio-Rad would require 10X to use the same search terms as Stilla uses.

There is no basis to apply the Stilla approach to this case and especially no basis to force 10X to be limited to the same custodians or terms that Stilla selects. 10X has asserted antitrust claims. Stilla has not. Even with respect to just the patent claims, 10X has patent counterclaims asserting two patents against Bio-Rad, while Stilla does not, and Bio-Rad has asserted two patents against 10X not asserted against Stilla. 10X and Stilla's products and technologies are also entirely different and sold into different markets for different uses. Bio-Rad's proposal that 10X must use the same custodians and search terms as Stilla is contrary to basic principles of discovery given the significant differences between the cases.

Even now, when discovery has barely begun and the parties have not yet met and conferred substantively about the nature and scope of discovery required in this case, Bio-Rad's preemptive limits are manifestly unworkable based on facts that are already known and in the public record. For instance, Bio-Rad's proposed limit of five Bio-Rad custodians is fewer than the number of

people it is known from public information were aware of Bio-Rad's plans for RainDance—plans that are highly relevant to the subject matter of 10X's antitrust case. Bio-Rad's Executive Vice President and President of the Life Science Group, who was the business lead in the RainDance acquisition has testified in open court that she "presented the RainDance opportunity to the senior executives and the Board of Directors and received approval to purchase the company." Trial Transcript, *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, C.A. No. 15-152-RGA (D. Del. Nov. 5, 2018) at 122:17-23. Based on this statement alone the number of individuals at Bio-Rad who participated in the decision to make an acquisition that 10X alleges was anticompetitive and unlawful and who therefore may have specifically relevant information (namely, the senior executives and the members of the board) is already substantially higher than Bio-Rad's preemptive and arbitrary limit of five Bio-Rad custodians. In reality, the number of people at Bio-Rad with information relevant to 10X's antitrust and unfair competition claims is far greater than just those witnesses, including but not limited to Bio-Rad employees in management, finance, sales, marketing, legal, as well as individuals from RainDance, and individuals at Bio-Rad who are part of the Bio-Rad's product development efforts in at least the NGS sample prep space.

Moreover, while the foregoing shows that Bio-Rad's proposal is not workable even just for 10X's antitrust claims, this says nothing about the patent claims in this case for which additional custodians will certainly be required, including but not limited to Bio-Rad's employees knowledgeable about the development, operation, marketing, and sales of Bio-Rad's products and methods accused of infringing the patents asserted by 10X. Even just as to Bio-Rad's own asserted patents, Bio-Rad's initial disclosures already identify five Bio-Rad employees as having relevant information (the maximum number of custodians Bio-Rad proposes to allow). Indeed, just the combined number of named inventors who have been at Harvard and individuals involved in

licensing at Harvard whose information will be relevant to the patent claims asserted against 10X substantially exceeds Plaintiffs' proposed *two* custodian limit for Harvard custodians. Moreover, the multiple named inventors who have been at Bio-Rad and/or RainDance shows that even if this were only a patent case Bio-Rad's proposal would be unworkable. With the patent issues and the antitrust issues combined there is simply no way to justify any such preemptive limit.

Bio-Rad's reference to the prior litigations between Bio-Rad and 10X does not support Bio-Rad's unreasonable requested discovery limits in this case. None of the prior litigations involved antitrust claims. Moreover, Bio-Rad here has asserted three new patents that are not related to the patents asserted in the prior litigations. The discovery in these prior litigations was also sharply limited with respect to the information relevant to the antitrust claims. For example, in the Delaware 152 case involving RainDance relied on in Plaintiffs' statement above, Bio-Rad joined the case after buying RainDance and successfully refused to provide *any* email or other ESI discovery because fact discovery in that case had closed.[4] Thus, significant discovery relevant to 10X's claims and defense here remains to be taken. Indeed, Bio-Rad's assertion that 10X's claims relate "solely" to the RainDance acquisition misstates the scope of relevant discovery. Bio-Rad's acquisition of RainDance, in addition to being an illegal acquisition, was also a part of an anticompetitive scheme that is ongoing and about which highly relevant evidence must be produced. In any event, to the extent that Bio-Rad's prior productions include material that is related to this case, the parties have agreed to cross-use of prior discovery and Bio-Rad will not be obliged to reproduce that material, so there is no burden. But because Bio-Rad's prior productions

