## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BIO-RAD LABORATORIES, INC., THE UNIVERSITY OF CHICAGO, LAWRENCE LIVERMORE NATIONAL SECURITY, LLC, and PRESIDENT AND FELLOWS OF HARVARD COLLEGE,<br>　　　　　Plaintiffs,<br><br>　　v.<br><br>STILLA TECHNOLOGIES, INC., and STILLA TECHNOLOGIES,<br>　　　　　Defendants. | Civil Action No. 1:19-cv-11587-WGY<br><br>**DEMAND FOR JURY TRIAL** |
| BIO-RAD LABORATORIES, INC.,<br>　　　　　Plaintiff,<br><br>PRESIDENT AND FELLOWS OF HARVARD COLLEGE,<br>　　　　　Co-Plaintiff,<br><br>　　v.<br><br>10X GENOMICS, INC.,<br>　　　　　Defendant. | Civil Action No. 1:19-cv-12533-WGY<br><br>**DEMAND FOR JURY TRIAL** |
| 10X GENOMICS, INC.,<br>　　　　　Counterclaim Plaintiff,<br><br>PRESIDENT AND FELLOWS OF HARVARD COLLEGE,<br>　　　　　Counterclaim Co-Plaintiff as to certain claims,<br><br>　　v.<br><br>BIO-RAD LABORATORIES, INC.,<br>　　　　　Counterclaim Defendant. | |

## JOINT STATEMENT REGARDING DISCOVERY DISPUTES

Pursuant to the Court's oral order during the July 31, 2020 Scheduling Conference, the Parties have met and conferred regarding any present and reasonably foreseeable discovery disputes ("Discovery Issues") and submit the following disputes to be resolved by the Court. The following document provides: 1) agreed resolutions for handling Discovery Issues; and 2) where the parties are not in agreement, the parties' proposals for resolving the disputed Discovery Issues.  Where the parties are not in agreement, the parties respectfully request that the Court select a proposal to be used for resolution of each identified disputed Discovery Issues.

## I.     DISPUTED DISCOVERY ISSUES

The following are the remaining disputes between Plaintiffs, 10X, and Stilla to be resolved by the Court:

| **Issue #1: No Duplicative Depositions** | |
|---|---|
| Bio-Rad Proposal: | Stilla and 10X's Proposal: |
| 10X and Stilla shall coordinate to avoid noticing the deposition of a person more than once and shall be limited to 7 hours cumulatively for that person pursuant to Fed. R. Civ. P. 30(d)(1) absent agreement of the parties or leave of Court. | 10X and Stilla shall coordinate to avoid noticing the deposition of a person more than once, and that person shall be limited to 7 hours cumulatively in that person's personal capacity pursuant to Fed. R. Civ. P. 30(d)(1) absent agreement of the parties or leave of Court, except as follows: 10X and Stilla may depose Ms. Tumulo, Mr. Shinoff, and Mr. Link for up to a combined 10 hours (each witness) in their personal capacities. |

**Bio-Rad's Position:**

Federal Rule 30(d)(1) limits depositions to seven hours of testimony for each witness. Given that discovery has been consolidated in the Stilla and 10X cases, there is no reason to deviate from this rule for these three individuals.  Ms. Tumulo, Mr. Shinoff, and Mr. Link have

each previously been deposed multiple times in their personal capacity and in their capacity as

30(b)(6) witnesses in prior litigations between Bio-Rad and 10X.  Altogether, this totals over 40

hours of testimony (approximately 20 hours for Ms. Tumolo, 16 hours for Mr. Shinoff, and 10

hours for Mr Link).  10X and Stilla's request for an additional 30 hours of testimony from these

same three witnesses (9 past the limit) is wholly unnecessary and not proportional to the needs of

the case.

**10X's Position:**

This dispute is narrow. 10X and Stilla have agreed to work with Bio-Rad to minimize the

burden on fact witnesses to limit their Rule 30(b)(1) depositions to a single day of testimony

rather than the two days they would be subject to if noticed separately by 10X and Stilla. The

only exceptions to this agreement are for three key fact witnesses who would ordinarily be

expected to testify for a full seven-hour day in each of 10X's and Stilla's cases because of the

depth of their knowledge and centrality to the issues. For Ms. Tumolo, Mr. Shinoff, and Mr.

Link, 10X and Stilla propose limiting their testimony in their personal capacities to 10 hours.

10X's initial disclosures show that these three witnesses are necessary for numerous topics that

do not overlap with the single patent shared between the Stilla and 10X matters.

- **Ms. Tumolo** (Executive Vice President, President, Life Science Group):

  "Information relating to the parameters and dynamics of the relevant markets;

  information relating to participants and roles in the relevant markets; information

  relating to the Droplet Genetic Analysis Technology Market and licensing of that

  technology; information relating to Bio-Rad's anticompetitive conduct;

  information relating to market share in the relevant markets; information relating

  to competition in the relevant markets; information related to Bio-Rad's policies,

  practices, plans, or other conduct in relation to 10X; information about Bio-Rad's

acquisition of RainDance including acquisition of the RainDance Patents and other assets; information related to Bio-Rad's reasons for acquiring RainDance; information relating to the valuation of and plans for the RainDance Patents and other assets; information relating to Bio-Rad's plans for continuation or cessation of research and development efforts and product lines acquired from RainDance; information related to Bio-Rad's litigation against 10X; information relating to Bio-Rad's and/or RainDance's customers; information relating to Bio-Rad's and/or RainDance's sales; information relating to Bio-Rad's acquisitions."

- **Mr. Shinoff** (Vice President, Business Development, Life Sciences, Digital Biology): "Information relating to the parameters and dynamics of the relevant markets; information relating to participants and roles in the relevant markets; information relating to the Droplet Genetic Analysis Technology Market and licensing of that technology; information relating to Bio-Rad's anticompetitive conduct; information relating to market share in the relevant markets; information relating to competition in the relevant markets; information related to Bio-Rad's policies, practices, plans, or other conduct in relation to 10X; information about Bio-Rad's acquisition of RainDance including acquisition of the RainDance Patents and other assets; information related to Bio-Rad's reasons for acquiring RainDance; information relating to the valuation of and plans for the RainDance Patents and other assets; information relating to Bio-Rad's plans for continuation or cessation of research and development efforts and product lines acquired from RainDance; information related to Bio-Rad's litigation against 10X; information

relating to Bio-Rad's and/or RainDance's customers; information relating to Bio-Rad's and/or RainDance's sales; information relating to Bio-Rad's acquisitions."

- **Mr. Link** ("Information relating to the conception and reduction to practice of the subject matter disclosed and claimed in the Bio-Rad Asserted Patents and the prosecution thereof; information relating to the state of the relevant art and the purported validity and value of the Bio-Rad Asserted Patents; information relating to prior art to the Bio-Rad Asserted Patents; information relating to the prosecution of patent applications and patents that are prior art to the Bio-Rad Asserted Patents; knowledge of prior artists' work and publications relating to the Bio-Rad Asserted Patents; information relating to the licensing of and ownership of the Bio-Rad Asserted Patents and the prior art patents and patent applications; information about the marketing, sales, distribution, design, research, development, operation and capabilities of products Bio-Rad contends embody or are used to practice any of the Bio-Rad Asserted Patents; information about any alleged harm to Bio-Rad as a result of 10X's alleged use of the Bio-Rad Asserted Patents; information relating to licensing of Bio-Rad's, Harvard's, or RainDance's intellectual property or products; existence or lack thereof of attempts by Bio-Rad, Harvard, or RainDance to commercialize the Bio-Rad Asserted Patents; any valuation analysis for the Bio-Rad Asserted Patents; information relating to Bio-Rad's, Harvard's, or RainDance's licensing of other intellectual property or products; information about Bio-Rad's acquisition of RainDance including acquisition of Bio-Rad's asserted rights to the Bio-Rad Asserted Patents. Information relating to the invalidity of the Bio-Rad Asserted

Patents. Information relating to the unenforceability of the Bio-Rad Asserted

Patents."

10X Amended Initial Disclosures (July 29, 2020) at 6-8, 13-14. The Court's Pretrial

Order envisions that deposition hours for 10X and Stilla will only overlap for "topics relating to

U.S. Patent No. 8,871,444 and/or 9,919,277." ECF No. 39 at 2-3. Otherwise, Stilla and 10X have

independent deposition hours. The large number of topics specific to the 10X/Bio-Rad case

where these three witnesses are expected to have knowledge warrants a substantial amount of

non-overlapping deposition time. The modest increase of less than a half day deposition per

witness balances the defendants' need to develop their case through Bio-Rad's most significant

fact witnesses while consolidating the portion of discovery that overlaps between Stilla and 10X.

.

| Issue #2: Limits on Third-Party Subpoenas | |
|---|---|
| Bio-Rad Proposal: | 10X's Proposal: |
| 10X and Bio-Rad shall be prohibited from serving more than 15 third-party subpoenas absent leave of Court.<br><br>10X has already served 14 third-party subpoenas, containing 191 requests for production of documents. | A limit on third-party subpoenas is unnecessary. The parties are nearing the practical limit of when subpoenas can be enforced before the close of fact discovery, and the subpoenas impose no additional discovery burden where overall deposition time is already limited by court order and where depositions will take place remotely.<br><br>A party shall not be precluded from obtaining discovery from third parties that may also be in the possession, custody, or control of a party that is refusing to provide the full scope of requested information, e.g., due to improper time, scope, or relevance objections.<br><br>Bio-Rad is ordered to cease all interference with third-party compliance with 10X's subpoenas and immediately provide all third-party productions that Bio-Rad has withheld. |

**Bio-Rad's Position:**

10X has served 14 separate third-party subpoenas containing 191 document requests. In addition to the 325 Requests for Production it served on Bio-Rad, 10X has served a total of ***516 document requests***. It has done so despite already having 360,000 documents and over 2 million pages of material from Bio-Rad from six prior or co-pending litigations between 10X and Bio-Rad. The parties have agreed that all of this material (along with the transcripts of dozens and dozens of depositions) may be used in this case. While this extensive record should be the starting point for completing discovery and getting this case to trial efficiently, 10X effectively wants to start from scratch and expand discovery exponentially. 10X's subpoenas are part of its ongoing abuse of the discovery process, documented throughout this joint statement, in an attempt to harass Bio-Rad and third parties with onerous requests seeking tons of unrelated,

competitively sensitive information across the life sciences industry for the last decade.  As documented below, 10X seeks duplicative depositions of countless witnesses that have already been deposed on the subject matter at issue in this case.  Likewise, 10x wants documents and deposition discovery from Bio-Rad's CEO, even though two courts have already ruled that this is improper.  10X further insists upon production of documents regarding numerous technologies and business relationships that have no relevance here.  And 10X seeks to propound facially overbroad search terms on Bio-Rad and Harvard University including a multitude of open-ended words laden with wild cards.   Such disproportionate discovery is barred by Rule 26.

As to 10X's 14 third party subpoenas specifically, half of them are related to 10X's antitrust counterclaims and are duplicative with the 325 requests it has served on Bio-Rad, most of which relate to the antitrust counterclaims.  There is simply no legitimate need for this volume of subpoenas for a counterclaim that 10X has repeatedly represented to this Court is ***only about one 2017 merger***, and for which 10X has or will have documents from the parties. For example, ***multiple*** subpoenas ask for "all documents, communications, and things related to 10X" or "all documents and communications with Bio-Rad referencing 10X" without limitation to the instant suit, time period, or alleged markets.  As another example of 10X's fishing expedition, multiple subpoenas request information from third parties regarding litigations without limitation to subject matter, such as "all communications with outside counsel for Bio-Rad and RainDance, including attorneys at Weil, Gotshal & Manges" regarding 10X, or "all documents, communications, and things related to *any litigation* involving Bio-Rad or RainDance." (emphasis added.)

These requests are the exact opposite of 10X's stated positions to the Court: To avoid a complete dismissal of their counterclaims, 10X unequivocally stated that it is not challenging any

other conduct than Bio-Rad's 2017 merger with RainDance, including First Amendment *Noerr-Pennington*-protected patent litigation against 10X or any other third-party D.I. 75 at 6-7 ("10X's claim is that Bio-Rad's acquisition of RainDance patents was unlawful, not that the individual patent lawsuit on its own violates the antitrust laws.") or a refusal to license (*Id.* at 7 ("10X is challenging Bio-Rad's acquisition of RainDance, not a mere unilateral refusal to deal")).  Now, for purposes of seeking blunderbuss discovery, 10X has flipped positions.  According to 10X, Bio-Rad's patent enforcement litigations against other parties and other acquisitions besides the 2017 RainDance merger are part of its counterclaims, and that it needs discovery going back virtually a decade, to 2011. None of these positions can be supported or reconciled.  10X's attempt to turn Bio-Rad and third-parties upside down for its narrow counterclaims about one closed transaction from 2017 involving one party (RainDance) should be put to a stop.  *See* July 31, 2020 Stat. Conf. Tr. at 7 ("This idea that the Rules Committee of the Judicial Conference has promulgated about proportionality, in this Court's judgment, has real teeth."); *see, e.g., In re Asacol Antitrust Litig.*, No. CV 15-12730-DJC, 2017 WL 11476172, at *3 (D. Mass. Jan. 3, 2017) (denying motion to compel because "materials defendants are seeking are cumulative of information more easily available from other sources, will not assist the defendants in proving market share "in any meaningful way" and would not "provide much other than anecdotal evidence").

Yet, 10X wants more. This is especially outrageous when 10X already has or will soon receive the relevant discovery from the parties: Not only has Bio-Rad already produced over 360,000 documents, but in a good-faith effort to resolve disputes and move this case toward the just and speedy resolution called for by Fed. R. Civ. P. 1., Bio-Rad has agreed to produce documents for an ***overwhelming majority*** of 10X's 325 requests (277, or  85% of the requests),

including documents it is seeking from third parties such as non-privileged documents regarding litigations against 10X and communications with third parties. By contrast, Bio-Rad has served 81 requests, and zero third party subpoenas, limiting the scope of discovery to relevant and proportional topics. An illustrative example of 10X's unnecessary subpoenas is Grant Thornton: 10X served a third party subpoena on Grant Thornton, but Bio-Rad has already agreed to produce documents in its possession related to Grant Thornton, and 10X already has many documents related to Grant Thornton's role in the RainDance merger, which 10X has been citing in its submissions to the Court. *See, e.g.*, D.I. 121, Second Amended Countercl. at ¶ 163 (citing to third-party subpoena recipient Grant Thornton's documents).  If a limit on third-party subpoenas is not imposed, 10X will continue to serve unnecessary, cumulative, and abusive third-party subpoenas, in violation of Rule 45(d)'s requirement to avoid undue burden on non-parties, and further burdening the Court with unnecessary disputes and prolonging the resolution of this matter. *Cabi v. Boston Children's Hospital*, 2017 WL 8232179 (D. Mass. June 21, 2017) (granting motion to quash third-party subpoena as to certain categories of discovery not relevant to Plaintiffs' underlying claims).

Far from being proportional to the needs of this case, 10X's fourteen third-party subpoenas are an example of an elaborate fishing expedition designed to harass and oppress parties with even a tangential relationship to this litigation.  Bio-Rad believes 15 third-party subpoenas are more than sufficient given the voluminous discovery at the parties' disposal and the claims at issue.  Especially in light of the fact that the Court has indicated some of 10X's counterclaims will be dismissed, unlimited third party discovery is unjustified. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558-59, 570 (2007) (holding "extensive scope" and "unusually high cost" of antitrust discovery requires that the claims must be at a minimum, plausible.); *See*

*also Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528, n. 17 (1983) ("a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed."). Further, these subpoenas substantially burden Bio-Rad because it has confidentiality agreements with many of these third parties and many of the requested documents relate to business activities wholly unrelated to the case, and disturbs the ongoing business relationships with Bio-Rad.  In the case of Grant Thornton, which worked with Bio-Rad counsel on the RainDance merger, Bio-Rad is reviewing documents for potential privilege before producing them to RainDance.

Therefore, given the abusive number of requests and subpoenas that 10X has served to date and the Court's indication that a portion of 10X's antitrust counterclaims would be dismissed, Bio-Rad proposes that 10X should be limited to a reasonable 15 third-party subpoenas.  This will help to efficiently move this case toward trial and cut down on third-party discovery disputes, which will inevitably consume judicial and party resources.  10X's argument that they require unlimited third-party subpoenas because Bio-Rad had not yet answered the counterclaims and is somehow in the dark is nonsensical.  Bio-Rad's motion to dismiss arguments were very transparent about the deficiencies in 10X's antitrust counterclaims.  Further, 10X's reasoning is belied by the Court's guidance that at least some of 10X's antitrust counterclaims will be dismissed 10X thus has no legitimate reason to need *more* discovery after the case is narrowed. Jul. 31, 2020 Stat. Conf. Tr. at 12 ("Not all these claims are going to survive").

**10X's Position:**

Bio-Rad's attempt to limit 10X's subpoenas to 15 third parties is arbitrary, unnecessary, and prejudicial to 10X's defenses, counterclaims, and remedies, and is another mid-stream attempt to limit 10X's ability to prove its case. Bio-Rad takes a narrow subpoena dispute and

uses it to disparage 10X's side of every discovery issue at once, attributing ill motives to 10X and referring alternately here and throughout to blunderbusses and fishing. This aggregation obscures reality. Each specific discovery issue must be considered on its merits.

An examination of 10X's subpoenas, each of which is targeted to relevant evidence, shows that these subpoenas constitute proper discovery and should not be capped prematurely. The third parties who have or will receive a subpoena all have unique knowledge and/or documents related to Bio-Rad's willful infringement, inequitable conduct, antitrust violations, or licensing practices, and are necessary to establish the elements of 10X's respective defenses, counterclaims and remedies. Bio-Rad focuses almost entirely on the antitrust portion of this case to complain that the requested discovery is voluminous. But the Supreme Court acknowledged the common understanding that antitrust matters are "potentially massive factual controvers[ies]" involving an "extensive scope" of discovery and "unusually high cost." *See Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528, n. 17 (1983); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558-59, 570 (2007). It is indeed common in antitrust cases to seek discovery from the participants in the market and the parties themselves affected by the anticompetitive conduct. For example, 10X is seeking discovery addressing the nature of the RainDance acquisition, the reasons for it, and the true effects of it, in multiple different antitrust markets as alleged in l0X's counterclaims.

Discovery has been proceeding on all of 10X's antitrust claims and the Court has acknowledged that some claims will be found plausible and will proceed. Only some of the subpoenas in this case relate to antitrust; others are primarily directed to the parties' dueling patent infringement lawsuits with attendant defenses and remedies issues. Discovery in this case is not limited to a single illegal transaction. This case requires the deep factual development of

three distinct and contested markets, Bio-Rad's acts—alone and in concert with others—over the

course of years in these markets, the harms from Bio-Rad's conduct, and numerous other issues

as elaborated in 10X's detailed pleadings. The fact that Bio-Rad acknowledges that the vast

majority of RFPs properly seek discoverable information shows that the raw number of requests

does not suggest the requests are gratuitous. And yet, Bio-Rad has been subject to far less

document discovery burden than a typical antitrust defendant.

The bulk of documents from Bio-Rad in this case were deemed produced from prior

patent infringement litigations, not from searches directed at antitrust issues. A pervasive theme

in Bio-Rad's approach to discovery in this case is to claim that largely unspecified productions

from prior cases justify Bio-Rad's decision not to investigate, not to search, and not to produce

relevant information in this case that falls squarely within the scope of legitimate requests for

production. Bio-Rad has made no showing that the prior productions in different cases between

Bio-Rad and 10X are sufficient to address the issues that are in dispute between the parties here.

In this case Bio-Rad is asserting different patents than it has asserted before. It is accusing new

products that were only recently released. 10X accuses Bio-Rad of antitrust violations that have

never been litigated. And 10X accuses Bio-Rad of asserting patents that were obtained by

inequitable conduct. Bio-Rad has searched for and produced far fewer documents for this case,

and as discussed below, Bio-Rad has attempted to limit its responsibilities even further by

pushing more issues than will fit into the highly-constrained ESI-discovery process and then

attempting to constrict that process to an unreasonable degree. Additionally, Bio-Rad cites 10X's

subpoena to Grant Thornton as "unnecessary," but Grant Thornton has additional documents in

various forms not discoverable from Bio-Rad or Harvard.  For example, Grant Thornton has

internal analyses and relevant phone recordings. The requested information cannot be obtained through Bio-Rad or Harvard.

Meanwhile, Bio-Rad complains about the number of subpoenas, but does not tell the Court that Bio-Rad – through its counsel and perhaps otherwise – has been affirmatively interfering with third-party compliance with Court-ordered subpoenas. Bio-Rad should be ordered to cease all interference with third-party compliance with 10X's subpoenas and immediately provide all third-party productions that Bio-Rad has withheld. One third party, Blacktrace, has reported that Bio-Rad's counsel has encouraged it not to respond to the subpoena because this Court has not yet disposed of Bio-Rad's motion to dismiss 10X's antitrust counterclaims. Pacific Biosciences, represented by the same counsel as Bio-Rad, is blocking discovery, having argued that the pending motion to dismiss provides it cover to do so. Diagenode, which had been properly served and with presence in the United States, suggested that Bio-Rad's counsel had encouraged its objection that 10X's subpoena was somehow improperly extraterritorial and that 10X should not get e-mail discovery from Diagenode. Moreover, Grant Thornton, the accounting firm that conducted the critical "fair value analysis" of Bio-Rad's acquisition of RainDance, revealed that Bio-Rad's counsel invoked privilege over its production. 10X has sought the legal basis for that privilege claim from Bio-Rad's counsel one week ago and has received no response. Bio-Rad's counsel has neither produced the documents nor provided support for the privilege claim although it has now been improperly withholding this third-party production.

It is also unnecessary to limit the number of third-party subpoenas. The parties are nearing the practical limit of when subpoenas can be enforced before the close of fact discovery, and the subpoenas impose no additional discovery burden where the Court has already limited

the overall number of deposition hours a party may take and where depositions will take place remotely. Neither the Federal Rules nor the Local Rules place a limit on the number of subpoenas a party can serve. The Court did not cap the number of subpoenas in its Pretrial Schedule. ECF No. 39. There is no good cause for applying an arbitrary limit late in discovery that would curtail discovery that 10X had planned in reliance on the lack of such a cap.

Further, Bio-Rad's request is untimely and prejudicial. The parties negotiated discovery limits at the outset of the case over seven months ago, and the Court imposed strict limits on various types of discovery, including the limits in the number of interrogatories, requests for admission, and deposition hours but not the subpoenas. Although Bio-Rad had full notice at that time of 10X's antitrust counterclaims, it did not seek to limit 10X's ability to obtain third-party discovery. Since then, the case has expanded significantly in size because 10X has asserted two patents against Bio-Rad and 10X has also asserted substantial inequitable conduct claims that render unenforceable both patents asserted against 10X and which in mere pleading form span over 55 pages. Even if in a smaller case this number of subpoenas may not be expected, this is a reasonable number of subpoenas for this case because these third-party documents and testimony are relevant to 10X's claims or defenses. Bio-Rad received notice of each of the subpoenas and never complained to 10X about their number or scope until this past week when the parties were meeting and conferring over this submission to the Court, and appears to be manufacturing a dispute, hoping to persuade the court to handicap 10X after it has served 14 subpoenas and prepared several others. It would be highly prejudicial to 10X to limit the number of subpoenas now to interfere with 10X's ability to obtain necessary, relevant discovery. For example, 10X has not even begun serving subpoenas necessary for proving its inequitable conduct defenses and its claim that Bio-Rad's infringement is willful.

Each of the subpoenas has discrete and unique relevant scope as target, and these are summarized below:

**Antitrust Violations**

10X has pled counterclaims of antitrust violations in three separate markets, all stemming from Bio-Rad's illegal acquisition of RainDance. Subpoenas are necessary for various actors to establish the relevant markets and to show the anticompetitive conduct, intent, and injury for each alleged market. Each party has essential knowledge and evidence of at least one of the foregoing and is described below.

- Dropworks Inc. is a potential entrant in the same ddPCR market that has been sued for patent infringement by Bio-Rad. Dropworks possesses information related to showing Bio-Rad's anticompetitive conduct, establishing the relevant market, and the state of competition in the relevant markets.

- Perella Weinberg Partners LP was RainDance's outside financial advisor for RainDance's sale that resulted in the illegal acquisition by Bio-Rad. Perella Weinberg has unique information related to the valuation of RainDance's intellectual property, including how other potential purchasers valued the IP, and Bio-Rad's reasons for acquiring RainDance, all of which are relevant to Bio-Rad's anticompetitive conduct.

- Grant Thornton LLP is an accounting firm that was engaged by Bio-Rad to conduct a "fair value analysis" for its acquisition of RainDance. Grant Thornton has information related to the valuation of RainDance's intellectual property and Bio-Rad's reasons for acquiring RainDance that are relevant to the anticompetitive nature of Bio-Rad's conduct.

- Michael Hunkapiller is the CEO of Pacific Biosciences of California, Inc. and was on the RainDance Board of Directors at the time of the Bio-Rad acquisition. He has unique insight and knowledge surrounding the circumstances of Bio-Rad's acquisition of RainDance.

- IDEX Corporation is a microfluidic chip manufacturer for ddPCR products who has information regarding the market landscape and Bio-Rad's attempt to monopolize the market.

- Illumina, Inc. is a collaborator with Bio-Rad who is believed to have information related to Bio-Rad's attempt to interfere with a business and potential business between Illumina and 10X, Bio-Rad's anticompetitive conduct including directed to 10X, and knowledge of the RainDance acquisition's negative impact on customers.

- Pacific Biosciences of California, Inc. was a collaborator of RainDance and has information related to Bio-Rad's anticompetitive conduct.

- Marc Stapley is a former Illumina, Inc. executive who has personal knowledge of Bio-Rad's anticompetitive conduct.

- Viresh Patel is a former marketing director at Bio-Rad during the RainDance acquisition and is thought to have information related to the reasons for the acquisition and Bio-Rad's decisions to terminate RainDance's product line.

- Stilla Technologies is a nascent competitor in the ddPCR market who was identified as a potential licensee to the RainDance patents but now has been sued for patent infringement by Bio-Rad, which has delayed entry into the U.S. market of Stilla's ddPCR product. Stilla has information related to showing Bio-Rad's anticompetitive conduct, establishing the relevant market, and showing the lack of competition in the relevant markets.

- John Boyce is the founder of GnuBio, another company acquired by Bio-Rad and has information concerning the acquisition that will be used to show a pattern of Bio-Rad's behavior of acquiring other competitors to aggregate their patents and harming competition in the relevant markets.

- John Goetz was the Chief Operating Officer of Bio-Rad during the RainDance acquisition and is thought to have information related to the reasons for the acquisition and Bio-Rad's decisions to terminate RainDance's product line.

- John Luckey was the former vice president of product development at RainDance during the RainDance acquisition who has information related to RainDance's NGS sample preparation product development that was eventually terminated by Bio-Rad.

- Joel McComb previously served on Bio-Rad's Board of Directors and has information related to Bio-Rad's acquisition of RainDance.

**<u>Damages/Licensing</u>**

For 10X's damages case, Bio-Rad's licenses, such as 1CellBio, and licensing practices, including offers to license the patents-in-suit such as those made to HiFiBio Inc. and Blacktrace Inc., will be critical to what is likely to be a damages analysis based exactly on such licenses and licensing negotiations.  A description of each party and the relevant information held by each party is described below.

- 1CellBio Inc. is a company that makes NGS sample preparation products, founded by David Weitz (a named inventor on both patents asserted by 10X and those asserted by Bio-Rad). 1CellBio has licensed certain Harvard patents to Bio-Rad, including attempting to license the patents 10X asserted here, and has information regarding licensing rates including its own internal discussions of those rates. 1CellBio also has information regarding Bio-Rad's anticompetitive conduct.

- HiFiBio Inc., also founded by David Weitz, was a potential licensee of the asserted patents and is thought to have information related to licensing discussions regarding the asserted patents.

- Blacktrace Inc. is a company that makes NGS sample preparation products and is a licensee of droplet genetic analysis technology that is thought to have information related to licensing rates including its own internal discussions of those rates. Blacktrace also has information regarding Bio-Rad's anticompetitive conduct.

- Sanford Wadler is Bio-Rad's former general counsel who has information related to Bio-Rad's licensing practices, which may be critical to rebutting Bio-Rad's damages contentions as Bio-Rad presently refuses to provide full discovery into its licensing practices and negotiations of the key agreements, including those it has previously affirmatively relied upon without disclosing the full context in which those licenses arose.

## 10X's Asserted Patents

For 10X's willful infringement claims, 10X has served a subpoena on Diagenode Inc., and 10X plans to serve a subpoena on David Weitz and Jeremy Agresti. David Weitz, Jeremy Agresti, and Diagenode Inc. have information relevant to the design and development of the Bio-Rad Accused Instrumentalities and for proving the willful infringement of 10X's Asserted Patents.

- Diagenode Inc. is Bio-Rad's business partner in providing ATAC-seq technology to end users, and therefore has information essential to Bio-Rad's liability for induced infringement. Bio-Rad not only instructs Diagenode on how to use the Bio-Rad Accused Instrumentalities, but also instructs users, customers, researchers, and other entities for whom Diagenode is a preferred provider of the technology. *See* ECF No. 113 (Second Am. Countercl.) ¶¶ 276-77.

- David Weitz and Jeremy Agresti are both named inventors on the 10X Asserted Patents and have knowledge on issues related to the design and development of the Bio-Rad Accused Instrumentalities and also to the role and value of the patented inventions in the Accused Instrumentalities. *Id.* ¶¶ 250-63. David Weitz is also a named inventor on both patents asserted by Bio-Rad and is the founder of 1CellBio described above. Dr. Weitz also has information related to Bio-Rad's anticompetitive conduct and also the licensing of the patents in suit.

- Dr. Agresti was hired by Bio-Rad as a Senior Staff Scientist and has information relating to the development and operation of Bio-Rad's Accused Instrumentalities. *Id.* ¶ 257. Because of Dr. Agresti's dual role as an inventor in 10X's Asserted Patents and scientist in the development of the Bio-Rad accused products, he has knowledge related to willful

infringement. Dr. Agresti also has information related to the RainDance acquisition and Bio-Rad's anticompetitive conduct.

## Inequitable Conduct

For 10X's inequitable conduct defenses, 10X plans to serve subpoenas on the following parties: Brown Rudnick, Thomas C. Meyers, Adam Schoen, Alan Sherr, Locke Lord, and Mintz Levin. Each party has essential information related to 10X's counterclaims and defense of inequitable conduct.

- Thomas C. Meyers and Adam Schoen of Brown Rudnick LLP are the prosecuting attorneys of the 444 and 277 Patents, and they were key actors whose conduct is the subject of 10X's inequitable conduct claims. *See, e.g.*, ECF No. 113 (10X Answer) ¶¶ 86, 100, 122, 124-25.

- Alan Sherr was the Vice President and head of IP at RainDance was also involved in prosecuting the 277 and 444 Patents. *See, e.g.*, *id.* ¶¶ 86, 100, 122, 137, 146.

- Brown Rudnick, Locke Lord, and Mintz Levin are patent prosecution firms that were involved in prosecuting the patents and applications that form the basis of 10X's inequitable conduct claims.

Lastly, Bio-Rad seeks to limit subpoenas to information that cannot be obtained from the parties in the litigation, and cites to Grant Thornton. But Grant Thornton complied with the subpoena and it is only Bio-Rad disrupting the document production. No third party has moved to quash 10X's subpoena nor has 10X moved to compel compliance. The third parties—where Bio-Rad and Bio-Rad's counsel have not interfered in the process—are cooperating with 10X in providing the relevant information. Finally, Bio-Rad's proposed limit on information that "may be" collected from Bio-Rad is hollow where Bio-Rad has refused to provide highly relevant discovery in the critical areas relevant to 10X's subpoenas, including antitrust counterclaims, remedies and licensing practices, and has imposed arbitrary time, scope and relevance objections. Bio-Rad cannot both refuse discovery and argue that 10X should receive it from Bio-Rad instead of third parties.

For all these reasons, 10X respectfully requests that the Court not impose an arbitrary limit on the number of subpoenas that may properly be served and that the Court instruct Bio-Rad to stop all interference with third-party compliance with 10X's subpoenas and immediately provide all third-party productions that Bio-Rad withheld.

| Issue #3: Amending Infringement/Non-Infringement Contentions | |
|---|---|
| Bio-Rad Proposal:<br><br>Any infringement and invalidity contentions served before the opening claim construction briefs are deemed to be effective and do not require a separate motion for leave.<br><br>Bio-Rad does not agree that 10X's proposed amended infringement contentions for the 085 and 526 Patents meet the good cause standard, but it willing to forgo objection if Bio-Rad is also granted leave to amend. There is nearly 2 month left in fact discovery and opening expert reports are not due until October 21, 2020.<br><br>Bio-Rad has good cause pursuant to Rule 16.6(d)(5) in view of recently produced non-public information and claim construction disclosures | 10X's Proposal:<br><br>Any proposed amendment to the parties' preliminary contentions must comply with the good cause requirements of Local Rule 16.6(d)(4).<br><br>10X's proposed amended infringement contentions for the 085 Patent and the 526 Patent served prior to claim construction meet the good cause standard and leave to amend should be granted.<br><br>Bio-Rad does not have good cause to expand its contentions on the "genetic element" limitation of the 277 Patent and leave to amend on that element should be denied. |

**Bio-Rad's Position:**

Both Bio-Rad and 10X served amended infringement contentions before the parties served claim construction briefs in this case. More recently, Stilla has proposed an amendment to its invalidity contentions. Given the early stage of this case, Bio-Rad proposes that the Court allow each of the parties' previously-served amendments in the interest of efficient

administration of justice, as it will move this case towards trial without unnecessary motion practice. There is good cause for the amendments pursuant to the express provisions of Rule 16.6(d)(5) in view of recently produced non-public information and 10X's recently advanced claim construction positions. Further, given the early stage of the case and Bio-Rad's diligence in seeking amendment, there can be no prejudice from the amendments.

The amendment Bio-Rad has proposed was served on 10X on July 3, seventeen days before opening claim construction briefing and over nine months before trial. While Bio-Rad does not agree that 10X has good cause for its proposed amendments, Bio-Rad is willing to forgo its objections to 10X's amendments if both parties' amended contentions are deemed effective. This procedure is fair to all parties and allows them to effectively litigate their positions while minimizing disputes.

### Bio-Rad Has Good Cause to Amend Its Infringement Contentions

10X's proposal should also be rejected because Bio-Rad has good cause to amend its infringement contentions under Local Rule 16.6(d)(5), which allows for supplementation of infringement contentions by leave of court upon a timely showing of good cause and lack of prejudice. Bio-Rad's proposed amendment adds only a small change to its infringement theory, and is responsive to non-public information discovery by Bio-Rad and new non-infringement theories presented by 10X.

The relevant limitation of the 277 Patents recites, inter alia, a droplet generator to produce a plurality of microcapsules comprising a genetic element linked covalently or non-covalently to a bead.[1]  Bio-Rad's preliminary infringement contentions identified sample genetic

---

[1] The full text of claim 1 of the 277 patent is below.

material (e.g., cells, DNA fragments, or cell nuclei) as the claimed "genetic element," and 10X's

barcoded gel beads as the claimed bead, as depicted in the figure below.



DI0001 Ex. 8 at 16.

Bio-Rad's contentions explain that the claimed "enzymatic reaction on the genetic element" is

conducted when barcodes linked to the gel bead attach to the DNA fragments from the cell or

other sample material, and the barcoded fragments are amplified, as depicted in the annotated

figure below (annotations in red).

---

1. A method for conducting an enzymatic reaction, comprising the steps of:

    providing a droplet generator to produce, under microfluidic control, a plurality of aqueous microcapsules surrounded by an immiscible continuous phase that comprises a fluorinated oil that comprises a fluorinated polymer surfactant, each of the plurality of microcapsules comprising an enzyme, a genetic element linked covalently or non-covalently to a bead, and reagents for the enzymatic reaction;

    pooling the microcapsules into one or more common compartments such that a portion of the plurality of microcapsules contact each other but do not fuse with each other due to the presence of the surfactant; and

    conducting the enzymatic reaction on the genetic element of at least one of the plurality of microcapsules within the one or more common compartments.



BIORAD-MA00048593.

Bio-Rad's amended infringement contentions add that the claimed "genetic element" can also be satisfied by the oligonucleotide barcodes attached to 10X's gel bead, depicted below.



*Id*.

This amendment was prompted by Bio-Rad's discovery of non-public information not available to Bio-Rad at the time of its preliminary infringement contentions. This newly discovered information suggests that once the sample material (e.g., cell) and the gel bead are encapsulated in a GEM, the gel bead may be dissolved prior to the breakdown of the cell that

releases DNA from the cell's nucleus.[2]  See e.g., 10X-000063740 at slide 28 (explaining that the cell lysis agent is in the gel bead, meaning that the gel bead must dissolve for the cell to be broken down).  Thus, in 10X's single cell applications, the DNA in the cell nucleus may not be released in time for it to attach to the fully-formed gel bead.  Only the barcodes released from the gel bead upon dissolution are available for the DNA fragments to bind to.  Bio-Rad's amendment is also justified because it is responsive to 10X's theory in its March 2, 2020 non-infringement contentions, which is consistent with the non-public information located by Bio-Rad.  10X contends that in "10X's products, the sample nucleic acids are not linked covalently or non-covalently to a bead at the time the droplet generator is provided" because "the cell is not lysed at the time" and "the gel bead is not dissolved" such that "the sample nucleic acids cannot physically link to the bead."  *See* 10X Non-infringement contentions, Ex. B.  Bio-Rad's additional "genetic element" theory is responsive to this non-public information and 10X's non-infringement theory because it points to a genetic element that is physically linked to the gel bead.

Bio-Rad's proposed amendment is modest, and does not prejudice 10X.  In Bio-Rad's amended contentions, the components of 10X's products that Bio-Rad relies on for providing a droplet generator to produce microcapsules, pooling the microcapsules, and conducting an enzymatic reaction remain the same.  Moreover, under both interpretations, the claimed enzymatic reaction is satisfied by the same barcoding reaction. The only difference is whether the "genetic element" is part of the barcode or part of the sample material.  This is a small

---

[2] Bio-Rad did not know of this information when it served its preliminary infringement contentions. 10X's assertion otherwise is baseless. Even if Bio-Rad had known of this information, it would not have been permitted to rely on it.

difference, and 10X has plenty of time and has requested adequate discovery to respond to this contention.

Bio-Rad's amended infringement contentions are timely because, as stated above, they were served early in this case—seventeen days prior to opening claim construction briefing and nine months prior to trial. Further, Bio-Rad amended its contentions diligently after uncovering non-public information through discovery and receiving 10X's non-infringement theories. In fact, in anticipation of circumstances that would lead to proposed amendments to contentions, the parties agreed to exchange amended infringement and non-infringement contentions on July 3 to give each party time to incorporate any new theories into its claim construction briefs. Bio-Rad fully abided by this agreement, and its amended contentions should therefore be considered prompt. 10X's assertion that it did not have time to alter its claim construction briefing is non-sensical in light of this agreement, where the parties chose a deadline to serve amended infringement contentions specifically to allow adequate time to incorporate any changes into opening claim construction briefs. 10X had ample opportunity to update its claim construction briefing after learning of Bio-Rad's amended contentions if it wished to, and its failure to do so does not warrant additional claim construction briefing.

### 10X Does Not Have Good Cause to Amend Its Infringement Contentions

10X cannot meet the good cause standard to amend its infringement contentions to identify the "bis-acrylamide" component of the gel to meet the "plurality of species" limitation of the 085 patent. However, as previously indicated, Bio-Rad is willing to forgo its objection at this early stage of this case while discovery is ongoing to allow both parties to amend their contentions. 10X's amendment cannot meet the good cause standard because the information it

relies on in its new theory was publicly available, and previously cited by 10X in its preliminary infringement contentions.

The 085 Patent recites a method that includes providing a fluidic droplet containing a plurality of species, and causing the fluidic droplet to form a gel droplet containing the plurality of species, wherein the plurality of species are bound to the gel droplet.  10X relies on Bio-Rad's gel beads used in the accused products, and argues that two components of the gel mixture constitute a "plurality of species." 10X originally relied on oligonucleotides conjugated to acrydite (a component of the gel) for the "plurality of species," and later amended to also include the "bis-acrylamide" component of the gel to meet the "plurality of species" limitation.  10X, however, relies on a public document in support of its contention that Bio-Rad's gel beads contain bis-acrylamide, and even cited to the same public document in its original infringement contentions.  The relevant portion of the public document cited in 10X's infringement contentions is reproduced below, and the original document in fact highlights the bis-acrylamide component.



10X's statement that it did not understand exactly how "oligonucleotides and other bead precursors may be provided in fluidic mixtures that are subsequently hardened into

polyacrylamide gels" does not excuse its alleged inability to point to a plurality of species in the gel.  At the time of its preliminary contentions, 10X had previously contended that "oligonucleotide species are provided in fluidic mixtures that are subsequently hardened into polyacrylamide gels" and knew of at least the two components that it now seeks to rely on for the "plurality of species." 10X Preliminary Contentions Ex. G.  This was the extent of the knowledge 10X needed to have in order to point to a plurality of species, and the specifics of Bio-Rad's process do not change these basic principles.  The fact of 10X's knowledge of both "species" it relies on is proven by the fact that it referenced both the "oligonucleotides conjugated to acrydite" originally relied on, and the bis-acrylamide that it now relies on, in its preliminary contentions. 10X Preliminary Contentions, Ex. G.  Accordingly, there is no non-public information that 10X can point that allows it to meet the good cause standard for amending infringement contentions for the 085 Patent.

10X argues that it should be permitted to amend its infringement contentions to rely on non-public information in place of public information.  Bio-Rad does not object to such amendments so long as they do not involve an unjustified change in 10X's infringement theory. That is not the case for the addition of bis-acrylimide for the "plurality of species" limitation because 10X relies on the same public documentation for this new theory that it cited in its unamended contentions.

Finally, 10X argues that it served its proposed amendments more than three months earlier than Bio-Rad, but neglects to mention that during those three months, the case was stayed, and that the parties agreed to exchange amended infringement and non-infringement contentions on July 3 to give each party time to incorporate any new theories into its claim construction briefs.

**10X's Position:**

### 1.  Local Rule 16.6(d)(5) Should Not Be Ignored

10X and Bio-Rad have served on each other proposed amendments to infringement contentions. This dispute arises because the parties are not similarly situated with respect to their amendments. 10X served its proposed amendments more than three months earlier than Bio-Rad and those contentions are properly based on newly produced information; Bio-Rad's contentions recite a brand new infringement theory that is based on evidence admittedly known to Bio-Rad before the initial contentions. Because Bio-Rad's proposed amendments do not meet the good cause standard, Bio-Rad proposes a blanket exemption, asking the Court to permit all amendments served before claim construction briefing whether or not good cause can be shown. There is no reason to deviate from the local rules. The parties should be permitted to amend contentions upon showing good cause; amendments that do not meet that standard—either because they are based on a lack of diligence or because they would unduly prejudice the other side—should not be allowed.

### 2.  Bio-Rad Does Not Have Good Cause To Amend Its "Genetic Element" Infringement Contention For The 277 Patent

10X does not object to the vast majority of Bio-Rad's proposed amended infringement contentions on the 277 Patent or the 444 Patent. However, Bio-Rad lacks good cause to add its new theory in its 277 Patent contentions that the oligonucleotide barcodes attached to 10X's gel beads are the claimed "genetic element," and the Court should not grant Bio-Rad leave to amend on this ground.

To evaluate "good cause" "[t]he first question is whether [the party seeking to amend its contentions] has been reasonably diligent in amending its contentions." *Abiomed, Inc. v. Maquet Cardiovascular LLC*, No. 16-10914-FDS, 2020 U.S. Dist. LEXIS 120578, at *12 (D. Mass. July

9, 2020). Bio-Rad was not diligent in bringing its new theory on the "genetic element" limitation because its new theory is based entirely on information that was publicly available and known to Bio-Rad—even previously litigated by Bio-Rad—at the time of Bio-Rad's preliminary contentions. Specifically, Bio-Rad's proposed amendment relies ***solely on public information*** about how 10X's oligonucleotide barcodes are part of and attached to 10X's gel beads, citing documents that were publicly available for facts that Bio-Rad already knew.

The patent claim requires a "genetic element" to be "linked covalently or non-covalently to a bead." *See* 277 Patent at Claim 1. Bio-Rad has always known from public documents that the oligonucleotide barcode molecules were linked to 10X's gel beads. Bio-Rad admits that the document it cited in its original contentions shows this linkage:



BIORAD-MA00048593 (annotated by Bio-Rad). Bio-Rad did not assert an infringement theory that the oligonucleotide barcode is a "genetic element linked . . . to a bead." There is no dispute that Bio-Rad knew these oligonucleotide barcodes were linked to beads and that Bio-Rad has not asserted until now that the barcode reagents are "genetic elements." Bio-Rad's flip-flop in its new infringement theory—citing the same public evidence it has always cited—is not diligence.

Bio-Rad's assertion that it needed non-public information is false. Bio-Rad identifies a single slide of a single document, slide 28 of 10X-000063740, in its position statement to support

its argument, but Bio-Rad did not cite to this document, or any other non-public document, anywhere within its proposed amended infringement contentions. That is because Bio-Rad did not need non-public information to understand how 10X's products work and what the 277 Patent's claims recite. Bio-Rad's original infringement theory was that the sample nucleic acids, for example from a lysed cell, were the "genetic elements." Bio-Rad now acknowledges that this theory is flawed because 10X's gel beads dissolve and thus the sample nucleic acids are not "linked" to the beads. Even if this were somehow new information to Bio-Rad it would not excuse Bio-Rad's decision not to identify the oligonucleotide barcodes Bio-Rad knew for certain were linked to beads as "genetic elements." Nothing in the non-public slide changes what Bio-Rad knew from public documents about the oligonucleotide barcodes themselves, or their linkage to beads. Evidence that Bio-Rad's chosen theory should lose does not give Bio-Rad license to switch to a theory it could have asserted from day one.

Moreover, Bio-Rad did ***not*** need non-public information to know 10X's gel beads dissolve immediately following GEM generation. For example, Bio-Rad's preliminary infringement contentions for the 277 Patent state no fewer than eleven times that "[i]mmediately **following GEM generation, the Gel Bead is dissolved** [] and [in the 10X single-cell accused products] any co-partitioned cell is lysed." Indeed, the quoted document that Bio-Rad cites in its preliminary infringement contentions is an exhibit attached not only to its original complaint in this case (ECF Nos. 1-9, 1-10), but also its original complaint in the immediately preceding 1699 Case in the District of Delaware.

Bio-Rad's single slide of a single document does not even apply to all of the 10X accused products, and thus cannot show good cause for Bio-Rad's new theory for all 10X accused products. Some of 10X's accused products do not require breaking down a cell in a droplet. Bio-

Rad is careful to limit its arguments above about cells breaking down being dependent on the gel bead dissolving to "10X's single cell applications," which comprise a subset of the 10X accused products. For example, the 10X Genome Sequencing accused product uses DNA, not cells, in the droplets with the gel beads. Bio-Rad knew that this product does not use cells in GEMs before it served its preliminary infringement contentions; Bio-Rad cited a document showing DNA, not cells, used with the 10X Genome Sequencing in its preliminary infringement contentions. Bio-Rad cannot rely on facts relating to when cells break down in droplets in some 10X accused products to excuse its new infringement theory for all 10X accused products. When Bio-Rad brought suit against 10X for alleged infringement of the 277 Patent, Bio-Rad knew and understood those facts about how 10X's products operate, and Bio-Rad should have brought its theory about how those products meet the "genetic element" limitation at that time. Bio-Rad has learned nothing since serving its preliminary contentions that justifies its lack of diligence in bringing its "genetic element" theory earlier in the case.

Bio-Rad's proposed amendment is prejudicial to 10X. Bio-Rad asks this Court to allow its new theory eleven months after it filed its first Complaint on the same 277 Patent against 10X in the District of Delaware and eight months after it re-filed this case in the District of Massachusetts. Bio-Rad's decision to withhold the contention deprived 10X of many months of investigating its non-infringement and invalidity positions, including understanding Bio-Rad's view of the scope of the "genetic element" term prior to the parties' exchange of claim terms and proposed constructions five months ago. First, Bio-Rad accused the sample nucleic acids as the claimed genetic element, and now Bio-Rad is attempting to add a new infringement theory that the oligonucleotide barcode reagents attached to the gel beads are the genetic element. Bio-Rad's new theory raises a new claim construction issue regarding the meaning of the claim term

"genetic element" because Bio-Rad is now accusing barcoding reagents—which are not "genetic"—instead of the sample material. Bio-Rad's presentation of its new contentions a couple of weeks prior to opening claim construction briefs does not excuse denying 10X the opportunity to consider Bio-Rad's new contention during the months-long process of understanding and narrowing the parties' claim construction disputes, including exchanging proposed claim terms and constructions, exchanging proposed constructions for terms proposed by the other party, and filing the joint claim construction statement (ECF No. 82). Further, the parties have now filed their opening claim construction briefs, and Bio-Rad has deposed 10X's expert who submitted a declaration in support of 10X's opening claim construction brief. This claim construction process would need to be done again for the "genetic element" claim term if Bio-Rad were granted leave to amend at this late stage because Bio-Rad's new infringement theory implies an improperly broad, new construction of the term. Bio-Rad suggests that "the parties agreed to exchange amended infringement and non-infringement contentions on July 3 to give each party time to incorporate any new theories into its claim construction briefs. This is not true. 10X never agreed to incorporate a new theory where Bio-Rad lacked good cause to amend its contentions. Agreeing to a schedule for exchange is not the same as agreeing to allow any new contentions into the case, with or without good cause. Because Bio-Rad does not have good cause to bring this amendment, the Court should deny Bio-Rad leave to amend its contentions on the "genetic limitation" limitation.

### 3.    10X Has Good Cause To Amend Its Infringement Contentions

Because 10X added patent counterclaims in its amended partial answer, 10X served its Local Rule 16.6(d)(1) preliminary infringement disclosures on the same day 10X filed those counterclaims against Bio-Rad asserting infringement of the 085 Patent and the 526 Patent. *See* ECF No. 53, ¶¶ 205, 209 (February 5, 2020). At that time, 10X's counterclaims and contentions

were limited to public information. 10X could not rely on any information produced in other litigations for purposes of this case. *See* ECF No. 65-1 [E-Discovery Stipulation] at Section VII.B (filed Feb. 14, 2020) (ordered as modified on Feb. 18, 2020, ECF No. 67). On March 2, Bio-Rad made its first production of confidential documents in this case pursuant to Local Rule 16.6(d)(4). 10X incorporated the confidential information from that production and served amended contentions three weeks later. The local rules provide that, absent undue prejudice, good cause to amend preliminary infringement contentions is supported where the amendment arises out of "discovery of nonpublic information about the asserted infringement that was not discovered or located, despite diligent efforts, before the service of the infringement claim charts." LR 16.6(d)(5)(C). 10X has good cause to amend its infringement contentions because its timely and diligent amendments incorporate and depend on confidential information that 10X could not rely on or that had not even been produced yet when 10X's preliminary contentions were due.

### a.     10X's Proposed Amendments To Its 085 Patent Infringement Contentions

10X accuses of infringement Bio-Rad's manufacture of gel beads used in Bio-Rad's ATAC-seq assay for isolated nuclei. Bio-Rad's bead manufacturing is done behind closed doors and the procedure and ingredients are not available to the public. 10X's preliminary infringement contentions—served prior to Bio-Rad's first confidential production in this case and before the parties' agreed to cross-production and use of prior litigation materials—necessarily relied solely on publicly available information related to Bio-Rad's process. 10X's proposed amended infringement contentions for the 085 Patent meet the good cause standard in LR 16.6(5)(C) because they incorporate confidential evidence to add detail to the theories in 10X's preliminary contentions. 10X's amendments have not changed the infringement theory. The amended

contentions maintain the same theory and add now name the exact gel-bead-precursor components in Bio-Rad's current commercial manufacturing process and the role of bis-acrylamide in that process based on nonpublic information.

10X's preliminary contentions relied on Bio-Rad patent applications for circumstantial evidence of Bio-Rad's likely manufacturing process. For example, 10X's preliminary contentions relied on Bio-Rad's patent applications[3]—US20170198345A1 and US20160060621A1—for descriptions of how oligonucleotides and other bead precursors may be provided in fluidic mixtures that are subsequently hardened into polyacrylamide gels, a process claimed in the 085 Patent. Reliance on these patent applications was understandably imperfect. The patent applications from 2016 and 2017 pre-date Bio-Rad's commercial process by two years and thus do not necessarily reflect the actual, final commercial process Bio-Rad uses today. Bio-Rad's later confidential production shows that the patents do not detail the final accused process, and do not even list the correct ingredients that go on to form a gel bead—the "species" required by the asserted claims.

Bio-Rad itself complained in its non-infringement contentions that "10x's reliance patent application publications" was not sufficient proof of how Bio-Rad's products operate, including for example that these patent applications are not sufficient on the questions of whether Bio-Rad's beads contain a plurality of species and further complaining that "10x has not pointed to any support for a plurality of species." Bio-Rad's non-infringement contentions were served March 5, 2020, the same day it made its first confidential production concerning gel bead manufacturing. 10X's amended contentions incorporate and rely upon the confidential

---

[3] The infringing gel bead manufacturing methods were developed at Bio-Rad by Dr. Jeremy Agresti, a named inventor on the 085 Patent.

documents that Bio-Rad produced that same day relating to the "species" limitation. *See* BRMA00000001-23, BRMA00000075-0124; BRMA0000140; BRMA0000141; BRMA00000143-17. After Bio-Rad's production of these materials, 10X diligently prepared and served its proposed amended contentions three weeks later.

Bio-Rad objects to 10X's proposed 085 Patent amended contentions on the ground that the accused aspects of Bio-Rad's gel bead manufacturing process were publicly known. Yet when asked, Bio-Rad did not provide any evidence of a public disclosure of the exact gel-bead-precursor components used in its current manufacturing process or the role of bis-acrylamide in that process.[4] Only now in briefing months later does Bio-Rad note a single public document that gives a chemical description of the as-sold gel beads under the Toxic Substances Control Act, stating that Bio-Rad's "Barcode mix" contains "Polyacrylamide-co-methylene-bis-acrylamide." That document refers to the final, solid gel bead and does ***not*** purport to describe the process of making the gel bead. The patent claims require ingredients to be combined in a specific way to form a gel bead with specific characteristics. The raw chemical composition of the final bead does not inherently disclose which species are present in a fluidic droplet (or even that a fluidic droplet is used) during the process of making a bead. Importantly, it appears that Bio-Rad's document is not complete in describing the contents of the gel bead—there is no mention of the oligonucleotide-acrydite species that also comprise the final bead. 10X had good cause to wait for confidential discovery rather than relying on a document that does not describe the accused ***process*** of making the beads, and apparently does not even describe the final bead accurately.

---

[4] Bio-Rad also did not respond to 10X's request to confirm that 10X's amended contentions for the 085 Patent only include public information, such that 10X could submit them with this briefing.

Bio-Rad has not identified any prejudice from 10X's amended 085 Patent contentions. 10X's amended contentions do not add products or asserted claims, nor do they change the theory of infringement. For these reasons, the Court should grant 10X leave to amend its 085 Patent infringement contentions.

> **b.     10X's Proposed Amendments To Its 526 Patent Infringement Contentions**

10X's proposed amended infringement contentions for the 526 Patent meet the good cause standard in LR 16.6(5)(C) because they only incorporate newly produced, confidential documents in support of the theories in asserted in its preliminary contentions and because there is no prejudice to Bio-Rad.

The accused infringement of the 526 Patent occurs during droplet formation in Bio-Rad's ATAC-seq for isolated nuclei workflow. 10X's amended infringement contentions for the 526 Patent incorporate newly produced confidential documents to give additional detail to 10X's original contentions that the barcoded gel bead is the claimed particle that comprises reagents for carrying out the claimed nucleic acid amplification, and that one or more of those reagents comprise nucleic acids. *See e.g.,* BRMA00000125-139 [March 1, 2018 Bio-Rad presentation titled "Single Cell ATAC-seq Data Deep Dive"], BRMA00000024-74 [confidential August 7, 2019 Bio-Rad presentation titled "Droplet Barcoding: Single cell NGS sample prep".[5] 10X's amended contentions also point to newly available confidential evidence in support of its contentions that the barcoded gel beads for ATAC-seq comprise a hydrogel and comprises a cross-linked polyacrylamide polymer. *See, e.g.,* BRMA00000024-74. These confidential

---

[5] Other confidential documents not available to 10X to rely on at the time of the preliminary contentions include BRLITC-01888475, BRLITC-01888969, BRLITC-01890232, BRLITC-01920409, BRLITC-01875304.

documents were first available for 10X to rely on in this case after 10X's preliminary contentions were served on March 2, 2020. 10X diligently prepared and served its proposed amended contentions on Bio-Rad on March 25, 2020, just before the 90-day stay.

10X's amended 526 Patent infringement contentions do not add products or asserted claims, nor do they expand the scope of 10X's contentions in the case. Bio-Rad has not articulated any prejudice to 10X's proposed 526 Patent infringement contentions and, subject to the corrections and clarifications 10X has made during meet and confer, Bio-Rad has confirmed that it does not object to 10X's amendments to the 526 Patent infringement contentions. For these reasons, the Court should grant 10X leave to amend its 526 Patent infringement contentions.

| Issue #4: Rule 30(b)(6) Deposition Topics | |
|---|---|
| Bio-Rad Proposal (Stilla Does Not Oppose): | 10X's Proposal: |
| The Defendants shall serve no more than **50** Rule 30(b)(6) deposition topics on Bio-Rad, collectively, given that discovery has been consolidated between the cases.  Any topics that Stilla and 10X do not agree to share shall be split equally between Stilla and 10X.<br><br>Bio-Rad shall serve no more than **30** Rule 30(b)(6) deposition topics on 10X, and no more than 30 Rule 30(b)(6) topics on Stilla.<br><br>Each of the identified topics shall be singular and not contain subparts. | The Court's Pretrial Schedule Order controls—there is no limit on the number of depositions or the number of Rule 30(b)(6) topics, and the operative limit is the total number of hours of deposition. ECF No. 39 at 2-3. |

**Bio-Rad's Position:**

10X's request for an unlimited number of 30(b)(6) deposition topics is excessive and disproportionate to the needs of this case.  *See generally* D.I. 134.  The fact that 10X has served

325 Requests For Production and still demands more suggests that 10X will similarly abuse the 30(b)(6) process by noticing an unreasonable number of topics that is disproportionate to the needs of the case. *See e.g. In re Celexa and Lexapro Marketing and Sales Practice Litigation*, 2017 WL 9324342, at *2 (D. Mass. May 10, 2017) ("The revised definition of relevance in Fed.R.Civ.P. 26(b)(1) reflects amendments made in December 2015 that were intended to restore proportionality as an express component of the scope of discovery, **thereby preventing over-discovery and the use of discovery for delay or oppression**.") (emphasis added) (internal quotations and citations omitted).  Finding witnesses for 30(b)(6) depositions and ensuring that they are prepared to testify on each topic for which they are designated is time consuming and burdensome.  Fifty topics should be more than sufficient.  Further, given that the 10X and Stilla Cases are consolidated for discovery and in order to avoid unnecessary duplication on overlapping issues, it is logical for 10X and Stilla to only serve a single 30(b)(6) notice on Bio-Rad.  Stilla does not oppose.

**10X's Position:**

The parties met and conferred on deposition limits at the outset of the case and proposed no limit on Rule 30(b)(6) topics, which the Court adopted in the Pretrial Schedule order. *See* ECF No. 39 at 2-3. The parties and the Court agreed to limit depositions only by a limit on total hours per side and without restriction on the number of individual deposition notices or corporate deposition topics. *Id.* The local rules similarly do not put a limit on the number of Rule 30(b)(6) topics. Bio-Rad's mid-discovery request to limit Rule 30(b)(6) topics is inappropriate. The parties have not even served their Rule 30(b)(6) notices yet. There is no need to reconsider the lack of a limit in ECF No. 39 or to impose a limit beyond the local rules.

Even if it were necessary to reconsider ECF No. 39 in this regard, the limit proposed by Bio-Rad is too low in the context of this litigation. As described above, the 10X/Bio-Rad case

alone has three different sets of offensive claims and corresponding defenses. In the most recent ITC proceeding between the same parties involving only 10X's offensive patent claims and Bio-Rad's defenses (ITC Inv. No. 337-TA-1100), Bio-Rad served a corporate deposition notice to 10X totaling 87 topics. 10X's corporate notice to Bio-Rad on 10X's offensive claims totaled 92 topics. Here, each party will serve corporate deposition notices that cover both sides of dueling patent infringement cases and also an antitrust dispute. Yet Bio-Rad proposes having 10X and Stilla split only 50 topics, leaving 10X with a fraction of the number Bio-Rad and 10X have used without undue burden in recent cases with fewer claims and defenses.

The parties should be entitled to proceed under the Pretrial Schedule order and manage their Rule 30(b)(6) topics and deposition hours with the flexibility envisioned in the Federal Rules. Placing a limit on deposition would produce inefficiency. There are more distinct topics for deposition discovery in this case than in the parties' ITC proceedings, not fewer. Limiting the parties to fewer topics will require the parties to serve broader topics to achieve the same scope of corporate discovery. Broader topics with less specificity will make it more difficult to prepare the correct witnesses, likely leading to further disputes. Additionally, if a cap on 30(b)(6) topics resulted in fewer hours of corporate testimony, correspondingly more individual witness testimony may have to be taken to obtain the full scope of discovery. The burden on the parties would be similar and the burden on witnesses may be greater, as more people would be deposed to obtain the same discovery that could be obtained from adequately prepared corporate representatives. In any event, the burden to the parties is already managed by the Court-ordered cap on total deposition hours. There is no need for a limit on the number of corporate topics.

| Issue #5: ESI Discovery or Deposition from CEO of Bio-Rad, Mr. Norman Schwartz | |
|---|---|
| Bio-Rad Proposal: Given Mr. Norman Swartz's status as CEO of Bio-Rad, a large multinational corporation with thousands of products not at issue in this litigation, Defendants shall be prohibited from identifying Mr. Schwartz as an ESI custodian or noticing his deposition.  Two prior courts have rejected broad discovery from Mr. Schwartz, and sufficient discovery can be more easily had from other witnesses. | **10X's Proposal regarding Mr. Schwartz's email:**<br><br>Mr. Norman Schwartz was the actual decision maker with respect to the RainDance acquisition that is of central importance to 10X's antitrust claims and multiple other issues in this case. Mr. Schwartz also has responsive, non-cumulative information relevant to multiple issues in the case. Mr. Schwartz was properly identified as an ESI custodian and Bio-Rad shall produce his email using the search terms identified by 10X. |
| | **10X's Proposal regarding Mr. Schwartz's deposition:** The issue of Mr. Schwartz's deposition shall be decided after discovery of Mr. Schwartz's email has been completed. The parties shall meet and confer regarding the need for Mr. Schwartz's deposition after Mr. Schwartz's email has been produced and shall submit any dispute to the Court promptly if it cannot be resolved. The parties are expected to work together in good faith regarding issues of scope and timing. |
| | **10X's Alternative Proposal regarding Mr. Schwartz's deposition should the Court resolve the issue of Mr. Schwartz's deposition now:** Mr. Schwartz's unique personal knowledge of factual matters in dispute in this case, including regarding the RainDance acquisition, Bio-Rad's licensing practices, and Bio-Rad's conduct with respect to 10X, means that 10X can take his deposition.  10X's deposition of Mr. Schwartz will be limited to 4 hours. |

**Bio-Rad's Position:**

10x's request for email and other custodial ESI from Bio-Rad's Chairman and CEO,

Norman Schwartz, is yet another example of 10x's pursuit of abusive and disproportionate

discovery.  See generally D.I. 134.  To carry its burden of justifying discovery from an apex

witness such as Mr. Schwartz, 10X must show that he has "unique" or "personal" knowledge

relevant to the case.  *BlackBerry Ltd. v. Facebook, Inc.*, No. CV 18-1844-GW (KSx), 2019 WL

4544425, at *6-7 (C.D. Cal. Aug. 19, 2019) (denying motion to compel additional discovery of

CEO's ESI where he has no "unique or personal knowledge of the subject matter that warrants

[his email] information").  10X cannot make this showing, and its attempt to seek discovery from

Mr. Schwartz appears intended solely for harassment.

        Indeed, across the multiple litigations between the parties, this is the third time 10X has

sought such materials from Mr. Schwartz.  In both previous instances, 10X failed to justify broad

discovery of Mr. Schwartz's information.  Judge Andrews in the District of Delaware held that

10X should only be allowed limited email discovery "based on commercial success" and that any

search terms could return no more than 25 documents.   Likewise, in ITC Investigation No. 337

TA 1100, the judge granted Bio-Rad's motion for a protective order preventing Mr. Schwartz's

deposition, finding that "there appear to be multiple other witnesses who have superior or

equivalent knowledge" from whom 10X could seek discovery.  10X's attempt to make an end

run around these previous discovery rulings should be rejected.

        Mr. Schwartz, as Chairman and CEO of Bio-Rad, sits at the top of a publicly-traded

company that employs over 8,000 individuals, sells more than 8,000 different products, and

maintains research and manufacturing facilities in seven different countries.  His ESI contains

Bio-Rad's most sensitive information, spanning many aspects of Bio-Rad's business, most of

which are irrelevant.  Below, 10X asserts that it would not be disproportionate to probe the

documents of such a witness, but such an assertion simply is not credible given the collateral

topics that would unavoidably be implicated by discovery into Mr. Schwartz's ESI.

As multiple courts have recognized, there is no reason to believe Mr. Schwartz has unique information to justify 10x's burdensome discovery demand.  To the extent that he has any relevant information, 10x has already obtained or can obtain it in less burdensome ways, including ESI from the other identified custodians. For example, 10X's antitrust claims, as explained in Bio-Rad's pending motion to dismiss, are based on Bio-Rad's February 2017 acquisition of RainDance D.I. 69 at 5-6; D.I. 84 at 1.   Bio-Rad and 10X have already agreed to the use of materials from previous proceedings between the parties in this case, which include documents and emails from a prior case involving RainDance.  Bio-Rad will be producing ESI from Annette Tumolo and Josh Shinoff, the Bio-Rad employees most directly involved in this acquisition, and from Darren Link, a co-founder of RainDance and its Chief Technology Officer at the time of the acquisition. Further, 10X already has deposition testimony from Josh Shinoff and Annette Tumolo on the due diligence performed in connection with Bio-Rad's acquisition of RainDance and the valuations performed in connection with that transaction.

Below, 10X points to a selection of cherry-picked quotations from documents and deposition testimony to try and justify discovery from Mr. Schwartz.  If anything, this evidence shows that 10X already has a complete picture of Mr. Schwartz's role in the issues in this case. This is unsurprising because, as documented above, there has already been a massive amount of discovery in this case, including from the individuals identified above who played the central roles in the RainDance acquisition.  This previous discovery has swept in ample documentary evidence sufficient to show Mr. Schwartz's role in the RainDance acquisition and other events.

Importantly, what this evidence shows is that Mr. Schwartz is a typical CEO who acts as a final decision maker within Bio-Rad.  He gave the final go-ahead for the RainDance acquisition, he made general statements in press releases, and he was kept informed by subordinates.  This is

high-level CEO visibility, not "unique" and "personal" knowledge.  If the type of evidence upon which 10X relies were sufficient to justify discovery from a CEO, no CEO could avoid the burden of duplicative discovery.  In this regard, Judge Andrews in the District of Delaware and the ITC judge considered many of the exact same pieces of evidence upon which 10X now relies and still rejected 10X's previous requests for unnecessary and burdensome discovery from Mr. Schwartz.

In addition to the two previous instances where courts have rejected 10X's request for discovery from Mr. Schwartz, courts regularly reject discovery of a party's CEO, including email and ESI discovery, in circumstances analogous to those at issue here.  This is true even where, as here, the CEO has high-level visibility of the products involved in the case.  *See Tulip Computers Int'l B.V. v. Dell Computer Corp.*, C.A. No. 00-981-RRM, 2002 WL 818061, at *7 n.2 (D. Del. Apr. 30, 2002) (refusing to compel discovery of CEO's email where there was no indication of his involvement in the alleged incorporation of the accused feature "at a detailed level, such that discovery of his e-mail records would uncover in relevant documents"); *BlackBerry*, 2019 WL 4544425at *6-7 (denying motion to compel additional discovery of CEO's ESI where he has no "unique or personal knowledge of the subject matter that warrants [his email] information"); *Lutzeier v. Citigroup Inc.*, No. 4:14-CV- 00183-RLW, 2015 WL 430196, at *7 (E.D. Mo. Feb. 2, 2015) (denying email discovery of high- level executives where they do not have unique or personal knowledge of the subject matter at issue in the case).

**10X's Position:**

10X's antitrust claims in this case allege that Bio-Rad's acquisition of RainDance was illegal. Bio-Rad's CEO, Norman Schwartz is the person who made the decision to buy RainDance. Bio-Rad claims that Mr. Schwartz has no unique knowledge, suggesting that because he sits atop a large publicly traded company this somehow means he was not really

involved. But the evidence shows the opposite. Indeed, when Bio-Rad submitted its protective

order motion prior to the July 31 scheduling conference, a motion Bio-Rad cites and relies upon

for the present request, Bio-Rad did so with key evidence proving Mr. Schwartz's unique

knowledge and special role in the disputed matters *redacted*. Bio-Rad attempts to do the same

now, using the Protective Order to shield from view old business emails evidencing Mr.

Schwartz's key role in the RainDance acquisition while asking the Court to credit attorney

argument over the contemporaneous statements of Bio-Rad's and RainDance's executives. And

while Bio-Rad argues that the prior cases between Bio-Rad and 10X somehow mean that the

issue here has already been decided, that is simply not the truth, and indeed Mr. Schwartz has

been deposed more than once, including in litigation against 10X. Regardless, 10X's antitrust

claims have never been asserted in any of those other cases; they are asserted here.

The documents and testimony discussed below prove: (1) Mr. Schwartz was the

decisionmaker responsible for buying RainDance according to Bio-Rad's own witnesses; (2) Mr.

Schwartz communicated and negotiated directly with the RainDance CEO including about core

anticompetitive aspects of the acquisition; (3) Mr. Schwartz directed Bio-Rad's strategy in the

acquisition; (4) Bio-Rad prepared financial analysis of the acquisition specifically for Mr.

Schwartz; (5) key individuals on the RainDance side were specifically focused on how to

persuade Mr. Schwartz as the key decisionmaker; (6) Mr. Schwartz made public statements in

support of the acquisition that are contradicted by Bio-Rad's internal plans, Bio-Rad's behavior,

and Bio-Rad's later claims in federal court. Mr. Schwartz's company sued 10X in this Court. Mr.

Schwartz was the key player in disputed events at the heart of 10X's counterclaims and defenses

and he cannot sit on the sideline. The bare denials of Bio-Rad's lawyers cannot trump the

documents and the testimony. Bio-Rad's lawyers previously collected his email. 10X has already

agreed to use specific search terms that Bio-Rad proposed, none of which is directed to collateral topics as Bio-Rad claims. Mr. Schwartz's email should be produced.

Further, Bio-Rad asks the Court to rule now on whether Mr. Schwartz needs to be deposed. This dispute is premature and should be decided as is typically done after Mr. Schwartz's email has been produced. However, if the Court decides the issue now, Mr. Schwartz more than meets the standard for taking the deposition of a CEO.

## I.    THE LAW DOES NOT SUPPORT BIO-RAD'S REQUEST

Bio-Rad has the burden of showing that it has good cause to block discovery into Mr. Schwartz's email. Production of a CEO's email is proper where "it is likely [that the CEO] has **material, responsive** and ***potentially*** non-cumulative emails." *See Citrix Sys., Inc. v. AVI Networks, Inc.*, C.A. No. 17-1843, ECF No. 112 (D. Del. Apr. 28, 2019). This is because "[u]nlike an 'apex' deposition, collection, review, and production of [a CEO's] emails can (and almost certainly will) occur without meaningful imposition on [the CEO's] time." *Id.* Mr. Schwartz's responsive email should be produced where it has already been collected for review recently in another case against 10X and Bio-Rad "has not made a persuasive showing that the requested email production will be unduly burdensome . . . or disproportionate to the needs of the case, or that security concerns should cause the Court to deny [the] request." *Id. See also Vasudevan Software, Inc. v. MicroStrategy Inc.*, No. 11-cv-06637-RS-PSG, 2012 WL 5637611, at *6 (N.D. Cal. Nov. 15, 2012) (denying protective order based on "a persuasive showing that [the CEO's] emails **may be relevant** and **may lead to admissible evidence** if not admissible themselves").[6]

---

[6] Bio-Rad's cited cases do not show otherwise. In *Tulip Computers Int'l v. Dell Computer Corp.*, No. Civ. A. 00-981-RRM, 2002 WL 818061, at *7 (D. Del. Apr. 30, 2002), the court relied on statements "that certain of the identified executives were **involved**" in ordering Dell to produce

Bio-Rad's "unique knowledge" argument, which invokes the apex doctrine, does not apply to email production. *See Kinetic Concepts, Inc. v. Wake Forest Univ. Health Scis.*, No. SA-11-CV-163-XR, 2014 WL 1787813, at *2 & n.2 (W.D. Tex. May 5, 2014) (stating "the apex doctrine typically only shields corporate officers from depositions and not from document discovery," denying protective order, and deferring on deposition so party could "decide whether to pursue a deposition [of the CEO] *after reviewing [the CEO's] emails*"). As another court observed: "If discovery of high level executive [sic] is precluded due to the their position in the company a litigant would be hard pressed to ever show that the high level executive possessed personal knowledge regarding the allegations in the complaint." *Lauris v. Novartis AG*, No. 1:16-cv-00393-LJO-SAB, 2016 WL 7178602, at *3 (E.D. Cal. Dec. 7, 2016).

Lastly, "proportional[ity] to the needs of the case" is assessed "considering the importance of the issues at stake in the action, [and] the amount in controversy." Fed. R. Civ. P. 26(b)(1). The cost to Bio-Rad of having its lawyers review and produce Mr. Schwartz's emails is not disproportionate to the amount in controversy where Bio-Rad is seeking to enjoin a publicly traded company that provides critical technologies to scientists around the world who are using

---

email "for all of the identified executives, except [the CEO]" and found it "unclear . . . that a search of Dell CEO Michael Dell's emails [would] produce *responsive discovery*." Thus, the Court questioned whether "discovery of his e-mail records would uncover [] *relevant documents*." *Id*. at *7 n.2 The Court added: "[i]f Tulip obtains additional information that leads it to believe that a search of Michael Dell's e-mail will produce *responsive documents*, it should present that information to the court." *Id.* at *7. In *Blackberry*, Facebook's CEO's email *was ordered produced*. The court had "ordered Facebook to conduct searches for 'emails directly related to Mr. Zuckerberg's *Wall Street Journal* article'" that was "the singular basis on which Blackberry posit[ed] the relevance of the discovery[.]" *Blackberry Ltd. v. Facebook, Inc.*, No. CV 18-1844-GW, 2019 WL 4544425, at *2, *7 (C.D. Cal. Aug. 19, 2019). The court declined to add *more* Zuckerberg searches absent showing that he had knowledge. *Blackberry*, 2019 WL 4544425, at *6-7. In *Lutzeier*, the court denied discovery where defendant argued that it would "not yield admissible evidence" and that plaintiff did not "identify any specific information that these three executive[s] may have." *Lutzeier v. Citigroup Inc.*, No. 4:14-cv-00183-RLW, 2015 WL 430196, at *7 (E.D. Mo. Feb. 2, 2015).

10X's products in seeking to combat COVID-19, cure cancer, and fight other life-threatening diseases.

## II.    MR. SCHWARTZ'S EMAIL IS HIGHLY RELEVANT AND IS NOT CUMULATIVE

Bio-Rad's key claims are that "Mr. Schwartz has *no unique*, personal knowledge" about the relevant issues and that "Bio-Rad will also be producing ESI from Annette Tumolo and Josh Shinoff, the Bio-Rad employees most directly involved in [the RainDance] acquisition[.]" ECF No. 134 at 4, 5. Bio-Rad's claim about Mr. Schwartz is untrue and the evidence shows that Mr. Schwartz's email is non-cumulative of Ms. Tumolo's and Mr. Shinoff's.

When testifying under oath, Ms. Tumolo and Mr. Shinoff confirmed that it was Mr. Schwartz who decided to buy RainDance. Mr. Shinoff testified: "there is *only one actual decision maker* with respect to an acquisition of Bio-Rad, which is *the CEO*." 1679 Case, ECF No. 105-1 [Shinoff Deposition, Case No. 1:15-cv-00152-RGA ("152 Case")] at 58:3-5. According to Ms. Tumolo, both she *and Mr. Schwartz* were "*in the weeds*" and "were the ones *on the ground*" of the RainDance acquisition. 1679 Case, ECF No. 105-3 [Tumolo Deposition, Inv. 337-TA-1068] at 203:22-25. When asked if "Mr. Schwartz [was] relying on [Ms. Tumolo's] input in connection with the decision to acquire RainDance," Ms. Tumolo testified: "*You would have to ask him*, but I don't think Norman would take a decision that large based on any one person's input. He sought it from many places in the company." 1679 Case, ECF No. 105-2 [Tumolo Deposition, 152 Case] at 230:25-231:5. Thus, the very same people Bio-Rad says are suitable substitutes for Mr. Schwartz have testified that there *is no substitute* for Mr. Schwartz.

The evidence shows that Mr. Schwartz was uniquely personally involved in the transaction, including aspects of it that are directly related to 10X's antitrust claims. He communicated personally with the RainDance CEO where they discussed specific facts about the

acquisition—facts that go to 10X's claim that the acquisition was illegal. Specifically, the CEO of RainDance wrote to Mr. Schwartz, regarding subject matter that is central to 10X's antitrust claims, stating that RainDance had ██████████████████████████████████████ ██████████████████████ BRLITC-01174893 at 895. The RainDance CEO told Mr. Schwartz that a goal of the proposed acquisition was to ████████████████████████████ ██████████████████████████████████████████████ ████████████ *Id.* The RainDance CEO explained to Mr. Schwartz that RainDance believed Bio-Rad would ██████████████████████████████████████████████ ██████ *Id.* The way the acquisition increased Bio-Rad's leverage is a key aspect of 10X's claims. These communications with Mr. Schwartz illustrate why he is a necessary source of discovery into these facts.

The evidence further confirms that Mr. Schwartz's involvement was extensive and substantive. RainDance's financial advisors in the acquisition recognized that Mr. Schwartz was the key decisionmaker, referencing the ████████████████████████████████ ██████████████████████ 1679 Case, ECF No. 105-4 [Ex. D, BRLITC-00699754]. The advisor describes a conversation with Bio-Rad's CFO in which the third-party RainDance representative had said that Bio-Rad ████████████████████████████████████ ██████████████████████████████████████████████████ ████████ *Id.* Again, this highlights the anticompetitive nature of the acquisition. The email goes on: ████████████████████████████████████████ ██████████████████████████████████████ *Id.* An email from the RainDance CEO to Mr. Schwartz references *"questions/concerns you expressed* relative to *your valuation of RainDance,"* provides an

update on RainDance's lawsuit against 10X, and states: "**Norman**, **you** are correct … that the addition of RainDance would be a very good fit with Bio-Rad and I hope this information helps address **your concerns**." 1679 Case, ECF No. 105-5 [Ex. E, BRLITC-01854668] at 668, 670. Further, Bio-Rad's then COO, told Mr. Schwartz: "The attractiveness of acquiring RD [i.e. RainDance] is several fold, no more importantly in my mind than getting hold of their droplet intellectual property. By doing so we eliminate the possibility of a RD/10X merger and certain litigation from them. We get to turn that table around and begin licensing discussions with 10X." BRLITC-01752869. These statements, in evidence that Bio-Rad has insisted upon redacting, show that Mr. Schwartz was directly and intimately involved in the anticompetitive aspects of the RainDance acquisition that relate directly to 10X's antitrust claims.

Mr. Schwartz directed the strategy of the acquisition as well, writing to his subordinates: "With respect to Raindance, before offering up any better terms I would like to test their appetite for the deal currently on the table. In our conversation Friday, they indicated that they were expecting to talk to their board on Monday, presumable [sic] about the current offer. I will send the note to Kathy [the RainDance CEO] later today." BRLITC-01175551.

Discovery from Mr. Schwartz is necessary to test the truth of statements Bio-Rad made in support of its claims and defenses. Bio-Rad has previously claimed in an earlier case that: "Ms. Tumolo, when she was looking at the company, she said the **products aren't very good**, but they have very important intellectual property" and "**we're going to disable the products or whatever you do, you know, to stop selling them** and maybe support a few people, but get out of that business" and "[s]o **she went to the CEO**, I assume . . . and said . . . **the products aren't very good**[.]" 1679 Case, ECF No. 107-7 [Ex. G, 152 Case Trial Tr.] at 49:4-6, :11-13, :19-21; *see also id.* at 125:15-16.

Mr. Schwartz's public statement, which Bio-Rad quoted to the SEC, contradicts Bio-Rad's statements at trial and its behavior: "'***We welcome the opportunity to expand our product offering with RainDance products*** and technologies,'" 1679 Case, ECF No. 107-8 [Ex. H, Bio-Rad's Feb. 23, 2017, Form 8-K] at 4. A scenario projection in a series of slides called "P&Ls for Norman" expressly includes "additional QX revenue," in apparent reference to extra revenue from selling more of Bio-Rad's ddPCR products as a result of terminating the RainDance products and converting those customers. BRMA00085766 ("RainDance P&L Projections under Bio-Rad Ownership") at 772-775. Bio-Rad produced this document in this case as it provided it to the ██████████████████████████████████████████████ RainDance acquisition and Bio-Rad's licensing practices, thus highlighting the importance of Mr. Schwartz's key role in these events. Why was Mr. Schwartz making public statements about welcoming the opportunity to sell the RainDance products if Bio-Rad's true intent was to stop selling them?

Similarly, Ms. Tumolo claimed at trial against 10X that the $87 million price of RainDance was "for [RainDance's] portfolio [and t]he Chicago patents were the most important part of that to us." 1679 Case, ECF No. 107-7 [Ex. G, 152 Case Trial Tr.] at 165:25-166:3. Bio-Rad used these statements to bolster the perceived value of the RainDance patents and particularly the University-of-Chicago-licensed patents asserted in that case. How do these statements square with Mr. Schwartz's public statements about Bio-Rad looking forward to selling the RainDance products? The person who actually decided to buy RainDance is a key source of discovery.

***Mr. Schwartz's involvement in the disputed matters extends beyond the RainDance acquisition: Information about 10X.*** Putting the lawsuit against 10X in Bio-Rad's hands instead

of RainDance's was a key issue in the acquisition. BRMA00089663. It is also an important issue

in this case. Mr. Schwartz and the RainDance CEO envisioned a deal whereby Bio-Rad would

"assume full and sole responsibility for . . . resolving the currently outstanding litigation between

RainDance and 10X[.]" *Id*. Indeed, an analysis apparently prepared for Mr. Schwartz assumed a

royalty for 10X's sales beginning in 2019, that was barely ███████ the royalty rate Bio-Rad

ultimately won as damages. BRMA00089683 at 688. Similarly, communications between Bio-

Rad and Illumina reveal that Bio-Rad's "CEO, Norman Schwartz, was the person who pushed

back hard on the 10X co-marketing agreement" with Illumina. BRLITC-01200550.

   Mr. Schwartz has repeatedly made public statements about Bio-Rad's litigation campaign

against 10X. *See* 1679 Case, ECF No. 107-9, [Press Release, Dec. 23, 2019] (where

Mr. Schwartz is quoted as saying "[w]e are pleased with the [ITC's] decision" excluding 10X's

legacy products, and also accusing 10X of "advanc[ing] its position in the ***droplet-based NGS***

***sample prep market*** through its unauthorized use of Bio-Rad's intellectual property" and stating

that Bio-Rad would "continue to pursue its legal rights" against 10X's "Next GEM products, that

we believe infringe Bio-Rad's patents"). This information is of course relevant. Bio-Rad says

that it disputes 10X's market definitions in this antitrust case. But Bio-Rad's CEO has spoken

publicly about competition against 10X in the "droplet-based NGS sample prep market."

Mr. Schwartz not only has specific relevant knowledge, but Bio-Rad also puts that knowledge on

display when Mr. Schwartz speaks out publicly against 10X. *See also* 1679 Case, ECF No. 107-

10 [Ex. J, Nov. 14, 2018 Press Release] (quoting Mr. Schwartz as saying: "We are obviously

pleased with the outcome of the case" against 10X and "Bio-Rad remains committed to growing

and protecting its portfolio of patents in the droplet microfluidics space[.]"); 1679 Case, ECF No.

107-11 [Ex. K, July 24, 2019 Press Release] (quoting Mr. Schwartz: "We are obviously pleased

with the Court's decisions, upholding the jury's award of damages and vindicating our patent rights by granting an injunction."). Then, when Bio-Rad sued 10X again in the District of Delaware the day before 10X's IPO, Mr. Schwartz was again quoted in a Bio-Rad press release saying: "Bio-Rad will continue to grow and protect its portfolio of patents in the droplet microfluidics space[.]" 1679 Case, ECF No. 107-12 [Ex. L, Sept. 11, 2019 Press Release]. That same press release stated that "Bio-Rad is seeking all available remedies against 10X Genomics, including damages and injunctive relief." *Id.*

    *Information about 1CellBio.* Bio-Rad's dealings with a company called 1CellBio are also at issue. 1CellBio claimed to have a license to the asserted 10X patents. A recent Massachusetts state court proceeding proved that wrong. Bio-Rad obtained a purported sub-license to those patent rights and has told this Court that it has a license defense against 10X. Bio-Rad's purported license agreement with 1CellBio includes a royalty contradicting Bio-Rad's earlier high-damages claims. BRL00080153 at 156. Norman Schwartz signed that agreement. *Id.* at 168. Mr. Schwartz's involvement is not a *sine cure* or rubber stamp. Mr. Schwartz presented to the Bio-Rad board of directors on an investment in 1CellBio. BRMA00086602 at 608. This evidence shows that Mr. Schwartz was directly and personally involved in factual issues related to 1CellBio that are of importance to multiple aspects of 10X's claims and defenses.

    *Information about Bio-Rad's licensing practices.* Mr. Schwartz has already given testimony in a recent litigation concerning Bio-Rad's licensing payments for the QuantaLife acquisition, in which Bio-Rad was alleged to have artificially inflated the value of a ddPCR-related patent license in order to settle an unrelated dispute by funding it, improperly, out of the QuantaLife acquisition escrow. The license at issue in the Paladin litigation is a license between Life Technologies and Bio-Rad, and it was a license 10X expects to be highly relevant to this

case. Bio-Rad has refused to produce Mr. Schwartz's prior testimony from that litigation.

Mr. Schwartz's direct, personal involvement in Bio-Rad's licensing strategy makes his email

relevant to 10X's antitrust claims and contradicts Bio-Rad's remedy demands.

> *Information about Stilla.* Mr. Schwartz has direct personal knowledge of Bio-Rad's

strategy against Stilla, which is part of 10X's antitrust allegations. A document entitled "Arid

Slides 10242016 *Norman*.pdf" ("Arid" being the code name of the RainDance acquisition) that

has been produced by Bio-Rad in this case ██████████████████████████ Bio-

Rad's acquisition of RainDance and licensing practices, specifically lists Stilla as an out-

licensing opportunity for the RainDance IP—Stilla is the third listed company right after 10X.

BRMA00089683. Here too, Bio-Rad's submission ████████████ highlights Mr.

Schwartz's central role in the key events at issue here.

## III.   BIO-RAD'S RELIANCE ON PRIOR LITIGATIONS IS MERITLESS

Bio-Rad's claim that earlier lawsuits between Bio-Rad and 10X obviate the need to take

this discovery is wrong. Those cases did not involve 10X's antitrust claims. Multiple custodians

on both sides of this case—custodians Bio-Rad is not disputing, and custodians Bio-Rad is

seeking from 10X—have also been custodians in prior litigation. This case is different and both

parties are taking new discovery. Moreover, Mr. Schwartz's email was not produced in those

cases.

> *Currently-stayed patent case in Delaware*. Bio-Rad's reliance on the co-pending case in

Delaware should be rejected because Bio-Rad presented to this Court an incomplete record of

what happened in that case, redacting key testimony, while claiming falsely that Mr. Schwartz

lacks unique knowledge about the subject matter of this dispute.

Further, in that case, the judge ordered discovery of Mr. Schwartz's email that was

limited to a very narrow issue in that case: commercial success as a secondary consideration of

the alleged non-obviousness of the RainDance patents Bio-Rad asserted there. There was no

finding that Mr. Schwartz lacked unique knowledge. Indeed, the judge expressly stated of

Ms. Tumolo, "as she pointed out, she's not the ultimate decisionmaker." ECF No. 134-4 at 11.

Moreover, Bio-Rad's representations to the Court in that case were disproven by

subsequent events. Bio-Rad relied on Ms. Tumolo and Mr. Shinoff as adequate replacements for

Mr. Schwartz, just as Bio-Rad is doing here. But in the court-ordered process that followed that

motion, Bio-Rad ran searches on Mr. Schwartz's email and revealed that there were nearly ***one

thousand emails*** of Mr. Schwartz that addressed RainDance and that were ***not sent to or from

Ms. Tumolo, Mr. Shinoff, or anyone at RainDance*** (the last of which included Darren Link,

whom Bio-Rad relies upon here). Before this issue could be resolved, the case was stayed. Bio-

Rad seems to argue on the one hand that producing Mr. Schwartz's email is burdensome and on

the other hand that the needed information has already been produced. This makes no sense. If

all the information has already been produced, then there is no added burden. If it has not been

produced—and it has not—then Mr. Schwartz's direct personal involvement shows why it needs

to be produced. The fact is that the prior discovery revealed the tip of the iceberg and it is

established fact that Mr. Schwartz has many emails about central issues in the case that 10X

cannot get from the other custodians Bio-Rad wants to rely upon.

***10X's ITC investigation against Bio-Rad.*** Bio-Rad's reliance on the ALJ's decision in

10X's ITC investigation against Bio-Rad (1100 Investigation) denying Mr. Schwartz's

deposition is inapposite. That motion sought Mr. Schwartz's deposition, not his email, and thus

the apex doctrine applied, unlike here. Moreover, the subject matter about which 10X sought that

deposition did not involve the RainDance acquisition. That case does not resolve the issue here.

## IV.   BIO-RAD'S ARGUMENTS ABOUT BURDEN FAIL

Bio-Rad's argument that production of Mr. Schwartz's email is unduly burdensome is not correct. Bio-Rad's counsel has confirmed its own belief (applied to 10X's CEO) that when a CEO participated in a decision to buy or not to buy RainDance, in a manner that was "in the weeds" of that decision and not a mere "rubber stamp," then discovery from that CEO is appropriate and even necessary. Moreover, Bio-Rad's counsel has acknowledged that producing email from someone at the top of the company does not burden that person, does not involve that person's time, and only involves attorney work. Here, Mr. Schwartz's email has already been collected. Bio-Rad's lawyers were already running searches on it in the case that was recently stayed in Delaware. Bio-Rad already proposed search terms specifically for Mr. Schwartz (by rewriting 10X's search terms to its own liking), and 10X has already chosen from among them.

Bio-Rad's argument that Mr. Schwartz's email should not be produced because Bio-Rad has many other products that are not at issue in this case is a non-sequitur. 10X is not seeking irrelevant emails from Mr. Schwartz and the products and technology at issue *in this case* include the Bio-Rad ddPCR products that Bio-Rad has touted at trial "as a growth driver." 1679 Case, ECF No. 107-7, 152 Case Trial Tr. at 126:14-15. Production of Mr. Schwartz's email will not be a meaningful imposition on Mr. Schwartz's time. It is work conducted by lawyers running searches on computers and reviewing emails for privileged information.

Bio-Rad's claim that producing Mr. Schwartz's email is disproportionate makes no sense. Bio-Rad is trying to enjoin a publicly traded company, the products of which have far reaching consequences for groundbreaking research into multiple areas of critical importance to human life and health. Bio-Rad makes *no showing* to suggest that the burden of Bio-Rad's lawyers reviewing and producing Mr. Schwartz's email that has already been collected comes anywhere near being disproportionate with the amount in controversy here.

The reality is that Bio-Rad is reneging on its discovery commitments. In Bio-Rad's March 9, 2020, response to an RFP seeking Mr. Schwartz's communications, including email,[7] Bio-Rad expressly stated that it would search for and produce certain "documents prepared by or for or sent to or from . . . Norman Schwartz . . . ," subject to the restrictions in the protective order excluding email "[u]nless agreed otherwise, for example, ***pursuant to a custodial request for production***." Bio-Rad then confirmed in a March 26, 2020, letter that it "previously agreed to produce documents prepared by or sent to or from . . . Norman Schwartz . . . and related to Bio-Rad's acquisition of RainDance." On July 17, 2020, Bio-Rad specifically confirmed there were terms and portions of terms for Mr. Schwartz that were likely unobjectionable. In a July 20, 2020, Letter, Bio-Rad again confirmed that it would produce documents "prepared by or sent to or from . . . Norman Schwartz . . . ," and that Bio-Rad would not "agree to search emails responsive to this request ***unless*** pursuant to a custodial ESI request as contemplated by the ESI stipulation in this case." Then, the next day, nearly a month after 10X identified Mr. Schwartz as a custodian, the same day when Bio-Rad sent its proposed rewrite of 10X's search terms ***for Mr. Schwartz***, Bio-Rad first objected to producing Mr. Schwartz's email under the ESI provisions. Bio-Rad has reneged on its discovery commitments.

## V.   MR. SCHWARTZ'S DEPOSITION WILL BE NECESSARY AND THIS ISSUE SHOULD BE ADDRESSED AFTER DISCOVERY OF MR. SCHWARTZ'S EMAIL

Whether Mr. Schwartz needs to be deposed should be decided after his email has been produced so that the issue can be decided in light of a full record. However, should the Court reach this issue now, the evidence already proves that Mr. Schwartz meets the standard to depose

---

[7] 10X's RFP No. 30 states: "All Documents and Communications prepared by or for or sent to or from Annette Tumolo, Norman Schwartz, any member of Bio-Rad's Board of Directors, or any Bio-Rad Officer, and related to 10X or RainDance."

a CEO.  Indeed, the issues here are similar to those decided recently by Judge O'Toole in the

*Lynx v. Zebra* case:

> Zebra's Motion for Protective Order Quashing Notice of Deposition of Zebra's CEO
> (dkt. no. 271) is DENIED. Zebra's argument that the so-called "Apex Doctrine" protects its
> CEO, Anders Gustafsson, from being deposed by Lynx is plainly without merit. Unlike the
> executives in the cases cited by Zebra, Gustafsson was ***more than just a figure-head*** who was
> otherwise uninvolved in the subject of the litigation. The emails submitted by Lynx in opposition
> to the protective order make clear that Gustafsson was active not only in Zebra's ***business***
> ***dealings with Lynx*** but also in its ***negotiations with the NFL and other parties***. ( See Culig
> Decl., Exs. 4-5, 9, 13-14 (dkt. no. 300).) ***Lynx is accordingly entitled to depose Gustafsson***. To
> the extent that Zebra requests an order that the subject matter of the deposition be limited to the
> telephone conversations he allegedly had with individuals at Lynx, that request is similarly
> DENIED.

*Lynx Sys. Developers v. Zebra Enter. Sols. Corp.*, No. 15-12297-GAO, 2018 U.S. Dist.

LEXIS 126552 (D. Mass. July 25, 2018), *6-7 (emphasis added). Here too, Mr. Schwartz was

more than a "figure-head." He was "active" in the negotiations, and beyond that, the

decisionmaker responsible for the RainDance acquisition.  Mr. Schwartz therefore has unique

personal knowledge of this critical set of issues. He meets the apex standard that Bio-Rad

wrongly tries to apply to production of email. His deposition is required for the just resolution of

this case.

## VI.   BIO-RAD'S REQUEST FOR THE EMAIL OF 10X'S CEO DR. SERGE SAXONOV BELIES ITS POSITIONS REGARDING MR. SCHWARTZ

Bio-Rad's position on Mr. Schwartz is inconsistent with its demand for the email of

10X's CEO, Dr. Serge Saxonov. While on the one hand Bio-Rad tries to protect its CEO from

email discovery (even though his emails have already been collected), Bio-Rad at the same time

is pressing for 10X to produce the email of its own CEO, Dr. Saxonov. Bio-Rad cannot have it

both ways. 10X has shown that Mr. Schwartz is a necessary source of discovery. Bio-Rad has

made no equivalent showing for Dr. Saxonov. Nonetheless, absent contrary guidance from the

Court, 10X is prepared to search and produce Dr. Saxonov's email. But 10X should not be

required to do so if the Court finds that an exception applies to Mr. Schwartz notwithstanding his

extensive involvement in the key events at issue in this case.

| Issue #6: Number of ESI Custodians in the 10X Case | |
|---|---|
| Bio-Rad Proposal:<br><br>As this Court has already ordered (over 10X's objection) in the e-Discovery Order, 10X and Stilla shall select no more than 5 Bio-Rad custodians.  This is proportionate given the multiple previous litigations between the parties. | 10X's Proposal:<br><br>Given the number of distinct and complex issues presented by the claims and counterclaims in the 10X case, including 10X's antitrust counterclaims, in addition to 2 patents asserted by Bio-Rad, 2 patents asserted by 10X, and 10X's allegations of inequitable conduct, 10X and Bio-Rad may select up to 10 ESI custodians each.<br><br>The additional 5 custodians that 10X receives are not shared with Stilla, and 10X alone has the right to select terms for these custodians. |

**10X's Position:**

Early in this case, before the Court had been presented with detailed substantive briefing

about 10X's antitrust counterclaims, and before 10X had asserted detailed inequitable conduct

allegations, the Court entered default custodial discovery limits in the original E-Discovery

Order (ECF No. 67 at 7-9). Now that the parties are in the midst of discovery and the Court has

reviewed significant substantive briefing it is apparent that the limits originally set in that Order have turned out to be disproportionately low given the diverse and complex issues it is now clear are proceeding through discovery in the *10X* Case (Case No. 19-cv-12533). 10X respectfully submits that good cause exists under the terms of that Order to allow 10X to raise the number of custodians allowed under that order from five custodians shared entirely with Stilla to a total of 10 custodians for 10X. Ten custodians is the bare minimum necessary for 10X to have a fair opportunity to defend itself against Bio-Rad's patent claims, assert its own patent claims, and prosecute its antitrust claims and inequitable conduct claims against Bio-Rad. Ten custodians is a modest number for any case, much less the complex case that this is, and it is an extraordinarily low number for an antitrust case of this importance. 10X does not oppose Bio-Rad having the same scope of discovery even though Bio-Rad has not shown good cause.

While Bio-Rad complains that the discovery 10X seeks is disproportionate to the needs of this case, that is wrong. First, the amount in controversy by which proportionality is judged under the Rules is very high including because Bio-Rad is seeking to enjoin 10X. Second, the reality is that despite the passage of time, Bio-Rad has barely begun to produce responsive documents; Bio-Rad has ***not*** begun to produce custodial email; and 10X is being forced to defend itself without the ability to take adequate discovery from the company that is trying to enjoin it. In the prior cases between the same parties that Bio-Rad relies upon, Bio-Rad itself insisted on much higher discovery limits. Bio-Rad is only opposing those higher limits now by arguing the discovery from the earlier cases should somehow be enough. But Bio-Rad has made no showing that the evidence from those prior cases is the same evidence that 10X needs to defend itself in this case. Meanwhile, Bio-Rad is has repeatedly blocked 10X's efforts to take basic discovery from non-custodial sources. On the one hand Bio-Rad has repeatedly stated on

relevant topics that it will only provide discovery from email custodians, while on the other hand Bio-Rad has asked the Court to place severe restrictions on email discovery. This is Bio-Rad's strategy and it is preventing the parties from reaching the merits of this case in a way that is fair. By refusing non-custodial discovery and severely restricting custodial discovery Bio-Rad is not allowing 10X to get the information it needs to defend itself.

The E-Discovery Order was entered when this case had just begun. It allows 10X five custodians from Bio-Rad by default—all of which need to be shared with Stilla—and allows that limitation to be modified upon a showing of good cause. ECF No. 67 at 8. The case has now progressed and there is good cause under the E-Discovery Order for five additional custodians. The *10X* Case is large and complex, and the discovery sought is less than what would ordinarily be proportional to it. Since deciding the E-Discovery Order, the Court has had the benefit of considering 10X's antitrust claims and 10X's opposition to Bio-Rad's motion to dismiss. The claims proceeding through discovery in the *10X* Case include two patents asserted by Bio-Rad against 10X products, two patents asserted by 10X against Bio-Rad products, 10X's claims of inequitable conduct, and 10X's antitrust and unfair competition claims against Bio-Rad. Many of these claims are not subject to a pending motion to dismiss, and, as the Court has noted during the July 31, 2020 conference, 10X has antitrust claims that are expected to survive the pending motion to dismiss. As the Court also recognized during that conference, 10X's antitrust case presents "complex" issues.

Now that the Court has decided there are claims that will be moving forward, 10X needs a fair chance to prove these claims on the merits. 10X's antitrust claims are based on Bio-Rad's anticompetitive acquisition of RainDance in 2017. Through that acquisition, Bio-Rad monopolized the market and eliminated head-to-head competition with RainDance. 10X has

alleged antitrust violations in three separate markets: (1) a technology market for genetic analysis on a droplet-based platform; (2) a market for droplet-based single cell next generation sequencing ("NGS") sample preparation products; and (3) a market for ddPCR products. 10X needs evidence about the contours of each of these markets, competition in each, and the harm to competition from the Bio-Rad/RainDance merger in each. This evidence will include not only evidence about the acquisition itself, but also for example, detailed evidence on product characteristics, product uses, pricing, sales volumes, research and development plans, sales and marketing plans, customers, patent licensors and licensees, negotiations and discussions with customers, licensors, and licensees, as well as other topics. Five custodians, where custodians and terms are shared with Stilla, is not adequate to allow 10X to develop the evidence it needs for even the antitrust and unfair competition claims, much less the combination of these claims and the patent related claims and defenses in the *10X* Case.

There is good cause in this large and complex case to allow 10X to take the additional discovery that it needs and has not been able to obtain under the default discovery limits. 10X's current custodians include Bio-Rad's CEO and another executive who were involved in the RainDance acquisition, a Bio-Rad employee involved in licensing and the RainDance acquisition, a former Bio-Rad marketing director, and one of the named inventors on the asserted patents who was also a RainDance founder, is now a Bio-Rad vice president, and is a central figure in 10X's inequitable conduct claims. Good cause exists to obtain at least five additional custodians to get discovery into Bio-Rad's sales practices before and after the acquisition, the technical features of Bio-Rad's products (which can relate both to the patent claims and the antitrust markets), and the former RainDance executives involved on the RainDance side of the acquisition. There are far more distinct issues in dispute implicating far more specific individuals

than there are custodians. There are many more than ten individuals who are deeply involved in the facts that give rise to 10X's claims and defenses in this case.  The practical impact of continuing to limit the number of custodians in this case to five, and forcing 10X to share those five with Stilla, is that there is no way 10X will ever be given an opportunity to fairly explore the basic facts that Bio-Rad's decision to sue 10X for an injunction have put at issue.

Moreover, the discovery sought is at least proportional—and in fact is far less than what is proportional—to the needs of this case. This case involves Bio-Rad seeking to enjoin and likely seeking a large damages award against the innovative and successful products of a publicly traded company that are used in research to combat deadly diseases such as COVID-19 and cancer. The complexity and importance of the many different issues, the importance of discovery in resolving those issues, and amount in controversy all weigh in favor of a greater scope of discovery being proportional to the needs of this case under Rule 26(b)(1). Moreover, both parties are publicly traded and have the resources to provide additional discovery, and the parties relative access to each other's internal information is limited to what has been deemed produced in other litigations and the relatively small number of additional productions made in this case, and this case raises new, specific, and substantial issues that have never been litigated previously and require additional discovery—including those in 10X's antitrust claims, inequitable conduct claims, license, estoppel, as well as remedies both Bio-Rad and 10X seek, and Bio-Rad's district court injunction request on 10X's newly designed products, Next GEM. The parties' agreement for convenience to agree to use prior productions again in this case should not weigh against the parties obtaining discovery that has not been provided in any prior case.

The discovery allowed by default in the present case is disproportionately low, further confirming that there is good cause for additional discovery. Despite the wide range of issues and the high stakes, the Court's E-Discovery Order effectively limited 10X's default discovery to fewer than five ESI custodians because *all five* of 10X's custodians are shared must overlap with five of Stilla's custodians in the *Stilla* Case (Case No. 19-cv-11587). By contrast, Bio-Rad is entitled to *thirteen* custodians between Stilla and 10X (none of which it must share) and Stilla is entitled to *eight* custodians presently (only five of which it must share with 10X). First, Requiring the level of overlap imposed on 10X itself is unfairly prejudicial to 10X. The *10X* Case and *Stilla* Case have minimal overlap: only a single patent overlaps between the two cases, and the cases involve 3 additional patents in each case that are different, and the parties' claims and defenses are very different. For example, 10X has a licensing defense based on its license with Harvard, and 10X and Stilla have different inequitable conduct claims on different patents. 10X and Stilla offer different products that are used for different applications: Stilla offers ddPCR products and 10X offers next generation sequencing sample preparation products.[8] Thus, the requirement that 10X's ESI custodial discovery must overlap entirely with that of Stilla's is not appropriate and is actively stifling 10X's ability to defend itself. Second, contrasting the two cases is informative to show how low the ESI discovery limits are in the *10X* Case because in the smaller *Stilla* Case, where Stilla is neither asserting patents nor antitrust counterclaims against Bio-Rad, Stilla receives *more* discovery than 10X because it receives eight ESI custodians, only five of which are shared with 10X. *Stilla* Case, ECF No. 44 at 7. Thus, Bio-Rad receives eight custodians from Stilla and five separate custodians from 10X to develop its issues, but 10X is

---

[8] High level details on these different technologies are provided in 10X's antitrust and unfair competition counterclaims. *See* ECF No. 113, ¶¶ 41-59.

limited to five custodians for which all of the issues in the *10X* Case and many of the issues in the *Stilla* Case must be addressed. That is not fair or proportional under Rule 26 to the needs of the *10X* Case, and good cause exists for additional discovery.

Comparing the default discovery provided in the present case to other cases between 10X and Bio-Rad also confirms that the default limits are disproportionately low, and the amount of discovery that 10X requests is not burdensome. In multiple prior cases Bio-Rad and 10X have agreed to ten email custodians, and in the Delaware Case No. 1:18-cv-01679 ("1679 Case") (which was recently stayed), ***Bio-Rad insisted that each party should have <u>at least a total of ten</u>*** <u>***custodians.***</u> The 1679 Case was a much smaller case than this one with only two patents asserted against 10X, no patents asserted against Bio-Rad, and no antitrust counterclaims. Thus, it is not unduly burdensome to provide the five additional custodians that 10X has requested, and is instead entirely consistent with the scope of discovery the parties have agreed to in prior cases. Moreover, in the 1679 Case the parties had also agreed to reuse productions in prior cases, and Bio-Rad still demanded a total of 10 custodians, which further confirms prior productions related to other issues do not limit the new discovery required in a case that presents new issues. The additional discovery requested is further supported by the demonstrated importance of 10X's antitrust claims. ███████████████████████████████████████████

███████████████ Bio-Rad's acquisition of RainDance and related conduct—the same conduct that is the subject of 10X's antitrust counterclaims in the present case. ██████████████

██████████████████████████████████████████████████████

██████████ about the RainDance acquisition, legacy RainDance products, patents, licenses and licensing competition, and droplet-based genetic analysis products including ddPCR and single-

cell NGS sample prep and competition in these products. *See* BRMA00090554 ███████████

███████████████ [9] ███████████████████████████████

The discovery sought is far less than that typically provided in antitrust cases. The antitrust agencies and the courts recognize that broad discovery with ***50 or more custodians*** is typically needed in merger cases such as this one. The Department of Justice ("DOJ") and the Federal Trade Commission share responsibility at the federal level for investigating mergers. The DOJ's default presumption in merger investigations is at least 20 custodians for each of the merging parties (40 per merger) plus the right to add 5 more custodians per side at any time (50 per merger). DOJ, *Model Timing Agreement* (2018), https://www.justice.gov/atr/page/file/1111336/download, at II(A). The DOJ also believes that this number of custodians "is not sufficient to prepare the Division for a trial on the merits." *Id.* at IV(C). The FTC's default presumption is at least 35 custodians per side, or 70 per merger. *Reforms to the Merger Review Process* (2006), https://www.ftc.gov/sites/default/files/attachments/merger-review/mergerreviewprocess.pdf, at 9-10. These defaults are often insufficient, and the DOJ and the FTC regularly require more custodians. *See, e.g.,* Antitrust Modernization Commission, *Report and Recommendations* (2007), https://govinfo.library.unt.edu/amc/report_recommendation/amc_final_report.pdf, at 164 (reporting that, in practice, merger investigations averaged 126 custodians with a median of 94 custodians).

The discovery rules "envision[] generally unrestrictive access to sources of information." *Horizons Titanium Corp. v. Norton Co.*, 290 F.2d 421, 425 (1st Cir. 1961). Courts specifically

---

[9] To the extent additional information would benefit the Court, 10X will promptly provide supporting evidence at the Court's request.

recognize that discovery in antitrust cases should be extensive. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 558-59 (2007) (emphasizing the extensive discovery required in antitrust cases); *United States v. United Shoe Machinery Corp.*, 110 F. Supp. 295, 298-99 (D. Mass. 1953) (Wyzanski, J.) (detailing "trial of prodigious length" in antitrust case, with "exhaustive requests for discovery," including "47 depositions"); *Kellam Energy, Inc. v. Duncan*, 616 F. Supp. 215, 217-18 (D. Del. 1985) ("[T]here is a general policy of allowing liberal discovery in antitrust cases . . . . [B]road discovery may be needed to uncover evidence of invidious design, pattern or intent"); *In re Uranium Antitrust Litigation*, 480 F. Supp. 1138, 1155 (N.D. Ill. 1979) ("[T]he heart of any American antitrust case is the discovery of business documents. Without them, there is virtually no case"); *Manual for Complex Litigation, Fourth* § 30, https://www.uscourts.gov/sites/default/files/mcl4.pdf , at 519 ("Antitrust litigation can…. involve voluminous documentary and testimonial evidence, extensive discovery, complicated legal, factual, and technical (particularly economic) questions, numerous parties and attorneys, and substantial sums of money"). In recent litigation challenging the Sprint/T-Mobile merger, there were 97 custodians from the merging parties. *State of NY v. Deutsche Telekom*, Case 1:19-cv-05434-VM-RWL (S.D.N.Y. 2019), ECF No. 148 (Letter to Court, July 30, 2019). In other antitrust cases, courts regularly order additional discovery on top of custodian numbers that far exceed the numbers requested here. *See, e.g., Discover Fin. Servs., Inc. v. Visa U.S.A., Inc.*, 2006 WL 3230157, at *1 (S.D.N.Y. Nov. 8, 2006) (ordering additional production on top of 96 existing custodians for one party); *Oxbow Carbon & Minerals LLC v. Union Pacific Railroad Co.*, 322 F.R.D. 1 (D.D.C. 2017) (ordering production from plaintiff's CEO on top of plaintiff's 19 existing custodians); *In re EpiPen Marketing, Sales Practices and Antitrust Litig.*, 2018 WL

1440923 (D. Kan. Mar. 15, 2018) (ordering additional custodians on top of 23 existing custodians).

Stilla includes a footnote stating that it reserves the right to take half of the additional terms and custodians should 10X obtain them. That is not appropriate. Stilla has not joined 10X's request, and has no request of its own. 10X has shown good cause based on the specific needs of its case and its claims to obtain these additional custodians. 10X was already required to share all of its custodians and terms allowed by default with Stilla, while Stilla has had three custodians not shared with 10X. 10X respectfully requests that it be permitted to select the additional five terms and custodians, but does not oppose Stilla obtaining the documents produced.

**Bio-Rad's Position:**

As discussed above, the question of the number of ESI search terms and custodians has already been decided by the Court back on February 19, 2020.  ECF No. 67 at 7-8 (Section VI.C – Email and Custodial ESI Requests).  10X argues that the 5 custodian limit was entered by "default."  However, in ruling on the e-Discovery Order, the Court specifically *rejected* 10X's request for unlimited ESI custodians and instead limited 10X to "a total of no more than 5" Bio-Rad custodians.  *Id*. at 8.  Now, 10X improperly seeks reconsideration without meeting its heavy burden to revisit and upend the Court's order by ***doubling*** the number of custodians with 2 months left in fact discovery.  It should not be permitted.

There is no legitimate justification for 10X's disproportionate and unjustified request.  As Bio-Rad explained in the proposed e-Discovery order, if anything, the circumstances here make 10X's demand for expanded discovery unusually unwarranted. The parties have been engaged in ***six prior and ongoing litigations***, and the parties have agreed that the discovery from these cases

maybe used this case. This discovery encompasses ***3,516,288 pages of material across 625,132 documents*** relating to virtually every aspect of the companies' businesses. In this light, 10X's assertion that it now needs to double the number of custodians and terms makes no sense.

10X argues that these additional custodians are necessary because it has asserted antitrust counterclaims against Bio-Rad (an argument already made by 10X and rejected by the Court). Yet, all of 10X's antitrust counterclaims relate solely to the alleged unlawful 2017 acquisition by Bio-Rad of RainDance. When that acquisition completed, 10X and RainDance were engaged in patent litigation. At the time, 10X took extensive discovery of both Bio-Rad's and RainDance's acquisition due diligence files and deposed all of the key witnesses related to this transaction. Thus, 10X should already have nearly everything it needs for its antitrust counterclaims and, importantly, should not be using a new forum to fish for information it regrets not having sought before in the parties' previous patent litigation. After numerous meet and confers and dozens of hours spent on this topic, 10X has failed to identify with any specificity what else it believes is missing that it did not and could not have sought before.

10X's attempt to justify its request is a transparent and improper attempt to smear Bio-Rad with a ██████████████████████████████ from earlier this year is far afield and overblown. ████████████████████████████████████████████████ ████████████████████████████████████ 10X knows this because Bio-Rad has nothing to hide and turned over, subject to the protective order in this case, everything it provided on a voluntary basis. 10X, on the other hand, has failed to produce its own communications on this subject. And despite 10X's best efforts, ██████████████████████████████████████ ████████████████████████

The patent case is scheduled for trial in April. The parties have already exchanged over 3.5 million pages of documents. Rather than engaging in never-ending and disproportionate dragnet discovery of email custodians, the parties should focus on getting the additional discovery they truly need and getting this case ready for trial as instructed by the Court. *See* Fed. R. Civ. P. 1.

| Issue #7: Number of ESI Search Terms | |
|---|---|
| Bio-Rad Proposal (Stilla Does Not Oppose): | 10X's Proposal: |
| As this Court has already ordered in the e-Discovery Order, 10X and Stilla shall select no more than 5 search terms for 5 Bio-Rad custodians.  Bio-Rad agrees to one additional search term (6 total) for 2 of the 5 Bio-Rad custodians. | 10X and Bio-Rad may select up to 10 terms each for each of the 10 custodians. |
| | Terms may not combine different people, concepts, or things that are not related to each other in the context of this case. |
| Terms may not be disjointed combinations of terms referring to different people, concepts, or things. However, Bio-Rad agrees that the terms listed above in Section III shall Count as one term if the total number of hits per term is limited to 3,000 | The most recent terms 10X served previously on Bio-Rad that relate to the 10X case (as opposed to the Stilla case) are deemed to be proper search terms under this provision and so are Bio-Rad's terms that Bio-Rad served on 10X. |
| | The parties shall identify a final set of custodians and search terms one week after the Court issues its order regarding the present discovery disputes.  For the most recent terms that have been previously identified by 10X and Bio-Rad, the producing party will proceed with the document production promptly upon the issuance of this Court's order and shall not await the identification of the additional custodians or terms to commence such review and production. |

**Bio-Rad's Position:**

The question of the number of ESI search terms and custodians has already been decided by the Court back on February 19, 2020.  ECF No. 67 at 7-8 (Section VI.C – Email and Custodial ESI Requests).  In ruling on the e-Discovery Order, the Court specifically rejected 10X's request for unlimited ESI custodians and instead limited 10X to "a total of no more than 5" Bio-Rad custodians and no more than five ESI search terms/phrases per custodian.  *Id*. at 8.  Nevertheless, 10X has refused to comply with the Order and select five reasonable, non-disjointed terms for the custodians it identified.  Now, 10X improperly seeks reconsideration without meeting its heavy burden to revisit and upend the Court's order by ***doubling*** the number of custodians and ***doubling*** the number of terms with 2 months left in fact discovery.  It should not be permitted.

There is no legitimate justification for 10X's disproportionate and unjustified request.  Tellingly, Stilla has not joined in 10X's reconsideration request making clear from even another accused infringer's perspective that this is an over-reach by 10X.  Stilla and Bio-Rad have had no trouble coming to an agreement on reasonable limits on e-Discovery, and Stilla does not oppose Bio-Rad's proposal.  Indeed, the Stilla litigation is even more complicated because involves four different patents from four different entities (BioRad, Harvard, Lawrence Livermore National Laboratory, and the University of Chicago).  Nothing about the 10X case is so unusual as to warrant such an expansion.

As Bio-Rad explained in the proposed e-Discovery order, if anything, the circumstances here make 10X's demand for expanded discovery unusually unwarranted. The parties have been engaged in ***six prior and ongoing litigations***, and the parties have agreed that the discovery from these cases maybe used this case. This discovery encompasses ***3,516,288 pages of material across 625,132 documents*** relating to virtually every aspect of the companies' businesses. In this

light, 10X's assertion that it now needs to double the number of custodians and terms makes no sense.

10X argues that these additional custodians are necessary because it has asserted antitrust counterclaims against Bio-Rad (an argument already made by 10X and rejected by the Court). Yet, all of 10X's antitrust counterclaims relate solely to the alleged unlawful 2017 acquisition by Bio-Rad of RainDance. When that acquisition completed, 10X and RainDance were engaged in patent litigation. At the time, 10X took extensive discovery of both Bio-Rad's and RainDance's acquisition due diligence files and deposed all of the key witnesses related to this transaction. Thus, 10X should already have nearly everything it needs for its antitrust counterclaims and, importantly, should not be using a new forum to fish for information it regrets not having sought before in the parties' previous patent litigation. After numerous meet and confers and dozens of hours spent on this topic, 10X has failed to identify with any specificity what else it believes is missing that it did not and could not have sought before.

The patent case is scheduled for trial in April. The parties have already exchanged over 3.5 million pages of documents. Rather than engaging in never-ending and disproportionate dragnet discovery of email custodians, the parties should focus on getting the additional discovery they truly need and getting this case ready for trial as instructed by the Court.  *See* Fed. R. Civ. P. 1.

**10X's Position:**

Bio-Rad has exploited the ESI Custodial discovery framework in the E-Discovery Order (D.I. 67) to attempt to unfairly preclude 10X from obtaining discovery, and Bio-Rad's unreasonable approach to the already restrictive discovery limits that the Court imposed over 10X's opposition have made the low minimums in the Order unworkable. The E-Discovery Order permits by default five search terms with up to five additional terms per custodian upon a

showing of a distinct need based on the size, complexity, and issues of this case. 10X's currently

served terms over five meet this standard, and the needs of the case confirm that the ten term

limit is appropriate going forward. Bio-Rad's proposal further attempts to limit the scope of

discovery by placing further restrictions on formulating terms and should be rejected because it

is an unnecessary additional restriction that will only lead to additional disputes. Bio-Rad

incorrectly represents that 10X is seeking reconsideration and challenging the Court's Order. But

10X is not seeking reconsideration, and is instead seeking additional search terms based on the

needs of this case as permitted by the Court's Order.  Lastly, only 10X's proposal addresses the

date for providing the search terms, which is necessary to ensure that the producing party has

sufficient time to produce documents by the agreed-to deadline, i.e., two weeks before the

deposition of the custodian. The needs and complexity of this case, as well as the extensive

discovery typically required in antitrust cases like the present, are described in the preceding

section regarding the Number of ESI Custodians in the *10X* Case. The fact that Stilla has not

joined when it already has higher discovery limits is no surprise and is in no way relevant to this

request. In fact, Stilla's footnote seeking to take custodians should 10X obtain them is only

further confirmation that Stilla also wants additional discovery. Instead, the relevant benchmarks

are Bio-Rad's own demands in prior cases with 10X and the antitrust guidelines that 10X cited in

its preceeding section. As described in that section, the *10X* Case involves Bio-Rad's patent

infringement claims against 10X, 10X's patent infringement claims against Bio-Rad, 10X's

inequitable conduct claim, and 10X's antitrust and unfair competition claims against Bio-Rad.

These claims raise a range of issues that must all be addressed, including through email

discovery. For example, there are issues related to the technical operation of the accused

products (which are the subject of the patent claims), the scope of the inventor's knowledge of

the prior art (which is relevant to 10X's inequitable conduct claim), and the antitrust markets and

Bio-Rad's anticompetitive behavior within them (which are related to 10X's antitrust claims).

Bio-Rad attempts to argue that discovery has reached an advanced stage to argue that

10X should not receive discovery. This is misleading and should carry no weight. This case was

stayed for 90-days, and so it is not at the stage of discovery as a typical case would be. The Court

on March 26, 2020, granted a 90-day stay of all deadlines in the case. *See* ECF No. 96, March

26, 2020, Hr. Tr., at 20:3-4 ("I do intend that the 90-day stay stay the 10X aspects of this case as

well as ***Stilla***.") (emphasis added); *id.* at 21:6-7 ("[Y]ou should understand that the court

deadlines, the Court's orders are all stayed for 90 days."); *id.* at 22:3-6 ("My intent—what's

driving the Court's action is Covid-19. My intent was to stay everything for 90 days. Everything.

And we'll see where we are."). During the stay, Bio-Rad produced no documents. No parties

answered discovery responses. During the ordered 90-day stay, 10X has focused its time and

resources on providing critical tools for COVID-19 research during this unprecedented global

medical emergency. *See* https://pages.10xgenomics.com/3p-immunology-coronavirus-tools.

Thus, the parties are three months behind where they normally would be, and 10X should not be

deprived of discovery on that basis. Moreover, 10X served search terms on Bio-Rad on June 29,

and since then has in good faith attempted diligently to reach an agreement with Bio-Rad to

allow the ESI search term process to proceed. Bio-Rad's unwillingness to negotiate a reasonable

solution should not be a basis to deprive 10X of discovery.

Additional terms are needed in this case, and they are permitted by the E-Discovery

Order's grant of permission to the parties to jointly agree to modify the limits on search

terms/phrases without the Court's leave, but Bio-Rad has refused to agree to a reasonable scope

of search terms.[10] Rather than deal reasonably with 10X, Bio-Rad has used the terms of the E-Discovery Order to further restrict 10X's access to discovery. As with the custodians, the E-Discovery order requires that for ***all five*** of 10X's custodians, Stilla and 10X must select the same five terms, despite the multitude of non-overlapping issues in the two cases. This problem is further exacerbated by Bio-Rad's unreasonably narrow interpretation of the scope of the search terms. For example, 10X and Stilla have sought discovery into emails that mention each of their names, but searching both names counts as two terms against both defendants, which is almost half of all of the terms 10X and Stilla are allowed by default. The unfairness of Bio-Rad's approach is illustrated by the fact that Bio-Rad is seeking the same scope of discovery—mentions of its own company name—from each of the 10X and Stilla custodians, but that same scope of discovery counts as only a single term for Bio-Rad against each of the custodians. This is not a workable or fair system and it does not give 10X a fair scope of discovery to litigate its claims.

10X and Stilla have proposed collectively nine to ten terms per custodian, and 10X needs the terms that relate to its case. The terms that 10X has proposed are all directly relevant to the issues in this case. The terms 10X has proposed, with only minor modifications, are all terms that ***Bio-Rad proposed*** to 10X as acceptable formulations of terms that avoid what it alleged to be improper grouping under the Protective Order. Bio-Rad has raised no other objections to these terms other than numerosity and an unspecified concern regarding the possibility of "unreasonably large numbers" of hits, which is addressed further below. 10X repeatedly offered to exchange hit counts to address such concerns, but Bio-Rad refused. Bio-Rad also identifies no

---

[10] Bio-Rad's recent offer of a single additional term on two custodians does not sufficiently increase the scope of discovery in this case.

particularized burden associated with running 10X's search terms. Bio-Rad provides no identification of how many emails that have not previously been produced it would need to produce now. 10X needs the search terms identified, and there are no countervailing considerations that Bio-Rad has supported with any facts. Thus, these terms should be deemed proper, as 10X proposes.

Bio-Rad argues that 10X took "extensive discovery of both Bio-Rad's and RainDance's acquisition due diligence files and deposed all of the key witnesses." That is not the case. 10X does is not here seeking the due diligence files. 10X is seeking email discovery that was *denied* in the district court litigation that was pending when Bio-Rad purchased RainDance. After Bio-Rad bought RainDance, 10X sought email from Ms. Tumolo, Mr. Shinoff, *and* the person most likely to have discoverable information about the RainDance acquisition, whoever that might be. 152 Case, ECF No.  199-1, Ex. 1 at 9. Bio-Rad opposed and the Court *denied* 10X's request, 152 Case, ECF No.  207 at 7:22-23. There is no sense in which 10X has already received the discovery that it is seeking now. 10X specifically sought email discovery from two of the custodians sought here and was denied in the prior litigation, and was denied the email of the person most likely to have the information. The acquisition is at issue in this case and discovery into that acquisition should be allowed in this case. Moreover, 10X also seeks discovery from Dr. Link, who is now the subject of an inequitable conduct claim that was not previously at issue in any prior litigation. The production from prior cases is also not a replacement for discovery in the present case. The fact that Bio-Rad has produced other documents does not mean that Bio-Rad has produced the documents requested in this case. 10X does not ask for Bio-Rad to re-produce the emails that have been produced in prior litigations, which only reduces any burden associated with production because identical and previously produced documents need not be

produced again. The only remaining question for the Court is whether the terms over five terms

are needed in this case, and each of the terms that 10X has proposed is necessary. All of the

terms proposed that relate to the *10X* case are needed in this case. The first two terms for all

custodians are the names of the defendants in the two cases (10X and Stilla), and given that Bio-

Rad also served terms with its own name on all custodians of both defendants, there is no dispute

that the discussions of the other parties in the litigation are relevant. 10X's own name is

particularly relevant because it was one of the targets of Bio-Rad's anticompetitive activities, and

Stilla—as a nascent competitor in the ddPCR market—is similarly relevant to 10X's antitrust

and unfair competition claims.

For three of the custodians, 10X has also proposed a RainDance term to obtain discovery

into the acquisition that is central to its antitrust claims. In its place for the fourth custodian,

Darren Link, a named inventor on patents asserted against 10X who is a key part of 10X's

inequitable conduct claim, 10X has proposed the names of prior artists.

The remaining two terms in the first five for Ms. Tumolo relate to the ddPCR technology,

which is relevant to 10X's antitrust claims, and a licensing term. Licensing is directly relevant to

damages on Bio-Rad's patent claims as well as 10X's antitrust claims related to the technology

market that involves the licensing of intellectual property. 10X's licensing search term covers the

licensing of intellectual property, licensing including the technology fields relevant to this case

such as ddPCR, and particular licensing discussions that 10X has identified through discovery or

that Bio-Rad has relied upon in previous litigations. There is a need for Ms. Tumolo's additional

term—"'single cell' or 'single-cell.'" 10X and Bio-Rad offer products that allow single cells to

be processed for next generation sequencing in a way that allows the expression of genes from

those single cells to be analyzed, and 10X's single cell products have been accused of infringing

Bio-Rad's patents in this space. This single cell sequencing technology is relevant both to the patent claims and to the markets in the antitrust case, including both the Droplet Genetic Analysis Technology Market and the Droplet **Single-Cell** Product Market. ECF No. 113 [10X Answer], Antitrust Counterclaims, ¶¶ 10, 95.

Regarding the remaining two terms in the first five for Mr. Shinoff, the 1CellBio term is relevant to a license Bio-Rad has relied upon in this case (*see* ECF No. 74) and that is relevant to damages in this case. The last of the five terms for Mr. Shinoff is a similar licensing term to that for Ms. Tumolo. The two additional terms for Mr. Shinoff that are relevant to the *10X* Case relate to the ddPCR technology and ATAC. The first term—"droplet or ddPCR or 'dd PCR' or dd-PCR or dpcr or 'digital pcr'" —relates to the ddPCR technology, and discovery into ddPCR is needed in this case because it also relates to two of the antitrust markets in 10X's antitrust claims: the Droplet Genetic Analysis Technology Market and the **ddPCR** Product Market. ECF No. 113 [10X Answer], Antitrust Counterclaims, ¶ 10. The final term—"ATAC"—refers to the assay for transposase-accessible chromatin performed on the product accused of infringing the patents asserted in 10X's patent counterclaims, as well as 10X's product accused of infringement of Bio-Rad's asserted patents. ECF No. 113 [10X Answer], Patent Counterclaims, ¶¶ 264-66. The products that perform ATAC are also part of the Droplet Genetic Analysis Technology Market and the Droplet Single-Cell Product Market. ECF No. 113 [10X Answer], Antitrust Counterclaims, ¶ 71.

Regarding the remaining two terms in the first five for Viresh Patel, they relate to the ddPCR market and competition within it and the single-cell market and competition within it, which is relevant to at least 10X's antitrust claims. There is a need for Mr. Patel's additional

term—"(grant w/3 thornton)"—because this is the firm that performed the fair value analysis for the RainDance acquisition.

Regarding the remaining two terms in the first five for Darren Link, the first relates to licensing, which is relevant for the same reasons described for Ms. Tumolo and Mr. Shinoff. The next term identifies the prosecuting attorneys identified in 10X's inequitable conduct defense that were involved in the inequitable conduct committed during the prosecution of the 444 and 277 Patents. ECF No. 113 [10X Answer], Defenses, ¶¶ 86, 100, 122, 124-25, 141, 146, 160-61. There is a need for Dr. Link's additional two terms. First, the term "(surfactant* w/20 *fluor*) or (*fluor* w/20 oil) or (F%alkyl* w/20 (oil or surfactant*))" relates directly to the claim language in the first claim of the 444 and 277 Patents asserted against 10X ("fluorinated polymer surfactant") and a description of a surfactant in the specification—"using F-alkyl dimorpholinophosphates as surfactants." 444 Patent at 18:38-39. This is relevant to Bio-Rad's claims of patent infringement and 10X's defenses to them. Second, the term "7%129%091 or (091 w/20 patent*)" is the number of the patent identified in 10X's inequitable conduct defense as having been buried. ECF No. 113 [10X Answer], Defenses, ¶ 101.

Thus, every term that relates to the *10X* Case is relevant to core issues within it. Moreover, these topics relate to only a subset of the Requests for Production on which 10X is seeking discovery. In response to 10X's requests for production, Bio-Rad identified in response to each one on which it agreed to produce documents the portions of the E-Discovery Order stating that it is not required to search email. During meet and confer, counsel for Bio-Rad repeatedly stated that it was not producing email and confirming that categories of information— such as licensing negotiations—were expected to exist predominately in email. 10X needs

discovery into email to develop both its claims and its defenses, and it needs more email discovery than is permitted by default in the E-Discovery Order.

For the additional custodians beyond the original five addressed in the preceding section regarding the Number of ESI Custodians in the 10X Case, 10X also needs ten terms for each of those custodians to obtain discovery into the multiple different issues across the claims in the *10X* Case.  The *10X* Case is large and complex, containing claims raising distinct issues, as described above. Contrary to Bio-Rad's assertion, the Stilla litigation is not "more complicated." Like the Stilla litigation, the 10X litigation involves not only four patents, but two patents asserted against 10X's products, and two patents asserted against Bio-Rad's products, and the two sets of products in the present case increases the complexity.  That complexity is further increased by 10X's substantive antitrust claims (spanning 40 pages) and inequitable conduct defense which spans 55 pages of the pleadings, and the antitrust counterclaims, in addition to other defenses such as licensing., which further confirms the need for additional terms.  This evidence will include not only evidence about the acquisition itself, but also for example, detailed evidence on product characteristics, product uses, pricing, sales volumes, research and development plans, sales and marketing plans, customers, patent licensors and licensees, negotiations and discussions with customers, licensors, and licensees, as well as other topics. For example, email discovery of sales employees could involve discovery into different products, and different competitors related to ddPCR and NGS Sample Preparation, the sales practices before and after the acquisition, and the responses of customers to the acquisition of RainDance or the termination of RainDance Products. As another example, technical discovery related to the antitrust claims could also require discovery into multiple products in the relevant markets, including the structure and operation of Bio-Rad's products in particular. The operation of Bio-

Rad's accused products is also relevant to 10X's patent infringement claims against Bio-Rad, whether Bio-Rad's products are embodying products for Bio-Rad's own patent infringement claims. As a final example, 10X will also need discovery into competitors, the markets, Bio-Rad, and the acquisition from RainDance executives.

Five custodians, where custodians and terms are shared with Stilla, is not adequate to allow 10X to develop the evidence it needs for even the antitrust and unfair competition claims, much less the combination of these claims and the patent related claims and defenses in the *10X* Case.

Thus, the scope of this discovery is reasonable, proportional, and well within the scope of what the parties have agreed to in prior litigations. Under Rule 26(b)(1), five additional search terms is proportional to the needs of the case given the importance of the issues, the importance of discovery in resolving the issues, the parties' access to information, and the high stakes because Bio-Rad is seeking an injunction and likely a large damages award against the successful products of a publicly traded company. The burden of the discovery proposed does not outweigh its benefit, and in fact the parties have run ten search terms on custodians previously in the Delaware 1679 litigation, in which 10X and Bio-Rad were running ten search terms against ten custodians.

Stilla includes a footnote stating that it reserves the right to take half of the additional terms and custodians should 10X obtain them. That is not appropriate. Stilla has not joined 10X's request, and has no request of its own. 10X has shown a need based on its case and its claims to obtain these additional terms. 10X was already required to share all of its custodians and terms allowed by default with Stilla, while Stilla has had three custodians not shared with

10X. 10X's respectfully requests that it be permitted to select the terms for any additional custodians in its case.

Bio-Rad's further narrowing of the scope of the search terms to exclude "disjointed combinations of terms referring to different people, concepts, or things" is only intended to further deny 10X discovery necessary to fully and fairly litigate this case, and it will result in more disputes, not fewer. Bio-Rad confirmed in email on July 9, 2020, that it would be "reasonable with respect to closely related terms" within a single search term, but now appears to be reneging on that agreement and replacing it with an unreasonably restrictive proposal on the scope of terms. Bio-Rad should not now be permitted to change its position on its prior agreements regarding the scope of search terms, particularly as to the terms Bio-Rad already agreed to above. Moreover, the E-Discovery order already places multiple restrictions on the search terms, including that the search terms must be narrowly tailored to the particular issues addressed by the request, that the terms cannot use the producing party's name or product name unless combined with narrowing search criteria that sufficiently reduce the risk of overproduction.[11] ECF No. 67 at 8-9. This framework—which was proposed by Bio-Rad— already balances the burdens and benefits of custodial discovery, and to impose an additional restriction would take an approach to production that is too restrictive, particularly when Bio-Rad has provided no particularized showing of burden. Finally, the language Bio-Rad proposes is vague, and adopting it will only lead to further disputes regarding what a "disjointed" combination of terms is.

---

[11] Bio-Rad does not even comply with all of the existing restrictions because it served a search term containing 10X's name—Chromium—without sufficient narrowing search criteria: "(benefit* or feature*) AND (Chromium)." And yet is seeks to impose additional restrictions on 10X after 10X complied with scope of custodial discovery under the E-Discovery Order.

For example, it was reasonable, given the scope of the issues in this case and the scope of the invalidity case, for Bio-Rad to agree (as it has) to a grouping of prior artists as a single term. It is not reasonable to apply a requirement that each prior artist would need to be a different term because it includes a different person. Thus, the understanding of the parties that has been applied to the case should remain in place, which is to preclude terms that "combine different people, concepts, or things that are not related to each other in the context of this case."

Only 10X's proposal addresses the timing of the identification of search terms—which must be done one week after the Court issues the Order addressing the present discovery disputes. It is necessary to establish a time by which the terms must be identified so that the producing party can begin processing the emails for production by the time of depositions in this case. The currently identified terms can proceed immediately to the document production process.

| Issue #8: ESI Search Terms Breadth | |
| --- | --- |
| Bio-Rad Proposal (Stilla Does Not Oppose):<br><br>Parties' ESI search terms shall be narrowed such that no single term will return more than 3,000 documents.<br><br>The terms for a single custodian may not return more than 15,000 documents (a total of 75,000 documents for 5 custodians). | 10X Proposal:<br><br>Given the number of distinct and complex issues presented by the claims and counterclaims in the 10X case no hit count limit shall be imposed on searches of Bio-Rad's and 10X's email. |

**Bio-Rad's Position:**

10X's presently proposed search terms are wildly overbroad.  If permitted, it will result in the substantially disproportionate review of significant amounts of irrelevant documents.  Indeed,

the latest demand contains 9 or 10 terms—in contrast to the Court-ordered 5 terms—for each

custodian, with terms as broad as "droplet" (with no limitations) or "10X" (with no

limitations).[12]  Given the history between the parties, the term "10X" alone can be expected to

result in an untenable amount of documents making transparent that 10X's un-capped search

term proposals is an inefficient and irresponsible way to proceed with discovery in violation of

the Rules.  *See* Fed. R. Civ. P. 1.

Here, too, another accused infringer's perspective undercuts 10X's radical position.

Specifically, Bio-Rad and Stilla have already agreed to a much more reasonable approach that

allows the parties to propose broader terms and then narrow them until a reasonable number of

documents for review can be reached.  This common sense process is both efficient and

eliminates any disputes as to what constitutes an overbroad term.  75,000 documents (15,000 per

custodian) should be more than sufficient for 10X's legitimate needs.

As discussed above, the Bio-Rad and 10X have been engaged in six prior and ongoing

litigations, and the parties have agreed that the discovery from these cases maybe used this case.

---

[12] For reference, the Defendant's latest proposal of 10 terms for just one of Bio-Rad's custodians is shown below:
1. 10x* or "10 X" or "10-X" or 10%X [Timeframe: 2012 to present]
2. Stilla* or Stila* [Timeframe: 2012 to present]
3.  *Ismagilov* or rustem or *Quake* or *Thorsen* or *Leamon* or *454* or *Anderson* or *Sadtler* or "Abraham Lee" or "Abe Lee" or *Sepp* [Timeframe: 2004 to present]
4. (licens* or settl* or royalt* or acqui*) and (patent* or "intellectual property" or IP or claim* or invention* or Caliper or Chicago or Harvard or "Medical Research Council" or MRC or "United Kingdom Research" or UKRI) [Timeframe: 2004 to present]
5. (thomas w/5 meyer*) or schoen [Timeframe: 2002 to present]
6. (surfactant* w/20 *fluor*) or (*fluor* w/20 oil) or (F%alkyl* w/20 (oil or surfactant*))
7. 7%129%091 or (091 w/20 patent*) [Timeframe: 2004 to present]
8. Naica* or Prism or Geode or "Crystal Miner" or "crystal digital PCR" [Timeframe: 2012 to present]
9. "surface tension" or wedge* [Timeframe: 2012 to present]
10. Dangla or Baroud [Timeframe: 2012 to present]

This discovery encompasses 3,516,288 pages of material across 625,132 documents relating to virtually every aspect of the companies' businesses. In this light, 10X's assertion that it now needs unlimited discovery with exceedingly broad terms is an improper attempt to use this forum to revisit discovery decisions and rulings from other cases and is unjustified.

**10X's Position:**

Bio-Rad seeks not only to restrict 10X's discovery to the disproportionately low default limits in the E-Discovery Order, but also to add a new restriction on the scope of ESI discovery found nowhere in the E-Discovery Order: hit count limits (i.e., limiting the number of documents produced to a predetermined number despite the number of documents responsive (or "hits") to a search term(s). Given the number of issues in the *10X* Case across the diverse claims (including Bio-Rad's patent infringement claims, 10X's patent infringement claims, 10X's inequitable conduct claim, and 10X's antitrust claim), no strict hit count limit should be imposed. The E-Discovery order already requires that the search terms must be narrowly tailored to the particular issues addressed by the request and that the terms cannot use the producing party's name or product name unless combined with narrowing search criteria that sufficiently reduce the risk of overproduction.[13] ECF No. 67 at 8-9. This framework—which was proposed by Bio-Rad and adopted by the Court over 10X's objection—already balances the burdens and benefits of custodial discovery very much in favor of the producing party, and to impose an additional restriction would take an approach to production that is far too restrictive, particularly when Bio-

---

[13] Bio-Rad does not even comply with all of the existing restrictions because it served a search term containing 10X's name—Chromium—without sufficient narrowing search criteria: "(benefit* or feature*) AND (Chromium)." And yet is seeks to impose additional restrictions on 10X after 10X complied with scope of custodial discovery under the E-Discovery Order.

Rad has made no particularized factual showing of burden. Bio-Rad provides no identification of

the number of hits 10X's terms produced, or why that would be disproportionate to the needs of

a case in which Bio-Rad is seeking to enjoin the successful products of a publicly traded

company that are used in the fight against diseases such as COVID-19 and cancer. Bio-Rad

selected in this case to reduce its burden by using narrow search term restrictions, which Bio-Rad

has demanded in the parties' negotiations. To add a further restriction on top of the narrowing

that has already occurred is not appropriate because it will deprive 10X of the limited scope of

discovery permitted under the Order that it needs to develop its case.

Bio-Rad has also shown no need to modify the Court's order to provide *less* discovery,

and there is none. Bio-Rad provided no hit counts, and merely asks the Court to speculate that

10X's terms will result in "substantially disproportionate review of significant amounts of

irrelevant documents." A discussion of any burden cannot happen in the abstract, and Bio-Rad

has not shown there is any undue burden or disproportionate discovery. Moreover, 10X's search

terms are not different in kind from Bio-Rad's. Bio-Rad criticizes 10X for serving a term with its

company name. Bio-Rad has done the same thing and served search terms with its own name.

Additionally, Bio-Rad's proposed new hit count limit is further inappropriate because it

is too restrictive. Limiting searches to 3,000 documents does not limit the burdens and only

serves to limit discovery. The producing party will be producing up to 10,000 hits per custodian,

regardless of how they are distributed between the searches. Imposing a 3,000 hit limit on

individual searches is not likely to affect the number of hits the producing party will need to

produce, but it does serve to cut off what may be highly relevant discovery. Moreover, given the

large number of issues in this case, limiting custodial discovery to 50,000 documents is far too

little. In another recent case between 10X and Bio-Rad, the parties agreed to a hit count limit of

10,000 per search, and the Delaware Default Standard for Discovery provided for 10 searches, which resulted in a maximum total number of hits of 100,000. Case No. 18-cv-01679-RGA, ECF No. 33 at 23; Delaware Default Standard for Discovery at 5, *available at*

https://www.ded.uscourts.gov/sites/ded/files/pages/Electronic%20Discovery%20Default%20Standard_0.pdf. The 1679 Case was significantly simpler than the present case in that it involved only two patents asserted against 10X. Case No. 18-cv-01679-RGA, ECF No. 1. This case was only recently stayed, and so no changed circumstances can explain why Bio-Rad would agree to more discovery in a simpler case and less discovery in a more complicated case with 10X claims pending against Bio-Rad. Case No. 18-cv-01679-RGA, ECF No. 128. Because the 1679 Case is now stayed, Bio-Rad is not even producing the 100,000 emails it was agreeing to produce in that case, and so could readily produce that volume in this case given that it had already agreed to do so in the co-pending 1679 Case. Instead, the 1679 Case confirms that Bio-Rad's approach to discovery is merely an attempt to deprive 10X of relevant information it could use to support its claims and not any actual claim of burden. While the parties must negotiate in good faith if there is an actual issue with burden, there is no burden shown here, and 10X respectfully requests the hit counts be rejected.

| Issue #9: Cooperation to Identify Custodians in 10X Case | |
| --- | --- |
| Bio-Rad Proposal: | 10X's Proposal: |
| Pursuant to the e-Discovery Order in the 10X case, "parties shall cooperate to identify the proper custodians subject to [ESI] request and proper search terms/phrases." D.I. 67 at 8.<br><br>The parties have already cooperated to identify individuals most likely to have relevant information in the initial disclosures. The identification of additional individuals with information on any requested topic | The party producing email shall cooperate with the party requesting email to identify the proper custodians most likely to have the information sought by the requesting party. Within 3 business days of a request to identify proper custodians, the producing party shall identify the individuals most likely to have the information sought after a good faith investigation. |

| within a short time frame is not warranted nor proportional to the needs of the case.  10X has already selected 4 of the 5 ESI custodians it is permitted under the e-Discovery Order. | |

**10X's Position:**

The language of the E-Discovery Order itself—which is the content of Bio-Rad's proposal—has not been sufficient to make Bio-Rad cooperate in identifying custodians. For example, 10X has been waiting almost four weeks (since July 14, 2020) for Bio-Rad to identify custodians with information about specific licensing negotiations. To move the production of custodial ESI quickly to allow the parties to meet the discovery deadlines in this case, a short and specific deadline should be imposed on the parties to identify relevant custodians upon request.

**Bio-Rad's Position:**

10X has already selected the 5 ESI custodians it was permitted.  Bio-Rad has sought a protective order preventing the selection of Bio-Rad's CEO, Norman Schwartz.  Thus, at most (if the Court does not grant Bio-Rad's motion), 10X should be permitted only one additional custodian.  As such, 10X's proposal is completely unnecessary.  The parties are already required to cooperate to identify the proper custodians, which they can do if 10X has any additional custodians to identify.

10X's request for a 3-day turnaround time to identify the custodians most likely to have information sought by 10X is also manifestly unreasonable on its face.  Bio-Rad has over 8,200 employees.  Finding the most likely potential custodian on any issue identified by 10X within that time frame is simply unworkable and would impose an unreasonable burden.

**Issue #10: Bio-Rad's Interrogatory Seeking Knowledge of Asserted Patent Rights (No. 9)**

| Bio-Rad Proposal: | 10X Proposal: |
|---|---|
| When and who within 10X learned of the rights stemming from the Patents-in-Suit or any Related Patents (and the surrounding circumstances) is not privileged.<br><br>Per Bio-Rad's Interrogatory No. 9, 10X must disclose "the facts and circumstances of 10X's first knowledge of the Patents-in-Suit and any Related Patents, including without limitation the individuals who first became aware of these patents, when those individuals first became aware of these patents, and the reasons these individuals first became aware of these patents." | To the extent 10X first became aware of either of the Patents-in-Suit before the filing of Bio-Rad's complaint, 10X did so through a privileged communication with counsel. Bio-Rad is entitled to a privilege-log-level information that discloses the non-privileged aspects of that first communication, including the "when" and "who" and 10X's basis for asserting the privilege. |

**Bio-Rad's Position:**

The information Bio-Rad has requested from 10X is not subject to attorney client privilege or work product protection.  The date of 10X's first knowledge of the patents-in-suit, the identity of the person or persons who first became aware of these patents, and the circumstances in which those individuals first became aware of these patents does not reveal any aspect of an attorney client communication for the purpose of obtaining legal advice.  This information is of particular relevance in this case where the parties have been engaged in multiple litigations, Bio-Rad obtained an injunction against some of 10X's products, and 10X claims it obtained a license to these patent rights in 2013.  Even assuming 10X first learned of the patents via a conversations with its attorneys, Bio-Rad's request for the date of those conversations, the identity of those involved, and circumstances of such conversations does not call for 10X to divulge the contents of an attorney client communication.  Indeed, the law is abundantly clear that the factual circumstances surrounding knowledge of patents are not privileged:

> The facts of when Apple became aware of the existence of the patents-in-suit, whether and when Apple's outside counsel became aware of the patents-in-suit, and whether and when outside counsel communicated knowledge of their existence to Apple are not privileged. What Apple or its outside counsel knew as an objective fact is not privileged merely because it happened that counsel gave, or Apple sought, legal advice about that fact.

*Pers. Audio, LLC v. Apple, Inc.*, No. 9:09CV111, 2011 WL 13134849, at *3 (E.D. Tex. Apr. 26, 2011). *See also Intervet, Inc. v. Merial Ltd.*, 256 F.R.D. 229, 233 (D.D.C. 2009) (requiring party to supplement interrogatory response "to state the name(s) of the person(s) who first discovered the . . . patent," "the dates when these discoveries were made," and "the circumstances under which the discovery was made, including, if applicable, that the patent was discovered by an attorney for Intervet").

10X argues that a privilege log will be sufficient to respond to this interrogatory. That is incorrect. While a log may divulge the high-level topic and date of a particular written communication, it would not reveal when 10X *first* knew of Patents-in-Suit or any Related Patents, nor would it reveal the reasons the persons first became aware.

**10X's Position:**

To the extent 10X first became aware of either of the Patents-in-Suit before the filing of Bio-Rad's complaint, 10X did so through a privileged communication with counsel. Bio-Rad is entitled to a privilege-log-level information that discloses the non-privileged aspects of that first communication, including the "when" and "who" and 10X's basis for asserting the privilege. Contrary to Bio-Rad's assertion, such a log would disclose when 10X "first knew" of the Patents-in-Suit because it identifies the date 10X obtained that information through counsel. However, Bio-Rad's interrogatory attempts to go beyond non-privileged circumstances and probe the "reasons" 10X or its counsel communicated a fact. Bio-Rad's interrogatory appears to call for the content of a privileged communication or the mental impressions of counsel or client.

Bio-Rad's cases confirm that Bio-Rad is not entitled to breach the privilege in this way. In *Personal Audio*, the court held that the only fact the plaintiff was entitled to was "***when*** Apple and/or its counsel became aware of the existence of the patents-in-suit" and that this was "all that Personal Audio might discover." *Pers. Audio, LLC v. Apple, Inc.*, No. 9:09CV111, 2011 WL 13134849, at *3 (E.D. Tex. Apr. 26, 2011) (emphasis supplied). There should be no dispute that 10X can respond to Interrogatory No. 9 with privilege-log-level information, which will give Bio-Rad the circumstances of 10X's awareness of the patents without disclosing privileged information.

| Issue #11: 10X Board of Director Materials | |
|---|---|
| Bio-Rad Proposal: | 10X's Proposal: |
| 10X should be compelled to produce Board of Director materials related to the 10X accused products, digital PCR, Bio-Rad, or RainDance as requested in Bio-Rad's Requests for Production Nos. 7-10, and 66. | 10X agrees to produce Board of Director materials related to the 10X accused products, digital PCR, Bio-Rad, or RainDance pursuant to Bio-Rad's Requests for Production Nos. 7-10, and 66. |
| Bio-Rad agrees, and has already agreed, to produce board of director materials that are responsive to 10X's RFPs, e.g., RFP No. 16 (Bio-rad agrees to search for and produce "documents that were made by or shown or communicated to, any of Bio-Rad's Board of Directors, Bio-Rad's CEO, or Bio-Rad's officer, that concern ddPCR, NGS Sample Prep, ddSEQ, GnuBio, Stilla, or RainDance from 2016 through present), RFP No. 30, and RFP No. 138. | Bio-Rad agrees, as requested in 10X's Requests for Production Nos. 16, 30, 41, 138, 200, 213, 219, 256, 264, and 276, to produce Board of Director materials (including presentations, meeting notes and materials provided to the executives/officers as requested in 10X's RFPs) that relate to ddPCR, PCR, NGS (including NGS Sample Prep, which includes without limitation ddSEQ, ATAC-SEQ and single-cell isolation), RainDance (including without limitation the RainDance acquisition), the Asserted Patents and Related Patents, inventors on any Asserted Patents or Related Patents, 10X (without restriction), Stilla, GnuBio, David Weitz or 1CellBio, 3BG, Bio-Rad's partnership with Illumina in the NGS sample prep space, Dolomite, Black Trace, |

| | Diagenode, Celsee, and the following to the extent not covered above:<br><br>• Harvard in the context of the asserted/related patents, RainDance or Bio-Rad's licenses with Harvard, Bio-Rad or RainDance patents or portfolios (in ddPCR or NGS), or Bio-Rad's ddPCR or NGS sample prep products;<br><br>• the University of Chicago and related to droplet-based microfluidic platforms, Bio-Rad or RainDance patents or portfolios (in ddPCR or NGS), and/or Rustem Ismagilov;<br><br>**From 2011-onward** |
|---|---|

**Bio-Rad's Position:**

Bio-Rad has requested a tailored set of board of director materials from 10X that are relevant and proportional to the issues in the case.  The request is specifically limited to only materials related to 10X accused products, digital PCR, Bio-Rad, or RainDance.  These documents are relevant given the board of directors is likely to receive and discuss information on important issues and is a crucial source of high level and reliable information about 10X's products, performance, and the relevant markets.  Further, the fact that a certain topic is the subject of board communications provides insight into its relative importance within a company.

10X's proposal for the exchange of board of director materials is unbalanced and overly burdensome for Bio-Rad.  10X asks that Bio-Rad essentially produce board of director materials covering any technology tangentially related to the patents at issue, and every competitor or partner Bio-Rad has ever had in the ddPCR and NGS sample prep spaces.  This includes Bio-Rad's board of director materials on acquisitions and deals that have nothing to do with either

parties' patent infringement case or 10X's antitrust counterclaims, which allege only that Bio-Rad's merger with RainDance was anticompetitive.

10X even goes so far as to ask for every board of director document Bio-Rad has related to 10X.  Bio-Rad and 10X are competitors in this space, have been involved in dozens of cases opposite each other, and 10X was founded by former Bio-Rad employees.  Given this history, it is unreasonable to assume that every Board of director presentation where 10X is mentioned without a time limitation will be relevant to this issues in this case.  In fact, the 10X accused products in this case were not introduced until 2019.  Bio-Rad has already agreed to produce board of director materials related to the accused products, ddPCR, and NGS sample prep.  As 10X admits, Celsee is in the NGS sample prep space, meaning documents regarding competition with Celsee will be captured. 10X is not entitled to other, non-relevant board materials about Celsee. There is no need to dredge up the entire history of Bio-Rad and 10X's disputes for the purposes of this case, and the set of documents Bio-Rad has agreed to produce provide more than adequate information for 10X to build its case.

10X's ask for any board of director materials related to Harvard and University of Chicago in the context licenses with each institution is likewise unduly burdensome.  Harvard and the University of Chicago are large research institution that Bio-Rad works with globally.  Not every board document that references Harvard's or the University of Chicago's license agreements with Bio-Rad will be relevant to the issues in this case, and 10X has refused any request to narrow this scope of documents.

Importantly, 10X has not agreed to nearly as broad of a production of its Board of director materials as it asks of Bio-Rad.  For example, 10X has not come anywhere close to agreeing to produce any board of director document related to Bio-Rad—note that Bio-Rad's

RFPs 7-10 and 66 do not request all board of director materials related to 10X.  10X's contention that all of these materials are relevant to 10X, but should be withheld from Bio-Rad, is abusive and unfair.  Bio-Rad has asked 10X for a reasonable, tailored set of documents from 10X's board of directors to comprehend how 10X's management views and understands 10X's products and their place in the ddPCR and NGS sample prep markets.  10X has attempted to withhold this information unless Bio-Rad agrees to produce essentially unlimited discovery of Bio-Rad's board of director materials in a huge array of unrelated technology spaces and strategic decisions with no time restrictions.  10X should not be permitted to gain access to irrelevant information that is disproportionate to the needs of this case while ensuring that its own sensitive documents remain protected.

**10X's Position:**

Bio-Rad's request for 10X's Board materials is lopsided, unfair and disproportional.

First, Bio-Rad seeks ***10X's Board materials relating to Bio-Rad and RainDance*** but now refuses (having previously apparently agreed) to produce ***Bio-Rad's Board materials relating to 10X***. Bio-Rad argues "10X even goes so far as to ask for every board of director document Bio-Rad has related to 10X." But that is the scope that Bio-Rad is seeking from 10X ***and more,*** because Bio-Rad seeks materials not only about Bio-Rad but also RainDance. Bio-Rad complains that it should not produce its Board materials because Bio-Rad and 10X are competitors. Then the same rationale applies to 10X and the parties' production of Board materials about each other should be symmetrical. Second, Bio-Rad's time limitation too is completely unbalanced. It seeks 10X's Board materials ***without any time limitation***. But it seeks to limit its production to information ***since 2016.*** Bio-Rad has been besieging 10X with lawsuits since before 2016 so references to Bio-Rad may appear earlier than 2016 in 10X's materials and Bio-Rad's requests for Board materials are sweeping and would require 10X to review and

potentially produce materials from as early as 2012. The same time limit should apply to Bio-Rad's production because events relevant to 10X's antitrust counterclaims and remedies contentions occurred at least as early as 2011, when Bio-Rad entered the droplet market, and perhaps even before. Further, Bio-Rad's time limitation is arbitrary as Bio-Rad has agreed to produce documents related to GnuBio starting in 2016, but it acquired GnuBio in 2014 and the materials regarding the acquisition are key. Bio-Rad misrepresents its contentions by saying that it is only accusing products introduced in 2019. That is false. Bio-Rad is accusing products introduced several years earlier as well. In sum, Bio-Rad is excluding highly relevant information by limiting the time frame to 2016. These two issues are emblematic of the remarkably asymmetrical approach Bio-Rad is taking to requesting 10X's sensitive Board materials but refusing to search its own materials with a scope commensurate to Bio-Rad's own requests. Bio-Rad haled 10X into court here, having filed this case on the eve of 10X's IPO, attempting to upset it. Bio-Rad should not be afforded the opportunity to take expansive discovery of 10X's Board materials if at least the same scope does not apply to its own materials.

The remainder of the disputes regarding the scope of Bio-Rad's production is actually narrow—as long as Bio-Rad is held to the agreements it made in its responses to 10X's requests for production.

Bio-Rad's proposal above states that it has agreed to produce the full scope of RFP Nos. 30 ("All Documents and Communications prepared by or for or sent to or from Annette Tumolo, Norman Schwartz, any member of Bio-Rad's Board of Directors, or any Bio-Rad Officer, and related to 10X or RainDance") and 138 ("All Documents and Things (including without limitation meeting minutes and PowerPoint slides) relating to any presentation or meeting (including without limitation of Your board of directors and/or shareholders), at which any of the

following were discussed or considered: 10X, RainDance, Harvard, Stilla, the University of

Chicago, 1CellBio, Illumina, GnuBio, Dolomite, Black Trace, diagenode, David Weitz, any

Asserted Patent or any one of the Related Patents and Applications, any other inventor listed on

any Asserted Patent or any one of the Related Patents and Applications, any patent owned by

10X (including any provisional application, non-provisional application, or publication), this

Action, the 1699 Case, or other litigation between 10X and You"). As to Harvard and University

of Chicago and the remainder of 10X's request, 10X is simply stating the scope that Bio-Rad has

agreed to in its supplemental responses to 10X's requests for production. Indeed, Bio-Rad agreed

to produce all of the following Board materials:

- Presentations discussing any of the 10X accused products or the asserted patents
  - Bio-Rad notes that it has already agreed to produce competitive analysis documents;
- Presentations discussing Bio-Rad's partnership with Illumina in the NGS sample prep space;
- Presentations discussing Bio-Rad's acquisition of RainDance;
- Presentations comparing Bio-Rad's products to Stilla's products or discussing Stilla's infringement of the asserted patents;
- Presentations discussing Harvard in the context of the asserted/related patents or Bio-Rad's ddPCR or NGS sample prep products;
- Presentations discussing the University of Chicago and related to droplet-based microfluidic platforms and/or Rustem Ismagilov;
- Presentations discussing David Weitz or 1CellBio;
- Presentations referencing Diagenode and ddSEQ, ATAC-Seq, or single cell isolation;
- Presentations referencing Dolomite Bio or Blacktrace

Bio-Rad's 8/7 Supplemental Resp. to 10X's Second Set of RFPs at 100-101.

Thus, the remaining dispute between the parties is only whether Bio-Rad should produce

(1) materials that relate to next generation sequencing ("NGS") and (2) Celsee.

As to (1) (**NGS**),  Bio-Rad is improperly limiting the scope of production regarding NGS

to ddPCR and NGS Sample Preparation. To the extent that it will contend there are substitutes to

ddPCR or NGS Sample Preparation products relevant to its antitrust contentions outside those two areas, then it must produce NGS materials more broadly.

As to (2) (**Celsee**), Bio-Rad's exclusion of relevant Celsee-related Board materials is improper. Celsee is a company in the NGS Sample Preparation space that Bio-Rad recently acquired. Bio-Rad's recent investment in Celsee is relevant not only to issues related to antitrust markets and competition for 10X's antitrust claims but for Bio-Rad's allegations about the value of its droplet-related patents and the importance of enforcing them. Bio-Rad should produce Board materials relating to the Celsee acquisition as described in RFP Nos. 16, 30, 41, 138, 200, 213, 219, 256, 264, and 276. These documents are directly relevant to Bio-Rad's motivation to acquire other companies in the space as well as its own competitive position. Bio-Rad's pattern of buying up actual and potential competitors in the NGS space also provides contextual evidence of the anticompetitive nature of Bio-Rad's prior conduct that is being challenged in this case. Relevance of Celsee materials is further discussed in Issue #23. Bio-Rad's agreement to produce only certain Celsee-related documents confirms the relevance of these materials. Bio-Rad cannot deny that its Board discussed this acquisition and it should produce those materials.

| Issue #12: 10X Documents Related to Importation of Accused Products ||
|---|---|
| Bio-Rad Proposal:<br><br>10X should be compelled to produce documents related to importation of the Chromium Controller, GEM generation chips (e.g., "Chromium Next GEM Chip G"), and gel bead kits, and any components thereof pursuant to Bio-Rad's Requests for Production Nos. 4, 9, 15. | 10X Proposal:<br><br>10X agrees to produce non-privileged documents sufficient to show importation of the Chromium Controller, GEM generation chips (e.g., "Chromium Next GEM Chip G"), and gel bead kits within the scope of Bio-Rad's Requests for Production Nos. 4 and 15, to the extent such documents exist. |

**Bio-Rad's Position:**

Bio-Rad requires information about 10X's importation of the accused products, including components thereof, at least to supports its contentions of contributory infringement under 35 U.S.C. § 271(c).  Under § 271(c), in relevant part, a party is liable for contributory infringement if it offers to sell, sells, or imports a material apparatus for use in practicing a patented process, constituting a material part of the invention.  Thus, in order to prove contributory infringement of the asserted method claims, Bio-Rad should be permitted discovery on the importation of 10X's accused products and components of the accused products.

10X's accused products operate using several components.  10X's Chromium controller works to move several materials, including genetic material (e.g., cells), fluid comprising enzymes and reagents, and gel beads through a 10X microfluidic chip coated with oil and designed to generate GEMs ("gel in emulsions").  To use 10X's products, a user must have the Chromium Controller (or Chromium Connect) instrument, the appropriate chip and reagent kit, and the gel bead generation kit which allows a user to make the gel beads that deliver barcodes to the DNA within the cells.  An exemplary version of this workflow is depicted below.



All of these pieces—the Chromium instrument, the GEM generation chip and associated reagent kit, and the gel bead kit—are material parts of 10X's accused products, and Bio-Rad requires information on whether any of these parts, or components thereof, are imported to support its case.

**10X's Position:**

10X has agreed to produce documents ***sufficient to show*** importation of the accused Chromium Controller, GEM generation chips, and gel bead kits. Producing documents "sufficient to show" is more than enough given the marginal, if any, relevance.  Further, 10X confirmed to Bio-Rad that the financial information that 10X has and will produce includes all 10X sales in the United States of the products Bio-Rad has accused. The only asserted patent claims against 10X are method claims, which makes the activity in the United States (where the

method steps must be performed) uniquely relevant. Bio-Rad has made no showing that producing all documents about any importation information is warranted or proportional.

Bio-Rad also fails to address the key dispute between the parties: what are the "components thereof" of the Chromium Controller, GEM generation chips, and gel bead kits for which it is seeking importation documents, and why does it need importation documents for these "components"? It references "components thereof" in one clause at the end of its brief above without telling the Court what that is, without admitting that it has not requested that information in a properly served request for production, and without admitting that it has not identified "components thereof" in its infringement contentions. Bio-Rad confusingly states that: "10X's accused products operate using several components," and then identifies the Chromium Controller, the chip and reagent kit, and the gel bead generation kit as themselves "components," "parts," "materials," or "pieces" of the 10X accused products. This is not the issue, and Bio-Rad's attempt to hide the ball is unhelpful. Bio-Rad never identifies the "components" of the controller, the "components" of the chips, or the "components" of the gel bead kits for which it is now, for the first time, requesting importation documents. Bio-Rad never explains why Bio-Rad needs more than documents sufficient to show importation (if any) of the Chromium Controller, GEM generation chips, and gel bead kits themselves. Bio-Rad never explains how requiring 10X to produce importation documents related to the "components thereof" of the controller, chips, and gel bead kits is proportional to the needs of this case given the heavy burden it would place on 10X to search for and produce such documents.

Bio-Rad's reference to "components" in its proposal is vague and does not define the scope of documents that Bio-Rad is seeking. It is unclear whether its breadth includes, for example, the basic chemicals or raw materials, such as enzymes, magnetic particles, or strip

tubes, that are used by 10X in creating its state-of-the-art assay reagents, and 10X has numerous

suppliers for such chemicals and items. Determining whether any such "components thereof" are

imported or not by each of the numerous suppliers would be unduly burdensome and

disproportional to the needs of this case.

Moreover, Bio-Rad has never requested importation documents for "components thereof"

of 10X's Chromium Controller, GEM generation chips, or gel bead kits. This last-minute fishing

expedition for importation documents for components of 10X's Chromium Controller, GEM

generation chips, or gel bead kits should not be permitted. A request for "components" is not in

Bio-Rad's discovery requests. Bio-Rad's requests for production do not actually request

documents related to the importation of components, only importation of the "***10X Accused***

***Products***." Bio-Rad's requests for production define the "10X Accused Products," without

mention of components, as: "all products identified in Bio-Rad's infringement contentions

served in this Case including without limitation: all of 10X's **instruments** (including but not

limited to any of the Chromium Controller, Chromium Single Cell, or Chromium Connect

instruments) used with any of 10X's **chip** and **reagent kits** (including but not limited to any of

the Single Cell CNV, Single Cell Gene Expression, Single Cell Immune Profiling, Single Cell

ATAC, Genome Sequencing, or Exome Sequencing solutions) and all variants and variations

thereof." Bio-Rad attempts to justify its newfound expansive request by relying upon Section

271(c) that sets forth requirements of proof for contributory infringement, but Bio-Rad's

proposed second amended infringement contentions do not mention "components" in its Section

271(c) infringement contentions. Instead, Bio-Rad's Section 271(c) proposed second amended

infringement contentions for the 277 Patent identifies instruments, chips and reagent kits only:

> With respect to contributory infringement under 271(c), as set forth in ¶¶ 58-59 of
> the complaint, users practice the infringing method claimed in the '277 Patent

when using the products listed above [any of 10X's instruments (including but not limited to any of the Chromium Controller, Chromium Single Cell, or Chromium Connect instruments) used with any of 10X's compatible chip and reagent kits (including but not limited to any of the Single Cell CNV, Single Cell Gene Expression, Single Cell Immune Profiling, Single Cell ATAC, Genome Sequencing, or Exome Sequencing solutions)]. 10X contributes to infringement of the '277 Patent at least by supply of these products. Specifically, 10X supplies **instruments** (the Chromium Controller, Chromium Single Cell, and Chromium Connect), and consumables (including **chips and reagent kits** for Single Cell CNV, Single Cell Gene Expression, Single Cell Immune Profiling, Single Cell ATAC, Genome Sequence, and Exome Sequencing, and kits for library preparation) that allow users to practice the patented process of the '277 Patent. The accused products are a material part of the claimed invention, and are especially made or adapted for use in an infringing manner and are not staple articles of commerce capable of substantial non-infringing uses. On information and belief, 10X had knowledge of the '277 Patent, see Complaint ¶¶ 50-52, and knows that its products constitute a material part of the inventions of the '277 Patent and are not a staple article of commerce suitable for substantial noninfringing use. 10X's sale and offer for sale of these products constitutes contributory infringement.

*See* Bio-Rad's July 3, 2020 Proposed Second Amended Infringement Contentions, 277 Claim Chart at 1 (emphasis added). Bio-Rad's Section 271(c) contentions for the 444 Patent are no different—they also do not mention "components." "Components" of 10X's Chromium Controller, GEM generation chips, or gel bead kits are not accused of infringement anywhere in Bio-Rad's infringement contentions. Finally, Bio-Rad's infringement contentions overall define the accused products, again without mention of components, as: "any of 10X's **instruments** (including but not limited to any of the Chromium Controller, Chromium Single Cell, or Chromium Connect instruments) used with any of 10x's compatible **chip** and **reagent kits** (including but not limited to any of the Single Cell CNV, Single Cell Gene Expression, Single Cell Immune Profiling, Single Cell ATAC, Genome Sequencing, or Exome Sequencing solutions)."

Accordingly, 10X's production of the importation documents should be limited to the documents **sufficient to show the importation, if any, of the accused instruments, chips, or gel bead kits.**

| Issue #13: Third-party Confidential Documents | |
|---|---|
| 10X's Proposal:<br><br>To the extent that information responsive to document requests or interrogatories is withheld on the basis of third-party confidentiality, the party withholding the information shall diligently attempt to obtain permission from the third party to produce the information and provide a reasonable amount of time for the third party to seek a protective order if necessary.<br><br>If the third party does not give permission or seek a protective order within 10 days, the party will produce the third-party information and documents. | Bio-Rad Proposal:<br><br>To the extent that information responsive to document requests or interrogatories is withheld on the basis of third-party confidentiality, the party withholding the information shall diligently attempt to obtain permission from the third party to produce the information and provide a reasonable amount of time for the third party to seek a protective order if necessary. |

**10X's Position:**

The parties agree that if documents are withheld on the basis of third-party confidentiality, the party withholding documents must undertake the task to clear those confidentiality concerns so that the responsive documents will be produced. The dispute between the parties here is very narrow. Bio-Rad's proposal fails to provide any solution at all for the common situations in which a third party denies permission, refuses to seek a protective order, or just simply does not respond to the request for consent. 10X's position provides third parties a reasonable amount of time (10 days) either to consent or to seek a protective order, striking the proper balance between protecting the interests of third parties while not impeding discovery.

Similar provisions are typical in protective orders. *See for example* Section 11 of Stipulated

Protective Order for Litigation Involving Patents, Highly Sensitive Confidential Information

and/or Trade Secrets in the District Court for the Northern District of California (providing a

similar procedure). 10X's proposal is particularly useful in this case where fact discovery is fast-

paced and will soon be nearing completion.

**Bio-Rad's Position**:

      10X's proposal would require Bio-Rad to produce third party information and documents

without the permission of the third-party if that the party does not seek a protective order within

10 days.  10X should not be permitted to force Bio-Rad to open itself up to the liability of

improperly disclosing third party confidential information.  Not only can 10X not require Bio-

Rad to unilaterally disclose a third parties' information, but 10X also cannot use this order bind a

third party to seek a protective order with 10 days.  Depending on the volume of material, simply

collecting it would be 10X's proposal is therefore unworkable and should be rejected.

| Issue #14: Reliance on Subject Matter Falling Within the Scope of Refused Discovery ||
| --- | --- |
| 10X's Proposal: | Bio-Rad Proposal: |
| Where a party applies a time or scope restriction in searching for and/or providing responsive information, that party shall be precluded from presenting witness testimony where it did not produce the underlying information that is in its possession, custody, or control.<br><br>If a party has refused to produce documents in response to a request, that party cannot later rely on evidence in any contention, report, | Any request to preclude a party from relying on testimony or other evidence must be raised in a motion in limine, Daubert motion or other appropriate motion that is specifically directed to the particular evidence in question.<br><br>Bio-Rad and 10X have agreed that discovery from the six previous and/or ongoing litigations between them may be used in this case, including Bio-Rad's previous productions to 10x of more than 3.5 million pages across more than 625,000 documents. |

| | |
|---|---|
| submission to the Court, or at trial within the scope of discovery it refused to provide. | Time, date and other restrictions applied by Bio-Rad to avoid re-producing previously produced information is appropriate and does not imply that 10X does not already possess that information from the extensive discovery already in 10X's possession.<br><br>Bio-Rad has also objected to numerous overlapping requests among the 325 requests for production served by 10X to date.  Bio-Rad's refusal to produce a document in response to a request that overlaps with another request for which Bio-Rad has agreed to produce the same information does not imply that 10X does not have access that information and does not support exclusion of that or related evidence at trial. |

**10X's Position:**

The general principle at issue here—that a party cannot withhold responsive documents in discovery and later offer self-serving contentions and testimony on the same subject—should not be legitimately in dispute. As a matter of basic fairness a party cannot stymie cross examination by withholding discovery to let its witnesses testify unchecked. While these matters are typically handled at the motion in limine stage, the parties here would benefit from the Court adopting some simple rules of the road for dealing with the discovery disputes at issue in this document before pretrial motions are filed. At the final pretrial conference there is little to no time remaining to cure discovery violations. Affirming this basic principle now will let all parties proceed with reasonable expectations while there is still time to produce the relevant evidence and prepare proper contentions based on documents actually produced rather than withheld.

The specific document-production disputes highlighted in this joint statement illustrate why there must ultimately be consequences for a party's unilateral refusal to produce responsive documents. For example, Bio-Rad in the past has offered trial testimony concerning licenses

from the early 2000s including contentions about the context of the negotiations. *See supra* Issues #15, 16. Bio-Rad now objects to producing negotiation documents or other licenses from the same time period, preventing effective questioning to test the veracity of Bio-Rad's witnesses' statements or to highlight counterexamples from the same time period. If Bio-Rad is permitted now to avoid searching for responsive documents based on arbitrary date and subject-matter cutoffs, it should be made clear now that Bio-Rad's ability to offer a one-sided appraisal of the same facts will not be allowed later in discovery or at trial.

Bio-Rad's arguments that (1) some documents were produced in previous cases and (2) Bio-Rad has objected to certain RFPs as duplicative do not address the problem. The issue with prior productions is that they are based on searches conducted under different parameters and there is no assurance they are complete for the claims and defenses at issue here. If there are no remaining responsive documents, the burden on Bio-Rad is minimal. The very fact that Bio-Rad is refusing to search for such documents—and in some cases is withholding documents that it knows exist—suggests that searches in unrelated cases were not comprehensive for the purposes of this case. Further, any overlap between RFPs does not entitle Bio-Rad to avoid searching. The overlap emphasizes the importance of such documents to multiple issues in this case. It is indisputable that there are multiple areas where Bio-Rad is not searching for and producing documents on any request.

**Bio-Rad's position:**

10X's proposal is inappropriate under the circumstances of this case and will do nothing to reduce or avoid future motion practice on the same issues.  Bio-Rad has agreed that 10X may use in this case any of the more than 3.5 million pages of documents, comprising more

than 625,000 separate documents that Bio-Rad has previously produced in the six prior or co-pending litigations between 10X and Bio-Rad.  The relief 10X seeks would permit 10X to ask the Court to preclude Bio-Rad from relying on evidence that Bio-Rad has refused to re-produce in this case because 10X already possesses that evidence from prior litigation and is free to use it in this case.  In addition, 10X has served 325 Requests For Production on Bio-Rad, many of which are overly broad and overlapping.  In the course of reasonably responding to 10X's large number of requests, Bio-Rad has narrowed the range of evidence it agreed to produce in response to some requests because the same information is responsive to other requests for which Bio-Rad has agreed to produce evidence. Granting the relief 10X now seeks in the abstract will not obviate the need for the Court to assess whether to exclude particular testimony or evidence at the time Bio-Rad seeks to introduce or rely upon it, and simply invites 10X to ask the Court to parse its 325 overlapping and overly broad Requests For Production in the course of future motions to exclude.  Accordingly, any request to preclude a party from relying on testimony or other evidence should be brought in an appropriate motion specifically directed to that particular evidence, and the Court should reject 10X's proposal.

| Issue #15: Relevant Licenses | |
|---|---|
| 10X's Proposal:<br><br>Bio-Rad shall produce license agreements related to microfluidics, droplet-based genetic analysis, sequencing, PCR, ddPCR, or NGS from 2004-present, and related payments. [*See e.g.*, 10X's RFP Nos. 5, 26, 106, 116.]<br><br>10X has already agreed to produce its licenses in response to Bio-Rad's similar request.<br><br>In the alternative, Bio-Rad need not produce PCR-related licenses from before 2015 if it | Bio-Rad Proposal:<br><br>Bio-Rad need not produce license agreements for technologies unrelated to the technology at issue in this case.  Bio-Rad will produce licenses related to droplet-based genetic analysis, droplet-based microfluidics, and PCR instrumentation, from 2015-present. Bio-Rad has already produced licenses in previous litigations between Bio-Rad and 10X dating back to 2006. |

| | |
|---|---|
| confirms to the Court that it will not rely upon the Applera PCR or the Applied Biosystems licenses that it relied upon in the parties' prior litigations. | |

**10X's Position:**

In two prior district court litigations between Bio-Rad and 10X, Bio-Rad built its damages case, and 10X responded, on the basis of different licenses that the parties contended were comparable to the particular patents-in-suit and that analysis formed the basis for the so-called *Georgia-Pacific* hypothetical negotiation—the framework used in patent damages law to determine the appropriate reasonable royalty.  Although Bio-Rad has improperly failed to respond at all two weeks ago to the damages interrogatory, Bio-Rad is likely to be seeking the same 15% royalty rate as in the prior trial between the parties in this Court (the 152 Case), based on the same licenses that Bio-Rad contended were comparable to *different allegedly "foundational" patents from a different owner and inventors*. Although it is likely to make licenses the crux of its damages case, Bio-Rad improperly attempts to limit the production of relevant licenses to 10X by imposing (1) a narrow technological scope and (2) an arbitrary time-limit. Both limits are improper in light of the breadth of technology at issue in this case for the remedies in the patent case and the antitrust claims based on patent licensing. Indeed, Bio-Rad recently agreed produce the full technological scope of licenses and has reneged on its commitment.  Bio-Rad now refuses to produce them. It has also served requests on 10X that cover both the same technological scope 10X seeks and are not limited in time so the parties' requests are symmetrical and the same rules should apply. This alone should be enough to compel Bio-Rad's production of highly relevant licenses and their related payments and avoid

Bio-Rad's selective picking of licenses whose rates it likes over a multitude of other licenses that have much lower rates and more comparable technological connection to the patents-in-suit.

Bio-Rad says it will not produce licenses that it deems "unrelated" to the patents-in-suit and accused products, and that is why it will produce only droplet-based licenses from 2015 or later. But in prior litigations Bio-Rad premised its damages case on licenses that fail that test-- patents to non-droplet technologies that were often licensed before 2015. If Bio-Rad is to rely in this case on such "unrelated" licenses it must produce its other licenses from the same fields and the same time period.

First, Bio-Rad seeks to limit the technology covered by the licenses by seeking to exclude **non-**droplet microfluidics and relatedly **non-**droplet next generation sequencing (NGS). First, Bio-Rad previously agreed to much of the requested discovery that it now refuses to produce, thus conceding its relevance, including "documents and communications within its possession, custody, or control relating to patent out-licensing or in-licensing concerning ddPCR, PCR, and NGS sample preparation" and "documents within its possession, custody, or control constituting license agreements executed by Bio-Rad for patents related to ddPCR, PCR, and NGS sample prep." *See*, Bio-Rad's responses to 10X's First Set of RFPs (RFP Nos. 5, 29). Bio-Rad's changed position is untimely and improper.  This should end the inquiry about the proper technological scope.  In any event, both droplet and non-droplet microfluidics, and droplet and non-droplet NGS is relevant.  Microfluidics in general is a relevant field because both the 10X accused products and Bio-Rad accused products are microfluidic devices and the claims of the patents Bio-Rad asserted include the requirement for microfluidic control.  Non-droplet NGS is also relevant according to Bio-Rad's own antitrust contentions.  Indeed, Bio-Rad appears intent on arguing that **non-**droplet-based NGS products may be part of the same market as droplet-based

NGS products. *See* ECF No. 69 [Bio-Rad Motion to Dismiss] at 16.  See ECF No. 69 [Bio-Rad

Motion to Dismiss] at 16 ("Additionally 10X itself acknowledges that ***other, non-droplet*** based

technology can perform the same functions as droplet-based products. *See Id*. ¶¶ 61-62 (stating

that both ddPCR and non-droplet-based products 'can . . . quantify a given DNA or RNA

sequence in a unit of genetic material'"). Bio-Rad also served a document request on 10X that

seeks both droplet and **non-**droplet NGS licenses. Bio-Rad's RFP No. 46 (seeking NGS Sample

Preparation licenses without any limitation); *see also* Bio-Rad's RFP Nos. 47-49, 52, 57-59 (all

seeking information about NGS Sample Preparation). Bio-Rad cannot both argue that non-

droplet NGS technology is relevant and then not provide basic discovery about it such as the

licenses in that technological area.

      Second, Bio-Rad also seeks to limit the technological scope to PCR ***instrumentation***

only, having previously agreed to produce licenses in the PCR field without any limitations.

Bio-Rad has previously relied on PCR ***reagent*** licenses too when accusing the same 10X

products it accused here, and Bio-Rad has not conceded that it will not rely on PCR reagents

licenses in this case.  Moreover, Bio-Rad itself served a request for production on 10X seeking

precisely the full scope of PCR licensing.  *See* Bio-Rad's RFP No. 46 ("All Documents and

Communications regarding the purchase, acquisition, licensing, or potential licensing of any

patents, including through mergers and acquisitions, concerning PCR, ddPCR, or NGS Sample

Prep."); *see also* Bio-Rad's RFP Nos. 47, 48, 57-59 (all seeking information about PCR). Bio-

Rad knows PCR is relevant and if it's seeking discovery about it, it must also provide it in return.

      (2) Bio-Rad's arbitrary time limit for license production is also improper.  Bio-Rad's own

requests for production, such as RFP No. 46 that seeks PCR, ddPCR, and NGS Sample Prep

licenses, is not limited in time.  But Bio-Rad seeks to limit 10X to licenses from 2015-onward.

Bio-Rad's own request reveals that 10X's request for licenses from 2004 to the present is relevant and proper.  Bio-Rad argues that it has produced pre-2015 licenses in prior litigation, but that is not a complete story. In the parties' prior litigation, where Bio-Rad accused the same 10X products and asserted other patents acquired from RainDance, Bio-Rad joined the litigation late (after it acquired RainDance who was the plaintiff) and then cherry-picked its own licenses from a broader spectrum of technologies, including PCR in particular, and those licenses dated back to 2005 and years in between 2005 and 2010.  Bio-Rad has more recently also alleged that the same licenses are comparable for calculation of a reasonable royalty in a now-stayed litigation in the District of Delaware for yet a different set of patents acquired from RainDance. *See, e.g.*, Case No. 18-1679-RGA, Bio-Rad's Second Supplemental Response to Interrogatory No. 5 (identifying "comparable licenses" including BRLITC-00668505, a licenses between Applera and Bio-Rad); Case No. 1:15-CV-00152, Expert Report of James E. Malakowski, at 30-33 (describing the same license); BRLITC-00668505 (Applera license). In this case, 10X seeks a fair opportunity to see all Bio-Rad's licenses in the relevant field from 2004-onward such that its experts can analyze them and determine their comparability, or rebut Bio-Rad's late, and still undisclosed, damages contentions.  It would be prejudicial to allow Bio-Rad to once again selectively identify licenses favorable to its case without revealing the full extent of its own and RainDance's licensing in the relevant technological area.

This discovery is proportional to the needs of this case.  Bio-Rad's damages contentions were due nearly two weeks ago in response to an interrogatory 10X served.  Bio-Rad flatly failed to respond at all, so its damages contentions are improperly hidden for now.  But Bio-Rad is expected, as in prior cases, to request a high royalty rate of 15%, found only in a couple of cherry-picked licenses (as opposed to the bulk of the licenses that are in the 3% range).

Naturally, 10X needs discovery in order to test and refute Bio-Rad's allegations. This is also even more important in this case, which is the first one between these parties involving antitrust claims, for which 10X should be permitted discovery into its antitrust technology market, especially where Bio-Rad is threatening to embroil competition between droplet and non-droplet products. Bio-Rad has identified companies such as Celsee and Becton Dickinson, which offer well-based NGS products, as competing against Bio-Rad in the NGS space. *See* Bio-Rad's Responses to 10X's Second Set of Interrogatories (Interrogatory No. 2) at 8.  Accordingly, Bio-Rad should produce its licenses in that field.

**Bio-Rad's Position:**

Bio-Rad has agreed to produce license agreements for technologies related to the patents and devices at issue in this case over a reasonable time period.  10X's request for license agreements encompassing unrelated technology areas is another example of 10X's abusive use of the discovery process to gain access to confidential information from a competitor.

Bio-Rad is a multifaceted company that sells more than 8,000 products.  10X's broad-ranging requests for licenses related to PCR, ddPCR, NGS, microfluidics, sequencing, and genetic analysis from 2004-present covers licenses unrelated to the products at issue in this case. For example, 10X's request for all licenses related to PCR would cover Bio-Rad's gel electrophoresis and western blotting products.  These types of products allow researchers and clinicians to roughly quantify proteins in a sample, and involve amplifying genetic material via PCR and driving the amplified material through a slab of gel such that different proteins collect into a series of fluorescently labelled bands for detection.  This technology is unrelated to the droplet-based methods at issue in this case, in which individual cells or molecules are captured in tiny fluidic droplets for barcoding and amplification.

Bio-Rad's proposal focuses on droplet-based applications and genetic material amplification licenses, which is appropriately proportional to the needs of this case. This group of licenses would cover all of Bio-Rad's ddPCR products as well as thermal cyclers used for non-droplet based PCR applications and other droplet-based microfluidic tools (e.g., those used in Bio-Rad's food and water testing products). 10X has not identified any relevant technology groups that Bio-Rad practices in that would not be covered by Bio-Rad's proposed scope for discovery of license agreements. 10X's suggestion that it should obtain discovery of all Bio-Rad licenses related to microfluidics highlights 10X's distorted perception of what is relevant in this case. The field of microfluidics is broad and has wide ranging applications (e.g., inkjet printers, to name one unrelated example), not all of which are relevant to this case. Therefore, Bio-Rad has agreed to provide licenses related to the types of microfluidics that are actually relevant to this case—those related to droplet technology. One example of an unrelated application of microfluidics is Bio-Rad's diabetes testing products, which use capillary collection systems to manipulate blood samples of a patient. These testing systems have been around for much longer than ddPCR, and use a different approach to microfluidics that does not involve the complex process at issue here of placing tiny amounts of sample material into microfluidic droplets in a controlled manner.

The time frame in which Bio-Rad has agreed to produce licenses is proportional to the needs of this case, particularly given the enormous amount of documents that have already been produced in this case from prior litigations. 10X's only argument justifying collecting license agreements over the last 16 years is that Bio-Rad relied on one license agreement from 2006 in a previous case. However, 10X has access to all of the documents produced in that litigation, as

well as all of the license agreements produced to show damages in several prior district court cases Bio-Rad and 10X have been involved in.

10X's opposition is misleading in that is suggests that only licenses from the RainDance case have been deemed produced in this action.  That is not the case.  The protective order in this case deems produced documents that were produced in two district court cases, two ITC investigations, one state court case, and one arbitration proceeding.  10X already has access to the allegedly "cherry picked" licenses that were used by Bio-Rad in prior litigation, as well as additional license agreements entered into by RainDance and Bio-Rad dating back to 2006 pursuant to the cross use agreement.

10X's narrative regarding the scope of the licenses Bio-Rad has agreed to produce is unsupported and confuses the relevant technology.  First, Bio-Rad did not previously agree to produce "license agreements related to microfluidics, droplet-based genetic analysis, sequencing, PCR, ddPCR, or NGS from 2004-present" as 10X currently requests.  In an attempt to minimize dispute with 10X, Bio-Rad had agreed to produce licenses related to PCR, ddPCR, and NGS sample preparation (not next generation sequencing itself, which is not synonymous, and is an area in which Bio-Rad does not itself practice) from 2016-present.  When 10X stated that this scope was insufficient, Bio-Rad broadened its agreement in two areas that it believed were most relevant to the needs of this case: droplet-based microfluidics, and droplet-based genetic analysis, and modestly narrowed the broad category of "PCR" to PCR instrumentation.  Bio-Rad believed this was an appropriate compromise, because it gave 10X even more access to droplet based technology which Bio-Rad thought would move the parties toward agreement.  10X's attempt to paint Bio-Rad's attempt at reasonable compromise as malfeasance is transparent and untrue.  Bio-Rad's requests of 10X for licenses in similar spaces is PCR, ddPCR and NGS

sample prep is also not comparable to 10X's requests.  10X is a focused company with products primarily in the NGS sample prep space, and has only existed since 2012.  Thus, if 10X has a license that is related to PCR, it is highly likely that such a license would be relevant to NGS sample prep.  The same is not true of Bio-Rad.

Moreover, 10X's emphasis on the idea that non-droplet based products could be substitutes misses the mark.  The relevant inquiry here is not whether there are other non-droplet based products anywhere in the market that could be substitutes for the relevant technology, it is which of the areas Bio-Rad practices are likely to have relevant licenses. Bio-Rad's proposal gives 10X access to an appropriate and relevant scope of licenses agreements, in addition to what it already has access to from prior litigations.  10X's request would amount to searching a huge portion of Bio-Rad's licenses over the last sixteen years, and this type of unmeasured approach to discovery is not warranted here.

| Issue #16: Licensing Negotiations | |
|---|---|
| 10X's Proposal:<br><br>Bio-Rad shall produce licensing negotiations for the following:<br><br>(a) licenses it contends are comparable or otherwise relevant to the evaluation of a reasonable royalty;<br><br>(b) negotiations relating to the Asserted Patents, which include without limitation RainDance/Harvard license, RainDance/Harvard assignment agreement, Bio-Rad/1CellBio agreements and any other agreements RainDance/MRC; RainDance/MRC assignment to Bio-Rad;<br><br>(c) licenses relating to the Accused Products or the products Bio-Rad contends practice the Asserted Patents,<br><br>(d) to the extent not covered by (a)-(c):  Applera/Bio-Rad agreements; Life Technologies/Bio-Rad agreements, Bio-Rad/Caliper agreements; and RainDance/Caliper agreements.<br><br>[10X's RFP Nos. 76, 92, 105, 115, 121, 175] | Bio-Rad Proposal:<br><br>Bio-Rad shall produce relevant licensing negotiations in the following categories <u>to the extent they are located pursuant to an ESI custodial request</u>:<br><br>(a) licenses it contends are comparable or otherwise relevant to the evaluation of a reasonable royalty;<br><br>(b) negotiations relating to the Asserted Patents, which include without limitation RainDance/Harvard license, RainDance/Harvard assignment agreement, Bio-Rad/1CellBio agreements and any other agreements RainDance/MRC; RainDance/MRC assignment to Bio-Rad;<br><br>(c) licenses relating to the Accused Products or the products Bio-Rad contends practice the Asserted Patents,<br><br>(d) to the extent not covered by (a)-(c):  Applera/Bio-Rad agreements; Life Technologies/Bio-Rad agreements, Bio-Rad/Caliper agreements; and RainDance/Caliper agreements.<br><br>[10X's RFP Nos. 76, 92, 105, 115, 121, 175] |

**10X's Position:**

Bio-Rad is refusing to search its central repositories for negotiations of licenses it agrees are relevant to the case, and instead insists on forcing 10X to rely only on email productions from a handful of custodians—without even confirming that those custodians have the relevant negotiations.  Bio-Rad also knows that licensing negotiations about comparable licenses and

licenses to the patents-in-suit are relevant to the hypothetical negotiation and the determination of the reasonable royalty—both because (1) Bio-Rad was ordered to produce such negotiations recently by the District Court of Delaware in the 1679 case between 10X and Bio-Rad where it was asserting two other patents acquired through the RainDance acquisition; and (2) it affirmatively relied upon licensing negotiations—through *testimony* of its trial witnesses in a prior trial between the same parties—where it was asserting another set of patents acquired through the RainDance acquisition. Bio-Rad now objects to producing negotiation documents or other licenses from the same time period, preventing effective questioning to test the veracity of Bio-Rad's witnesses' statements or to highlight counterexamples from the same time period.

Bio-Rad finally confirmed on August 8 that *it does have databases* (and only a handful at most) that store Bio-Rad's negotiations and that could be searched. In addition, Bio-Rad also already has some negotiations documents collected and produced in the Paladin Litigation, where some of the licenses relating to ddPCR (alleged embodying products in this case) that would be relevant, that are stored centrally, and thus not burdensome to produce. Bio-Rad argues that it does not have "a single" repository of "all the licenses," but it has stated in telephonic meet and confers that it has had a few central locations over time that would store licenses *specifically*. Bio-Rad is most likely going to be seeking a double-digit reasonable royalty from 10X that could amount to many millions of dollars. Therefore, it is not burdensome or disproportional to compel Bio-Rad to check a handful of license repositories for responsive negotiations.

Furthermore, Bio-Rad has failed to comply with its deadline of two weeks ago to provide a response to the damages interrogatory and has refused to identify the custodians who have relevant licensing negotiations. Accordingly, 10X needs the full scope of its request to test

whatever future contentions Bio-Rad serves and to fully build its damages case. Negotiations

provide important context for explaining the technology covered by the licensed patents, the

identity of licensed products, and additional considerations that affect the rate determination and

license scope. Payment history on a license allows 10X to test the assertions Bio-Rad makes

regarding the economic implications of the licenses. If Bio-Rad is relying on licenses, it needs to

allow 10X discovery into the context and real-world application of those licenses, which is most

often not available from the simple recitation of the licensing terms but is often critical in

assessing the applicability of an agreement and its comparability for the purposes of the damages

analysis. *See Phx. Sols. Inc. v. Wells Fargo Bank, N.A.*, 254 F.R.D. 568, 582 (N.D. Cal. 2008)

("Fundamentally, the third-party negotiations could help Wells Fargo ascertain the extent of its

liability to Phoenix and to formulate an appropriate litigation strategy. This court is not

persuaded by Phoenix's arguments that licensing or settlement negotiations themselves are not

relevant because the final agreement reflects the culmination of the negotiations and that

positions taken by the parties prior to reaching a final agreement are therefore insignificant.").

In the 1679 Case, the court ordered Bio-Rad to produce the negotiations related to Bio-

Rad's three allegedly comparable licenses, stating "**the comparable licenses are a big deal, so I**

**think, given the size of this case, that it's worthwhile getting negotiations**." Case No. 18-

1679-RGA, EFC No. 59 (10/17/19 Hr'g Tr. at 36:2-14. The size of that case was less than one-

quarter of this case in the number of claims and counterclaims asserted. The 1679 Case was

recently stayed, due to four IPR petitions 10X filed and the PTAB instituted against Bio-Rad,

and Bio-Rad had not completed production of the licensing negotiations the Delaware court had

ordered. Moreover, production of negotiation documents for potentially comparable licenses—

those that Bio-Rad intends to rely upon but also those 10X may rely upon—is crucial in this case

because of Bio-Rad's prior reliance on testimony regarding negotiations to its advantage where it had not produced the underlying documents. For example, Bio-Rad witnesses Ms. Tumolo (Bio-Rad's corporate witness at trial) and Mr. Malackowski (Bio-Rad's damages expert in that case and this), testified about negotiations and payments regarding at Negotiations provide important context for explaining the technology covered by the licensed patents, the identity of licensed products, and additional considerations that affect the rate determination and license scope. least the Applera/Bio-Rad, Applied Biosystems/QuantaLife, Life Technologies/Bio-Rad, Bio-Rad/Caliper, and RainDance/Caliper licenses despite not having produced the negotiation documents or payments.  Bio-Rad used their unsupported testimony in service of Bio-Rad's bid for a high double-digit royalty, arguing that such a royalty rate was either agreed to or effectively paid even where the rate in the agreement, such as the Life Technologies agreement was quite low (sub-3%).  Case No. 15-152-RGA, Trial Tr. at 142-144, 157-160, 184-186, 215-217 (Tumolo); 620-622, 634-635 (Malackowski). 10X was deprived of the opportunity to adequately rebut Bio-Rad's untested assertions.

Bio-Rad's refusal to provide the full scope of this discovery is especially egregious in light of the recent revelation that Bio-Rad has tried and failed to license its RainDance patents— including in some cases the asserted patents specifically—to more than fifty separate entities. BRMA00090481 (███████████████████████████████████ related to Bio-Rad's acquisition of RainDance). Those documents also reveal that Bio-Rad failed to license these patents even at rates much lower than the 15% rate that Bio-Rad may be looking to seek here.  Documents showing Bio-Rad failed to license on certain terms is highly relevant to the value being attributed to the asserted patents as well as secondary considerations of obviousness on which the asserted patents, but that evidence may not be produced if Bio-Rad

does not search its databases and/or does not select and produce emails from the custodians that Bio-Rad confirms have the relevant negotiations.

**Bio-Rad's Position:**

Bio-Rad agrees to produce the licensing negotiations 10X has requested pursuant to the ESI stipulation in this case because licensing negotiations would have primarily taken place over email, even as far back as 2006.  For instance, with regard to the license agreement between RainDance and the University of Chicago, 10X already has 3,422 emails from the custodian at the University of Chicago relevant to licensing, which reflect the negotiation of this license.

10X's request that Bio-Rad search its files for one-off documents related to licensing negotiations that happened to end up in a central repositories (as opposed to email) is burdensome and inefficient.  As Bio-Rad has explained to 10X, it does not have a single central repository that stores all licenses and negotiations.   Thus, it is not a simple, or productive, exercise for Bio-Rad to locate negotiations in these files.  E-mail discovery is the more appropriate mechanism to obtain this type of information.

| Issue #17: Paladin Litigation | |
|---|---|
| 10X's Proposal:<br><br>Bio-Rad shall produce the depositions taken in the Paladin litigation (*Bio-Rad Laboratories, Inc. v. Paladin III, L.P.*, Supreme Court, New York County, Index no. 651641/2014) of Mr. Schwartz, Ms. Tumolo, and Mr. Wadler.<br><br><br>[10X RFP Nos. 29, 49, 105, 106, 110, 111, 112, 115, and 116] | Bio-Rad Proposal:<br><br>Bio-Rad shall produce the deposition transcripts taken in the Paladin litigation (*Bio-Rad Laboratories, Inc. v. Paladin III, L.P.*, Supreme Court, New York County, Index no. 651641/2014) of Ms. Tumolo, and Mr. Wadler. |

**10X's Position:**

The Paladin litigation centered on a license between Life Technologies and Bio-Rad, and this is a license 10X expects to be highly relevant to the damages determination in this case. This license covered Bio-Rad's ddPCR product, which allegedly practices the patents asserted against 10X. The valuation of patents in the Life Technologies agreement that related to droplet-technology and that cover ddPCR products is a potential comparable license to the hypothetical negotiation, and the evidence from the Paladin case may help determine its true value for this case.

10X's request is very narrow: **three depositions and their exhibits**. Bio-Rad calls this a "fishing expedition" but 10X's request could not be more specific and tailored.  Moreover, Bio-Rad has conceded relevance by agreeing to produce some materials. Bio-Rad agreed to produce two of the three depositions, those of Ms. Tumolo and Mr. Wadler, but now refuses to also produce the third: its CEO Mr. Schwartz's prior testimony. Bio-Rad also refuses—without any explanation—to produce deposition exhibits from all three depositions. There is no burden on

Bio-Rad because Bio-Rad would only be sending over three depositions recently taken and their associated exhibits. Bio-Rad has also agreed and then reneged on the agreement to produce Mr. Schwartz' deposition. As discussed extensively under Issue #5, Mr. Schwartz's direct, personal involvement in Bio-Rad's licensing strategy, including this Life Technologies license on relevant products that allegedly use the same patents that Bio-Rad is asserting against 10X, makes this deposition relevant to 10X's antitrust claims and Bio-Rad's remedy demands.

In prior litigation between 10X and Bio-Rad, Bio-Rad's witnesses Ms. Tumolo and Mr. Malackowski testified about the Life Technologies license at trial. Specifically, as discussed about regarding Bio-Rad's overall refusal to produce licensing negotiations, including for this license, Ms. Tumolo testified that the low 3% rate in the license was deceiving because of a much higher effective rate effected by the high $12 million license fee:

> Q. And you mentioned and have gone through these 15-percent licenses for licensing rates for other licenses. How is it that this one [Life Technologies license] was three percent?
>
> A. Well, I think the company was -- the patent only had a couple of years left in its life, and the company had put a high value on the running royalty rate. And in the end, what we negotiated with them, *largely at their request* was that we would put -- shift that royalty rate value into an upfront payment. To us it was -- it didn't matter. We needed -- we expected those rights as part of the QuantaLife acquisition. So we paid the 12 million and agreed to a small running royalty.
>
> Q. And in terms of did you do an equation or approximation of what the running royalty would be at least for your business purposes at the time taking the $12 million into account?
>
> A. Yeah. I mean, it would have been *a double-digit royalty* for the life of the patent. Yeah.

Case No. 15-152-RGA, Trial Tr. at 157-160, 184-186; *see also id*. at 620-622, 634-635 (Malackowski). At that trial, 10X was deprived of the opportunity to adequately rebut Bio-Rad's untested assertions. It did not have emails or documents regarding those licensing negotiations.

It turns out that Bio-Rad's licensing fee of $12 million was very likely artificially inflated in order to settle an unrelated dispute—regarding a separate audit claims Life Technologies made—by  funding that audit, improperly, out of the QuantaLife acquisition escrow and thus forcing the QuantaLife securityholders to pay for Bio-Rad's audit liability:

> One of the questions raised by the pleadings is whether Bio-Rad's negotiations for the [Life Technologies] Cytonix license were commercially reasonable. Bio-Rad contends that they were; on the other hand, **Paladin alleges that the Cytonix license is the product of a bad faith, deliberate effort by Bio-Rad to defraud the Securityholders into paying for a portion of the cost that Bio-Rad had to pay to settle an unrelated audit dispute between Bio-Rad and Thermo Fisher.**

*Bio-Rad Laboratories, Inc. v. Paladin III, L.P.*, Sup Ct, New York County, Index No. 651641/2014, ECF No. 206, at 1 (May 2, 2018) (emphasis added). This $12 million lump sum payment is how Bio-Rad justified that the low 3% rate in the Life Technologies agreement was not comparable and therefore the documents from the Paladin Litigation are directly relevant to the present litigation to prove the opposite and to shed light on Bio-Rad's licensing practice. Bio-Rad should produce Mr. Schwartz's deposition from that case and the exhibits for all three deposition 10X requested.

**Bio-Rad's Position**:

In a fishing expedition, 10X demands the depositions taken of Mr. Schwartz, Ms. Tumolo, and Mr. Wadler taken in the Paladin litigation, a state court case of marginal relevance that was filed roughly 6 years ago.  10X's demand for Mr. Schwartz's deposition is another example of 10X's pursuit of abusive and disproportionate discovery.  *See generally* D.I. 134. This is now the *third* time 10X has sought such discovery materials from Mr. Schwartz.  And in both previous instances, the judge denied such discovery from Mr. Schwartz.  10X's last ditch

effort here should be rejected.  There is simply no reason to believe that Mr. Schwartz has unique

information to justify 10X's burdensome discovery demand.

In an effort to resolve disputes and move this case toward the just and speedy resolution

called for by Fed. R. Civ. P. 1, Bio-Rad has agreed to produce the deposition transcripts of Ms.

Tumolo and Mr. Wadler from the Paladin litigation.  10X's repeated unsuccessful demand for

discovery from Mr. Schwartz is exactly the type of request that exceeds the scope of relevant and

proportionate discovery in this case and patently runs afoul of the plain text of Fed. R. Civ. P.

26(b)(1).  10X has advanced no proportionate reason to require the production of deposition

testimony from Mr. Schwartz from the Paladin case.  Nor could it.  The deposition transcripts of

Ms. Tumolo and Mr. Wadler should be sufficient.

| Issue #18: RainDance Licensing Negotiations | |
|---|---|
| 10X's Proposal: | Bio-Rad Proposal: |
| Bio-Rad shall produce RainDance's licensing negotiations prior to the RainDance Acquisition for the following:<br><br>   (a)  RainDance Patents;<br><br>   (b)  patents held by third parties relating to PCR, ddPCR, or NGS.<br><br>[10X's RFP Nos. 184, 185] | Bio-Rad shall produce RainDance's licensing negotiations prior to the RainDance acquisition <u>to the extent they are located pursuant to an ESI custodial request</u> for the following:<br><br>   (a)  RainDance Patents;<br><br>   (b)  patents held by third parties relating to PCR, ddPCR, or NGS.<br><br>[10X's RFP Nos. 184, 185] |

**10X's Position:**

In this case, Bio-Rad is asserting that 10X infringes two patents to which Bio-Rad

purportedly got the rights by buying RainDance. RainDance's patent portfolio is a material part

of the patent portfolio that Bio-Rad has aggregated and is now using to exclude and suppress

competition in multiple relevant markets. The licensing history of those patents is relevant both to the anticompetitive nature of Bio-Rad's practices and to the reasonable royalty analysis that is part of the patent case. Further, Bio-Rad has based its arguments in support of a permanent injunction on the money that it spent to buy RainDance and has claimed that what it really paid for was the patents. There is no question that Bio-Rad needs to produce RainDance's licensing history and stop trying to avoid this basic discovery obligation.

Bio-Rad does not appear to dispute that the evidence of RainDances's licensing practices prior to the RainDance acquisition needs to be produced. But Bio-Rad is insisting that it only has to produce these documents if they happen to come up in a custodial ESI search even though 10X's ESI custodians and terms are presently extremely limited and Bio-Rad has refused to identify the relevant custodians. Of course, if the RainDance licensing history is located in custodial ESI then Bio-Rad should be cooperating with 10X to address that issue in the custodial ESI process—which it is not doing. But this is obviously not a replacement for conducting a reasonable search of non-custodial sources of information. Bio-Rad's apparent intention of carving out central repositories of licensing-related files even if they include the relevant licensing history is an unprincipled shirking of Bio-Rad's basic discovery obligations. Bio-Rad should be required to produce this relevant evidence from non-custodial sources to the extent that it exists there and can be located by a reasonable search.

**Bio-Rad's Position:**

Because 10X is requesting communications, Bio-Rad will produce the requested documents pursuant to the ESI procedures in this case.  Bio-Rad has already produced or agreed to produce licenses from previous litigations between the parties, including RainDance, and in response to 10X's various document requests.  This is sufficient. There is no reason why 10X

requires additional discovery beyond the scope of the ESI agreement: 10X unequivocally represented to the Court that it was not challenging Bio-Rad's unilateral licensing decisions. ECF 75 at 7 ("But 10X is challenging Bio-Rad's acquisition of RainDance*, not a mere unilateral refusal to deal*.") (emphasis added).  Its only alleged injury is its inability to obtain a license from Bio-Rad as a result of the injunction in the RainDance litigation, not as a result of Bio-Rad's licensing conduct. 10X's counterclaims contain no allegations regarding any other "aggregation" of patent portfolios aside from the merger with RainDance. The history of Bio-Rad's licensing practices is not in dispute. There is no need for Bio-Rad to engage in more burdensome discovery for its licensing negotiations.

| Issue #19: Lawrence Livermore Licensing Negotiations | |
|---|---|
| 10X's Proposal:<br><br>Bio-Rad shall produce licensing negotiations between Lawrence Livermore National Laboratories and RainDance or Bio-Rad prior to the RainDance acquisition relating to PCR, ddPCR, or NGS.<br><br>[10X's RFP Nos. 296, 297] | Bio-Rad Proposal:<br><br>Bio-Rad shall produce licensing negotiations between Lawrence Livermore National Laboratories and RainDance or Bio-Rad prior to the RainDance acquisition relating to PCR, ddPCR, or NGS conducted by RainDance prior to the RainDance Acquisition <u>to the extent they are located pursuant to an ESI custodial request.</u><br><br>Bio-Rad has agreed to produce licensing negotiations related the asserted patents in the Stilla case, which includes a Lawrence Livermore patent, and agrees to produce those negotiations to 10X pursuant to the cross-use agreement in this case.<br><br>[10X's RFP Nos. 296, 297] |

**10X's Position:**

The Lawrence Livermore patents that were variously licensed to Bio-Rad and to RainDance before the RainDance acquisition form a material part of the patent portfolio Bio-Rad has aggregated and is now using to exclude and suppress competition in multiple relevant markets. The licensing history of those patents is relevant both to the anticompetitive nature of Bio-Rad's practices and to the reasonable royalty analysis that is part of the patent case. Bio-Rad is trying to avoid producing this discovery that should be completely basic as relevant to all the claims in this case.

Prior to the RainDance acquisition, both Bio-Rad and RainDance had obtained certain limited licenses to patents from Lawrence Livermore. One example was the Anderson patent, which Bio-Rad is currently asserting against Stilla. That patent was licensed to Bio-Rad and it was also licensed to RainDance. Following the RainDance acquisition those licensing rights were aggregated. In the case of the Anderson patent this meant that it was no longer co-exclusively licensed but became allegedly exclusively licensed to Bio-Rad. This is only one example. Both Bio-Rad and RainDance were two separate Lawrence Livermore patent rights holders prior to the RainDance acquisition. RainDance's patent portfolio included large portions that were assembled through licensing from other entities, including the University of Chicago, Harvard, the MRC, and Lawrence Livermore.

Bio-Rad does not appear to dispute that the evidence of Lawrence Livermore's licensing practices prior to the RainDance acquisition with both of the entities involved in that acquisition needs to be produced. The problem is that Bio-Rad is insisting that it only has to produce these documents if they happen to come up in a custodial ESI search even though 10X's ESI custodians and terms are presently extremely limited and Bio-Rad has refused to identify the relevant custodians. Of course, if the Lawrence Livermore licensing history is located in the

custodial ESI then Bio-Rad should be cooperating with 10X to address that issue in the custodial ESI process—which Bio-Rad is not doing. But this is obviously not a replacement for conducting a reasonable search of non-custodial sources of information. Bio-Rad's apparent intention of carving out central repositories of licensing-related files even if they include the relevant licensing history is an unprincipled shirking of Bio-Rad's basic discovery obligations. Bio-Rad should be required to produce this relevant evidence from non-custodial sources to the extent that it exists there and can be located by a reasonable search.

**Bio-Rad's Position**:

Again, Bio-Rad agrees to produce the licensing negotiations 10X has requested pursuant to the ESI stipulation in this case because licensing negotiations would have primarily taken place over email, even as far back as 2006. Bio-Rad has already agreed to produce licensing negotiations for the Lawrence Livermore patent at issue in the Stilla case, which would include negotiations for the portfolio which were licensed together.

10X's request that Bio-Rad search its files for one-off documents related to licensing negotiations that happened to end up in a central repositories (as opposed to email) is burdensome and inefficient. As Bio-Rad has explained to 10X, it does not have a single central repository that stores all licenses and negotiations. And, collectively, the amount of licensing negotiations 10X is asking Bio-Rad to search for is unreasonable. Thus, it is not a simple, or productive, exercise for Bio-Rad to locate negotiations in these files. E-mail discovery is the more appropriate mechanism to obtain this type of information.

| Issue #20: Documents Related to Valuations of RainDance or Harvard Intellectual Property | |
|---|---|
| 10X's Proposal:<br><br>Bio-Rad shall produce valuations, valuation analyses, or appraisals of any and all RainDance or Harvard intellectual property in the PCR, ddPCR or NGS Sample prep space, collectively or individually, and related communications and documents from 2010-present. [10X RFP Nos. 103, 104] | Bio-Rad Proposal:<br><br>Bio-Rad shall conduct a reasonable search for and produce non-privileged, non-work product documents constituting valuations, valuation analyses, or appraisals of RainDance intellectual property and Harvard intellectual property in the ddPCR or NGS Sample prep space from 2013-present.  Bio-Rad shall not be required to search for and produce related communications and documents. |

**10X's Position:**

Bio-Rad improperly limits discovery of valuations, valuation analyses, or appraisals of RainDance or Harvard intellectual property in three ways: (1) Bio-Rad should produce related communications and documents, (2) Bio-Rad should go back three extra years to 2010 (if any valuations were performed between 2010 and 2013), and (3) Bio-Rad should include PCR in the scope of the search.

First, communications and documents related to valuations, valuations analyses, or appraisals are highly relevant to patent damages and 10X's antitrust counterclaims. Communications and related documents shed light on what was considered and how the valuations and appraisals developed. They provide important context about what led to the final valuations and appraisals. Bio-Rad provides no basis for not producing communications or documents related to valuations, valuations analyses, or appraisals in its response. Its response fails even to mention them.

Second, the time period should be 2010 to present, because around 2010 Bio-Rad acquired QuantaLife, the company from which Bio-Rad got its ddPCR products that are at issue

in this case, and at least to the extent Bio-Rad considered RainDance or Harvard intellectual property around the time or in connection with its acquisition of QuantaLife, the production should not be limited to 2013 to present. If a valuation or appraisal of RainDance or Harvard intellectual property occurred in 2010, it would be no less relevant to this case than if it had occurred in 2013. Bio-Rad has failed to show how providing documents for an additional three years would be unduly burdensome, especially when compared to the highly relevant information that such valuations or appraisals would contain. Bio-Rad has failed even to confirm whether responsive documents before 2013 exist. This discovery is proportional to the needs of the case.

Third, the technologies should include not only ddPCR and NGS Sample Prep, but also PCR. As discussed above, Bio-Rad has used licenses that make no reference to ddPCR or NGS Sample Prep and instead cover other technologies like PCR in previous cases seeking damages from 10X. Bio-Rad has been withholding its damages contentions in this case, but it has certainly not conceded that it will not rely upon old PCR intellectual property. This demonstrates that valuations and appraisals for RainDance's and Harvard's intellectual property in this field would also be relevant to damages and 10X's antitrust counterclaims. Bio-Rad has failed to show how providing documents relating to valuations, valuation analyses, or appraisals of RainDance or Harvard intellectual property in the PCR field would be unduly burdensome and not proportional to the needs of the case. Bio-Rad provides no basis for not producing documents relating to RainDance intellectual property in the PCR field, failing even to mention them in its response.

**Bio-Rad's Position**:

Bio-Rad's proposal for producing valuations of RainDance or Harvard Intellectual property is appropriately limited in time and scope.  10X's contention that it requires valuations, analyses, or appraisals for ***any and all*** RainDance or Harvard intellectual property in the PCR, ddPCR or NGS Sample prep space is not reasonably tailored to the needs of this case, and potentially encompasses many irrelevant technologies.  Valuations of Harvard intellectual property that fall outside the scope of the ddPCR or NGS sample prep spaces (e.g., PCR, as 10X requests) are unlikely to be relevant to the issues in the case, and Bio-Rad should not be required to search for and produce these documents.  2013 through present is also a reasonable time frame to produce the agreed upon documents, as it is consistent with the statute of limitations in patent cases, already extending several years prior to the hypothetical negotiation which 10X contends would have been in Q2 2016.

| Issue #21: Industry Royalty Rates | |
|---|---|
| 10X's Proposal: | Bio-Rad Proposal: |
| Bio-Rad shall produce patent royalty rates actually or customarily paid in each industry involving 10X Accused Products, the Bio-Rad Accused Instrumentalities, or any product that Bio-Rad alleges practiced the Bio-Rad Asserted Patents before 2016 pursuant to RFP No. 117. Bio-Rad limits the production to 2016 to the present.  Bio-Rad has failed to provide its damages contentions, which were due two weeks days ago, but the hypothetical negotiation likely occurs in Q2 2016, such that the rates available ***before*** are highly relevant and would have considered by the hypothetical negotiators. | In response to RFP No. 117, Bio-Rad has already agreed to conduct a reasonable search for and produce non-privileged, non-work produce documents discussing royalty rates actually or customarily paid in each industry involving 10X accused products, Bio-Rad accused products, or Bio-Rad's embodying products from 2016-present.  Bio-Rad does not agree to create any documents listing royalty rates paid in the requested industries.

Bio-Rad's time frame of 2016 is reasonable because it has already produced license agreements in other litigation dating back to 2006, and 10X has contended that a hypothetical negotiation for damages purposes would have occurred in 2016. Regardless, if 10X wishes to understand royalty rates customarily paid in these |

|  | industries, it can refer to the licenses themselves. |
|---|---|

**10X's Position:**

Bio-Rad improperly limits its discovery of patent royalty rates actually or customarily paid to 2016 to present. Discovery into actual royalties paid is ordinarily produced as is the information about the customary rates in the industry.  Both are typically considered by damages experts.  Bio-Rad imposes a time limit on its production.  But Bio-Rad has failed to comply with its deadline to provide sufficient Interrogatory responses related to its damages contentions, therefore Bio-Rad has not provided an affirmative reason for its time frame limitation. As discussed for Issues #15 and 16, in previous cases Bio-Rad has relied on licenses that have dated back to 2005 and 10X anticipates that Bio-Rad will rely on the same licenses in this case. Bio-Rad has repeatedly affirmatively relied upon Caliper/RainDance, ApplieBio/QuantaLife and Applera/Bio-Rad (now-expired) licenses that also pre-date 2015 and date as far back as 2005. The RainDance license with Harvard from which Bio-Rad asserts its rights to the patents in this case was executed in **2006**. Despite Bio-Rad's failure to disclose its damages contentions, the hypothetical negotiation likely occurs in Q2 2016, when 10X started selling its accused products, such that rates available before 2016 are highly relevant and would be considered by the hypothetical negotiators. This request involves rates ***customarily paid*** in the industry.  This assessment looks for trends in the industry, and those rates are formulated over time, and are not set for the first time in 2016, which would be the natural result of Bio-Rad's position. The hypothetical negotiators are assumed to have the knowledge from the past, in particular the immediate past (of a few years), and the information sought in this request would provide the supporting data.  Bio-Rad has also refused to identify its products that allegedly practice the

asserted patents, but if ddPCR products allegedly practice, then Bio-Rad would only have to look for documents from several years prior to 2016. Contrary to Bio-Rad's argument that all 10X needs are the licenses, just having the royalty rates in the licenses is not enough.  The actual paid royalty information provides highly relevant information for 10X to evaluate the execution and effective royalty rates of those licenses. Bio-Rad's witnesses in the past litigations testified about effective rates in Bio-Rad's licenses that are not the stated rates, and thus documentary evidence about such rates would provide the necessary context and potentially provide a rebuttal to uncorroborated testimony. For example, 10X's discussion of the Paladin Litigation in Issue #17 is an example of how just the terms of a license are not the full story on the actual considerations and effective royalty rates for a particular agreement.

**Bio-Rad's Position:**

10X's proposal for patent royalty rates for any product that practices the Bio-Rad Asserted Patents before 2016 is inappropriate and places an undue burden upon Bio-Rad.  In the course of reasonably responding to 10X's large number of requests, Bio-Rad has already agreed to conduct a reasonable search for and produce non-privileged work product documents and communications relating to patent out-licensing or in-licensing concerning ddpPCR, PCR, and NGS sample preparation products from 2016 through present (RFP No. 5).  Bio-Rad has also agreed to conduct a reasonable search for and produce non-privileged, non-work product documents within its possession, custody, or control constituting license agreements executed by Bio-Rad for patents related to ddPCR, PCR, and NGS Sample Prep (RFP No. 29).

Furthermore, Bio-Rad's timeframe (from 2016 to present) is appropriate because it provides 10X with documents dating back to a year prior to the RainDance acquisition.  Other than a conclusory allegation that pre-2016 rates are relevant because the "hypothetical

negotiation likely occurs in Q2 2016," 10x has not explained why Bio-Rad's reasonable time frame is insufficient.

Bio-Rad's time frame dating back to 2016 is further reasonable because additionally because 10X already has a large number of license agreements in its possession, for example, BRLITC-0094227-BRLITC-00094244; Bio-Rad-MA0048791-Bio-Rad-MA00048793; Bio-Rad0012121-Bio-Rad0012198; BRLITC-00691856-BRLITC00691874; and BRLITC-00692006-BRLITC-00692087.  10X's request for license agreements predating 2016 is far too excessive and disproportionate to the needs of this case, and should thus be denied.

| **Issue #22:  Documents Related to RainDance Products That Allegedly Embody the Asserted Patents** | |
|---|---|
| 10X's Proposal: | Bio-Rad Proposal: |
| Bio-Rad shall confirm that the documents produced by Bio-Rad or RainDance in previous litigations are fully responsive to 10X's requests for information about any RainDance embodying products, to the extent they exist. | Bio-Rad believes that the documents produced by Bio-Rad in previous litigation are fully responsive to 10X's request for information about any RainDance embodying products, to the extent they exist. |
| Bio-Rad shall identify by Bates number no later than August 17, 2020, documents produced by Bio-Rad or RainDance in previous litigations sufficient to show for RainDance's embodying products, to the extent they exist, (1) the testing, design, and operation of RainDance's products, (2) internal and external financial statements for RainDance's products, (3) sales and marketing documents for RainDance's products, (4) licenses, agreements, and contracts for RainDance's products, and (5) efforts to compete against third parties or 10X with RainDance products. | If after reviewing the current production, 10X continues to believe they do not have documents sufficient to show the design and operation of RainDance's products, it should explain why. |
| To the extent that Bio-Rad's identification of such documents reveals that the documents were not previously produced, Bio-Rad will search for and produce such documents responsive to 10X's RFPs listed below. *See, e.g.,* 10X RFP Nos. 8, 62, 64, 78-81, 84, 86, 93-95, 99-101, 105, 117, 124, 140, 143-150, 152-155. *See also* Bio-Rad's responses to 10X RFP Nos. 8, 62, 64, 69, 79-81, 84, 86, 87, 89, 93-96, 99, 101, 105, 117, 124, 140, 143, 145-150, 152-154, 167. | |

**10X's Position:**

Bio-Rad states only that it ***believes, but refuses to confirm,*** that the documents produced in the previous RainDance litigation are fully responsive to 10X's requests for information about any alleged RainDance embodying products, to the extent they exist. Bio-Rad's belief, however,

does not verify that Bio-Rad has searched for and determined that it has produced such documents—especially the documents that are responsive to 10X's document requests in this case and relevant to the particular claims and defenses here. 10X cannot confirm that Bio-Rad's previous productions are complete because 10X cannot know what Bio-Rad or RainDance had searched for or not searched for, and 10X cannot know what Bio-Rad or RainDance withheld. One particularly important example is the category of competition documents 10X seeks. In the second quarter of 2016, when 10X started selling its accused products, RainDance and Harvard, not Bio-Rad, were the alleged owners of the asserted patents. Accordingly, one of the issues that will matter to damages will be any RainDance attempts to compete with 10X or Harvard. Only RainDance, and now Bio-Rad, who acquired RainDance, know the scope of RainDance's documents regarding any such competition efforts, whether successful or failed. 10X can search Bio-Rad's production for these documents but it can never know whether, as Bio-Rad states, that production was fully responsive and comprehensive. Bio-Rad should be compelled to give 10X this basic information that 10X cannot obtain in any other way.

The records from the previous RainDance litigation, however, reveal that Bio-Rad/RainDance agreed to produce only a small fraction of the documents 10X now requests about RainDance products. Bio-Rad points to its responses to 10X RFP Nos. 13, 26, and 27 in the RainDance litigation, but there is no record of Bio-Rad/RainDance agreeing to produce documents regarding the testing, design, and operation of RainDance's products, sales and marketing documents for RainDance's products, or efforts to compete against third parties with RainDance products. For example, Bio-Rad's response to 10X RFP No. 13 in the RainDance litigation agrees to produce only documents regarding comparisons of RainDance products with 10X products, not third-party products. Further, Bio-Rad's response to 10X RFP No. 27 in the

RainDance litigation agrees to produce only documents regarding manufacturing and marketing **costs**, not manufacturing and marketing of RainDance products. Based on this, it is highly likely that Bio-Rad's and RainDance's previous productions are not fully responsive to 10X's request for information about RainDance products.

As a means to confirm that Bio-Rad's production for RainDance products is indeed responsive in most relevant parts to 10X's responses, 10X proposed and Bio-Rad refused to identify by production number the key documents in previous litigation productions sufficient to show for RainDance's embodying products, to the extent they exist, (1) the testing, design, and operation of RainDance's products, (2) internal and external financial statements for RainDance's products, (3) sales and marketing documents, business plans, and strategy documents for RainDance's products, (4) licenses, agreements, and contracts for RainDance's products, and (5) efforts to compete against third parties or 10X with RainDance products. Bio-Rad's argument that it should not be obligated to identify responsive documents to all of 10X's document requests is extreme, as is much of its briefing regarding its discovery obligations, and should be ignored. 10X is not making such a request. 10X is requesting only that Bio-Rad identify documents sufficient to show the key issues enumerated above. Documents related to any RainDance products that embody any asserted claim of the Asserted Patents are highly relevant to key issues including infringement and damages. For example, 10X's RFP Nos. 62 and 95 request testing, design, and operation documents as well as sales and marketing documents, respectively, for embodying products, which are highly relevant to infringement because they are evidence of Bio-Rad's understanding and applications of the asserted claims of the Asserted Patents to products. Damages are assessed differently too if the value is being derived from the asserted patents and based on if and how allegedly the party's products derive

the value from the asserted patents. As another example, 10X's RFP Nos. 80, 93, 100, and 105 request financial statements, efforts to compete against 10X or third parties, and licenses, agreements, and contracts, respectively, for embodying products, which are also highly relevant to damages. The very fact that Bio-Rad is refusing to confirm that these highly relevant documents are in its prior production suggests that searches for unrelated requests and for different claims and defenses were not comprehensive for the purposes of this case.

Bio-Rad acquired RainDance during RainDance's litigation with 10X and thus should have RainDance's documents in its possession, custody, or control because they should have been placed under a litigation hold. Bio-Rad's refusal to actually confirm that documents relevant to this case have been produced is entirely improper. Bio-Rad provides no reasonable basis to refuse to provide the tailored confirmation, and if such documents are not in its production to produce such responsive documents.

**Bio-Rad's Proposal:**

Bio-Rad is not denying 10X's request to produce documents describing RainDance's products. Bio-Rad has simply stated that it believes documents sufficient to show the design, operation, and financials for RainDance's products has already been produced in this case via the production of all documents from the RainDance v. 10X litigation.

Bio-Rad does not understand why 10X appears to believe that these documents were not produced in litigation with RainDance.  While Bio-Rad does not  believe it should be required to re-search RainDance's files for documents, Bio-Rad invited 10X to point to any categories of documents it believed it was not already in possession of that were relevant to the needs of this case.   Rather than actually go look at the document production, 10X alleges that  "there is no record of Bio-Rad/RainDance agreeing to produce documents regarding the testing, design, and operation of RainDance's products, sales and marketing documents for RainDance's products, or

efforts to compete against third parties with RainDance products." This is simply untrue. Bio-Rad agreed to produce documents comparing RainDance's products to 10Xs (10X RFP 13), sales, revenue, and profit margins for its products (10X RFP 26), documents showing the manufacturing and marketing of its products (10X RFP No. 27), among other things. There is no reason to re-litigate the material from the RainDance case when it is already available to the parties in this case. 10X's repeated requests for guarantees from Bio-Rad that every responsive document will be produced from the RainDance files is inefficient and contrary to the cross-use agreement in this case which deems produced documents from prior litigations between the parties. It is also unreasonable demand that Bio-Rad identify production numbers of responsive documents—there is no basis for the contention that Bio-Rad has an obligation to sort through the thousands of documents produced in the RainDance litigation and identify which specific documents are responsive to 10X's 325 document requests.

10X's statement that it cannot confirm that Bio-Rad's previous productions are complete because it does not know what Bio-Rad or RainDance withheld is untrue. 10X was a party in the RainDance case and has access to all of the documents produced. 10X made an eleventh hour attempt to point to documents that were allegedly not produced in the RainDance litigation. However, still, 10X has not looked at the actual documents and determined if there are documents sufficient to demonstrate the testing, design, and operation of RainDance's products.

| Issue #23: Genetic Analysis Companies Acquired By Bio-Rad - Celsee | |
|---|---|
| 10X's Proposal: | Bio-Rad Proposal: |
| Bio-Rad shall produce documents related to Celsee, a Single-Cell NGS Sample Prep company that Bio-Rad recently acquired, including<br><br>(a) Documents related to the acquisition, responses to it, and plans following it [10X RFP Nos. 46, 190, 193, 194, 196-98, 204-207];<br><br>(b) Celsee's patents or products [10X RFP Nos. 191, 192, 195, 202, 208, 209, 210, 213, 214, 215];<br><br>(c) Documents also relating to 10X [10X RFP Nos. 200, 211, 212];<br><br>(d) Licensing [10X RFP Nos. 201, 203]; and<br><br>(e) Financial information [10X RFP Nos. 216-18]. | Bio-Rad will produce documents related to Celsee to the extent they are related to the alleged markets, products, and Bio-Rad's strategy and marketing within those markets from 2016 to present. 10X RFPs Nos. 195, 199, 208, 209, 300; see also 10X RFPs 6. 9, 10, 11, 12, 16, 21, 50, 51, 52, 53, 185, 293, 294.<br><br>Bio-Rad does not agree to conduct additional, independent searches for documents regarding the Celsee acquisition unrelated to the RainDance merger that 10X has repeatedly told the Court is the sole basis of its antitrust counterclaims. |

**10X's Position:**

Celsee is a company in the NGS sample prep space that was recently acquired by Bio-Rad. Instead of using microfluidic droplets for single cell sample preparation for NGS, Celsee uses tiny wells. Celsee touts using wells and gravity as "gentle" while criticizing droplets as supposedly "harsh." Bio-Rad has claimed to have invested half a billion dollars in its "droplet business" and has taken key positions about how important droplets are for single-cell NGS sample preparation. But now Bio-Rad has invested $160 million in buying a company that markets using wells to do that job. Bio-Rad's recent investment in Celsee is relevant not only to issues related to markets and competition for 10X's antitrust claims but for Bio-Rad's allegations

about the value of its droplet-related patents and the importance of enforcing them. Moreover, given the extent to which Bio-Rad has previously relied upon its statements about the value of its "droplet business" to seek high royalties and an injunction against 10X, it can hardly be held disproportionate if 10X needs discovery into Bio-Rad's sudden decision to invest in a company that claims to be trying to do the job without droplets.

Bio-Rad's argument that discovery should be curtailed because the RainDance Acquisition is supposedly the "sole" basis for 10X's antitrust claims lacks merit. As 10X has alleged in its Answer and Counterclaims, while the RainDance Acquisition is central to those claims, the legal and factual theories in support of those claims implicate and involve conduct beyond the fact of the acquisition itself. Facts beyond the RainDance Acquisition itself— including Bio-Rad's ongoing pattern of acquisitions—are relevant to, for example, Bio-Rad's intent to monopolize, antitrust injury, and an anticompetitive scheme that spans multiple aspects of Bio-Rad's conduct over a course of years. *See, e.g.*, D.I. 113, ¶¶ 13-14, 16, 36, 77, 85, 96, 99, 101, 111. The fact is that 10X's antitrust claims require addressing disputed issues in multiple contested markets that have unfolded over a period of years and Bio-Rad's role in those markets and its ongoing strategy of acquiring competitors and would-be competitors beyond RainDance is a part of that highly relevant history that speaks to the anticompetitive nature of Bio-Rad's conduct.

Bio-Rad should produce documents relating to the Celsee Acquisition including assessments of Celsee's patents, products, decisions regarding the future of Celsee's product lines, and research and development. These documents are directly relevant to Bio-Rad's motivation to acquire other companies in the space as well as its own competitive position. Bio-Rad's pattern of buying up actual and potential competitors in the NGS space also provides

contextual evidence of the anticompetitive nature of Bio-Rad's prior conduct that is being challenged in this case.

Assessment and valuations of the Celsee patents and products whether or not carried out in connection with the Celsee Acquisition are potentially relevant to damages, including for reasonable royalty, and the appropriateness of definitions of the alleged product markets in this case.

Communications between Bio-Rad and Celsee that mention or relate to 10X as well as documents or communications that mention or relate to both Celsee and 10X are relevant because 10X is a competitor as well as a customer in the droplet-based genetic analysis space. Moreover, 10X has sued Celsee for patent infringement among other things and Bio-Rad's history of buying into lawsuits with 10X is also relevant. These requests are narrowly tailored only to those documents that mention 10X.

Documents regarding the licensing of Celsee's patents is potentially relevant to disproving Bio-Rad's assertions regarding remedies, and also relate to the relevant market definition in the present case. Celsee's licenses before and after acquisition are relevant to whether and how Bio-Rad's licensing practices differ from those in the relevant markets where 10X alleges Bio-Rad has acted anticompetitively.

Celsee's financial information is relevant to evaluating Bio-Rad's decision to acquire Celsee, what Bio-Rad chooses to do with Celsee's products and research and development after acquisition,  the viability of Bio-Rad's remedy demands, and Bio-Rad's assertions concerning the markets at issue in 10X's antitrust claims. Production of financial documents prepared in the ordinary course would not be burdensome for Bio-Rad which certainly has and maintains the financial information of a company it acquired.

Bio-Rad's agreement to produce only certain Celsee-related documents confirms the relevance of these materials. But the Celsee production should not be limited to those documents that Bio-Rad's lawyers deem relevant to Bio-Rad's alleged anticompetitive conduct. The scope of relevance is far broader than a single category of antitrust issues. Allowing Bio-Rad to select documents related to only a single issue invites cherry picking where documents that bear on Bio-Rad's patent remedies contentions get buried because Bio-Rad decides they are not relevant to antitrust. In contrast to the subjective and unenforceable standard of relevance that Bio-Rad proposes, the specific categories of Celsee related documents that 10X requests are well-defined, easy to enforce, and directly relevant to matters in dispute in the present case.

Bio-Rad's arbitrary 2016 date cutoff is also inappropriate where Celsee was founded years earlier, in 2011, and to the extent that Bio-Rad has earlier responsive documents in the same repositories, they are no less relevant and no more burdensome to produce merely because they were created at most five years prior to Bio-Rad's proposed cutoff.

**Bio-Rad's Position:**

In a good-faith effort to resolve this discovery dispute, Bio-Rad has already agreed to conduct a search for and to produce documents about Celsee's single-cell products that are discussed in documents regarding Bio-Rad's products, marketing, market share, and strategy in the alleged market for droplet single-cell products over the last four years—before and after the RainDance acquisition—from 2016 onwards.  However, Bio-Rad does not agree to conduct additional, independent searches for documents regarding the Celsee acquisition itself.

As 10X has repeatedly represented to the Court, "this case is about Bio-Rad's illegal acquisition of ***RainDance***." D.I. 75 at 1 (emphasis added); *see also* ("the ***central allegation*** of 10X's pleading [is] that Bio-Rad unlawfully acquired RainDance.") (emphasis added).  "It is

axiomatic that the complaint may not be amended by the briefs." *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984). 10X's counterclaims, which it amended for the second time only a month ago, contains no allegations that any of Bio-Rad's other acquisitions (QuantaLife, GnuBio, or Celsee) were anticompetitive. This should be the end of this discovery issue.

Yet 10X has served ***over 40 requests*** regarding Bio-Rad's acquisitions of Celsee (as well as QuantaLife and GnuBio discussed in Issue Nos. 24-26), requesting every piece of paper about these unrelated transactions, such as deal documents, customer communications, negotiations, valuations, and more, going back ***almost a decade to 2011***. 10X is trying to supersize a case that they represented to the Court is about one 2017 merger into a sprawling, series of antitrust mini-trials involving multiple transactions and companies going back a decade.  This type of abusive and improper discovery behavior runs afoul of the plain text of Fed. R. Civ. P. 26(b)(1) that discovery be "proportional to the needs of the case[.]"  *See e.g. In re Celexa and Lexapro Marketing and Sales Practice Litigation*, 2017 WL 9324342, *2 (D. Mass. May 10, 2017) ("The revised definition of relevance in Fed.R.Civ.P. 26(b)(1) reflects amendments made in December 2015 that were intended to restore proportionality as an express component of the scope of discovery, thereby preventing over-discovery and the use of discovery for delay or oppression.") (internal quotations and citations omitted).

As for Celsee, Bio-Rad acquired that company on April 9, 2020—after 10X filed its antitrust counterclaims in this case.  So the Celsee transaction cannot possibly amount to anticompetitive conduct or give rise to any claimed antitrust injury for 10X.  Further, 10X has since amended its counterclaims twice, without adding any allegations regarding Celsee. That makes plain the Celsee acquisition is not relevant at all and 10X cannot somehow turn its

antitrust counterclaims into a free-standing series of discovery requests for a competitor to learn how a rival does business during the course of litigation. In any event, 10X's only alleged injury in the alleged droplet single-cell market was that the 2017 RainDance acquisition resulted in Bio-Rad enforcing an injunction against 10X in court, instead of hypothetically settling the litigation on favorable terms. Bio-Rad's acquisition of Celsee in this market has no bearing on 10X's claimed antitrust injury in this alleged market.

Even more egregious is 10X's assertion that it is entitled to documents regarding Celsee since 2011, when Celsee was founded. Nothing in 10X's antitrust counterclaims justifies discovery back to 2011 regarding a wholly unrelated entity for a case about a 2017 merger, and 10X's alleged injury from that merger.

This is a fishing expedition by a competitor plain and simple who elsewhere is suing Celsee offensively for patent infringement in the case captioned *10X Genomics, Inc. v. Celsee, Inc.*, Case No. 19-cv-00862 (D. Del.). This is abusive and exactly what the Supreme Court has cautioned against time and time again in antitrust cases. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558-59, 570 (2007) (holding "extensive scope" and "unusually high cost" of antitrust discovery requires that the claims must be at a minimum, plausible.); *see also Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528, n. 17 (1983) ("a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed."). The Court should therefore deny all of 10X's blunderbuss discovery requests about acquisitions other than the RainDance merger.

Bio-Rad respectfully requests that the Court deny 10X's blunderbuss and improper discovery requests about the unrelated 2020 Celsee transaction.

| Issue #24: Genetic Analysis Companies Acquired By Bio-Rad - GnuBio | |
|---|---|
| 10X's Proposal:<br><br>Bio-Rad shall produce documents related to GnuBio, a droplet-based sequencing company identified in 10X's counterclaim pleading, including documents related to the acquisition of GnuBio by Bio-Rad, presentations, customer responses, plans, acquired assets, valuations [10X RFP Nos. 16, 31, 45-47, 54, 138, 300-03] | Bio-Rad Proposal:<br><br>Bio-Rad will produce documents related to GnuBio to the extent they are related to the alleged markets, products, and Bio-Rad's strategy and marketing within those markets from 2016 to present. 10X RFPs 16, 45-47, 300; see also 10X RFPs 6, 7, 8, 21, 51, 52, 53, 185, 293, 294.<br><br>Bio-Rad does not agree to produce additional documents regarding the GnuBio acquisition unrelated to the anticompetitive conduct 10X alleges. |

**10X's Position:**

GnuBio is another Bio-Rad acquisition where Bio-Rad is seeking to limit the scope of relevant discovery that needs to be provided in a manner that is both improperly restrictive and too vague and subjective to provide any meaningful protection against blatant cherrypicking to the party who is seeking discovery.

Bio-Rad's suggestion that discovery into the GnuBio acquisition should be curtailed as unrelated to the anticompetitive conduct 10X alleges lacks merit. As 10X has alleged in its Answer and Counterclaims, while the RainDance Acquisition is central to those claims, the legal and factual theories in support of those claims implicate and involve conduct beyond the fact of the acquisition itself. Facts beyond the RainDance Acquisition itself—including Bio-Rad's ongoing pattern of acquisitions—are relevant to, for example, Bio-Rad's intent to monopolize, antitrust injury, and an anticompetitive scheme that spans multiple aspects of Bio-Rad's conduct. *See, e.g.*, D.I. 113, ¶¶ 13-14, 16, 36, 77, 85, 96, 99, 101, 111. The fact is that 10X's antitrust claims require addressing disputed issues in multiple contested markets that have unfolded over a period of years and Bio-Rad's role in those markets and its ongoing strategy of

acquiring competitors and would-be competitors beyond RainDance is a part of that highly

relevant history that speaks to the anticompetitive nature of Bio-Rad's conduct.

First, while Bio-Rad tries to frame this issue as only related to 10X's antitrust claims, this

is not the case at all. Bio-Rad has relied upon the money it has spent buying companies in the

droplet space, including all such acquisitions, expressly at trial to justify its demand for a

permanent injunction against 10X: "Our overall investment, including all of the acquisitions and

R&D investment is over a half billion dollars." 152 Case Trial Tr. at 126:3-5. The GnuBio

acquisition is part of Bio-Rad's supposed half-billion-dollar investment that it claims justifies an

injunction. This means 10X can take discovery into that acquisition. Thorough discovery into the

nature of that acquisition is necessary to test the supposed nexus between 10X's alleged

infringement and any supposed harm to Bio-Rad's investment. Discovery into this nexus is

especially warranted in the case of Bio-Rad's acquisition of GnuBio given that Bio-Rad stopped

trying to bring GnuBio's under-development products to market, shuttered its facilities, and

impaired its goodwill. Because GnuBio's products and research and development was

discontinued, discovery into Bio-Rad's assertion that its investment in GnuBio has been

impaired by 10X's alleged infringement is warranted.

Discovery into the GnuBio Acquisition is also relevant to 10X's antitrust claims. 10X

alleges of the GnuBio acquisition in its counterclaims that "Bio-Rad's acquisition of RainDance

was part of a pattern of Bio-Rad's behavior of acquiring other competitors to aggregate their

patents and eliminate competition in technology markets. For example, in 2014, Bio-Rad

acquired GnuBio, a company developing a droplet-based sequencing workflow, and aggregated

its patents with those of Bio-Rad." D.I. 113 (7/13/2020 10X's Answer & Counterclaims) at 103,

¶ 85. Bio-Rad's pattern of buying potentially competing companies, terminating competing or

potentially competing products and research and development efforts is certainly relevant to the anticompetitive nature of the party's other acquisitions fitting that same pattern. Moreover, 10X does not only have Clayton Act Section 7 claims. 10X also has Sherman Act Section 2 claims for attempted monopolization. To the extent that Bio-Rad's ongoing pattern of acquiring companies in order to aggregate market power is part of Bio-Rad's ongoing attempted monopolization, or created the groundwork for the attempted monopolization that occurred when Bio-Rad illegally acquired RainDance, that history of aggregation or attempted aggregation of market power is relevant. Bio-Rad's own counsel has stated that a company's acquisition of other companies can be relevant to how that company obtained its alleged market power.

Bio-Rad's attempt to restrict responsive documents to 2016 and following is especially inappropriate where Bio-Rad has tried to rely offensively on this acquisition to justify its remedies demands and the acquisition occurred in 2014, two years prior to Bio-Rad's arbitrary proposed date cutoff.

**Bio-Rad's Position:**

Bio-Rad incorporates by reference its position in response to Issue No. 23 (Celsee) as the issues are very similar.

In a good-faith effort to resolve this discovery dispute, Bio-Rad has already agreed to conduct a search for and to produce documents about GnuBio's single-cell products that are discussed in documents regarding Bio-Rad's products, marketing, market share, and strategy in the alleged market for droplet single-cell products over the last four years—before and after the RainDance acquisition—from 2016 onwards.  However, Bio-Rad does not agree to conduct additional, independent searches for documents regarding the GnuBio acquisition itself.

Bio-Rad acquired GnuBio in 2014.  10X's one sentence in its pleading mentioning the background fact that Bio-Rad had previously acquired GnuBio in 2014 has nothing to do with its counterclaims and the RainDance merger.  Countercl. ¶ 85 ("For example, in 2014, Bio-Rad acquired GnuBio, a company developing a droplet-based sequencing workflow, and aggregated its patents with those of Bio-Rad.") 10X has not and cannot challenge the GnuBio merger as it falls outside the four-year limitations period, 15 U.S.C. § 15(b), and would be barred by laches in any event. 10X never alleges a series of anticompetitive mergers, it only alleges *one* anticompetitive merger. Without specific allegations stating how the GnuBio merger was anticompetitive, the only "pattern" of behavior 10X could possibly allege is that Bio-Rad entered into a legal transaction with GnuBio.  10X has no legitimate grounds for seeking discovery related to the 2014 GnuBio acquisition to somehow determine the competitiveness of the 2017 RainDance merger.

Nor can 10X get discovery of the GnuBio acquisition under the guise of the patent claims. Bio-Rad has agreed to produce documents related to its investments in the alleged markets. 10X's assertion that all documents related to Bio-Rad's acquisitions simply because of a line in a declaration in another litigation that Bio-Rad has invested half a billion dollars in technology flout the Court's emphasis at the most recent status conference that Rule 26's proportionality requirement "has real teeth." Jul. 31, 2020 Stat. Conf. Tr. at 7.

In sum, revisiting discovery disputes in other litigation, or a competitor challenging old and lawful behavior by a rival, are not legitimate bases for discovery.  *See* Fed. R. Civ. P. 1; *Twombly*, 550 U.S. at 570; *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528, n. 17 (1983).  Bio-Rad respectfully requests that the Court deny 10X's blunderbuss and improper discovery requests about the unrelated 2014 GnuBio transaction.

| Issue #25: Genetic Analysis Companies Acquired By Bio-Rad - QuantaLife | |
|---|---|
| 10X's Proposal: | Bio-Rad Proposal: |
| Bio-Rad shall produce documents related to QuantaLife, the company Bio-Rad acquired to enter the ddPCR space, including documents related to the acquisition of QuantaLife by Bio-Rad, customer responses, and investments following it. [10X RFP Nos. 46, 232-235] | Bio-Rad will produce documents related to QuantaLife to the extent they are related to the alleged markets, products, and Bio-Rad's strategy and marketing within those markets from 2016 to present. 10X RFP 232; see also RFPs 6, 7, 8, 16, 21, 51, 52, 53, 185, 293, 294, 300.<br><br>Bio-Rad does not agree to produce additional documents regarding the QuantaLife acquisition unrelated to the anticompetitive conduct 10X alleges. |

**10X's Position:**

Bio-Rad states that it is prepared to produce documents about Bio-Rad's acquisition of Quantalife, which is the acquisition that resulted in Bio-Rad's ownership of the patent portfolio it would later aggregate with the patent portfolio it acquired with its purchase of RainDance. It is also the acquisition that gave Bio-Rad a ddPCR product offering. There is no question this is relevant subject matter in the present case. The problem is that Bio-Rad is imposing arbitrary carveouts with subjective language that will be difficult or impossible to police and will invite the mischief of Bio-Rad trying to improperly produce wants to produce and withhold the rest. Moreover, Bio-Rad has entirely refused to provide discovery into QuantaLife's customers' responses to the acquisition.

Per Bio-Rad's counsel, how a party acquired market power is relevant. It was based on Bio-Rad's market position that it obtained through the QuantaLife acquisition that Bio-Rad had positioned itself so that when Bio-Rad subsequently acquired RainDance, this aggregation

caused substantial harm to competition and enabled Bio-Rad to seek to exclude competition in each of the relevant markets including by threatening and initiating patent litigation against 10X.

Bio-Rad's suggestion that discovery into the QuantaLife acquisition should be curtailed as unrelated to the anticompetitive conduct 10X alleges lacks merit. As 10X has alleged in its Answer and Counterclaims, while the RainDance Acquisition is central to those claims, the legal and factual theories in support of those claims implicate and involve conduct beyond the fact of the acquisition itself. Facts beyond the RainDance Acquisition itself—including Bio-Rad's ongoing pattern of acquisitions—are relevant to, for example, Bio-Rad's intent to monopolize, antitrust injury, and an anticompetitive scheme that spans multiple aspects of Bio-Rad's conduct. *See, e.g.*, D.I. 113, ¶¶ 13-14, 16, 36, 77, 85, 96, 99, 101, 111. The fact is that 10X's antitrust claims require addressing disputed issues in multiple contested markets that have unfolded over a period of years and Bio-Rad's role in those markets and its ongoing strategy of acquiring competitors and would-be competitors beyond RainDance is a part of that highly relevant history that speaks to the anticompetitive nature of Bio-Rad's conduct.

Moreover, the QuantaLife acquisition is not only relevant to 10X's antitrust counterclaims. As described above, Bio-Rad has relied upon the purported investments it has made in multiple acquisitions in order to try to justify its demand for a permanent injunction against 10X. This argument included the QuantaLife acquisition. Bio-Rad cannot fairly be allowed to rely on the dollars it invested by buying QuantaLife in trying to justify its demand for an injunction without 10X being allowed to take full and fair discovery into that same acquisition.

Here again Bio-Rad's proposed date cutoff of 2016 is inappropriate. Bio-Rad has relied offensively on the QuantaLife acquisition, which took place in 2011.

**Bio-Rad's Position:**

Bio-Rad incorporates by reference its position in response to Issue No. 23 (Celsee) as the issues are very similar.

In a good-faith effort to resolve this discovery dispute, Bio-Rad has already agreed to conduct a search for and to produce documents about QuantaLife's ddPCR products that are discussed in documents regarding Bio-Rad's products, marketing, market share, and strategy in the alleged market for ddPCR products over the last four years—before and after the RainDance acquisition—from 2016 onwards.  Moreover, Bio-Rad has already produced documents related to QuantaLife in the action captioned *Bio-Rad Laboratories, Inc. v. 10X Technologies, Inc.*, Case No. 14-01751 (Cal. App. Dep't Super. Ct.) ("Trade Secret Litigation"), which are deemed produced in the instant case pursuant to the Stipulated E-Discovery Agreement.  D.I. 67 VII.B. However, Bio-Rad does not agree to conduct additional, independent searches for documents regarding the QuantaLife acquisition itself.

Bio-Rad acquired QuantaLife long ago in 2011, after which Bio-Rad began offering ddPCR products. 10X cannot possibly use the QuantaLife merger to support its antitrust counterclaims regarding the RainDance acquisition. As a threshold matter, 10X cannot challenge the QuantaLife merger as it falls well outside the four-year limitations period, 15 U.S.C. § 15(b), and would be barred by laches in any event. Further, 10X admits that Bio-Rad's entry in the ddPCR market was as a result of the QuantaLife acquisition, which is procompetitive lawful behavior. Countercl. ¶ 16.  A competitor forcing a rival to search for additional needles in a haystack spanning almost over a decade is clearly disproportionate to the legitimate needs of this case.  *See* Fed. R. Civ. P. 26.

Bio-Rad respectfully requests that the Court deny 10X's blunderbuss and improper discovery requests about the unrelated 2011 QuantaLife transaction.

| Issue #26: Bio-Rad's Actual or Potential Acquisitions of Genetic Analysis Companies | |
|---|---|
| 10X's Proposal: | Bio-Rad Proposal: |
| Bio-Rad shall produce documents related to acquisitions by Bio-Rad of intellectual property related to genetic analysis on a droplet-based platform, NGS, or digital PCR from 2011 to the present. [10X RFP No. 46, 300] | Bio-Rad will produce documents related to the alleged markets, products, and Bio-Rad's strategy and marketing within those markets from 2016 to present. [RFPs 6, 7, 8, 9, 10, 11, 12, 21, 45, 46, 47, 50, 51, 52, 53, 185, 195, 199, 208, 209, 227, 228, 232, 292, 294, 300] |
| Bio-Rad shall produce documents and communications related to any contemplated acquisition of ATAC-seq companies, technology, and IP. [10X RFP No. 300] | This scope will include documents regarding Bio-Rad's acquisition strategy in the alleged markets, but will not include additional, independent searches for documents related to acquisitions that are unrelated to the RainDance merger that 10X has repeatedly told the Court is the sole basis of its antitrust counterclaims. |

**10X's Position:**

Documents concerning Bio-Rad's acquisitions of intellectual property related to genetic analysis on a droplet-based platform, NGS, or digital PCR from 2011 to the present are relevant to Bio-Rad's ongoing pattern of buying competitors and would be competitors in the space, which is relevant to 10X's antitrust counterclaims and to Bio-Rad's allegations in support of its remedies demands. Bio-Rad agrees that it needs to produce at least certain documents related to its market power and acquisition strategy in the relevant markets, but Bio-Rad has once again placed unworkable subjective limitations on its commitment to produce documents that will only create mischief if they are allowed to stand. Moreover, to the extent that Bio-Rad does not actually intend to produce documents regarding specific contemplated, attempted, failed, or

successful acquisitions, any such limitation is substantively improper and needs to be revealed so that it can be addressed per the Court's Order.

This pattern of Bio-Rad's ddPCR, NGS, and microfluidics-related acquisitions began in 2011 with Bio-Rad's acquisition of QuantaLife and include subsequent acquisitions in 2014 (GnuBio), 2017 (RainDance), and 2020 (Celsee). Bio-Rad itself claims that how a party acquired market power is relevant.  Thus, documents dating back to 2011 are relevant because that is the time when Bio-Rad first started to accrue the market power it wields today, power it would ultimately aggregate together with the power of RainDance. Bio-Rad's contemplated, proposed, or attempted acquisitions in the same space provide further confirmatory evidence of Bio-Rad's anticompetitive conduct and should be produced. Moreover, documents and communications relating to contemplated acquisitions of ATAC-seq companies are relevant to Bio-Rad's ability to compete with 10X.

Bio-Rad's argument that discovery should be curtailed because the RainDance Acquisition is supposedly the "sole" basis for 10X's antitrust claims lacks merit. As 10X has alleged in its Answer and Counterclaims, while the RainDance Acquisition is central to those claims, the legal and factual theories in support of those claims implicate and involve conduct beyond the fact of the acquisition itself. Facts beyond the RainDance Acquisition itself— including Bio-Rad's ongoing pattern of acquisitions—are relevant to, for example, Bio-Rad's intent to monopolize, antitrust injury, and an anticompetitive scheme that spans multiple aspects of Bio-Rad's conduct. *See, e.g.*, D.I. 113, ¶¶ 13-14, 16, 36, 77, 85, 96, 99, 101, 111. The fact is that 10X's antitrust claims require addressing disputed issues in multiple contested markets that have unfolded over a period of years and Bio-Rad's role in those markets and its ongoing

strategy of acquiring competitors and would-be competitors beyond RainDance is a part of that highly relevant history that speaks to the anticompetitive nature of Bio-Rad's conduct.

Also, here again, Bio-Rad has imposed an arbitrary date cutoff of 2016. Bio-Rad has been buying companies, thinking about buying companies, and trying to buy companies in this space since well before 2016 and there is no special burden in producing that complete history dating from when Bio-Rad first entered the space with its acquisition of QuantaLife through the present.

**Bio-Rad's Position:**

Bio-Rad incorporates by reference its positions stated in response to Issues 23-25 (Celsee, GnuBio, and QuantaLife), as the issues are very similar.

In a good-faith effort to resolve this discovery dispute, Bio-Rad has already agreed to produce and will continue to produce documents related to strategy in the markets alleged by 10X generally over the past four years—before and after the 2017 RainDance transaction.  Bio-Rad further agrees that the scope of these RFPs cover technologies and products that perform similar functions but do not fall squarely in the definition of 10X's alleged markets, such as ATAC-seq.

However, Bio-Rad does not agree to conduct additional, independent searches for and to produce documents specifically about ***all other actual or potential acquisitions over a nine-year period.***  On its face, this is an unreasonable discovery request.  10X's demand is not tethered to any of its allegations in any fair representation of its pleading.  As this Court knows, possible or actual transactions are evaluated at all different degrees by different people in a company at any given time and encompass a host of wholly irrelevant transactional information that 10X has no

legitimate need for in this case, such as deal documents, negotiations in the ordinary course of business, third-party consultant information, customer reactions, valuations, due diligence, finance and tax information, and consents, and regulatory filings.

Put simply, this is an irrelevant and costly fishing expedition by a competitor that violates the Rules and Supreme Court guidance in this area on discovery abuses.  *See* Fed. R. Civ. P. 1; Fed. R. Civ. P. 26; *Twombly*, 550 U.S. at 570; *Associated Gen. Contractors*, 459 U.S. at 528, n. 17 (1983).  Bio-Rad respectfully requests that the Court deny 10X's blunderbuss and improper discovery requests about the unrelated 2011 QuantaLife transaction.

| **Issue #27: Bio-Rad's Evaluation of Competitors - Dropworks** | |
| --- | --- |
| 10X's Proposal:<br><br>Bio-Rad shall produce documents related to Dropworks, a digital PCR company sued by Bio-Rad, including any assessments of its value, its intellectual property, or its products.  [10X RFP No. 226] | Bio-Rad Proposal:<br><br>Bio-Rad will produce documents related to Dropworks to the extent they are related to the alleged markets, products, and Bio-Rad's strategy and marketing within those markets from 2016 to present. [10X RFPs 227-228]; see also [RFPs 6, 7, 8, 9, 10, 11, 12, 21, 45, 46, 47, 50, 51, 52, 53, 185, 195, 199, 208, 209, 232, 292, 294, 300]<br><br>Bio-Rad will not conduct additional, independent searches for documents about Dropworks as that is unrelated to the RainDance merger that 10X has repeatedly told the Court is the sole basis of its antitrust counterclaims |

**10X's Position:**

Documents concerning Dropworks, an early entrant in the droplet digital PCR market that Bio-Rad has sued for patent infringement, are relevant to Bio-Rad's ability to, and practice of, using its illegally acquired monopoly power.  Bio-Rad's assessment of Dropworks' value and

the scope and value of its intellectual property and products or technology also is relevant to Bio-Rad's pattern of wielding its ill-gotten market power to stifle and exclude competition. Bio-Rad's documents related to a company that it has sued using the patents that 10X alleges Bio-Rad acquired illegally should not be withheld. Bio-Rad has stated that it will produce certain documents but once again it has imposed vague and subjective carveouts that will only lead to mischief. Bio-Rad should undertake a reasonable search and produce responsive documents that the reasonable search uncovers.

Bio-Rad's argument that discovery should be curtailed because the RainDance Acquisition is supposedly the "sole" basis for 10X's antitrust claims lacks merit. As 10X has alleged in its Answer and Counterclaims, while the RainDance Acquisition is central to those claims, the legal and factual theories in support of those claims implicate and involve conduct beyond the fact of the acquisition itself. Facts beyond the RainDance Acquisition itself— including Bio-Rad's ongoing pattern of acquisitions—are relevant to, for example, Bio-Rad's intent to monopolize, antitrust injury, and an anticompetitive scheme that spans multiple aspects of Bio-Rad's conduct. *See, e.g.*, D.I. 113, ¶¶ 13-14, 16, 36, 77, 85, 96, 99, 101, 111. The fact is that 10X's antitrust claims require addressing disputed issues in multiple contested markets that have unfolded over a period of years and Bio-Rad's role in those markets and its ongoing strategy of acquiring competitors and would-be competitors beyond RainDance is a part of that highly relevant history that speaks to the anticompetitive nature of Bio-Rad's conduct.

Bio-Rad's argument below that Bio-Rad's *Noerr-Pennington* theory renders discovery about Dropworks irrelevant presumes its own conclusion. Bio-Rad has sued Dropworks using patents that 10X alleges Bio-Rad is not allowed to own, and the extent to which the harm to

competition arising from Bio-Rad's illegal acquisition of those patents implicates Bio-Rad's conduct in relation to Dropworks is the proper subject of discovery.

**Bio-Rad's Position:**

Bio-Rad incorporates by reference its positions stated in response to Issues 23-26 (Celsee, GnuBio, QuantaLife, and other transactions) as the issues are similar.

10X's RFP 226 requests "all documents and communications" concerning Dropworks, because it states that Bio-Rad's patent infringement litigation against it is "relevant to Bio-Rad's ability to, and practice of, using its illegally acquired monopoly power." As this Court knows, this is First Amendment *Noerr-Pennington* immunized conduct, and 10X has not alleged any *Noerr* exception applies. Nor could it, as 10X does not have standing to challenge Bio-Rad's lawsuit against Dropworks. Therefore, this discovery is irrelevant and cannot be used to support 10X's counterclaims, because it has represented to the Court that it is *not* challenging Bio-Rad's *Noerr-Pennington* protected conduct. *See* D.I. 75 at 6-7 ("But 10X's claim is that Bio-Rad's acquisition of RainDance patents was unlawful, not that the individual patent lawsuit on its own violates the antitrust laws.").

To the extent documents regarding Dropworks is relevant to assess market definition, Bio-Rad has already agreed to produce competition-related documents that concern Dropworks (RFP 228) or Dropworks' products (10X RFP 227). Documents regarding Dropworks will also be produced to the extent they are responsive to 10X's other RFPs regarding competition in the ddPCR market.

Thus, 10X has no legitimate need for Bio-Rad to conduct additional, independent searches about Dropworks. Bio-Rad respectfully requests that the Court stop 10X's fishing

expedition into another company in the life science technology space unrelated to the 2017

RainDance merger.

| Issue #28: Financial Information | |
|---|---|
| 10X's Proposal: | Bio-Rad Proposal: |
| Bio-Rad shall produce complete, detailed financial data for both Bio-Rad and RainDance from 2011 to the present in Bio-Rad's possession. [10X RFP Nos. 79, 80, 148, 183] | Bio-Rad agrees to produce documents sufficient to show financial data for both Bio-Rad and RainDance from 2011 to the present in Bio-Rad's possession pursuant to 10X RFP Nos. 79, 80, 148, 183. |

**10X's Position:**

      10X's request is simple: 10X is requesting the complete, detailed financial information in

Bio-Rad's possession as it is maintained in Bio-Rad's systems or in such other locations where it

is maintained. Such complete financial information of the parties is routinely sought and

provided in both patent infringement and antitrust cases, and 10X has already provided and is in

the process of collecting similar financial information from its own records. Yet Bio-Rad has at

times suggested it will produce such financial information from its systems, while at other times,

such as in its July 20, 2020, letter, Bio-Rad has pointed to a number of documents containing

different financial information only at a high level or only covering part of the relevant time.

Bio-Rad's resort in the present statement to "documents sufficient to show financial data" is, in

this instance, an apparent attempt to reserve to Bio-Rad's own private judgment what needs to be

produced and what does not. The financial data requests that 10X has made are simple. They are

straightforward. They are commonplace in cases like this one. Bio-Rad should not be able to

avoid making a clear commitment about what it will produce; and Bio-Rad should not be

allowed to avoid producing the basic financial data that is required to litigate this case in a fair and just manner.

10X should not be forced to pick through documents containing different information in different forms to attempt to piece together the relevant financial information that Bio-Rad can simply produce with a minimal effort from computer systems that have all of the relevant data ready to hand. Having a complete set of consistent data is going to be especially important in this case because 10X alleges that, as a consumer of ddPCR products, it experienced anticompetitive harm from increased prices that resulted from Bio-Rad's monopolization of the ddPCR product market. ECF No. 113, ¶ 11. To understand those price changes, 10X will need, for example, historic pricing data before the RainDance acquisition to compare to pricing data after the acquisition to examine the trends both before and after to show the effect of the acquisition on price. This means the data needs to be consistent, broken down by small time periods, and also broken down by product. Bio-Rad cannot withhold the data that is easy to use for itself, and leave 10X sifting through a range of documents looking for relevant pieces of information piecemeal and then trying to tie the different pieces together at great expense. This would all be wasted effort. The parties are supposed to have financial data that they can work with efficiently to get to the merits of the issues in dispute. Moreover, Bio-Rad will need to provide updated financial information in this case anyway given how much time has passed since Bio-Rad last made a financial data production in litigation against 10X. This data is relevant both to 10X's patent infringement claims and to 10X's antitrust claims. When Bio-Rad makes an updated production there is no reason it should not simply produce the full set of required financial information at once in a cohesive and complete form. Indeed, given that Bio-Rad needs to update

its past productions anyway, there is no reason that it cannot provide all the required data at the same time so it can be used efficiently as a single complete data set.

Even though this financial information should be among the most basic and familiar aspects of discovery in a patent case and an antitrust case, Bio-Rad has stubbornly and repeatedly refused to tell 10X what it intends to produce. Bio-Rad refused during multiple calls. And Bio-Rad refused even in its current position statement. 10X has asked Bio-Rad to confirm that it will produce the full, complete, and detailed financial data in Bio-Rad's possession. 10X has explained that it is looking for the routine financial data: data broken down by product and monthly or quarterly periods for ddPCR and NGS Sample Prep products (both from RainDance and Bio-Rad). 10X has identified the types of financial data it needs: price (list price, average selling price, price net of discounts), discounts, revenue, sales, units sold, margins, costs, profit & loss, customer list, projections, and turnover studies. 10X has asked Bio-Rad to confirm that it will be searching for and producing the information in these categories maintained by Bio-Rad so that the parties could avoid a dispute. *See* 10X RFP Nos. 8, 10, 11, 19, 20, 21, 22, 23, 24, 25, 79, 80, 148, 183. But Bio-Rad has refused to engage and has not articulated what it will and will not produce, or what it finds objectionable about 10X's proposal. It simply repeatedly refuses to produce the financial information requested. Having no confirmation that Bio-Rad will provide the financial data as it maintains it, 10X must seek assistance of the Court.

**Bio-Rad's Position:**

10X has repeatedly served requests for production relating to financial information for both Bio-Rad and RainDance.  In an effort to resolve disputes and move this case towards the just and speedy resolution called for by Fed. R. Civ. P. 1, Bio-Rad has already agreed to produce:

documents sufficient to show sales and offers for sales of the Bio-Rad accused instrumentalities and Bio-Rad products that embody the asserted patents; documents sufficient to show costs, sales, revenue, profit and loss, list price, and selling price for Bio-Rad's ddPCR and NGS sample prep products from 2013 to present.   Such financial need not be produced in a cumulative fashion.  Once 10X has documents "sufficient to show" this information, that is all they need for this case.

What is more, 10X is already in possession of much of this information as early as 2011, as demonstrated, for example, by documents bearing Bates Nos. BRLITC-01744174-BRLITC-01744270; BRLITC-01744418-BRLITC-01744523; BRLITC-01541820-0154927; 10XG-0000574586-10XG0000574703; BRLITC-01187277; BIOR00000788.

10X is also already in possession of documents responsive to requests related to market share from 2016 to present, for example, BRLITC-0032613-BRLITC-00032652; BRLITC-01606814-BRLITC-01606845.  In addition, Bio-Rad has already agreed to conduct a reasonable search for and produce non-privileged, non-work product documents, if any, constituting projected sales profitability studies and reports, gross margin studies and reports, and turnover studies and reports, and documents referring to anticipated market trends or forecasts for the Bio-Rad accused products and Bio-Rad's embodying products from 2016-present.

Bio-Rad also agrees to conduct a reasonable search for and produce non-privileged, non-work product documents, if any, constituting projected sales profitability studies and reports, gross margin studies and reports, and turnover studies and reports, and documents referring to anticipated market trade or forecasts for the Bio-Rad accused products and Bio-Rad's embodying products from 2016 to present.

Additionally, Bio-Rad has already agreed to conduct a reasonable search for and produce any existing non-privileged, non-work product, regularly-prepared, annual financial statements of Bio-Rad and RainDance from 2015 to the present within its possession, custody, or control.

Still, 10X wants more. However, the remaining requests exceed the scope of relevant and proportionate discovery in the case. 10X's request is duplicative and fails to acknowledge and account for what Bio-Rad has already produced and what 10X already has. It is exactly this type of abusive discovery that contravenes Fed. R. Civ. P. 26(b)(1). *See e.g. In re Asacol Antitrust Litig.*, No. CV 15-12730-DJC, 2017 WL 11476172, at *3 (D. Mass. Jan. 3, 2017) (denying motion to compel because "materials defendants are seeking are cumulative of information more easily available from other sources, will not assist the defendants in proving market share "in any meaningful way" and would not "provide much other than anecdotal evidence"). For at least these reasons, the Court should deny 10X relief on Issue #28.

| Issue #29: Improper Date or Scope Restrictions | |
|---|---|
| 10X's Proposal: | Bio-Rad Proposal: |
| Bio-Rad shall remove the improper scope and date restrictions on its document production and produce documents in the following categories: <br><br> (a) Bio-Rad shall remove improper limitations on RFPs related to patents or portfolios, certain communications of RainDance and its Board or Pacific BioSciences, and communications with Grant Thornton (auditors on the RainDance acquisition), and communications between Bio-Rad and RainDance based on the RainDance acquisition, the Asserted Patents, or | Bio-Rad's responses to 10X's requests for production meet the legitimate needs of this case for an adjudication of this dispute. Bio-Rad's responses are fulsome but not limitless in time and scope as demanded by 10X given the massive amount of discovery already in use in this case. 10X's requests span over a decade of requested information to turn Bio-Rad upside down and are a classic overly-broad fishing expedition that is not proportional for this case. <br><br> (a) Bio-Rad's agreement to produce documents regarding the RainDance acquisition from 2013, and other discovery |

Bio-Rad [*e.g.*, 10X RFPs 2, 3, 4, 8, 187, 278, 320, 321, 322]

(b) Bio-Rad shall remove improper limitations on RFPs related to 10X [*e.g.*, 10X RFPs 28, 34, 39, 44, 45, 48, 137, 320, 322]

(c) Bio-Rad shall remove improper date restrictions for categories of documents such as assessments of the portfolios containing the asserted patents [*e.g.*, 10X RFP Nos. 2, 3, 6, 13, 17, 18, 19, 49, 281, 282, 283, 284, 321]

(d) Bio-Rad shall remove improper date limitations and produce both Bio-Rad and RainDance's documents related to ddPCR from 2011 to the present [*e.g.*, 10X RFP Nos. 7, 8, 17, 21, 43, 51, 52, 53, 56, 187, 293, 294, 295, 321]

(e) Bio-Rad shall remove improper date limitations and produce documents related to 10X from 2012 to the present [*e.g.*, 10X RFP Nos. 14, 39, 45, 48, 137, 320, 322]

(f) Bio-Rad shall remove improper date limitations and produce documents related to Droplet Single Cell and/or NGS Sample Prep Product Market from 2013 to the present [*e.g.*, 10X RFP Nos. 9, 10, 11, 44, 50, 51, 53].

from 2016 is proportionate to the needs of the case, regarding products launched in 2019 and a merger closed in 2017.   (b) Bio-Rad agrees to produce responsive documents related to 10X from 2016 onward. Bio-Rad already produced voluminous discovery from prior cases related to 10X from before 2016. 10X has no proper reason for requesting additional documents related to 10X prior to 2016.

(c) Bio-Rad's agreement to produce documents within reasonable time frames (as specified in its responses) regarding the hodge podge of RFPs 10X has identified in this category is sufficient.(d) Bio-Rad's agreement to produce documents regarding ddPCR from 2016 to present is sufficient—No conduct from before 2017 is at issue in the case. (e) Bio-Rad refers to its response on subpart (b) as the issues are identical. (f) Bio-Rad's agreement to produce documents regarding Droplet Single Cell and/or NGS Sample Prep from 2016 to present is sufficient—No conduct from before 2017 is at issue in the case.

**10X's Position:**

Bio-Rad's responses to 10X's requests for production include numerous arbitrary restrictions on the scope of relevant discovery that cannot be justified and should not get in the way of litigating this case on its merits. Bio-Rad's counsel repeatedly would neither state that the requested information had already been searched for and produced, nor identify any special

burden in searching for it and producing it. Bio-Rad's counsel frequently engaged in hypotheticals about possible burden of finding and producing theoretical swaths of documents without ever having confirmed if such burdens were even real and prior to undertaking any reasonable efforts to discover the true location or extent of documents in Bio-Rad's possession. Meanwhile, Bio-Rad has used this approach as an excuse for not committing to produce clearly relevant documents that there is no reasonable basis to withhold. Bio-Rad's approach to discovery in this case is not proper, as described further below. 10X has been and remains willing to agree on reasonable limits on discovery, and has proposed several such reasonable limits below that are not arbitrary and are instead tied to the facts of this case. 10X seeks the Court's assistance so that it will not be unfairly deprived of relevant information that it needs to try its case merely because Bio-Rad refuses to search for it.

A pervasive theme in Bio-Rad's approach to discovery in this case is to claim that largely unspecified productions from prior cases justify Bio-Rad's decision not to investigate, not to search, and not to produce relevant information in this case that falls squarely within the scope of legitimate requests for production. Bio-Rad has made no showing that the prior productions in different cases between Bio-Rad and 10X are sufficient to address the issues that are in dispute between the parties here. In this case Bio-Rad is asserting different patents than it has asserted before. It is accusing new products that were only recently released. 10X accuses Bio-Rad of antitrust violations that have never been litigated. And 10X accuses Bio-Rad of asserting patents that were obtained by inequitable conduct. The parties agreed that documents produced in prior cases should be deemed produced in this case as a matter of convenience and efficiency. It was essentially effortless. And it meant that in the cases where relevant documents had already been produced, they did not need to be produced again. That decision of ministerial convenience did

not come with a substantive presumption baked into it that the documents from the prior case were going to cover the issues that needed to be addressed in this case. The fact is that many areas of key discovery have either not been explored or have only been touched upon incidentally as the parties litigating the prior cases explored the issues that were most relevant to those cases does not mean that discovery in this case is complete or even close to it. 10X is not asking for Bio-Rad to reproduce documents it has already searched for and produced. But Bio-Rad cannot on the one hand cite the fact of old productions and on the other hand refuse to confirm that those productions are actually complete responses to 10X's current discovery requests. In other words, Bio-Rad cannot simply assume that it has complied with its discovery obligations. It has to actually investigate, exercise reasonable diligence, and confirm that it has not failed to produce information that 10X would have been entitled to in any other case. Bio-Rad has refused to take these basic steps. Instead Bio-Rad has applied arbitrary limits that mean Bio-Rad will not even search for the requested documents to determine whether they have been produced. This is wrong and it is not how discovery is meant to work. For one example, Bio-Rad has refused to confirm that it has searched for and produced all documents from before 2016 related to 10X. There are claims in this case that have never been litigated before that relate expressly to Bio-Rad's ongoing attempts to squelch competition from 10X and others and without Bio-Rad's investigation and confirmation it is all but impossible that Bio-Rad will have produced a reasonable scope of relevant and responsive evidence that 10X would have been able to collect in the ordinary course of any other case. Bio-Rad can certainly rely on its older productions to help meet its discovery obligations in this case, but it cannot use its old productions to avoid its discovery obligations in this case. Bio-Rad needs to confirm that all

relevant and responsive documents that can be located by a reasonable search have been produced.

Additionally, for many of the same requests, Bio-Rad has sought to limit the scope of the request by adding additional restrictions on its production. For example, there are requests for which Bio-Rad proposes producing documents that relate only to 10X and the Asserted Patents. Particularly in a case such as this with antitrust claims that are not limited to the Asserted Patents, such limitations are improper. Moreover, there is no reason to assume that the most relevant documents about 10X at Bio-Rad specifically relate to the Asserted Patents. As explained further below, 10X's requests are entirely relevant to the claims and defenses in this case without these restrictions and therefore Bio-Rad should be required to produce the full scope of the requested documents that can be located by a reasonable search.

Many of Bio-Rad's RFP responses improperly apply arbitrary date cutoffs that ignore the facts of the case and the principles behind the request. For example, Bio-Rad has frequently said that  it will only produce documents starting from 2016[14] and provides no rationale for such cutoff other than to note that it is one year before the acquisition. But Bio-Rad has identified no particular burden for collecting documents before 2016. Bio-Rad simply asserts that providing documents a year before the RainDance acquisition is sufficient. It is often not sufficient and Bio-Rad's position is untenable with respect to a number of important requests the relevance of which stems from facts and events taking place well before 2016. For example, Bio-Rad applies a date cutoff of 2016 to RainDance's NGS collaborations, but public documents confirm that

---

[14] Bio-Rad has proposed the following dates: (1) 2013 cutoff for 10X RFP Nos. 2, 3, 8, 10, 11, 282; (2) 2015 cutoff for 10X RFP Nos. 283, 284, 293, 294; (3) 2016 cutoff for 10X RFP Nos. 6, 7, 8, 9, 10, 11, 13, 14, 17, 19, 21, 43, 44, 45, 49, 51, 53, 56, 187, 281, 295, 320, 321, 322; and (4) 2016-17 time frame for 10X RFP Nos. 48, 50.

such collaborations existed prior to 2016. See https://www.pacb.com/press_releases/pacific-biosciences-and-raindance-technologies-partner-to-co-develop-and-commercialize-novel-solution-for-de-novo-whole-genome-assembly/ (2015 article regarding a partnership between Pacific Biosciences and RainDance to develop an NGS solution). The true extent of RainDance's putative involvement in the NGS space prior to the time when Bio-Rad bought the company has potential relevance for patent remedies and 10X's antitrust claims. 10X attempted to work with Bio-Rad to identify rational time limitations that were tied to the facts of the case such that they would both allow 10X to obtain the full scope of relevant discovery and reduce the possible burden on Bio-Rad, but those efforts were typically rejected by Bio-Rad without any meaningful explanation. 10X continues to propose those compromise dates below where applicable.

The relevant categories of Bio-Rad's improper restrictions of subject matter for which it will make a reasonable search and production of responsive documents is discussed as follows.

(a) Bio-Rad shall remove improper limitations on RFPs related to patents or portfolios, certain communications of RainDance and its Board or Pacific BioSciences, and communications with Grant Thornton (which performed fair value analysis of the RainDance acquisition), and communications between Bio-Rad and RainDance based on the RainDance acquisition, the Asserted Patents, or Bio-Rad [*e.g.*, 10X RFP Nos. 2, 3, 4, 8, 187, 278, 320, 321, 322]

Bio-Rad improperly limited multiple request for production by adding restrictions that excluded relevant information. For example, Bio-Rad limited assessments of Bio-Rad and RainDance Patents generally to those connected to the Bio-Rad acquisition of RainDance (RFP No. 2 and 3). The Bio-Rad and RainDance patents are the portfolios that Bio-Rad illegally aggregated as alleged in 10X's antitrust claims, and the RainDance portfolio contains the Asserted patents. Bio-Rad cannot refuse to produce documents related to the patents in the portfolios that contain the Asserted Patents, or the patents in the portfolios that are the subject of 10X's antitrust claims. The portfolio as a whole, how Bio-Rad valued it in the transaction, are

matters that Bio-Rad has placed in dispute by relying on the purchase price of the RainDance acquisition in support of its remedies demands in earlier litigation. Moreover, Bio-Rad's assessment of the entirety of the portfolio is highly relevant to the issues of antitrust market definition, antitrust injury, and exclusionary conduct as addressed in 10X's antitrust claims.

Bio-Rad has also limited its search for communications between Bio-Rad and another entity regarding Bio-Rad's patent rights to communications regarding Bio-Rad's "Asserted Patents." (RFP No. 187). Bio-Rad has similarly limited it its search for communications between Bio-Rad and RainDance to just communications related to the acquisition (RFP No. 4). These are not an appropriate limitation, particularly in light of 10X's antitrust claims that relate to Bio-Rad's use of the entire portfolios to result in anticompetitive harm. All communications between Bio-Rad and RainDance, not just those that Bio-Rad states are related to the acquisition itself, are relevant to the ongoing and evolving market dynamics and competition that culminated in Bio-Rad's illegal acquisition. The notion that the only relevant communications between these competing entities are the ones that led directly to the acquisition is unfounded and implausible. Bio-Rad has similarly limited its production regarding information regarding intellectual property to only that intellectual property also connected with the "Asserted Patents." (RFP No. 278). For the same reasons, that is improper.

Bio-Rad has also improperly limited the production of marketing, business plans, and strategy documents to Bio-Rad, excluding such documents from RainDance (RFP No. 8). RainDance was competing with Bio-Rad in the ddPCR market prior to the acquisition, and Bio-Rad must produce market documents for RainDance. Bio-Rad was conscious of this competition and Bio-Rad's strategies in response to this competition during the time prior to the acquisition are relevant. The ddPCR market in which Bio-Rad and RainDance competed was a relatively

new market at the time of the acquisition and it was newer when RainDance first started trying to sell itself, initially in a withdrawn IPO attempt and then through acquisition. Documents from both of the pre-merger entities going back far enough to have a complete understanding of their competitive dynamics is justified to have a full and complete understanding of the eventual acquisition and its significant in this new market.

Pacific BioSciences is a third party that worked with RainDance on NGS Sample Prep development and the CEO of which sat on RainDance's board.  Bio-Rad improperly limited documents and communications between RainDance or Bio-Rad and Pacific BioSciences, or RainDance and its Board of Directors, that relate to Bio-Rad or 10X  to only those communications regarding the Asserted Patents. Particularly in light of 10X's antitrust claims, such limitations are improper. Communications in which RainDance is discussing either 10X or Bio-Rad with its board member or another company are relevant to RainDance's role in the anticompetitive merger with Bio-Rad.    (RFP No. 320, 321, 322). Similarly, given that the anticompetitive merger occurred between Bio-Rad and RainDance, Bio-Rad cannot limit the scope of production of documents between them to only those that it characterizes as related to the acquisition itself. 10X is allowed discovery into the full scope of communications between the entities that committed the illegal merger. Again, Bio-Rad cannot limit its production related to Grant Thornton documents to only the RainDance 2017 acquisition. To the extent there were other documents related to RainDance that were communicated with Grant Thornton, Bio-Rad needs to produce those documents. If there are no such documents, Bio-Rad should so confirm. If such documents are indeed unrelated to the subject matter of this case, Bio-Rad should state enough information about the documents to establish that fact rather than simply refusing to produce.

**(b)** Bio-Rad shall remove limitations on RFPS related to 10X  [10X RFPs 28, 34, 39, 44, 45, 48, 137, 320, 322]

Bio-Rad repeatedly inserts improper limitations to attempt to avoid producing documents related to 10X. For example, Bio-Rad limited communications between RainDance or Bio-Rad and Pacific Bio-Sciences, or RainDance and its Board, related to 10X to communications related both to 10X and the Asserted Patents. In another instance, Bio-Rad limits a request that includes 10X generally, the accused products, or litigation to only the lawsuits filed by Bio-Rad against 10X or other competitors. As another example, communications between 10X and RainDance should not be limited only to negotiations relating to potential licensing or acquisitions prior to Bio-Rad's acquisition of RainDance when the request more broadly sought "discussions and negotiations." Bio-Rad also improperly limited a request for statements Bio-Rad made to anyone other than Bio-Rad about 10X to statements "concerning competition with 10X." If Bio-Rad has communications with third parties about 10X and it is not related to competition, those documents are particularly relevant. For example, if Bio-Rad discussed the fact that it was suing 10X with others, those communications would be relevant even if they did not relate to competition. Bio-Rad similarly limited its collection of documents related to communications with 10X and one of a number of specifically listed entities, whereas the request sought documents related to 10X and any one of the listed entities without being limited to communications between them. In another example, Bio-Rad limited its production of documents related to 10X's access to capital or value to only "valuations of 10X." Bio-Rad also limited the scope of its production of documents related to 10X's IPO to include only 10X's IPO itself and not planned or possible IPOs. Similarly, documents relating to step emulsification or Next GEM (10X's newly designed product) are relevant both to the technical issues related to the patents in this case, as well as the technologies in the markets generally. Bio-Rad cannot hide

the full scope of what it knows about this technology by only producing documents related to step emulsification as it relates to Bio-Rad's or 10X's products.

    (c) Bio-Rad shall remove date restrictions for categories of documents such as assessments of the portfolios containing the asserted patents [10X RFP Nos. 2, 3, 6, 13, 17, 18, 19, 49, 281, 282, 283, 284, 321]

Bio-Rad places date restrictions on requests for production that either should have no date restriction, or at most an early date restriction. Such RFPs relate to basic discovery that is routinely provided.

For example, documents related to the Bio-Rad, RainDance, or combined portfolios (10X RFP No. 2, 3) were limited by Bio-Rad to 2013 or 2016 on. Assessments of portfolios that contain the asserted patents at any time is relevant to the patent claims asserting those patents. For example, low assessments of the portfolio can show that all of the patents within it, including the Asserted Patents, are not valuable. It is not appropriate to place any time limits on the assessments of the portfolios containing the Asserted Patents. Similarly, documents related to the intellectual property related to genetic analysis on a droplet platform, PCR, ddPCR, or NGS (10X RFP No. 6, 49) were limited by Bio-Rad to 2016 on. This intellectual property is relevant to the content and characteristics of the Droplet Genetic Analysis Technology Market. Documents at any time that relate to this intellectual property are relevant to this antitrust market.

In prior litigations it was alleged that RainDance was attempting to compete with 10X in NGS Sample prep. 10X has sought discovery into any efforts RainDance made into developing NGS Sample Prep Products or the lack of such products, the products RainDance had in development, collaborations regarding NGS Sample Prep, and any harm caused by 10X. (RFP Nos. 13, 18, 19, 281-83, 321). But Bio-Rad has refused to provide discovery before 2016. This is not appropriate. Even the public information on RainDance's collaborations shows that they

began before 2016. See https://www.pacb.com/press_releases/pacific-biosciences-and-raindance-technologies-partner-to-co-develop-and-commercialize-novel-solution-for-de-novo-whole-genome-assembly/ (2015 article regarding a partnership between Pacific Biosciences and RainDance to develop an NGS solution). Any work RainDance did to develop NGS Sample Prep technology should be produced.

RainDance's capitalization tables and organizational charts (RFP No. 17, 284) should be produced without time limit as well. The individuals or entities over time who had an interest should be produced.

**(d)** Bio-Rad shall remove date limitations and produce documents related to ddPCR from 2011 to the present [10X RFP Nos. 7, 8, 17, 21, 43, 51, 52, 53, 56, 187, 293, 294, 295, 321]

In 2011 Bio-Rad acquired QuantaLife and this acquisition enabled Bio-Rad to enter into the ddPCR market in 2011.  With this acquisition, Bio-Rad also acquired a patent portfolio that it later aggregated with RainDance'sand after this acquisition began its pattern of acquiring would be competitors.  For requests or portions of requests that relate to ddPCR, a cutoff of 2011 when Bio-Rad entered the market is appropriate. These request fall into a number of categories:

*First*, documents related to the ddPCR product market, droplet genetic analysis technology market, competition, or products (10X RFP No. 7, 8, 21, 51, 52, 53, 187, 321), Bio-Rad limited document production related to the ddPCR market or products from 2016 on, and agreed to provide financial information from 2013 on. Bio-Rad must produce documents from at least 2011 because that is when Bio-Rad entered the ddPCR market. Assessments of the relevant markets, as called for in RFP No. 7, must be provided at least as of 2013 in order to assess the state of the markets, competition, efforts at finding substitute technologies, and the ultimate imact of the acquisition. In particular, competitive analyses in the relevant markets must be

provided at least as of 2013 (RFP Nos. 51, 52, 53). 10X sought documents from Bio-Rad since 2002 regarding products such as PCR products, but offered to compromise on 2011. Bio-Rad continued to insist on a 2016 date cutoff. Bio-Rad's ddPCR products are alleged embodying products, and Bio-Rad's analysis when entering the market is relevant to the antitrust claims and permit analysis of the market and changes over time. Bio-Rad again also made this early market relevant to remedies when it relied on the acquisition of QuantaLife and subsequent acquisitions to obtain an injunction. Case No. 15-152-RGA, ECF No. 516. Thus, if Bio-Rad was evaluating the market early on in its product development process has also placed early evaluations of the market associated with its ddPCR products at issue because it has relied on its acquisitions to obtain an injunction.

*Second*, information regarding the substitutability of non-droplet products for droplet products (10X RFP No. 293, 294)—or the absence of substitutes—is relevant to definition of the antitrust markets, in which Bio-Rad was a participant since 2011, not 2015.

*Third*, Bio-Rad's townhall presentations, earnings calls, organizational structure, and documents related to code of business ethics and conduct (10X RFP No. 17, 295, 43, 56) need to be produced from 2011 when Bio-Rad acquired QuantaLife and Bio-Rad entered a relevant market. Bio-Rad's townhall meeting presentations in particular include information relating to mission, long term goals, strategy to achieve Bio-Rad's goals, approaches to product development, sales opportunities, advertising, and conference participation. Thus, these presentations need to be provided from 2011 to the extent they relate to any technology at issue in this case. Bio-Rad's business plans are relevant to multiple issues, including the antitrust claims and how Bio-Rad assessed its position in the market, and thus what motivations were present before and leading up to the RainDance acquisition.

(e) Bio-Rad shall remove date limitations and produce documents related to 10X from 2012 to the present [10X RFP No. 14, 39, 45, 48, 137, 320, 322]

For requests or portions of requests related to 10X, a 2012 cutoff would be appropriate because 10X was established in 2012. Requests for Production Nos. 14, 39, 45, 48, 137, 320, 322 relate at least in part to 10X's products, competition, and licensing; Bio-Rad's communications with third parties about 10X; documents related to 10X and identified third parties; 10X valuations; 10X generally, the accused products, or litigation; communications between RainDance or Bio-Rad and Pacific BioSciences (a 3rd party that worked with RainDance on NGS Sample Prep development and whose CEO sat on RainDance's Board of Directors), or RainDance and any of its Board of Directors, about 10X. But for each Bio-Rad only agreed to produce documents from 2016 on. In one instance, Bio-Rad limited its valuations of 10X to 2016 and 2017 (RFP No. 48). Without confirmation that Bio-Rad has investigated and confirmed there are no other responsive documents, such Bio-Rad's date range cutoffs are improper. The 2012 date for the founding of 10X is appropriate and should be the date cutoff applied.

Documents related to 10X from before 2016 are relevant. RainDance sued 10X in 2015 and then sold itself and the litigation to Bio-Rad in 2017. How RainDance and Bio-Rad viewed 10X early on and how that view of 10X changed or did not change over time is relevant to 10X's antitrust claims and understanding what lead to the ultimate merger of RainDance and Bio-Rad.

Bio-Rad points to no special burden in producing the full scope and time of responsive information, it is relevant, and it should therefore be produced.

(f) Bio-Rad shall remove date limitations and produce documents related to Droplet Single Cell and/or NGS Sample Prep Product Market from 2013 to the present [10X RFP Nos. 9, 10, 11, 44, 50, 51, 53]

For requests or portions of requests related to the market for next generation sequencing ("NGS") sample prep or droplet single cell NGS sample prep, 10X a 2013 cutoff date is

appropriate to capture early market documents. Requests for Production Nos. 9, 10, 11, 44, 50, 51, and 53 sought documents related to the market for next generation sequencing ("NGS") sample prep or droplet single cell NGS sample prep and the step emulsion technology in that market, but for each Bio-Rad only agreed to produce market-related documents from 2016 on. Assessments of the relevant markets, as called for in RFP No. 9, must be provided as of 2013 in order to assess the market. One response that is particularly problematic limited the production of documents related to the projected or expected market share in the droplet single cell product market if 10X were no longer competing to the years 2016 or 2017 (RFP No. 50). Such analyses must be provided at least as of 2013, and in particular competitive analyses in the relevant markets must be provided as of 2013 (RFP Nos. 51 and 53). Without confirmation that Bio-Rad has investigated and confirmed there are no other responsive documents, such Bio-Rad's date range cutoffs are improper. In fact, in some of these responses, Bio-Rad agreed to provide financial information related to single cell NGS sample prep from *2013*, and still limited the production of information related to the market to 2016. The 2013 date is appropriate—as Bio-Rad's agreement to produce other documents related to the same products confirms.

The droplet single cell NGS sample prep market documents from 2013 to 2016 are relevant both to the markets that are the subject of 10X's antitrust claims and to remedies. Adopting a 2013 date ensures that 10X obtains documents related to Bio-Rad's subsequent entry into the droplet single cell NGS sample prep market and the lead up to it, including the initiation of work on these products. Companies typically evaluate the market they are entering, and such documents are relevant to understanding the forces in the market and how they evolve over time. In this case in particular related to an illegal merger, discovery into the market in which the merger occurs is relevant and includes evaluating that market over time. Bio-Rad has also made

such early documents relevant to remedies. A Bio-Rad witness in a prior case submitted a declaration after trial in support of Bio-Rad's injunction request that described alleged disruption to Bio-Rad's "droplet roadmap" by 10X. Case No. 15-152-RGA, ECF No. 516. Thus, if Bio-Rad was evaluating the market early on in its product development process has also placed early evaluations of the market associated with its NGS Sample Prep products at issue because it has relied on its early plans to obtain an injunction.

**Bio-Rad's Position:**

10X's reasons for removing reasonable date limits highlights its efforts to balloon this case and abuse discovery. Contrary to 10X's claims, its counterclaims are not so complex as to justify discovery without limitation on time, or from the beginning of the parties' founding or entry into the alleged market. It is 10X, not Bio-Rad, that is imposing arbitrary date ranges. For example, 10X has no justification why 10X's founding in 2012 has anything to do with the conduct at issue in this case.

**(a) Patents, RainDance, Pacific BioSciences, and Grant Thornton**: On the patent side, 10X's products at issue were released in 2019. On the antitrust side, 10X's counterclaims are about Bio-Rad's merger with RainDance in 2017. Bio-Rad has agreed to produce documents related to the RainDance merger from 2013 to present, since that is 10X's central allegation. Bio-Rad is agreeing to produce documents regarding competition and markets since 2016, which will give 10X enough information to assess the state of the market before and after the RainDance merger. 10X makes no argument why earlier documents from long before the alleged conduct took place is essential, proportionate, or even relevant to its claims. Therefore, there is no reason to extend discovery prior to 2016 with respect to 10X, especially given the discovery 10X

already has from prior litigations with Bio-Rad. The history between the parties demonstrates why 10X's request for documents related to 10X going back to its founding in 2012 is outlandish: Bio-Rad and 10X have been involved in several other litigations, are competitors, and several former Bio-Rad employees left Bio-Rad to found 10X. 10X attempts to abuse the discovery process to gain commercial information regarding a competitor, despite not having any relevance to the case.

Bio-Rad's agreement to produce documents between RainDance and Pacific BioSciences and referencing Bio-Rad and any of the Asserted Patents from 2016 to present is adequate. It is unclear how communications between RainDance and PacBio (a third party) are relevant to this case unless they are discussing the asserted patents.

(b) **Documents related to 10X**:  Bio-Rad has agreed to produce documents regarding 10X from 2016 to present, and to the extent that 10X is mentioned in documents regarding the RainDance merger, that will include documents going back to 2013. That is only one year after 10X's founding in 2012.  10X's request for all documents regarding 10X since 10X's founding in 2012 is absurd. 10X's statement makes plain that the reason 10X is seeking these documents has nothing to do with Bio-Rad's merger with RainDance, and instead range from Bio-Rad's lawsuits (which 10X has stated to the Court it is not challenging), "planned or possible IPOs", and all of Bio-Rad's communications with anyone about 10X, without limits to subject matter or time. Incredibly, 10X argues that all communications about 10X, regardless of when they were made, would be relevant to this litigation. Nothing about 10X's proposal is proportional or in keeping with Rule 26.

(c) **Assessments of patent portfolios**: 10X is requesting discovery with no reasonable no time limit on a hodge podge of issues that 10X admits it has already taken discovery on in other

cases.  In the interest of compromise, Bio-Rad has offered to search and produce documents within specific time frames.  For example, Bio-Rad, in response to RFP No. 3, agreed to search for and produce documents constituting assessments of the combined Bio-Rad-RainDance patent portfolio conducted in connection with Bio-Rad's acquisition of RainDance beginning in 2013.  Further, 10X, in RFP No. 17, requests "Documents sufficient to show the organizational structure of Bio-Rad and RainDance at all times from 2011 to the present."  In light of the significant discovery conducted between the parties, Bio-Rad offered to limit the search to 2016 to present.  This should be more than sufficient for this litigation.  Nevertheless, 10X continues to improperly seek information with no bounds.  This type of excessive discovery is contrary to the "just, speedy, and inexpensive determination of every action and proceeding."  Fed. R. Civ. P. 1.

10X argues that in prior litigations it was alleged that RainDance was attempting to compete with 10X in NGS Sample prep, and that any work RainDance did to develop NGS Sample Prep technology should be produced.  If that is the case, then 10X has all the discovery it needs on this issue from the prior litigations.  Nevertheless, Bio-Rad has already offered to search for documents in the past 4 years in an attempt to seek a compromise.  See, e.g., Bio-Rad's Response to 10X's RFP 17 ("Plaintiff agrees to conduct a reasonable search for and produce non-privileged, non-work product documents within its possession, custody, or control relating to any determination made by RainDance not to produce NGS sample prep products and RainDance's efforts to develop NGS sample prep products from 2016 to present.").  Again, given the prior litigations on the very issues 10X admits were at issue, it is improper for 10X to demand a "redo" of discovery from those cases.

**(d) ddPCR**: 10X has no justification why Bio-Rad's 2011 transaction with QuantaLife is related to its counterclaims about the RainDance acquisition. When Bio-Rad entered the alleged ddPCR market is not relevant, because 10X has not alleged that its 2011 merger with QuantaLife and entry into the alleged ddPCR market had anything to do with RainDance in 2017. 10X does not allege any other merger but the RainDance merger is anticompetitive, so the only "pattern" of behavior 10X alleges is that Bio-Rad has entered into legal transactions in the past. An antitrust plaintiff is simply not entitled to the defendants' documents for the entirety of its existence in any given market. Once again, 10X doesn't even pretend to seek proportional discovery.

**(e) Documents regarding 10X**: Bio-Rad refers to its response to (b) because the issues are identical.

**(f) NGS Sample Prep**: There is no reason for 10X to receive discovery regarding the alleged NGS sample prep market prior to 2016. 10X's statement that it requires discovery from 2013 to capture "early market documents" is not proportional to the case. A time frame of 2016 to present is enough to capture the state of the market before and after the merger. Moreover, Bio-Rad and RainDance's productions from the '152 patent case in Delaware concerned the NGS sample prep market and related droplet products, and such documents are already part of that production, which has been deemed produced in this case.

10X's requests for decades-long discovery is therefore not relevant or proportional to the case.

| Issue #30: Declaration of Annette Tumolo from 152 Case, D.I. 516 | |
|---|---|
| 10X's Proposal:<br><br>Bio-Rad shall produce all documents related to the statements and declaration of Annette Tumolo in the 152 Case, D.I. 519, from 2011 to the present and without limitations on scope, e.g., products within the alleged markets.  [10X RFP Nos. 229-38, 242, 243, 246-54] | Bio-Rad Proposal:<br><br>The Tumolo declaration was prepared in December 2018 in support of Bio-Rad's request for prospective injunctive relief in another case.  The scope of documents produced regarding this declaration should comport with the declaration's temporal and substantive scope and the issues in this case. Seven years-worth of backward-looking documents "without limitations on scope" is disproportionate.  Bio-Rad will produce documents from 2016 forward relating to Ms. Tumolo's statements regarding harm to Bio-Rad in the markets in which Bio-Rad and 10X compete. |

**10X's Position:**

Annette Tumolo provided testimony and a declaration in support of post-trial briefing in

the 152 Case that contained numerous assertions relevant to the claims and defenses in the

present case including Bio-Rad's: supposed expectation that it would release a product that

would "leap-frog" 10X and be ahead of the curve with new products (RFPs 229-230, 238, 242-

243, 248); investments and acquisitions of genetic analysis companies (RFP 232-237);

competitive advantage and capacity (RFPs 231, 246-247, 249-250); and harm from 10X (RFPs

251-254).  Knowing the full extent of alleged factual support for Ms. Tumolo's statements that

has ever existed within Bio-Rad is essential for 10X to be able to defend itself against Bio-Rad's

draconian remedies demands in this case when Bio-Rad previously based a similar request on

bare statements of its witness. There does not appear to be any dispute that Bio-Rad needs to

provide any documents reflecting whether or not the statements that Annette Tumolo made in

support of Bio-Rad's remedies demands were true. Yet, Bio-Rad seeks to impose an arbitrary

date limitation. If Bio-Rad is allowed to limit its search for related evidence to a narrow window

of time, this unfairly benefits Bio-Rad and threatens to deny 10X discovery that it needs to

defend itself. If there was ever any evidence that Bio-Rad was going to leap-frog 10X in 2019—

something that history now tells us did not happen—the evidence that this was even possible is

likely to exist between 2016 and 2019. But the same is not true for evidence against Bio-Rad's

supposed ability to outcompete 10X. Indeed, Bio-Rad first started trying to develop a single cell

product years before Bio-Rad's arbitrary date cutoff. If the long history of that product shows

that it was never poised to leapfrog 10X, never even close, then that is clearly relevant to

whether, when 2018 came, Ms. Tumolo's predictions were even plausible, let alone correct.

Indeed, Bio-Rad has relied on its investments in droplet-related acquisitions dating from 2011 on

in trying to support its remedy demands. Bio-Rad should not be able to hide any of this highly

relevant history behind arbitrary date cutoffs.

Bio-Rad's complaint that 10X seeks "unlimited discovery" about a single declaration

shows that Bio-Rad's complaints about "blunderbuss" discovery do not make sense. Bio-Rad

filed that declaration in support of its request for an injunction. Bio-Rad is seeking an injunction

again here, albeit against 10X's new products. And it is one declaration. If Bio-Rad does not

have support for it, it can say so. If Bio-Rad cannot locate support for it based on a reasonable

search then Bio-Rad should not be allowed to bolster its arguments or make them again later.

Moreover, Bio-Rad's argument that the testimony was in an earlier case misses the point. Bio-

Rad has sued 10X again and made it clear that Annette Tumolo is a key figure in its case.

Annette Tumolo's prior statements about highly relevant subject matter are relevant to this case

as well. She cannot testify here against a blank slate. Bio-Rad needs to produce the evidence it

has if it has any at all.

**Bio-Rad's Position:**

10X's roughly 20 RFPs regarding a December 2018 declaration of Annette Tumolo in the Delaware *RainDance* litigation is an attempt to forum-shop and get around the scope of discovery in the prior case and revisit the Federal Circuit's recent ruling. This is improper. Nonetheless, Bio-Rad has agreed to produce documents in response to these RFPs going back to 2016, **two years** prior to the declaration, and one year prior to the alleged anticompetitive *RainDance* merger.

The Tumolo declaration was prepared in support of Bio-Rad's request for injunctive relief after Bio-Rad secured a verdict of infringement against 10X. While the Tumolo declaration mentions some historical events for context, it is forward-looking and directed to ongoing harm from 10X's continued infringement in the market for droplet-based products. For instance, Ms. Tumolo stated that "l0X's early position in the emerging droplet market is allowing it to develop customer relationships that are hard to overcome." Likewise, she stated that l0X's infringing competition irreparably harms Bio-Rad because l0X is creating thought-leader advocacy and customer relationships that are resulting in a long term loss in market share that is hard to trace, difficult to quantify and tough to recoup. 10X's infringement is increasing our marketing and sales costs because it is expensive to sell head-to-head given l0X's infringement allowed it a head start in the market and to use similar technology."

All of these points were confirmed by the Federal Circuit in affirming the jury's verdict in the *RainDance* litigation and most of the permanent injunction: "***Based on its willful infringement—a finding 10X does not challenge on appeal—10X has established a strong market lead over Bio-Rad***." *Bio-Rad Labs., Inc. v. 10X Genomics Inc*., No. 2019-2255, 2020 WL 4431893, at *18 (Fed. Cir. Aug. 3, 2020). 10X's blunderbuss request for unlimited

discovery on Annette Tumolo's 2018 Declaration is improper forum shopping to revisit a point they lost in the *RainDance* litigation and should be rejected.

To the extent 10X seeks documents regarding the statements in this declaration, the scope of production should be commensurate with the scope of the declaration, both in substance and in time. 10X's request for documents that predate the declaration by **seven years** and relate to any and all statements in the declaration "without limitations in scope" is excessive and disproportionate to the needs of the case.

In its statement above, 10X effectively acknowledges that there is no need for seven years of backward-looking documents.  10X's lead argument is that the Tumolo declaration pertains to the "supposed expectation that [Bio-Rad] would release a product that would "leap-frog" 10X and be ahead of the curve with new products (RFPs 229-230, 238, 242-243, 248); investments and acquisitions of genetic analysis companies (RFP 232-237); competitive advantage and capacity (RFPs 231, 246-247, 249-250); and harm from 10X (RFPs 251-254)." These are all **forward-looking** issues, not issues that require discovery into seven years of historical documents "without limitations in scope."

Bio-Rad has agreed to produce documents going back to 2016 that relate to Ms. Tumolo's statements in the declaration regarding harm to Bio-Rad in the markets in which Bio-Rad and 10X compete.  This scope of production is reasonably tethered to the scope of the 2018 declaration and encompasses documents relevant to the issues in this case.

| Issue #31: Interrogatory No. 2 | |
|---|---|
| 10X's Proposal:<br><br>Bio-Rad shall provide full and complete responses to interrogatories, including all information and contentions presently known | Bio-Rad Proposal:<br><br>Given that fact discovery is progressing and is not currently scheduled to end until October 9, 2020, Bio-Rad shall provide reasonably |

| | |
|---|---|
| to Bio-Rad based on a good faith investigation, including by supplementing the following interrogatory for which Bio-Rad's responses are deficient by August 24, 2020:<br><br>• Interrogatory No. 2 – Bio-Rad shall respond to the interrogatory asked in full, including by stating in its response whether or not it has contentions regarding whether each identified product infringes any patent or patents that Bio-Rad has the right to enforce and if so which patent or patents. | supplemented responses to interrogatories consistent with F.R.C.P. 26(e), including all information and contentions presently known to Bio-Rad based on a good faith investigation, and without waiving objections regarding relevance or admissibility, no later than two weeks from the date this order is entered, as follows:<br><br>• Interrogatory No. 2—Pursuant to Rule 26(e), Bio-Rad shall supplement its response to identify products and sellers that compete with its products in ddPCR or NGS Sample Prep, as well as 10X's NGS Sample Prep product, and market share information to the extent available. Bio-Rad intends the scope of this response to include products that it contends are suitable substitutes. Bio-Rad will also respond with reasons for why it believes the products are substitutable. Bio-Rad will also state whether each identified product embodies any of the Bio-Rad asserted patents and identify the basis for this contention. |

**10X's Position:**

Bio-Rad's original response entirely failed to answer to this interrogatory and while Bio-Rad has now Bio-Rad has at least agreed to provide—almost a month after Bio-Rad's response was due—much of the required information, Bio-Rad is still refusing to provide contentions of key importance to the case. The text of the interrogatory is provided in full at the end of this section for reference. Interrogatory No. 2 seeks Bio-Rad's contentions about competing products, an issue of central importance to multiple issues in both the antitrust and the patent claims at

issue in this case. The present dispute relates to whether Bio-Rad will identify for substitute products whether it has contentions regarding whether those products practice any other patents that Bio-Rad has a right to enforce, and if so what those patents are. At present, Bio-Rad is prepared to state its contentions about whether and how any alleged substitutes infringe ***the Bio-Rad asserted patents***, but not whether or how they infringe any other patent that Bio-Rad has the right to enforce. The information Bio-Rad is planning to withhold goes to specific contentions to which 10X needs to know the answers. Market definition is a contested issue in this case and in one aspect it turns on the question of whether there are suitable substitutes for certain Bio-Rad products and certain 10X products. Other issues of market definition turn on whether there are suitable technological substitutes for the microfluidic architecture that 10X uses in its products. 10X needs to know both whether Bio-Rad plans to contend that there are substitutes 10X could use instead of microfluidic emulsions, in order to try to defeat 10X's market definition or claims of injury, and whether Bio-Rad contends those substitutes are in fact ones outside the scope of Bio-Rad's patent portfolio to understand whether Bio-Rad actually contends that they are in fact an available substitute 10X could use to replace the microfluidic emulsions it currently employs. Moreover, for Bio-Rad to attack market definition, market power, or injury, in the antitrust case, Bio-Rad needs to say whether any supposedly available substitute products are or are not, in Bio-Rad's view, infringing on patents in Bio-Rad's aggregated patent portfolio. If Bio-Rad has such contentions, Bio-Rad cannot hide them and then try to contest issues arising from whether alleged substitute products or technologies would be free from Bio-Rad's patent assertions. If Bio-Rad has no such contentions, it should say so in an interrogatory response rather than keep its contentions to itself and wait in ambush. If Bio-Rad asserts privilege over such contentions, it should say in an interrogatory response that it has believes about the subject matter of the

interrogatory but that they are privileged and accordingly Bio-Rad does not intend to rely upon them to prove its claims or defenses. Simply not answering is not how discovery is supposed to work. Bio-Rad should not be allowed to withhold these key contentions or prevent 10X from knowing what positions of Bio-Rad it is litigating against.

> **Interrogatory No. 2** - Identification of competing products as well as the identification of substitutable products to any Bio-Rad ddPCR product or for any Bio-Rad or 10X NGS Sample Prep Product, or any Accused Instrumentality, as well as the reasons and bases for why, including whether or not it infringes Bio-Rad's Asserted Patents is directly relevant to the issue of the appropriateness of definitions of the alleged product markets in this case as well as damages. A product market includes all those goods and services regarded as interchangeable or substitutable by consumers. The existence of substitutable products also goes to the *Panduit* factor of alleged non-infringing alternatives and the existence of substitutable products. To the extent that Bio-Rad refuses to identify such products as well as explain its reasoning and bases for its contention, it should be precluded from relying on them to challenge the alleged market definitions or rely on them as non-infringing alternatives.

**Bio-Rad's Position:**

10X's request asks Bio-Rad generate legal opinions in response to Interrogatory No. 2 on an issue that is irrelevant to this case: whether products sold by third parties practice the claims of patents that are not at issue in this case. Determining whether any product that competes with Bio-Rad in the ddPCR or NGS sample prep space infringes *any* patent that Bio-Rad has a right to enforce is incredibly burdensome and would in any event result in undiscoverable legal opinions and work product. It would require considerable effort for Bio-Rad to make that determination for just one of these products, even assuming Bio-Rad possessed sufficient information to do so, let alone make this determination for the dozens Bio-Rad has identified. 10X's request goes far beyond the scope of reasonable discovery in this case, and is accordingly unjustified.

---

**Issue #32: Interrogatory No. 3**

---

| 10X's Proposal: | Bio-Rad Proposal: |
|---|---|
| Bio-Rad shall provide full and complete responses to interrogatories, including all information and contentions presently known to Bio-Rad based on a good faith investigation, including by supplementing the following interrogatory for which Bio-Rad's responses are deficient by August 24, 2020:<br><br>• Interrogatory No. 3 – Bio-Rad has agreed to supplement its response to Interrogatory No. 3 to include additional license agreements related to droplet-based genetic analysis and droplet-based microfluidics from 2015-present (if any). Bio-Rad shall also provide licenses from before 2015 that are within the scope of this interrogatory. In addition to the information Bio-Rad will be providing, Bio-Rad shall also provide negotiations that led to each identified license and the persons who participated. | Given that fact discovery is progressing and is not currently scheduled to end until October 9, 2020, Bio-Rad shall provide reasonably supplemented responses to interrogatories consistent with F.R.C.P. 26(e), including all information and contentions presently known to Bio-Rad based on a good faith investigation, and without waiving objections regarding relevance or admissibility, no later than two weeks from the date this order is entered, as follows:<br><br>• Interrogatory No. 3—Pursuant to Rule 26(e), Bio-Rad will supplement its response to Interrogatory No. 3 to include additional license agreements related to droplet-based genetic analysis and droplet-based microfluidics from 2015-present (if any). Bio-Rad intends to identify of the information 10X requests in interrogatory No. 3, with the exception of negotiations that led to each license and the persons who participated. |

**10X's Position:**

For Interrogatory No. 3, Bio-Rad has agreed to respond to 10X's interrogatory to identify certain droplet-based genetic analysis and droplet-based microfluidics licenses, which this interrogatory requests. (The full text of the interrogatory is stated at the end of this section for reference.) But Bio-Rad has (1) imposed an arbitrary time limitation (agreeing only to respond with respect to licenses from 2015 to the present) and (2) refused to produce the negotiations for those licenses.  Generally, licenses in this space relate to multiple issues in this case, including most notably the antitrust counterclaims and remedies, and their relevance is not truly in dispute.

It is Bio-Rad's arbitrary limitations on providing relevant discovery—without ever articulating any specific burden in doing so—that are repeatedly a point of contention.

First, Bio-Rad has refused to identify licenses related to this technology from ***before*** 2015, but a broader temporal scope is required and relevant. Bio-Rad entered this technology space with the purchase in QuantaLife in 2011.  QuantaLife made ddPCR products—that are both an allegedly embodying product to patents-in-suit and also part of at least one antitrust market alleged in 10X's antitrust counterclaims. The QuantaLife acquisition is one significant datapoint that confirms that 2015 is not an appropriate cutoff and relevant licenses exist from before 2015. Moreover, even older licenses exist, and they remain relevant. Bio-Rad's own contentions support that conclusion.  For example, Bio-Rad has repeatedly affirmatively relied upon Caliper/RainDance, ApplieBio/QuantaLife and Applera/Bio-Rad (now-expired) licenses that also pre-date 2015 and date as far back as 2005. RainDance license with Harvard from which Bio-Rad asserts its rights to the patents in this case was executed in **2006**. Understanding the licensing landscape, changes to it, the technology covered by it, and the terms of that coverage is all relevant and discoverable.   These licenses will be used in support of 10X's market definition, which Bio-Rad contests, availability of technological substitutes, market power, and competitive and anticompetitive royalties.  It is plainly insufficient, even for the antitrust counterclaims alone, to only rely on licenses that were entered into around the time of the RainDance acquisition in 2017 because the contemporaneous rates do not provide the full scope of market conduct and licensing activity. Bio-Rad's argument that 10X already has documents related to the license Bio-Rad already ***chose*** to rely upon proves 10X's point. Bio-Rad is trying to force 10X to litigate against a backdrop of only the licenses from far back in time that Bio-Rad decided were most beneficial to Bio-Rad without providing the other

contemporaneous licenses that may provide context and counterpoints to Bio-Rad's chosen

position. If Bio-Rad wants to rely on licenses of its own choosing from long ago, Bio-Rad must

provide full and fair discovery into licenses from that time. 10X's interrogatory is limited to the

technological field Bio-Rad does not dispute is relevant and therefore it should be compelled to

provide all relevant licenses in it.

Second, Bio-Rad is refusing to provide discovery into the licensing negotiations and

persons who participated in those discussions. As discussed in several previous sections,

including for example Issue #16, licensing negotiations provide important context for explaining

the technology covered by the licensed patents, the identity of licensed products, and additional

considerations that affect the rate determination and license scope. Understanding the terms that

were both accepted and rejected on licenses in this technological space is highly relevant to

understanding licensing practices in this technological space and in the antitrust markets, and

identifying reasonable bounds in either ordinary circumstances or in the context of Bio-Rad's

anticompetitive conduct. That information can only come from discovery into the negotiations of

those licenses, which is reasonable and specifically requested. In the context of Bio-Rad's claims

seeking an injunction against the successful products of a publicly traded company, the likely

large damages amount that Bio-Rad will be seeking, and the seriousness of Bio-Rad's

anticompetitive conduct, this discovery is proportional to the needs of this case.

> **10X Interrogatory No. 3:** Identify and describe each license related to the Droplet
> Genetic Analysis Technology Market, any product or patent that performs or covers
> genetic analysis in microfluidic droplets or biological reactions in microfluidic droplets,
> any Asserted Patent, any Related Patent, or any patent that is comparable to any of the
> foregoing, including both active licenses and any expired or terminated licenses as well
> as all amendments and extensions; including all relevant patent(s) and the patent
> owner/assignee and co-owners (if applicable), the contract length, upfront payments,
> royalty rate, amounts actually paid or payable, the volume of licensed products;
> negotiations that led to that license and the persons who participated, whether the license
> is comparable, whether the license is sub-licensable (including an explanation of the

extent to which it is or is not), and any third party consideration owed to the patent owner/assignee or co-owners (sublicense income).

**Bio-Rad's Position:**

Bio-Rad has agreed to supplement its interrogatory response to include additional license agreements related to droplet-based genetic analysis and droplet-based microfluidics from 2015-present.  Further, Bio-Rad has already agreed to produce all licenses related to the asserted patents.   Thus, the primary disputes here are with respect to the 1) timing of the licenses and 2) the inclusion of all negotiations and who participated.

The time frame in which Bio-Rad has agreed to identify licenses is proportional to the needs of this case, particularly given the enormous amount of documents that have already been provided in this case from prior litigations.  10X's only argument justifying collecting license agreements over the last 16 years is that Bio-Rad relied on one license agreement from 2006 in a previous case.  However, 10X has access to all of the documents produced in that litigation, as well as all of the license agreements produced to show damages in several prior district court cases Bio-Rad and 10X have been involved in.

10X points to the acquisition of QuantaLife as a reason to go back further.  However, Bio-Rad acquired QuantaLife long ago in 2011, after which Bio-Rad began offering ddPCR products. 10X cannot possibly use the QuantaLife merger to support its antitrust counterclaims regarding the RainDance acquisition. As a threshold matter, 10X cannot challenge the QuantaLife merger as it falls well outside the four-year limitations period, 15 U.S.C. § 15(b), and would be barred by laches in any event. Further, 10X admits that Bio-Rad's entry into the ddPCR market was as a result of the QuantaLife acquisition, which is procompetitive lawful behavior. Countercl. ¶ 16.  A competitor forcing a rival to search for additional needles in a

haystack spanning almost over a decade is clearly disproportionate to the legitimate needs of this case.  *See* Fed. R. Civ. P. 26.

With respect to the negotiations for each of these licenses, licensing negotiations would have primarily taken place over email, even as far back as 2006.  For instance, with regard to the license agreement between RainDance and the University of Chicago, 10X already has 3,422 emails from the custodian at the University of Chicago relevant to licensing, which reflect the negotiation of this license.  The identification of *all* negotiations related to droplet-based genetic analysis and droplet-based microfluidics without any time restrictions is unreasonable and unduly burdensome in light of the history between the parties.

| Issue #33:  Interrogatory Nos. 4-5 | |
| --- | --- |
| 10X's Proposal: | Bio-Rad Proposal: |
| Bio-Rad shall provide full and complete responses to interrogatories, including all information and contentions presently known to Bio-Rad based on a good faith investigation, including by supplementing the following interrogatory for which Bio-Rad's responses are deficient by August 24, 2020:<br><br>&bull; Interrogatory Nos. 4-5 – Bio-Rad shall provide a full response including a statement of Bio-Rad's contentions and an identification of the facts and documents on which they are based that are known or available to Bio-Rad at the time of the supplemental response. | Given that fact discovery is progressing and is not currently scheduled to end until October 9, 2020, Bio-Rad shall provide reasonably supplemented responses to interrogatories consistent with F.R.C.P. 26(e), including all information and contentions presently known to Bio-Rad based on a good faith investigation, and without waiving objections regarding relevance or admissibility, no later than two weeks from the date this order is entered, as follows:<br><br>&bull; Interrogatory Nos. 4-5— Bio-Rad has properly invoked Rule 33(d) and 10X has failed to demonstrate why it is unable to ascertain the information it has requested from the voluminous document production 10X has asked for.  Additionally, pursuant to Rule 26(e), Bio-Rad will supplement its response at minimum to include |

|  | additional documents pursuant to Rule 33(d). |
|---|---|

**10X's Position:**

Bio-Rad has failed to provide any meaningful response to contention Interrogatories No. 4 and 5 (the text of which is provided at the end of this section for reference) by their due date a couple of weeks ago. These interrogatories go to specific contentions that are fundamental to Bio-Rad's apparent plans to escape from liability under 10X's claims and 10X therefore needs to know the answers. Market definition is a contested issue in this case and in one aspect it turns on the question of whether there are suitable technological substitutes that 10X could use to replace the microfluidic emulsions it currently employs. To the extent that Bio-Rad plans to contend that there are substitutes 10X could use instead of microfluidic emulsions, in order to try to defeat 10X's market definition or claims of injury, Bio-Rad needs to say so. Similarly, Bio-Rad has suggested that it was allowed to buy RainDance because the acquisition was procompetitive. Bio-Rad cannot just say this without explaining its reasons. Again, these issues go to the heart of the antitrust allegations. But when answering 10X's interrogatories, Bio-Rad cited a mere four documents for an interrogatory seeking Bio-Rad's contentions regarding the importance of microfluidic droplets in NGS sample preparation products, and then cited those same four documents as its contentions for the critical issues that form the basis of 10X's antitrust counterclaim, namely, efficiencies, synergies, or procompetitive benefits that Bio-Rad sought to achieve through its acquisition of RainDance. This was not a good faith attempt to answer either interrogatory.

Bio-Rad has now proposed taking almost an entire additional month to again provide an answer that will be inadequate. Bio-Rad is only agreeing to identify documents pursuant to Rule

33(d). But Rule 33(d) identification is appropriate only where "the burden of deriving or ascertaining the answer [would be] substantially the same for either party." Fed. R. Civ. Pro. 33(d) *see also Hypertherm, Inc. v. Am. Torch Tip. Co.*, No. 05-cv-373, D.I. 395 (D.N.H. Jan. 23, 2009) (granting motion to compel more complete answers to interrogatories seeking factual bases of a party's allegations and holding that reliance on 33(d) was insufficient: "Importantly, Rule 33(d) is not a means for a party to avoid answering interrogatories by making only a general reference to a mass of documents or records. In addition, the rule is construed narrowly to apply only to answers that can be derived from 'business records.'") (internal quotations and citations omitted).  These interrogatories are seeking Bio-Rad's antitrust contentions in this case, and it is not 10X's burden to guess about Bio-Rad's contentions as well as facts and evidence underlying them from a smattering of business documents containing a wide range of information. Bio-Rad has not yet answered 10X's antitrust counterclaims and it needs to promptly state its contentions and the underlying support so that the parties can engage in the orderly case development through discovery.  Bio-Rad should be compelled to provide the specificity in its contentions that 10X's interrogatories require.

**Interrogatory No. 4**: State your complete contentions, including by stating the basis of Your contentions, regarding the importance of microfluidic droplets in NGS sample preparation products, including the extent to which droplet-based products have advantages over well-based products or other products, the extent to which well-based products or other products have advantages over droplet-based products, whether droplet-based products compete more closely with other droplet-based products than they do with well-based products or other products, including identifying any fact that supports or contradicts Your contention including any person with knowledge of such fact and each Document that refers or relates to such fact.

**Interrogatory No. 5**: Identify and describe all efficiencies, synergies, or procompetitive benefits Bio-Rad sought to achieve through its acquisition of RainDance, including whether, how, and at what value each was actually realized as a result of the transaction, and why each such benefit could not have been realized through any other means such as exclusive or non-exclusive licensing.

**Bio-Rad's Position:**

Rule 33(d) expressly states that "the responding party may answer by: specifying the records that must be reviewed." (Emphasis added). Bio-Rad gave a proper Rule 33(d) response to 10X's interrogatories 4-5 by identifying specific documents in the record, and stated further that it will supplement its response pursuant to its duties under Rule 26(e). As this process makes plain, the parties have not completed their document collections and productions and 10X will receive supplemented responses well before the close of fact discovery.

10X has "the burden to show that deriving or ascertaining answers is not substantially the same for both parties." *Torres v. Johnson & Johnson*, No. CV 3:18-10566-MGM, 2018 WL 4054904, at *2 (D. Mass. Aug. 24, 2018). 10X has not and cannot meet its burden. 10X is a sophisticated commercial party that has propounded over 500 documents requests to Bio-Rad and third parties and has to accept the burden of what it has sought in document discovery. Put simply, 10X has to do the work; this is mutual, not one-sided discovery. *See* Fed. R. Civ. P. 1. Interrogatories 4 and 5 ask for Bio-Rad's contentions "regarding the importance of microfluidic droplets in NGS sample preparation products" and identify all "efficiencies, synergies, or procompetitive benefits Bio-Rad sought to achieve through its acquisition of RainDance." The information sought by 10X spanning almost a decade does not exist in a canned response sitting in Bio-Rad's files. But it does exist in ordinary course non-privileged documents, including those Bio-Rad has already identified by Bates Number to 10X. Therefore, the burden of ascertaining the answers is the same for both parties and a 33(d) response is proper.

10X cannot force Bio-Rad to do the work for it by preparing a narrative response, "however severe the discontent may be." *Torres*, 2018 WL 4054904 at *2 ("[G]eneral discontent with having to obtain discovery pursuant to the provisions of [Rule 33(d)], however

severe the discontent may be, is not a sufficient showing under the law for the Court to deny the option the rule provides.")  This is especially true where Bio-Rad has a pending motion to dismiss. 10X is turning the Federal Rules on its head by requiring Bio-Rad to state its contentions on a pleading that Bio-Rad has not had to answer yet. Therefore, a Rule 33(d) response is both proper and efficient.

**DISPUTED DISCOVERY ISSUES BETWEEN HARVARD AND DEFENDANTS:**

| Issue #34: Harvard's Public Interest Licensing Policies | |
| --- | --- |
| 10X's Proposal:<br><br>Harvard shall search for and produce documents and communications relating to Harvard's deliberations and decision to adopt its Covid19 Technology Access Framework or relating to other adopted or considered policies for providing public-interest access to Harvard technology and intellectual property used in the fight against threats to public and private health. | Harvard's Proposal:<br><br>Harvard's licensing policies and practices, including the COVID 19 framework, are publicly available on Harvard's websites and equally available to 10X as to Harvard. Additionally, Harvard agrees to conduct a reasonable search to determine whether any responsive internal policy documents exist with regard to public interest licensing beyond what is already publicly available.<br><br>Harvard will not produce internal communications with regard to the development of these policies. |

**10X's Position:**

The global pandemic has forced numerous patent rights holders to reconsider the true nature of the public interest in unfettered access to intellectual property that enables life-saving research, product development, and treatment of patients. Harvard recently engaged in such a process inspired by the COVID-19 outbreak. Harvard and other preeminent research institutions deliberated and then released a set of principles in a *Covid19 Technology Access Framework* to

ensure researchers and others would have ready access to patented technologies useful for fighting the disease. *See* https://otd.harvard.edu/about-otd/our-values/licensing-during-covid-19/. That framework includes Harvard's commitment to providing "rapidly executable non-exclusive royalty-free licenses to intellectual property rights that we have the right to license, for the purpose of making and distributing products to prevent, diagnose and treat COVID-19 infection during the pandemic and for a short period thereafter." *Id.*

This case concerns the assertion of Harvard patents against products that are used daily by researchers investigating COVID-19 and combatting the pandemic, as well as fighting cancers and other public health scourges of a similar magnitude. Currently, Bio-Rad is seeking an injunction against these products. The potential impact of this litigation on COVID-19 research is not "manufactured," as Harvard asserts, but is the result of the broader research community needing, adopting, and relying on 10X's products over others to solve this crisis. The balance of the public interest and the burdens on 10X and its researcher community against Harvard-licensed IP rights is front and center in the case. 10X seeks production of Harvard's documents and communications underlying its *Covid19 Technology Access Framework* and other similar policies concerning public access to biomedical technology from Harvard. The importance of this information is obvious. Deliberations within Harvard and communications with like-minded research institutions would illustrate how Harvard, as a repeat patent licensor, views its exclusive rights in relation to public health and the needs of researchers and whether its views have changed over time. Documents beyond the short, public framework document are also needed to see how the community has responded to Harvard's commitment.

Harvard states that it has not licensed droplet-based patents yet under the COVID-19 framework, but its license of other COVID-19-related technologies is potentially highly relevant

and the comparability of such licenses and technologies can only be assessed if Harvard

produces these materials. These searches are needed to see how Harvard's COVID-19 statement

interacts with its general approach to the public interest in its licensing practices.

Harvard's search is likely not voluminous or burdensome; virtually all of Harvard's

action around COVID-19 has happened in the last six months. This discovery is highly relevant

and is proportional to the needs of the case, particularly in view of Bio-Rad's injunction requests.

**Harvard's Position:**

10X is a for-profit company that is embroiled in litigation across the country with Bio-

Rad as the two entities compete for their own commercial purposes.  This battle began long

before COVID-19 emerged, and has nothing to do with the current pandemic.  10X's attempt to

manufacture an argument that an outcome against it in this litigation will harm the public interest

and hamper progress in the global fight against COVID-19 is simply opportunistic.

First, as 10X's own position statement acknowledges, the COVID-19 Technology Access

Framework is publicly available on Harvard's websites.  To the extent 10X believes that the

Framework supports its argument that its products should not be subject to an injunction, 10X is

free to make that argument and does not need Harvard's internal communications and

confidential documents.

Second, Harvard has represented to 10X that, to date, the only licenses granted under the

COVID-19 Technology Access Framework have concerned personal protective equipment

("PPE") and diagnostics.  It has not issued any licenses covering technology related to the

Asserted Patents, nor more generally droplet-based technologies. (Had they been, Harvard would

have agreed to produce those licenses.)  Nor have any of Dr. Weitz's technologies in other areas

been licensed under the Framework.   Accordingly, there is no reasoned basis for seeking

internal communications concerning the development of the Framework, nor the details of irrelevant and otherwise confidential licenses that have been entered into under the Framework. That technologies directly addressing the pandemic may have been licensed for the public interest has nothing to do with any evaluation of the public interest of the technologies actually at issue in the present case.

Third, Harvard has already committed to the production of a substantial amount of material in response to 10X's Requests for Production where those requests are focused on the technologies actually at issue in this case. A fishing expedition into Harvard's licensing under the COVID-19 Framework is, accordingly, disproportionate to the needs of this case and would be overly burdensome to Harvard, especially given Harvard's limited role in the lawsuit.

## II.   AGREED RESOLUTIONS IN BOTH THE 10X CASE AND THE STILLA CASE:

**Opinions or Advice of Counsel**:  Given the deadline to submit opinions and advice of counsel pursuant to L.R. 16.6(f) (not later than 28 days after entry of the Court's claim construction ruling), the parties agree that any issues with respect to disputes with regard to opinions or advice of counsel should be raised with the court (if needed) after the parties have had an opportunity to understand each party's position, meet and confer, and attempt to reach resolution after the deadline.

**Authentication**: Parties agree that any document produced by a party or entity responding to a subpoena in this action shall be deemed authentic unless a specific objection is raised before the pretrial conference. To the extent an objection is first raised near to or after the close of fact discovery, untimeliness in view of the close of fact discovery shall not be a basis to object to the diligent production of authenticating evidence—e.g., testimony or affidavit.

**Cross Use Provision**: The Parties agree to cross-production of all documents that have been will be produced in both the 10X Case and the Stilla Case, including without limitation, pleadings, contentions, disclosures, written discovery, documents and things produced pursuant to a subpoena in the 10X Case or the Stilla Case, and all other documents produced by the Parties. Any information designated under the Protective Order in either case shall be designated with at least the same level of protection under the Protective Order in the cross case. If a party's confidential information is the subject of a motion to impound, that party will be promptly served a copy of the complete set of motion papers.

The parties agree to submit Joint Amended Protective Orders in both the 10X Case and the Stilla Case by August 14, 2020.  The 10X Case PO will include the GDPR provisions from the Stilla Case PO.  The 10X Case PO will be further amended to allow Stilla's Outside Counsel to be considered Outside Counsel for purposes of the PO and the cross-use agreement in the 10X case. The Stilla Case PO will be amended to allow 10X's Outside Counsel to be considered Outside Counsel for purposes of the PO and the cross-use agreement in the Stilla Case.  Once the Court enters the amended POs, the Parties agree to cross-produce any documents that have been produced in the 10X Case to the Stilla Case, and any documents that have been produced in the Stilla Case to the 10X Case.

**Remote Depositions:** If requested by any party, a deposition shall proceed remotely by Zoom or other agreeable videoconferencing service. Any persons appearing at the deposition by videoconferencing service must appear on video using their own webcams, including any person present with the witness.

**Scope of ESI Searching:** In searching for electronically stored information from an ESI custodian, parties shall only be required to search e-mails.

**Production of Non-Cumulative Documents**: For the parties' Requests for Production, the parties shall not exclude from their searches and production drafts, documents containing notes or comments, and to the extent the documents are identified as part of the Court-ordered ESI protocol, different email chains discussing or forwarding the same document.

**Favorable and Unfavorable Responsive Documents:** In response to any request, production shall not be limited only to those documents or communications supporting or otherwise favorable to the producing party; nor shall responsive productions exclude documents contrary to or otherwise unfavorable to the producing party.

**Documents Related to Legal Interests or Rights in the Bio-Rad Asserted Patents:** Bio-Rad shall produce communications and negotiations related to assignments of the Bio-Rad Asserted Patents.  [10X RFP Nos. 73, 299]

**Documents Related to Griffiths 298 and Griffiths 303**: Bio-Rad agrees to conduct a reasonable search for and produce non-privileged, non-work product documents: (1) related to the prosecution of U.S. Patent Pub. No. 2006/0154298 ("Griffiths 298") or U.S. Patent No. 9,857,303 ("Griffiths 303"), (2) constituting prior art to Griffiths 298 or Griffiths 303, or (3) related to the conception or reduction to practice of Griffiths 298 or Griffiths 303 in its custody, possession or control, including the documents Bio-Rad may obtain as the purported licensee of MRC/UKRI.

**Production Prior to a Deposition:**  Parties shall engage in a rolling production of ESI custodians' email and shall complete such production promptly, in any event shall make reasonable attempts to complete such production 2 weeks prior to the deposition of the custodian.  If additional documents are discovered (despite reasonable attempts to locate the documents) within 2 week of the deposition, they shall be produced promptly.

**Interpreted Depositions**: If a deposition requires the use of an interpreter, the deposition shall be extended by an additional 3 hours (for a total of 10 hours on the record).

**Testimony of Named Inventors Who Reside Outside the United States.**  If Bio-Rad intends to rely upon the testimony of Andrew David Griffiths or Jerome Bibette, Bio-Rad will make reasonable efforts to make these witnesses available for deposition during the fact discovery period via remote means.

### III.    FURTHER AGREED RESOLUTIONS IN THE 10X CASE

**Bio-Rad's Valuations of 10X's Intellectual Property:** Bio-Rad shall produce its valuations of 10X's intellectual property pursuant to 10X's RFP No. 257 *before 2016*.

**Privilege Log (Bio-Rad and 10X)**: Bio-Rad and 10X agreed that each privilege log entry for withheld information must (i) identify by name the individual who authored or otherwise originated the communication or document, (ii) identify by name all individuals who received the communication or document, and (iii) specify whether each identified individual is an attorney and comply with this Court's e-Discovery order, which provides that "in-house attorney names shall be designated with an asterisk; outside counsel attorney names will be designated with a double asterisk." All privilege log entries shall provide the date of the communication or the date that the work product was created to the extent possible.

**10X Documents Related to Installation of Accused Products:** 10X agrees to produce non-privileged documents identified through a reasonable search related to installation of the accused products in the United States, such as records of installation by 10X or third parties, installation instructions provided to customers in the United States, and documents exchanged between customers and 10X regarding installation in the United States as requested in Bio-Rad's Requests for Production Nos. 3 and 16, to the extent such documents exist.

**Searching Non-Custodial and Non-Email Sources:** To the extent a communication or other document sought in discovery might or is known to exist in e-mail and/or the sources a party is not required to search listed in Section VI.B of the Stipulated E-Discovery Agreement (D.I. 67), that fact shall not excuse the responding party from its duty to conduct a reasonable search for the communication in non-electronic sources and the sources list in Section VI.A of the Stipulated E-Discovery Agreement (D.I. 67), unless otherwise ordered by the Court.

**10X Licenses:** 10X agrees that it has produced or will produce license agreements related to droplet-based genetic analysis, droplet-based microfluidics, and PCR instrumentation, from 2015-present, as requested in Bio-Rad's Requests for Production Nos. 24, 46 and 68.

**Litigation RFPs:** Bio-Rad agrees to produce non-privileged documents responsive to the full scope of RFP Nos. 32 and 33. For RFP No. 15 and 55, Bio-Rad agrees to include non-privileged documents regarding RainDance's filing of the '152 action against 10X from 2015 to present. Bio-Rad will produce documents relating to actual or potential litigation against 10X in response to RFP 55, except for potential litigation related to 10X products that are outside of all of the following markets: ddPCR Product Market, Droplet Single-Cell Market, and Droplet Genetic Analysis Technology Market. Regarding RFP No. 57, Bio-Rad agrees to produce non-privileged documents sufficient to identify persons involved in making public statements or statements to 10X customers or potential customers related to Bio-Rad's litigation against 10X. RFP No. 57 only requests documents with respect to litigations against 10X. See RFP No. 15.

**Order on Motion to Dismiss:** Within three business days of the Court's issuance of an opinion and ruling on Bio-Rad's Motion to Dismiss 10X's Antitrust Counterclaims, Bio-Rad shall provide 10X a proposal on narrowing discovery, if warranted.  Within three business days of receiving such a proposal, 10X shall provide a responsive proposal to Bio-Rad. 10X shall state in its responsive proposal any areas for potential narrowing of discovery where such narrowing depends on the outcome of any actual or planned amendment to the pleadings if not prohibited by the Court. Parties shall meet and confer, and if no agreement can be reached, Bio-Rad and 10X will submit a joint 5-page statement to the Court identifying any disputes within 14 days of the Court's ruling.

**Bio-Rad's Responses to 10X's Interrogatories:**

- Bio-Rad shall supplement its response to 10X interrogatory No. 1 to include its current validity contentions and its contentions regarding secondary considerations of non-obviousness (if it seeks to rely upon them)
- Bio-Rad will respond to 10X Interrogatory No. 6 to identify licenses that Bio-Rad may rely on at trial, its contentions regarding reasonable royalties and lost profits along with supporting documents, and provide contentions regarding the damages owed on the 10X asserted patents no later than August 24, 2020. Bio-Rad agrees to supplement its response to Interrogatory No. 6 to address relevant interrogatory responses from 10X within a reasonable time.
- Bio-Rad will supplement its response to 10X Interrogatory No. 7 to identify the scope of the injunction sought and its contentions along with supporting documents no later than August 24, 2020.
- For Interrogatory No. 8, by August 24, 2020, Bio-Rad agrees to supplement its response to 10X's contentions regarding licensing and inequitable conduct, and update its position regarding limitations on damages. By the same deadline, Bio-Rad also agrees to clarify or identify support for the quoted statement: "Daren Link didn't and couldn't identify anything more specific about Rustem Ismagilov's work related to the surfactants' composition."

**Production of Documents Produced From Third-Parties:**

If a party receives production-ready documents pursuant to a third-party subpoena (i.e., stamped for production and not properly subject to privilege review by the receiving party), the production shall be provided to the other parties within 3 business days.

If a party receives documents in relation to a third-party subpoena that are not production-ready, the production shall be provided to the other parties within 5 business days.

To the extent a party asserts privilege over a documents provided by a third party, the party will provide a privilege log within a reasonable amount of time (depending on volume and scope of documents produced), but no later than 14 days after the party first received the documents from the third party and in any case before the third party's deposition.

**Number of Requests for Production.**  Given that 10X has already served 325 document requests on Bio-Rad, 10X should be allowed to serve no more than five additional requests absent leave of Court.

**Disclosures Relating To Harvard's Relevance Culling Of Custodial ESI.** To the extent that Harvard withholds as not relevant any information identified in response to 10X's ESI search term hits, Harvard shall disclose to 10X the nature (e.g., subject matter, type (e.g., external / internal communications, presentations, publications, drafts)) and volume of the withheld information. Harvard will describe the nature of withheld documents in categorical terms (and would not be expected to provide, for example, a log of all withheld communications and the basis for the objection). The parties will meet and confer after Harvard's disclosure to determine whether there is an actual dispute as to Harvard's relevance screen and will attempt to narrow any dispute before submission to the Court.

**Harvard's Licensing In Relevant Technology Fields.** Harvard agrees to conduct a reasonable search for patent licenses that relate to genetic analysis using droplet-based technologies, including any licenses that relate to ddPCR "droplet digital PCR." Harvard will not search for nor produce patent licenses that relate to the broad categories of PCR, NGS, and microfluidics that would not otherwise be identified in the above search.

August 11, 2020

| | |
|---|---|
| /s/ Justin Constant | /s/ Ruben J. Rodrigues |
| Edward Reines | Geoffrey M. Raux (BBO# 674788) |
| Derek C. Walter | Michael J. Tuteur (BBO#543780) |
| Prachi Mehta | Ruben J. Rodrigues (BBO# 676573) |
| Weil, Gotshal & Manges LLP | FOLEY & LARDNER LLP |
| 201 Redwood Shores Parkway | 111 Huntington Avenue |
| Redwood Shores, CA 94065 | Boston, Massachusetts 02199 |
| Tel: 650-802-3000 | T: 617.342.4000 |
| Fax: 650-802-3022 | F: 617.342.4001 |
| bio-rad.10x.ma@weil.com | BOST-F-Harvard-Bio-Rad10X@foley.com |
| | graux@foley.com |
| Patrick J. O'Toole , Jr. | mtuteur@foley.com |
| Weil, Gotshal & Manges LLP | rrodrigues@foley.com |
| 100 Federal Street | |
| Boston, MA 02110 | ***Counsel for President and Fellows of Harvard*** |
| Tel: 617-772-8365 | ***College*** |
| Fax: 617-772-8333 | |
| bio-rad.10x.ma@weil.com | /s/ Elizabeth G.H. Ranks |
| | Whitney A. Reichel (BBO #663599) |
| Eric S. Hochstadt | Elizabeth G.H. Ranks (BBO #693679) |
| Weil, Gotshal & Manges LLP | Qiuyi Wu (BBO #704069) |
| 767 Fifth Avenue | FISH & RICHARDSON P.C. |
| Room 2421 | One Marina Park Drive |

New York, NY 10153
Tel: (212) 310-8538
Fax: (212) 310-8007
bio-rad.10x.ma@weil.com

Garland Stephens
Justin Constant
Weil, Gotshal & Manges LLP
700 Louisiana Street
Suite 1700
Houston, TX 77002
Tel: (713) 546-5011
bio-rad.10x.ma@weil.com

Audra Sawyer
Weil, Gotshal & Manges LLP
2001 M Street NW,
Suite 600,
Washington, DC 20036
Tel: (202) 682-7274
Fax: (202) 857-0940
bio-rad.10x.ma@weil.com

David S. Godkin
James E. Kruzer
Birnbaum & Godkin, LLP
470 Atlantic Avenue, 4th Floor
Boston, MA 02210
Tel: 617-307-6100
Fax: 617-307-6101
kruzer@birnbaumgodkin.com
godkin@birnbaumgodkin.com

***Counsel for Bio-Rad Laboratories, Inc.***

Boston, MA 02210-1878
wreichel@fr.com
liz.ranks@fr.com
qwu@fr.com
(617) 542-5070 Telephone
(617) 542-8906 Facsimile

Juanita R. Brooks (admitted *pro hac vice*)
FISH & RICHARDSON P.C.
12860 El Camino Real
Suite 400
San Diego, CA 92130
brooks@fr.com
(858) 678-5070 Telephone
(858) 678-5099 Facsimile

***Counsel for Stilla Technologies, Inc. and Stilla Technologies***

/s/ *Matthew D. Powers*

Matthew D. Powers (*pro hac vice*)
Paul T. Ehrlich (*pro hac vice*)
Stefani C. Smith (*pro hac vice*)
Robert L. Gerrity (*pro hac vice*)
Jennifer K. Robinson (*pro hac vice*)
Natasha M. Saputo (*pro hac vice*)
Gina Cremona (*pro hac vice*)
Utsav Gupta (*pro hac vice*)

Daniel Radke (*pro hac vice*)
TENSEGRITY LAW GROUP, LLP
555 Twin Dolphin Drive, Suite 650
Redwood Shores, CA 94065
Telephone:     (650) 802-6000
Facsimile:     (650) 802-6001
10x_BR_MA_Service@tensegritylawgroup.com

Azra M. Hadzimehmedovic (*pro hac vice*)
Aaron M. Nathan (*pro hac vice*)
Samantha A. Jameson (*pro hac vice*)
Kiley White (*pro hac vice*)
TENSEGRITY LAW GROUP, LLP
8260 Greensboro Drive, Suite 260
McLean, VA 22102
Telephone:     (703) 940-5033
Facsimile:     (650) 802-6001
10x_BR_MA_Service@tensegritylawgroup.com

Sarah Chapin Columbia (BBO #550155)
Katrina Rogachevsky (BBO #691373)
MCDERMOTT WILL & EMERY LLP
200 Clarendon Street, Floor 58
Boston, Massachusetts 02116-5021
Telephone:     (617) 535-4000
Facsimile:     (617) 535-3800
10X-BR-MWE@mwe.com

Leah Brannon (*pro hac vice*)
Kenneth Reinker (*pro hac vice*)
CLEARY GOTTLIEB
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone:     (202) 974-1500
Facsimile:     (202) 974-1999
Team-10x-Genomics-Litigation-
CGSHOnly@cgsh.com

*Counsel for 10X Genomics, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on August 11, 2020, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which will issue an electronic notification of filing to all counsel of record.