---

[4] *Bio-Rad Labs, Inc. v. 10X Genomics Inc.*, No. 15-cv-152-RGA (D. Del.) at ECF Nos. 204-206, 208 (discovery dispute letters in which 10X sought email and other ESI discovery from Bio-Rad consistent with the Delaware Default Standard for ESI discovery which Bio-Rad refused to provide) and ECF No. 207 (August 8, 2017 Hearing Transcript) at 7:21-23, 11:1-5 (Court granting Bio-Rad's request that Bio-Rad not be required to provide any email or ESI search term discovery).

do not include everything necessary for this case, Bio-Rad's attempt to preemptively limit discovery in this case is not proper.

Plaintiffs provide no justification for deviating from the standard practice in antitrust cases and civil litigation generally of permitting broad discovery and not imposing arbitrary limits in advance. This case involves antitrust claims and patent claims going in two directions and Bio-Rad's proposed limits are simply not appropriate. Nor can Plaintiffs explain how their proposed limit of five custodians and five search terms and the proposal that 10X use the same custodians and terms as Stilla could possibly meet the requirements of Rule 26 or meet the needs of this distinct case.

[Agreed Conclusion of Section VI.:]

E.   **COLLECTION METHODS.** The producing party need not employ forensic data collection or tracking methods and technologies, but instead may make electronic copies for collection and processing purposes using widely-accepted methods or methods described in manufacturers' and/or programmers' instructions, help menus, websites, and the like that preserve the metadata of the native files, including their filepaths and folder structure, contained therein (*e.g.*, .pst, .zip, etc.), except when and to the extent there is good cause to believe specific, material concerns about authenticity exist with respect to specific documents and materials. If the receiving party believes that there is such good cause, then the producing party and the receiving party shall meet and confer in good faith to determine the extent to which forensic and other data associated with the specific documents and materials should be produced. If the parties cannot reach an agreement, they will follow the provisions for resolving discovery and Protective Order disputes outlined in Section VIII of this Order.

**VII. USE OF CONFIDENTIAL MATERIALS FROM PREVIOUSLY FILED PROCEEDINGS BETWEEN THE PARTIES**

**A.** The parties have or are engaged in previously filed proceedings: *Bio-Rad Laboratories, Inc. v. 10X Genomics, Inc.*, Case No. 18-1679-RGA ("1679 Action"), *Certain Microfluidic Devices*, Inv. No. 337-TA-1068 ("1068 Investigation"); *Certain Microfluidic Systems*, Inv. No. 337-TA-1100 ("1100 Investigation"); *Bio-Rad Laboratories, Inc. v. 10X Genomics Inc.*, Case No. 1:15-cv-00152 (D. Del.) ("152 Action"); *In re Matter of the Arbitration between Bio-Rad Laboratories, Inc. & Bio-Rad QL, Inc. v. Benjamin Hindson, Kevin Ness, & Serge Saxonov*, Case No. 01-14-0001-5239 (American Arbitration Association Commercial Arbitration Tribunal) ("Arbitration"); *Bio-Rad Laboratories, Inc. v. 10X Technologies, Inc.*, Case No. MSC14-01751 (Cal. App. Dep't Super. Ct.) ("Trade Secret Litigation") (collectively, "Previously Filed Litigations").

**B.** The parties agree that each party deems produced in this Litigation all the documents that have been produced in the 1679 Action or that will be produced in the 1679 Action prior to the close of fact discovery in the present action. The production of documents in the 1679 Action includes the reproduction in the 1679 case of the 1100 Investigation materials, including the Previously Filed Litigations materials that were produced in the 1100 Investigation. *See* 1679 Case ECF. No. 33, ¶¶ 16-22. At any point, if either party needs replacement copies of image files, native files, metadata, or other information for some or all of the documents produced in this action that were also produced in the 1679 Action, the parties will meet and confer in good faith to reach a mutually agreeable solution. This provision does not apply to any documents from third parties that are not a party to this action.

**C.** Documents from the Previously Filed Litigations that were stamped with any confidentiality designation (*e.g.*, CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER; CONFIDENTIAL, HIGHLY CONFIDENTIAL, OUTSIDE

ATTORNEYS' EYES ONLY), shall be treated as OUTSIDE ATTORNEYS' EYES ONLY INFORMATION under the Protective Order.

      **D.**      If a party learns of documents from Previously Filed Litigations other than the 1679 Action that were not produced in the 1679 Action (including the reproduction there of the 1100 Investigation materials), the party will produce those documents in this Litigation. This provision does not apply to any documents from third parties that are not a party to this action.

      **E.**      The parties agree that discovery responses, pleadings, briefing, orders (including sealed orders), docket entries (including sealed docket entries), expert reports, disclosures, and stipulations served or filed by the parties; transcripts (including without limitation deposition transcripts, hearing transcripts, trial transcripts, transcripts of fact witnesses, and transcripts of expert witnesses); and exhibits or attachments to any of the foregoing from the Previously Filed Litigations shall be treated as discovery in this action and deemed produced in this action. This provision applies on an ongoing basis to the ongoing proceedings in the Previously Filed Litigations. This provision does not apply to the deposition transcripts of third parties that are not a party to this action. This provision does apply (1) to depositions of current employees of the parties and former employees if they were employed by one of the parties at the time of their deposition and (2) to the full transcript of each hearing or trial.

      **F.**      Party depositions from the Previously Filed Litigations will be treated as if taken in this action. Trial or hearing testimony shall be treated the same as deposition testimony taken in this action. Such transcripts do not count against either party's limits on depositions and may not be used as a basis to resist a deposition of a witness, even if that witness was previously deposed in another case. Each transcript shall be treated as though designated as OUTSIDE ATTORNEYS' EYES ONLY INFORMATION, unless portions were public, portions have been made public, or the transcript has otherwise had specific portions identified as non-confidential. Depositions that

contain third party confidential information shall not be used or relied on without first obtaining the third party's permission or removing or redacting such confidential information.

G.     Nothing in this provision should be interpreted as an admission that any information from Previously Filed Litigations is relevant or admissible in this Litigation. The parties reserve their respective rights in this Litigation to object to the admissibility or relevance of any documents, testimony, or other information produced, served, transcribed, or filed in the Previously Filed Litigations.

## VIII.  DISCOVERY DISPUTE RESOLUTION

A.     The parties agree to follow the Local Rule 37.1 procedures to resolve discovery disputes [**but the Parties have a dispute about whether to expedite the deadlines and timings in Local Rule 37.1. Plaintiffs propose the same deadlines and timings from Local Rule 37.1 while 10X proposes expedited deadlines and timings as shown below.**].

B.     Rule 37.1(a): Obligation to Confer. Before filing any discovery motion, including any motion for sanctions or for a protective order, counsel for each of the parties shall confer in good faith to narrow the areas of disagreement to the greatest possible extent. It shall be the responsibility of counsel for the moving party to arrange for the conference. Conferences may be conducted over the telephone. Failure of opposing counsel to respond to a request for a discovery conference within [**Plaintiffs: 7 days ; 10X: 3 days**] of the request shall be grounds for sanctions, which may include automatic allowance of the motion.

C.     Rule 37.1(b): Motions. If (1) opposing counsel has failed to respond to a request for a discovery conference within the [**Plaintiffs: 7 day ; 10X: 3 day**] period set forth in subsection (a), (2) opposing counsel has failed to attend a discovery conference within [**Plaintiffs: 14 calendar days ; 10X: 5 calendar days**] of the request, or (3) disputed issues are not resolved at the discovery conference, a dissatisfied party may file a motion and supporting memorandum. The motion shall include a certificate in the margin of the last page that the provisions of this rule have been complied with. The memorandum shall state with particularity the following:

(1) If a discovery conference was not held, the reasons why it was not;

25

(2) If a discovery conference was held, the time, date, location and duration of the conference; who was present for each party; the matters on which the parties reached agreement; and the issues remaining to be decided by the court;

(3) The nature of the case and the facts relevant to the discovery matters to be decided;

(4) Each interrogatory, deposition question, request for production, request for admission or other discovery matter raising an issue to be decided by the court, and the response thereto; and

(5) A statement of the moving party's position as to each contested issue, with supporting legal authority, which statement shall be set forth separately immediately following each contested item.

**D.**     Rule 37.1(c): The opposing party may respond to the memorandum within [Plaintiffs: **14** calendar days ; 10X's calendar days] after service thereof. The response, if any, shall conform to the requirements of subsection (b)(5) of this rule.

### [Plaintiffs' Statement Re: Section VIII. Dispute]

### 10's Demands to Depart from this Court's Local Rules are Unsupported (Section VIII)

10x desires to deviate from this district's local rules regarding the timing for resolving discovery disputes.  10x, however, provides no reason to depart from this Court's carefully crafted and adequate local rules.  The District of Massachusetts local rules and this Court's discovery policies as set forth on its website are more than adequate and need not be modified.

### [10X's Statement Re: Section VIII. Dispute]

Local Rule 37.1 provides that at least 28 days must elapse before a discovery dispute can be fully briefed for resolution (allowing up to 14 days for an opposing party to attend a requested conference and up to another 14 days for the opposing party to respond to the moving party's

discovery motion). A 28-day timeline for resolving discovery disputes simply is not workable given the schedule set for this case. For 10X's antitrust and unfair competition claims, the deadline for substantial completion of document production is two and a half months away (May 1, 2020) and the close of fact discovery is only three and a half months away (June 3, 2020). Pretrial Scheduling Order, ECF No. 39 at 19-20. The deadlines for discovery in connection with the parties' patent infringement claims and counterclaims are also fast approaching (May 22, 2020, for substantial completion and July 10, 2020, for the close of fact discovery). *Id.*

To accommodate this schedule, 10X proposes the same procedure called for by Local Rule 37.1 but with expedited deadlines. The opposing party must respond within three days of a request for a discovery conference to set a conference within five days of the request, and an opposing party must respond to a brief within five days. Although 10X expects that the parties will work cooperatively to avoid discovery disputes, if a dispute needs to be raised with the Court this procedure allows the dispute to be fully briefed for resolution within 10 days rather than 28 days.

## IX.    MISCELLANEOUS PROVISIONS

**H.    OBJECTIONS PRESERVED.**   Nothing in this Production Order shall be interpreted to require disclosure of information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or immunity.  The Parties do not waive any objections as to the production, discoverability, admissibility, or confidentiality of documents and ESI.

**I.**       Except as expressly stated, nothing in this Production Order affects the Parties' discovery obligations under the Federal Rules, Civil Local Rules, or Patent Local Rules.

**J.**       This Production Order may be modified in the Court's discretion or by stipulation.

**K.**      As in all cases, costs may be shifted for disproportionate ESI production requests

pursuant to Federal Rule of Civil Procedure 26.   Likewise, a party's nonresponsive or dilatory discovery tactics are cost-shifting considerations.

**L.** A party's meaningful compliance with this Production Order and efforts to promote efficiency and reduce costs will be considered in cost-shifting determinations.

**M.** Nothing in this Production Order prevents the parties from agreeing to use technology assisted review and other techniques insofar as their use improves the efficacy of discovery.

**IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.**

Dated: February 14, 2020                    WEIL GOTSHAL & MANGES LLP


By: _____/s/_____
                 Derek C. Walter
           Attorney for Bio-Rad Laboratories,
           Inc. and President and Fellows of
                    Harvard College


TENSEGRITY LAW GROUP, LLP


By: _____
                 Robert L. Gerrity
            Attorney for 10X Genomics, Inc.


IT IS SO ORDERED *as modified.*

Dated: *February 18, 2020*          *William G. Young*_____
                                      United States District Judge
                                          William G. Young

31