UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                               )
BIO-RAD LABORATORIES, INC. and )
PRESIDENT AND FELLOWS OF HARVARD)
COLLEGE,                        )
             Plaintiffs,        )
                               )
        v.                     )        CIVIL ACTION
                               )        NO. 19-12533-WGY
10X GENOMICS, INC.,            )
                               )
             Defendant.        )
_____)
```

YOUNG, D.J.                                    August 31, 2020

**MEMORANDUM AND ORDER**

## I.    INTRODUCTION

This motion to dismiss 10X Genomics' ("10X") antitrust counterclaims is the latest maneuver by Bio-Rad Laboratories ("Bio-Rad") in the multi-district struggle between these two competitors.  The current engagement grows out of a complaint Bio-Rad filed in this Court on December 18, 2019, accusing 10X of infringing on one of its patents and two patents it licenses from the President and Fellows of Harvard College ("Harvard").  See generally Compl., ECF No. 1.  This Court has already considered and denied 10X's motion to dismiss that complaint, ECF No. 24, though in so doing it transferred one of the three patents to the Northern District of California where the parties

have other ongoing litigation.  See generally, Bio-Rad Labs.,
Inc. v. 10X Genomics, Inc., No. 19-12533-WGY, 2020 U.S. Dist.
LEXIS 76156 (D. Mass. Apr. 30, 2020).  Before the Court now is a
set of antitrust counterclaims that 10X brought prior to that
decision.  See 10X Partial Am. Answer Bio-Rad and Pres. Fellow
Harvard College Compl. and 10X Am. Counterclaims Bio-Rad
("Answer"), ECF No. 53; Antitrust Counterclaims ("Def.'s
Counterclaims"), id.; Pl.'s Mot. Dismiss 10X Antitrust
Counterclaims ("Pl.'s Mot. Dismiss"), ECF No. 68.[1]

In its counterclaims, 10X paints Bio-Rad as an aggressor
illegally exploiting its market power to harm competition in
three distinct markets, corresponding to two types of genetic
analysis, as well as the market for genetic droplet research
technology generally.  Def.'s Counterclaims ¶ 7.  Bio-Rad moves
for dismissal of the counterclaims under Federal Rule of Civil
Procedure 12(b)(6), arguing 10X is trying to penalize it for
successfully enforcing its patents.  Pl.'s Mem. Supp. Mot.
Dismiss 10X's Antitrust Counterclaims ("Pl.'s Mem."), ECF No.
69.

---

[1] 10X also brought a separate set of patent counterclaims in
the same filing, which this opinion does not address.  See
Def.'s Counterclaims ¶ 152, Declaratory Judgment Counterclaims,
id. ¶ 205, Patent Counterclaims.  Harvard has realigned to 10X's
side of the Patent Infringement Counterclaims.  See Stip.
Realign Harvard Counterclaim Pl. Certain Counterclaims, ECF No.
112; Order, ECF No. 114.

10X must allege only "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  It is therefore far too early to answer the question whether 10X has unearthed an illegal scheme on the part of Bio-Rad to establish a monopoly in life sciences analysis, or whether this suit is merely the parting shot of a competitor defeated one too many times in the field.  It is enough to say that 10X has alleged sufficient facts to survive the motion to dismiss on some, but not all, of its claims, and save the moment of ultimate decision for summary judgment or trial.

For the reasons given below, the Court GRANTS the motion to dismiss as to counterclaim counts I, III, and IV, and DENIES the motion to dismiss with respect to counts II, V, VI, and VII.

**A. Background and Procedural History**

Bio-Rad and 10X are competitors in the market for life sciences tools.  See Def.'s Counterclaims ¶¶ 7-9.  Two particular types of genetic research tools are at issue in this case.  The first is droplet digital polymerase chain reaction ("ddPCR"), a genetic sequencing tool that allows scientists to calculate the presence and quantity of a target DNA molecule in a sample.  Id. ¶ 19.  The second is what 10X terms "Next-Generation Sequencing" ("NGS") sample preparation or "NGS Sample Prep," a set of techniques for reading known or unknown

nucleotide sequences in DNA.  Id. ¶¶ 7, 20.  Bio-Rad competes in the ddPCR market, while both parties compete in the NGS Sample Prep market.  Id. ¶¶ 56-59.  Universities, pharmaceutical companies, hospitals, governments, and other customers of the $50,000,000,000 annual market for life science tools require DNA sequencers such as the ones produced by both companies to conduct research and scientific operations.  Id. ¶ 41.

The fates of 10X and Bio-Rad have been forever-entangled. In 2012, after Bio-Rad acquired the life sciences firm QuantaLife, three scientists from QuantaLife who briefly had been working for Bio-Rad left to form 10X.  Answer ¶ 22.  The two parties have since brought their disputes over intellectual property to courts around the country.  Bio-Rad is the plaintiff in the underlying patent litigation before this Court.  Bio-Rad has also prosecuted patent infringement cases against 10X in Delaware, see RainDance Techs., Inc. v. 10X Genomics, Inc., No. 15-152-RGA, 2016 WL 927143 (D. Del. March 4, 2016) vacated in part 2020 WL 4431893 (Fed. Cir. Aug. 3, 2020) (the "152 case"); Bio-Rad Labs., Inc. v. 10x Genomics, Inc., 322 F. Supp. 3d 537 (D. Del. 2018), and before the U.S. International Trade Commission, see Certain Microfluidic Devices, Inv. No. 337-TA-1068, 2019 WL 7049092 (U.S.I.T.C. Dec. 18, 2019) (the "1068 ITC Investigation").  Bio-Rad is the plaintiff pursuing patent claims in the Northern District of California, see Bio-Rad

Labs., Inc. et al. v. 10X Genomics, Inc., Civ. A. No. 3:17-04339 (N.D. Cal. July 31, 2017), while 10X is the patent plaintiff before a different session of that court, see Compl., 10X Genomics, Inc. v. Bio-Rad Labs., Inc., Civ. A. No. 4:18-cv-00209 (N.D. Cal. Jan. 9, 2018).  10X was also the plaintiff in a successful separate action against Bio-Rad before the ITC.  See In the Matter of Certain Microfluidic Systems, Inv. No. 337-TA-1100, 2020 WL 748729 (U.S.I.T.C. Feb. 12, 2020) (the "1100 ITC Investigation").  The above list is not exhaustive, but demonstrates the parties' appetite for litigation is exhausting.

In 2017, Bio-Rad acquired the life sciences company RainDance Technologies, Inc. ("RainDance"), the owner of patents related to ddPCR analysis, one of the technologies at issue in these counterclaims.  Def.'s Counterclaims ¶¶ 10, 19, 21. RainDance is the company which originally brought the Delaware patent litigation, the 152 case; Bio-Rad stepped into its shoes following the acquisition.   See Bio-Rad, 322 F. Supp. 3d at 539.

10X brought these antitrust counterclaims on January 24, 2020, amended them on February 5, 2020, and submitted a second set of amended counterclaims on July 13, 2020 without further altering the antitrust portion.  ECF Nos. 32, 53, 113.  The parties have fully briefed the issues.  See Pl.'s Mem.; Def.'s Opp'n Mot. Dismiss 10X's Antitrust Counterclaims ("Def.'s

Opp'n"), ECF No. 75; Pl.'s Reply Mot. Dismiss 10X's Antitrust
Counterclaims ("Pl.'s Reply"), ECF No. 84.  This Court's April
30, 2020 decision does not address these counterclaims but does
summarize the underlying facts of the alleged patent
infringement that gave rise to the current action.  See Bio-Rad,
2020 U.S. Dist. LEXIS 76156, at *3-9.

### B. Alleged Facts

10X alleges that Bio-Rad has engaged in illegal
anticompetitive behavior in three markets, which it terms the
ddPCR market, the Droplet Single-Cell Product market ("DSCP
market"), and the Droplet Genetic Analysis Technology market
("DGAT market").  Def.'s Counterclaims ¶¶ 61-76.

The biological analysis technique of polymerase chain
reaction ("PCR") uses the rapid heating and cooling of strands
of DNA in order to make numerous copies.  Id. ¶¶ 46-47.
"Digital" PCR involves dividing the DNA into sub-units, then
running tests on each of the subunits to see if they react for a
desired genetic sequence, allowing for a quantitative count of
that sequence.  Id. ¶ 48.  The technology at issue here uses
droplets as sub-units, thus the first "d" in "ddPCR."  Id.  Bio-
Rad developed its ddPCR patent portfolio by acquiring QuantaLife
in 2011, and expanded it by acquiring RainDance in 2017, as
Raindance had multiple patents in the field.  Id. ¶¶ 49-52.  10X
alleges that ddPCR is more accurate, sensitive, and easier to

use than other PCR analysis techniques, and thus customers do not view other techniques as reasonable substitutes.  Id. ¶¶ 62-63.  10X alleges that Bio-Rad had a 90% market share in the ddPCR field prior to its acquisition of RainDance, and that it maintains over 90% control of the field after this acquisition. Id. ¶¶ 11, 65.  10X is a customer of Bio-Rad in the ddPCR market.  Id. ¶ 27.

The Droplet Single-Cell Product Market ("DSCP market") is the market for tools that use droplets to analyze DNA sequences in single cells.  Id. at 68.  It is a sub-market of the larger NGS Sample Prep market.  Id. ¶¶ 10, 20.  10X is in the business of NGS sample preparation through its Next GEM product line, and Bio-Rad competes in the NGS market through its ddSEQ product. Id. ¶ 16, 29.  10X claims it is impractical to conduct single-cell NGS sample preparation without using droplets, allowing no reasonable substitutes for DSCP market products.  Id. ¶ 69.  10X alleges that the two companies together constitute a majority of the market.  Id. ¶ 71.

The third market, the Droplet Genetic Analysis Technology Market ("DGAT market"), is upstream from the other two.  It consists of the technology and intellectual property underlying all droplet-based genetic analysis.  Id. ¶ 73.  10X alleges that, if Bio-Rad's patent rights are as broad as it claims, it would be a monopolist in this market, allowing it to charge

higher royalties because consumers would have no reasonable alternatives.  Id. ¶ 74.  10X is a competitor in this market because it holds patents and markets products in the downstream DSCP Market, and is a customer because it licenses products in this market.  Id. ¶ 76.

### C. 10X's Claims

10X's counterclaims grow entirely from Bio-Rad's acquisition of RainDance.  10X claims this acquisition violated antitrust laws with regard to all three markets.  Id. ¶¶ 10, 77.  As evidence of the deal's illegality, 10X asserts that the acquisition of RainDance has allowed Bio-Rad to achieve near-monopoly market power in the ddPCR and DGAT markets by eliminating a competitor and consolidating RainDance's patents. Id. ¶¶ 77, 81, 84, 88.

10X points to specific anticompetitive practices in all three markets.  In the ddPCR market, 10X alleges that Bio-Rad has eliminated RainDance's R&D and product lines, thus removing a potential competitor and reaping monopoly profits.  Id. ¶¶ 78-81, 104-105.  In the DGAT market, 10X asserts that the acquisition was part of a larger pattern of Bio-Rad snapping up competitors, and that the result has been that Bio-Rad owns a "thicket of patents" that make it difficult for competitors to enter the market or operate given the litigation risk, leading to an anticompetitive increase in patent licensing prices.  Id.

¶¶ 85, 87, 89-90, 93-94, 105.  Finally, regarding the DSCP market, 10X alleges that Bio-Rad has "specific intent" to drive 10X out of the market using its campaign of aggressive litigation.  Id. ¶ 96.

Because many of Bio-Rad's actions in the current litigation stem from the patents it acquired in buying RainDance, 10X argues that the assertion of these patents itself represents a cognizable antitrust injury as an illegal attempt to monopolize. Id. ¶¶ 94, 96-99.  10X asserts that the 152 case is part of this pattern of anticompetitive behavior and would have resolved more in its favor but for Bio-Rad's illicit aggregation of market power.  Id. ¶ 30 (citing RainDance Techs., 2016 U.S. Dist. LEXIS 33875).  It views the current case as another example of Bio-Rad's aggressive use of litigation to hobble it as a competitor. Id. ¶¶ 96, 102.

Count I of the counterclaims alleges that Bio-Rad's acquisition of RainDance in the DSCP market was unlawful under Section 7 of the Clayton Act, 15 U.S.C. § 18, because it has lessened competition substantially and tended toward creating a monopoly in this market.  Id. ¶¶ 114-117.

Count II alleges that, similarly, Bio-Rad's acquisition of Raindance has lessened competition and tended toward creating a monopoly in the upstream DGAT market, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.  Id. ¶¶ 119-120.

Count III alleges that Bio-Rad has attempted to monopolize the DSCP market, a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, by engaging in predatory and anticompetitive conduct, including the unlawful acquisition of Raindance, refusing to license its patent at reasonable rates, and weaponizing its patent portfolio in litigation.  Id. ¶¶ 123-126.

Count IV alleges that Bio-Rad's acquisition of RainDance, the filing of the current litigation, and the enforcement of the 152 case represent an illegal attempt to monopolize or attempt to monopolize the DGAT Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, because, should they be successful, Bio-Rad will achieve monopolistic market share in this technology market space.  Id. ¶¶ 131-133.

Count V alleges that Bio-Rad's acquisition of RainDance was unlawful under Section 7 of the Clayton Act, 15 U.S.C. § 18, with regard to the ddPCR market because it has consolidated an existing monopoly.  Id. ¶¶ 134-137.

Count VI alleges that Bio-Rad has monopolized or attempted to monopolize the ddPCR market in a manner illegal under Section 2 of the Sherman Act, 15 U.S.C. § 2.  Id. ¶¶ 138-142.

Count VII alleges unfair competition under the California Business and Professions Code § 17200 et seq.  Id. ¶¶ 144-148. 10X contends that Bio-Rad's actions have harmed California

residents in the scientific and medical community who depend on innovation and competitive pricing in these markets.  Id. ¶ 149.

10X requests that the Court declare that Bio-Rad acquisition of Raindance was unlawful, that it unlawfully monopolized or attempted to monopolize the three markets, and that it engaged in unfair competition.  Id. at 85.  It also seeks an injunction against continued unfair competition, an injunction requiring Bio-Rad to divest all patents, licenses, and products obtained from the RainDance acquisition, or alternatively an injunction requiring Bio-Rad to license at "competitive rates."  Id. at 86.  It finally requests triple damages for the antitrust injuries it has incurred.  Id.

## II. LEGAL FRAMEWORK

### A. Pleading standard

At the motion to dismiss stage the Court accepts all well-pleaded factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor.  See Langadinos v. American Airlines, Inc., 199 F.3d 68, 69 (1st Cir. 2000).  The pleading standard for antitrust cases is no higher than the "plausibility" standard for other causes of action. See Twombly, 550 U.S. at 570.  A party faces a heavy burden in moving to dismiss antitrust counterclaims, In re Nexium (Esomeprazole) Antitrust Litig., 968 F. Supp. 2d 367, 385 (D. Mass. 2013), but this Court need not allow claims to survive

when the well-pleaded facts fail reasonably to support the alleged legal conclusions.  Ocasio-Hernandez v. Fortuño-Burset, 640 F.3d 1, 12-13 (1st Cir. 2011).

### B. Antitrust Harm and Injury

Section 7 of the Clayton Act bans the acquisition of stock in a company when "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."  15 U.S.C. § 18; California v. American Stores Co., 495 U.S. 271, 284 (1990).  Section 2 of the Sherman Act makes it a crime to "monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States."  15 U.S.C. § 2.  To plead monopolization, a plaintiff must allege "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966).

Market power is defined in economic terms as "the ability to raise prices above those that would be charged in a competitive market."  Nat'l Collegiate Athletic Ass'n v. Board of Regents of the Univ. of Okla., 468 U.S. 85, 109 n.38 (1984). Monopoly power is defined as "the power to control prices or exclude competition," and requires a heightened degree of market power.  United States v. E. I. du Pont de Nemours & Co.

(Cellophane), 351 U.S. 377, 391 (1956).  It is very common for firms to assert some market power without that market power rising to cognizance under the antitrust laws, and some degree of market power may be pro-competitive by granting firms excess profits to invest in research and development.  See Erik Hovenkamp & Herbert Hovenkamp, Buying Monopoly: Antitrust Limits on Damages for Externally Acquired Patents, 25 Tex. Intell. Prop. L.J. 39, 70-71 (2017) ("Buying Monopoly").

A private plaintiff cannot merely allege that the defendant violated the Sherman or Clayton Acts, which is termed "anticompetitive harm" or "antitrust harm."  That plaintiff has standing only if it suffered injury as a direct result of the alleged anticompetitive harm, and that type of injury is an "antitrust injury."  Broadcom Corp. v. Qualcomm Inc., 501 F.3d 297, 320-21 (3d Cir. 2007).  An antitrust injury is defined as "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977) (rejecting the argument that any economic injury, such as lost profits, stemming from a merger unlawful under the Clayton Act is actionable).  For example, in American Sales Co., LLC v. AstraZeneca LP (In re Nexium (Esomeprazole) Antitrust Litig.), the First Circuit upheld a jury verdict finding that two drug companies had committed an antitrust violation through a

"reverse payment" scheme designed to keep the generic manufacturer out of the market, but that the plaintiffs, a class of retailers and purchasers, were not entitled to Clayton Act relief because they had failed to show they had suffered antitrust injury as a result.  842 F.3d 34, 60 (1st Cir. 2016).

## III. ANALYSIS

### A.    Preliminary Matters

#### 1.    Fed. R. Civ. Proc. 13(a)

Bio-Rad argues that all counterclaims should be barred under Fed. R. Civ. Proc. 13(a) because they qualify as compulsory counterclaims that should have been brought in the 152 Case.  Pl.'s Mem. 8 (citing McCaffrey v. Rex Motor Transp., Inc., 672 F.2d 246, 248-49 (1st Cir. 1982)).

Rule 13(a) directs that a counterclaim is compulsory when it "arises out of the same transaction or occurrence" as the original claim and "does not require adding another party over whom the court cannot acquire jurisdiction."  Fed. R. Civ. P. 13(a)(1).  The Supreme Court held in Mercoid Corp. v. Mid-Continent Inv. Co. that antitrust counterclaims in a patent infringement case are permissive, rather than compulsory, and so may be brought in a separate case.  320 U.S. 661, 671 (1944).  While many circuits have since cabined this ruling to the specific facts of the case, the First Circuit has not.  Fowler v. Sponge Prods. Corp., 246 F.2d 223, 227 (1st Cir. 1957).

[14]

In Eon Labs., Inc. v. SmithKline Beecham Corp., 298 F. Supp. 2d 175, 180 (D. Mass. 2003), this Court cited approvingly to the Second Circuit's decision in Critical-Vac Filtration Corp. v. Minuteman Int'l Inc. which narrowed Mercoid by distinguishing between counterclaims for misuse of patents (such as anticompetitive behavior), which are permissive because they are based on a separate set of facts than the underlying case, versus counterclaims for invalidity of patents, derived from the same set of facts and thus properly falling under the Rule 13 compulsory framework, 233 F.3d 697, 703 (2d Cir. 2000).  Unlike the counterclaims in Eon Labs, 10X's counterclaims in this case are all based on Bio-Rad's alleged misuse of its patents to engage in anticompetitive behavior, rather than their underlying validity, so they are permissive and not barred by Rule 13(a). See Amphastar Pharm., Inc. v. Momenta Pharm., Inc., 297 F. Supp. 3d 222, 230-231 (D. Mass. 2018) (Gorton, J.).

### 2.    The Noerr-Pennington Doctrine

Bio-Rad argues that patent enforcement, unless brought in bad faith or as a result of fraud on the patent office, does not constitute anticompetitive harm or injury under the Noerr-Pennington doctrine.  Pl.'s Mem. 10.  Bio-Rad is essentially correct, though in the First Circuit litigation may constitute antitrust injury for purposes of standing and damages.

The Noerr-Pennington doctrine, propagated by the Supreme
Court in Eastern R.R. Presidents Conference v. Noerr Motor
Freight, Inc., 365 U.S. 127, 139-40 (1961), and in United Mine
Workers v. Pennington, 381 U.S. 657, 670 (1965), shields
government petitioning activity from antitrust liability,
including the enforcement of patents through litigation.  United
Food & Commer. Workers Unions & Employers Midwest Health
Benefits Fund v. Novartis Pharm. Corp., 902 F.3d 1, 4 (1st Cir.
2018).  There are only two exceptions: if the patent is obtained
through fraud, or if the patent litigation is a "sham" covering
impermissible anticompetitive conduct.  Id. at 5 (citing Walker
Process Equip., Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172
(1965); Professional Real Estate Invs., Inc. v. Columbia
Pictures Indus., 508 U.S. 49, 51 (1993) (holding that patent
litigation is a "sham" only if it is "objectively baseless" and
designed to interfere with a competitor's business
relationships); see California Motor Transport Co. v. Trucking
Unlimited, 404 U.S. 508, 511 (1972).  As a result, the Noerr-
Pennington doctrine bars this Court from regarding litigation
brought in good-faith as anticompetitive harm.  See McGuire Oil
Co. v. Mapco, Inc., 958 F.2d 1552, 1561 (11th Cir. 1992).

10X contends the Noerr-Pennington Doctrine is inapplicable
because it was the original acquisition of RainDance that caused
anticompetitive harm as monopolization or attempt to monopolize.

[16]

Def.'s Opp'n at 6-7 (citing Amphastar Pharm. Inc. v. Momenta
Pharms., Inc., 850 F.3d 52, 57 (1st Cir. 2017)).[2]  Bio-Rad
counters by saying that these lawsuits are immunized from
antitrust scrutiny because lawful petitioning behavior is not
illegal "either standing alone or as part of a broader scheme."
Pl.'s Reply 7 (quoting Pennington, 381 U.S. at 670).

Insofar as 10X is arguing that non-baseless litigation by
Bio-Rad can constitute anticompetitive harm, the Noerr-
Pennington doctrine shields even litigation brought by a
monopolist or aspiring monopolist with the subjective intent of
harming a competitor, so long as it is not baseless.  See
Professional Real Estate, 508 U.S. at 59.  For example, in P.R.
Tel. Co. v. San Juan Cable Co. LLC, the court found that efforts
by the accused monopolist to exclude a rival through government
lobbying and repeated lawsuits could not constitute Sherman Act
violations because none of the lawsuits was baseless.  196 F.
Supp. 3d 207, 244 (D.P.R. 2016) (Woodcock, J.), aff'd, 874 F.3d
767 (1st Cir. 2017).  Thus, non-baseless litigation cannot

---

[2] In the patent portion of this case, 10X does attack the
validity of the RainDance patents as the product of inequitable
conduct.  See Answer Second Am. Counterclaims ¶¶ 99-105.  10X
does not, however, argue that Bio-Rad's litigation campaign
constituted misrepresentation or sham.  See Def.'s Opp'n 6-7
("Bio-Rad argues that under the Noerr-Pennington doctrine,
patent litigation only violates the antitrust laws if it is a
'sham.' . . . But 10X's claim is that Bio-Rad's acquisition of
RainDance patents was unlawful, not that the individual patent
lawsuit on its own violates the antitrust laws.").

constitute anticompetitive harm under the Sherman Act for

purposes of monopolization or attempted monopolization claims:

> This is not to say that litigation is actionable under
> the antitrust laws merely because the plaintiff is
> trying to get a monopoly.  He is entitled to pursue
> such a goal through lawful means, including litigation
> against competitors.  The line is crossed when his
> purpose is not to win a favorable judgment against a
> competitor but to harass him, and deter others, by the
> process itself -- regardless of outcome -- of
> litigating.

Professional Real Estate Investors, 508 U.S. at 74-75 (Souter,

J., concurring) (quoting Grip-Pak, Inc. v. Illinois Tool Works,

Inc., 694 F.2d 466, 472 (7th Cir. 1982)).

A separate question is whether such litigation can

constitute antitrust injury if an independent Clayton or Sherman

Act violation exists.  The starting point for analyzing this

question is Amphastar, in which the First Circuit, after ruling

that the plaintiffs had properly alleged antitrust harm by

claiming the defendants had lied to a standard-setting

organization, considered whether litigation by the defendant

could constitute antitrust injury for purposes of calculating

damages.  850 F.3d at 54, 57-58.  The court concluded the

plaintiff could receive antitrust treble damages for costs

incurred, and that the injury caused by lawsuits could be

considered antitrust injury when part of a larger scheme.  Id.

at 57.  The court cited approvingly to McGuire Oil for the

proposition that "the institution of state court litigation

against the Sherman Act plaintiff . . . could furnish the source
of the antitrust injury . . . even if it could not provide a
basis for a Sherman Act violation under the Noerr-Pennington
doctrine." Id. at 57 (omissions in original) (quoting 958 F.2d
at 1561). This Court reads the quotation from McGuire Oil as
indicating litigation can constitute antitrust injury, but not
antitrust harm. See Premier Elec. Constr. Co. v. National Elec.
Contractors Ass'n, Inc., 814 F.2d 358, 372-76 (7th Cir. 1987)
(ruling cost of fighting litigation could constitute sole
antitrust injury when the litigation resulted from a separate
Sherman Act violation); McGuire Oil, 958 F.2d at 1561 (ruling
litigation was not antitrust injury when there was no separate
predicate anticompetitive act); see also Order Mot. Dismiss at
26, 29 Intel Corp. v. Fortress Inv. Grp., LLC, Civ. A. No. 19-
07651 (N.D. Cal. July 15, 2020), ECF No. 190 (noting that
litigation can constitute antitrust injury when used to enforce
illegally-consolidated patents).

### 3. Divestiture

Bio-Rad argues that the doctrine of laches ought bar 10X
from seeking the "draconian" remedy of divestiture. Pl.'s Mem.
at 18. It accuses 10X of unreasonably delay in bringing the
antitrust counterclaims given that they are based on the three-
year-old RainDance merger. It also notes that leading scholars
in the field favor a laches period of less than four years for

divestiture.  Id. (citing Phillip E. Areeda & Herbert Hovenkamp,
Antitrust Law: An Analysis of Antitrust Principles and Their
Application § 1205b (4th ed. 2018)).

The doctrine of laches is an affirmative defense which asks
the court to consider "whether the plaintiff's delay in bringing
suit was unreasonable and whether the defendant was prejudiced
by the delay."  Fleet Nat'l Bank v. Gray (In re Bankvest Capital
Corp.), 375 F.3d 51, 61 (1st Cir. 2004).  The burden to prove
prejudice and unreasonable delay rests squarely on the shoulders
of the moving party.  Id.  The laches defense is fact-intensive
and typically not resolved at the pleading stage.  Vineberg v.
Bissonnette, 548 F.3d 50, 57 (1st Cir. 2008).

Bio-Rad argues that the alleged facts giving rise to 10X's
complaint arose three years ago, that there is no reasonable
excuse for its delay, and that it would be unduly prejudiced by
the remedy of divestiture because it has already fully
integrated RainDance.  Pl.'s Mem. 19.  10X points out that many
of the antitrust injuries it alleges, including the present
litigation, arose well after the RainDance merger, and that it
is asking only for the divestiture of specific patents rather
than the entirety of RainDance's assets.  Def.'s Opp'n. 18-19.

At the current stage this Court will adhere to the Ninth
Circuit's analysis that a maximum laches period of four years is
appropriate because it is the statute of limitation contained in

Section 4 of the Clayton Act.  See Solo v. SD-3C LLC, 751 F.3d
1081, 1086 (9th Cir. 2014).  Bio-Rad may be able to show after
developing the record that divestiture would be inequitable
because of the amount of time that has passed, but this Court
would note that as matter of law the laches period resets after
each separate antitrust injury.  Id.

Putting aside laches, 10X has made a prima facie case for
divestiture.  Divestiture is inappropriate when two firms have
already integrated and where divestiture would require more than
the separation of mere "stock or discrete tangible assets."
Taleff v. Southwest Airlines Co., 828 F. Supp. 2d 1118, 1124
(N.D. Cal. 2011) (quoting Ginsburg v. InBev NV/SA, 623 F.3d
1229, 1234 (8th Cir. 2010)).  Here, however, 10X is requesting
the divestiture of specific Bio-Rad patents, see Def.'s Opp'n at
18, a lesser request than the untangling of entire companies, as
was requested in Ginsberg, 623 F.3d at 1235.  Thus, it is
premature to bar the remedy of divestiture.

**B.  Market Definition**

Bio-Rad argues that 10X's three market definitions are
implausible.  It points out that the 152 case defined ddPCR and
Droplet Single-Cell Products as being in the same market of
"products that perform genetic analysis on a droplet platform,"
and asks this court to find the same.  Pl.'s Mem. 17 (quoting
Bio-Rad, 2019 WL 3322322, at *2).  It also argues that 10X's

definition of the DGAT market is insufficient because it does
not plead the specific "metes and bounds" of the market or the
firms' respective market shares.  Id. at 3.

"The outer boundaries of a product market are determined by
the reasonable interchangeability of use or the cross-elasticity
of demand between the product itself and substitutes for it."
Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962).  At
the pleading stage, a plaintiff plausibly must allege that the
products in the defined market are not reasonably
interchangeable for products outside the defined market, and
that consumers are not likely to substitute other products if
the given product becomes more expensive.  See Queen City Pizza,
Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 437 (3d Cir. 1997).
Once a plaintiff plausibly alleges a market, the determination
whether the defined market is correct is a question of fact not
suitable for dismissal under Rule 12(b)(6).  See In re Nexium,
968 F. Supp. 2d at 388 (citing Todd v. Exxon Corp., 275 F.3d
191, 199–200 (2d Cir. 2001)).

10X argues it has sufficiently pleaded that the three
different products perform different functions and should not be
considered within the same market, and that it has met the
technical pleading requirements by stating there are no
reasonable substitutes and a potential monopolist could
profitably increase prices.  Def.'s Opp'n 12.  It also argues

[22]

that Bio-Rad mischaracterizes the District of Delaware case, which merely found 10X and Bio-Rad were competing in the NGS Sample Prep space, a fact that does not contradict its market definitions.  Id. (citing Bio-Rad, 2019 WL 3322322 at *2).

Bio-Rad is correct that the District of Delaware court defined the product market as encompassing both ddPCR and DSCP, as 10X itself acknowledged in its briefs appealing that case. See Pl.'s Mem., Ex. E, Brief of Appellant-Defendant 10X 74, Bio-Rad Inc. v. 10X Genomic Inc., Nos. 19-2255, -2285 (Fed. Cir. Oct. 18, 2019), ECF No. 69-6.  The doctrine of collateral estoppel does not, however, require this Court to define the "market" in the same way as the 152 case because the type of market being defined here is not "the same as that involved in the earlier action."  Ramallo Bros. Printing, Inc. v. El Dia, Inc., 490 F.3d 86, 90 (1st Cir. 2007).  The Delaware court considered market definition for patent infringement rather than antitrust violations; it was asking the question of whether the two parties were direct competitors, not the question of whether their products were reasonably interchangeable with potential outside substitutes.  Bio-Rad, 2019 WL 3322322 at *1-2; see also Herbert Hovenkamp, Markets in IP and Antitrust, Faculty Scholarship at Penn Law 2133, 2141-2143 (2011) (examining the similarities and differences between markets in IP law and antitrust).  Once 10X and Bio-Rad have an opportunity to develop

[23]

the factual record to address specific antitrust indicia, this
Court may, or may not, find the antitrust market to match the
District of Delaware's definition of the patent infringement
market.  At the pleading stage, however, 10X sufficiently
alleges the "metes and bounds" of the market as being defined by
particular technological processes, and that available
technological alternatives are inferior, and thus poor
substitutes.  Def.'s Counterclaims ¶¶ 62-63, 68-69;.  Eastman
Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 482 (1992).

Despite Bio-Rad's arguments, 10X also sufficiently has
pleaded the "metes and bounds" of the DGAT market, though
hazily.  A technology market is defined as "the smallest group
of technologies and goods over which a hypothetical monopolist
of those technologies and goods likely would exercise market
power."  Hynix Semiconductor Inc. v. Rambus Inc., Nos. CV-00-
20905, C-05-00334, C-05-02298, C-06-00244, 2008 U.S. Dist. LEXIS
123822, at *15 (N.D. Cal. Jan. 5, 2008) (quoting U.S. Dept. of
Justice & Fed. Trade Comm'n, Antitrust Guidelines for the
Licensing of Intellectual Property § 3.2.2 (1995)).  This
definition is conceptually similar to defining any other market.
Id.  Technology markets are certainly easier to discern when
coextensive with a technological standard, see, e.g., Qualcomm,
501 F.3d at 315, but they may also be defined as the underlying
technologies required to "manufacture, import or sell" a

[24]

specific downstream product.  See Sandisk Corp. v. Kingston
Tech. Co., No. 10-243-bbc, 2010 U.S. Dist. LEXIS 152534, at *9-
10 (W.D. Wis. Nov. 15, 2010).

Here, 10X has defined the downstream market as "droplet-
based genetic analysis products," which properly delineates the
boundary of the upstream technology market with reference to the
relevant product.  Def.'s Counterclaims ¶ 72; cf. Sandisk Corp.,
2010 U.S. Dist. LEXIS 152534, at *10.  The fact that 10X has not
specified the applicable patents or intellectual property is not
fatal to its market definition, as a technology market may be
defined by the economic cross-elasticity of substitute
technologies rather than by reference to specific intellectual
property.  Hynix Semiconductor Inc., 2008 U.S. Dist. LEXIS
123822, at *17; see also U.S. Dept. of Justice & Fed. Trade
Comm'n, Antitrust Guidelines for the Licensing of Intellectual
Property § 3.2.2 (2017).  10X incorporates this issue of
economic substitution by pleading that "[a] hypothetical
monopolist in the [DGAT market] could profitably impose a small
but significant and non-transitory increase in price of that
technology above the price in a competitive market."  Def.'s
Counterclaims ¶ 73.  Its market definition is plausible as it
describes droplet-based analysis as a specific discipline within
the life sciences that encompasses ddPCR, DCSP, and other
techniques for which there are no reasonable substitutes.  Id.

[25]

¶¶ 19-20, 49, 56, 63-69.  The defined technology market is also not so inherently broad that it becomes implausible by covering numerous unrelated technologies.  Cf. Order Mot. Dismiss at 15, Intel Corp. Civ. A. No. 19-07651 ("The market as defined in the complaint covers all patents for 'high tech' (whatever that means exactly) electronic products . . . .").

With that said, 10X's market definitions –- particularly its definition of the technology market -- barely cross the required threshold of specificity.  Cf. Intellectual Ventures I LLC v. Capital One Fin. Corp., No. 13-cv-00740, 2013 U.S. Dist. LEXIS 177836, at *15-21 (E.D. Va. Dec. 18, 2013) (ruling plaintiff's technology market definition implausible because, inter alia, it did not plead that there were no available substitutes).  10X has still pleaded the technical elements for its market definitions, though, and that is enough for now.

### C. Clayton Act Violations

A private plaintiff may bring an action for a Clayton Act antitrust violation for monetary damages under the Section 4 of the Clayton Act, 15 U.S.C. § 15, or injunctive relief under Section 16, 15 U.S.C. § 26.  To succeed, the plaintiff must show both a Clayton Act violation and an antitrust injury.  See Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 344 (1990).

**1. Count I: Clayton Act Violation in Droplet Single-Cell Product Market**

10X alleges that Bio-Rad violated the Clayton Act in the DSCP Market through its acquisition of RainDance.  Def.'s Counterclaims ¶¶ 114-117.  10X alleges the acquisition of RainDance was an antitrust violation because it was likely to harm competition by excluding competitors with "superior products" and by reducing innovation in the market.  Id. ¶ 116. It alleges it has suffered antitrust injury by being forced to fight Bio-Rad's litigation campaign, being denied "necessary" patents, and potentially being excluded from the market.  Id. ¶ 117.

To allege that the acquisition of RainDance was a violation of the Clayton Act with respect to the DSCP market, 10X must provide facts indicating that the effect of the merger "may be substantially to lessen competition, or tend to create a monopoly."  United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 387 (1963) (quoting 15 U.S.C. § 7).  Absent mitigating evidence, a merger will be found to substantially lessen competition when it produces a firm controlling an undue percentage share of the market, and results in a significant increase in the concentration of firms in that market.  Id. at 363.  A claimant must show a "reasonable probability" of violation, rather than a "mere possibility."  United States v.

E. I. du Pont de Nemours & Co., 353 U.S. 586, 598 (1957)
(emphasis added).  If a firm exerts market power at the time of
suit, and that market power is traceable to a previous merger, a
court may use that as evidence that the previous merger (even if
it occurred well in the past) may have violated the Clayton Act.
Id. at 592.

     RainDance was never a major competitor in the DSCP market.
Def.'s Counterclaims ¶ 15.  In fact, "RainDance had . . . no
product that competed with 10X in single-cell NGS Sample Prep."
Id. ¶ 30.  Furthermore, 10X alleges that Bio-Rad began competing
in the NGS Sample Prep market only around the time it acquired
RainDance.  Id. ¶ 29.  This alone undermines 10X's claim because
it is generally implausible that the acquisition of patents
violates the Clayton Act if the acquiring party is using such
acquisition to enter a market where it did not previously
compete.  See SCM Corp. v. Xerox Corp., 463 F. Supp. 983, 1002
(D. Conn. 1978); SCM Corp., 645 F.2d at 1208 (affirming the
lower court and holding that "whether limitations should be
imposed on the patent rights of an acquiring party should be
dictated by the extent of the power already possessed by that
party in the relevant market into which the products embodying
the patented art enter").

     Furthermore, 10X alleges that it -- not Bio-Rad --  was the
one with the leading share in the DSCP market at the time of

[28]

filing, and that the two firms between them provide "the majority of all products in the market" at the time of filing. Id. ¶ 71.  In other litigation, 10X has claimed that it is an "established market leader in single cell genomics," with its Chromium single-cell instruments used at "93 of the top 100 research institutions and 13 of the top 15 biopharmaceutical companies."  See Pl.'s Mem., Attach. 2, Am. Compl. ¶ 9, 10X Genomics, Inc. v. Celsee, Inc., Civ. A. No. 19-00862 (D. Del. Nov. 14, 2019), ECF No. 69-2.  In this litigation, it never specifies Bio-Rad's market share either at the time of filing or at the time of the RainDance acquisition.  Thus, there is no way for this Court to evaluate market share to determine whether Bio-Rad is exerting unlawful market power in the DSCP market now or at the time of merger, while 10X's proclamations in the Celsee case make such an inference implausible.  See Spectrum Sports v. McQuillan, 506 U.S. 447, 455 (1993) (noting that the plaintiff must generally provide a definition of the relative market and examination of market power).

10X asserts that Bio-Rad's acquisition of RainDance was unlawful because it allowed Bio-Rad to aggregate a large patent portfolio, forming the platform for future litigation.  Def.'s Counterclaims ¶¶ 25-36.  This argument is unavailing because the acquisition of patents through merger is not anticompetitive absent market power, as patents do not themselves inherently

confer market power over the downstream product.  Illinois Tool
Works Inc. v. Indep. Ink, Inc., 547 U.S. 28, 46 (2006).

10X also fails plausibly to allege that the merger gave
Bio-Rad market power in the DSCP market as its arguments are
implausible or conclusory.  First, it alleges that Bio-Rad's
newly-combined post-merger patent portfolio allowed it to win
the 152 Case, when RainDance lacked the leverage to achieve
anything more than a settlement.  Def.'s Counterclaims ¶¶ 30,
111-112.  This is not evidence of improper market power in the
DSCP market.  That Bio-Rad's larger patent portfolio after the
RainDance acquisition made it more likely to succeed in
litigation -- even if credited as true -- provides no evidence
of market power in the downstream DSCP product market, but only
potential evidence that it had market power in its own corner of
the aggregated technology market, which is tautological because
patents are designed to provide a limited monopoly over the
exact technology they describe.  United States v. Univis Lens
Co., 316 U.S. 241, 250 (1942).

Second, 10X alleges that Bio-Rad charges supracompetitive
prices for its patent licenses in the DSCP market.  The presence
of supracompetitive pricing for licenses can be a strong
indicator of market power.  See Rebel Oil Co. v. Atlantic
Richfield Co., 51 F.3d 1421, 1434 (9th Cir. 1995).  Claiming
that prices are supracompetitive is a legal conclusion rather

than a fact, however, and must be supported by specific factual
allegations.  See Jacobs v. Tempur-Pedic Int'l, Inc., 626 F.3d
1327, 1340 (11th Cir. 2010).  Here, 10X does not allege with
specificity how the prices Bio-Rad charges for licensing are
actually supracompetitive within the DSCP market.  Furthermore,
as this claim must be based on an allegation that the Raindance
merger itself caused the supracompetitive pricing, SCM Corp.,
645 F.2d at 1208, it is not plausible because Bio-Rad was not
competing in this market at the time of the acquisition.  See
Def.'s Counterclaims ¶¶ 37, 74, 105, 126.  Therefore, this
argument cannot support an inference of market power within the
DSCP Market.

Where 10X has failed to allege a viable Clayton Act
violation, its claim that Bio-Rad's campaign of litigation was
anticompetitive cannot provide a basis for liability because
that litigation is protected Noerr-Pennington activity.  See
Professional Real Estate Investors, 508 U.S. at 59.  Costs
incurred in litigation can constitute antitrust injury only if
there is an underlying anticompetitive harm.  McGuire Oil Co.,
958 F.2d at 1561.

Similarly, 10X cannot claim it suffered an antitrust injury
from Bio-Rad's charging of increased prices or refusal to
license the technology at issue in the 152 Case.  Def.'s
Counterclaims ¶ 110.  "[T]here is no duty to aid competitors."

Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP,
540 U.S. 398, 411 (2004).  A patent, by design, grants a limited
monopoly to the patent-holder, and refusal to license absent a
separate violation of the law does not constitute an antitrust
violation.  See Data Gen. Corp. v. Grumman Sys. Support Corp.,
36 F.3d 1147, 1186 (1st Cir. 1994), abrogated on other grounds
by Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154 (2010).
Neither can it claim antitrust injury from its need to develop
"costly" alternatives to licensing patents held by RainDance,
which is simply the product of normal competition.  Def.'s
Counterclaims ¶ 110.

Taken as a whole, Bio-Rad's alleged actions in the DSCP
market constitute nothing more than healthy competition.  10X
has thus failed to state a claim for a Section 7 violation with
respect to the DSCP market.

### 2. Count II: Clayton Act Violation in Droplet Genetic Analysis Technology Market

10X alleges that the RainDance merger violates the Clayton
Act because it substantially lessens competition in the
technology market.  Id. ¶¶ 118-121.  More specifically, 10X
alleges that Bio-Rad's new-found monopoly on patents in the DGAT
market has allowed it to raise licensing costs to supra-
competitive levels, refuse to license patents to competitors,
and foreclose competition.  Id. ¶ 105.  For the antitrust

injury, 10X alleges that it has had to pay increased prices for licenses, has been denied licenses, has had to develop new technologies to remain in the market, and faces exclusion from the market by virtue of the antitrust litigation.  Id. ¶¶ 110, 121.

Unlike the DSCP product market, here 10X has plausibly alleged that Bio-Rad's acquisition of Raindance may have substantially reduced competition.  Id. ¶ 119.  10X alleges that RainDance and Bio-Rad competed in the defined DGAT market (unlike the DSCP market), id. ¶ 82, and that the acquisition reduced competition for licenses by removing a potential competitor.  Id. ¶ 87.  The Clayton Act can bar the acquisition of patents if the effect of that acquisition would be to lessen competition substantially or create a monopoly.  Eastman Kodak Co. v. Goodyear Tire & Rubber Co., 114 F.3d 1547, 1557 (Fed. Cir. 1997), overruled on other grounds by Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448 (Fed. Cir. 1998) (en banc).

The first step in the analysis is to ask whether the RainDance acquisition, at the time it occurred, plausibly could have allowed Bio-Rad to exert market power in the DGAT market. It is plausible that the acquisition of one competitor by another -- when both were active in the market -- substantially reduced competition in that market.  SCM Corp., 645 F.2d at 1208.  Neither party disputes that Bio-Rad currently possesses

[33]

broad patent rights in what 10X has defined as the DGAT market. Def.'s Counterclaims ¶ 74.  A patent does not automatically confer market power, Illinois Tool Works, 547 U.S. at 46, but technology markets are defined by the ownership of intellectual property, so a court may infer that a firm holding a large percentage (typically over 65%) of patents in the defined market is exerting market power.  See PNY Techs., Inc. v. SanDisk Corp., 2012 U.S. Dist. LEXIS 55965, at *23 (quoting Image Tech. Servs. v. Eastman Kodak Co., 125 F.3d 1195, 1206 (9th Cir. 1997).

10X does not allege Bio-Rad's market share, instead stating that, if Bio-Rad's assertions in court of its patent rights in the DGAT market are true it "would be a monopolist in this market."  Def.'s Counterclaims ¶ 74.  The label of "monopolist" is conclusory, and this Court accords it no weight.  10X's allegation that Bio-Rad raised royalty prices due to the reduction in competition when it acquired RainDance, id. ¶¶ 12, 74, does, however, provide some indication of newly-acquired market power.  See In re Nexium, 968 F. Supp. 2d at 389 (citing Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp., 79 F.3d 182, 196-97 (1st Cir. 1996)).  Unlike in the DSCP market, RainDance, 10X, and Bio-Rad are plausibly alleged to have all been competitors in the same technology market.  Def.'s

Counterclaims ¶ 12.[3]  10X has therefore alleged facts from which this Court could infer both reduced output (the reduction in number of competitors providing licenses) and increased prices for a sustained period of time, which are the required elements to allege market power when the exact market share is not defined.  See Rebel Oil Co., 51 F.3d at 1433-34.  With that said, these two allegations barely pass the threshold of specificity required for the Court to evaluate them, and do so only because 10X has alleged a plausible mechanism of reduced competition.  Cf. Intellectual Ventures I LLC, 2013 U.S. Dist. LEXIS 177836, at *12-28 (dismissing Sherman Act claims because of lack of specific allegations in the pleadings, and because plaintiff failed to explain why prices did not merely reflect defendant's lawful right to charge the patent license fee the market would bear).

As to whether 10X has alleged antitrust injury from this conduct, it has advanced plausible allegations of competitive injury in the payment of supracompetitive licensing fees.  See In re Nexium, 968 F. Supp. 2d at 389.

---

[3] 10X's allegation that the resolution of the 152 case in Bio-Rad's favor also indicates market power in the DGAT market, Def.'s Counterclaims ¶ 86, while possible in theory, is simply too teneous to support a finding of market power as it relies on the unprovable speculation that RainDance itself could not have achieved the same outcome.  See Twombly, 550 U.S. at 555.

10X has not, however, advanced a plausible theory of antitrust injury from the 152 case, because any injuries stemming from this litigation was not caused "by reason of anything forbidden in the antitrust laws."  Brunswick, 429 U.S. at 488.  The facts alleged here are similar to Eastman Kodak, where the Federal Circuit dismissed a claim under the Clayton Act because the plaintiff "would have suffered these same injuries regardless of who had acquired and enforced the patent against it."  114 F.3d at 1558.  Here, if the RainDance merger had never happened, 10X would still be subject to the exact same claims of patent infringement, as illustrated by the fact that RainDance chose to sue prior to its acquisition.  Def.'s Counterclaims ¶ 30.  With that said, because 10X has alleged antitrust harm, the other lawsuits (including this one) brought by Bio-Rad could potentially qualify as antitrust injury for the purposes of damages.  Amphastar, 850 F.3d at 57-58.

The Court therefore DENIES Bio-Rad's motion to dismiss as to Count II.

### 3. Count V: Clayton Act Violation in ddPCR Market

10X alleges that Bio-Rad's acquisition of RainDance violated the Clayton Act in the ddPCR market, arguing there was anticompetitive harm because 10X is a consumer in this product market and has been forced to pay supracompetitive prices. Def.'s Counterclaims ¶¶ 134-137.

10X alleges that Bio-Rad currently controls over 90% of the ddPCR market, id. ¶ 65, and that at the time of the acquisition, RainDance competed in the market with a share of less than 10%. Id. ¶ 51.  It additionally alleges that there are now fewer products available in the ddPCR market.  Id. ¶ 104.  A firm increasing its market share above 90% through horizontal merger is a classic example of conduct that may negatively impact competition though monopolizing behavior.  See Hewlett-Packard Co. v. Boston Sci. Corp., 77 F. Supp. 2d 189, 195-96 (D. Mass. 1999) (Saris, J.) ("For pleading purposes, an allegation of market share of 70 percent has been held to be an adequate basis for an inference of power in a relevant market.") (citing International Audiotext Network, Inc. v. AT & T, 893 F. Supp. 1207, 1217 (S.D.N.Y. 1994))).  Thus, 10X has properly alleged a violation of the Clayton Act.

10X claims antitrust injury in this market in having to pay supracompetitive prices for ddPCR products.  See Def.'s Counterclaims ¶ 137.  Bio-Rad argues that this claim is insufficiently precise to survive a motion to dismiss, as 10X does not allege any of the actual prices it has paid, nor whether RainDance's prices were less expensive.  Pl.'s Reply 4.

Bio-Rad further argues, id. at 11, that 10X's allegations in this market are no more specific than pleadings that other courts have dismissed.  See Tempur-Pedic Int'l, 626 F.3d at 1340

(holding an allegation insufficient that stated plaintiff's
resale price fixing agreements "have unreasonably restrained, do
unreasonably restrain, and will continue to unreasonably
restrain trade and commerce in the visco-elastic mattress market
. . . by eliminating price competition" (omission in original));
Intellectual Ventures, 2013 U.S. Dist. LEXIS 177836, at *20
(holding complaint to be insufficient when it made "conclusory
allegations that [the defendant] has demanded and received
'supracompetitive prices'" without specifying the prices of
royalties or licenses, or why those prices are
supracompetitive).  10X distinguishes Tempur-Pedic by noting
that, in that case, the plaintiffs had failed to explain the
mechanism of anticompetitive harm, whereas 10X has clearly
explained that mechanism in its complaint.  Def.'s Opp'n 10-11.
The same reasoning distinguishes Intellectual Ventures as well,
though 10X does not specifically address it.  See 2013 U.S.
Dist. LEXIS 177836 at *20.

While the allegations are perhaps a bit lacking in
specificity, they are plausible and sufficient to put Bio-Rad on
notice of the alleged violation.  Bio-Rad's motion to dismiss as
to Count V is therefore DENIED.

### D.  Sherman Act Violations

A plaintiff claiming a violation of Section 2 of the
Sherman Act must allege both "the possession of monopoly power

in the relevant market" and "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." Grinnell Corp., 384 U.S. at 570-71.

The acquisition of patents can constitute monopolization when "the dominant competitor in a market acquires a patent covering a substantial share of the same market." SCM Corp., 645 F.2d at 1205, 1210; see also Buying Monopoly, at 54-55 (noting that buying up all the patents in a field can constitute either anticompetitive conduct as a means of excluding rivals, or procompetitive conduct by enabling a firm's internal innovation). Maintenance of monopoly power is barred only if it is done through anticompetitive conduct. See Trinko, 540 U.S. at 407. Conversely, "[c]onduct that impairs the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way may be deemed anticompetitive." Qualcomm, 501 F.3d at 308 (citing Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 604-05 (1985)).

To demonstrate an attempt to monopolize, the plaintiff must show "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power."

[39]

Spectrum Sports, 506 U.S. at 456.   Some conduct that is illegal for a monopolist is legal for an aspiring monopolist because it would not have an anticompetitive effect unless undertaken by a firm possessing monopoly power.   United States v. Dentsply Int'l, Inc., 399 F.3d 181, 187 (3rd Cir. 2005).   The showing of specific intent requires "a specific intent to destroy competition or build monopoly," not mere competition.   Times-Picayune Publ'g Co. v. United States, 345 U.S. 594, 626 (1953).   The showing of "dangerous probability" requires the same type of analysis as finding a monopoly in the relevant market, as well as the defendant's alleged ability to harm competition in that market.   Spectrum Sports, 506 U.S. at 456.

Not all monopolies are necessarily anticompetitive. Trinko, 540 U.S. at 407 ("The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system.").   The additional element required to prove a violation of the Sherman Act is called "predatory" or "exclusionary" conduct.   See Dentsply, 399 F.3d at 186-87.   This type of conduct is defined as conduct that is both illegal and is designed "to foreclose competition, gain a competitive advantage, or to destroy a competitor."   Id. (quoting Eastman Kodak, 504 U.S. at 482-83).

Much of 10X's arguments for Sherman Act violations fall apart under this scrutiny.  10X argues, for all of its Sherman Act counts, that the predicate illegal act of monopolization was Bio-Rad's acquisition of RainDance.  Def.'s Opp'n 1; Def.'s Counterclaims ¶¶ 122-133, 138-142.  Yet, as discussed supra III.C.1, most of its theories of how it was harmed are not in fact examples of anticompetitive action.

Most importantly, Bio-Rad's entire campaign of litigation against 10X cannot constitute exclusionary acts because it is protected by the Noerr-Pennington doctrine.  See supra II.C.3. The exception to this rule endorsed by the First Circuit, see Amphastar, 850 F.3d at 57-58, applies only to a finding of anticompetitive injury for purposes of liability or standing, not for the finding of an antitrust cause of action.  Even were this Court to consider the litigation part of an anticompetitive "scheme" to monopolize, Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 707 (1962), the Noerr-Pennington doctrine would still render it protected conduct for purposes of finding a violation of the Sherman Act.  See Amphastar, 850 F.3d at 57; Abbott Labs. v. Teva Pharms. USA, Inc., 432 F. Supp. 2d 408, 428-30 (D. Del. 2006).  Additionally, several of 10X's other theories of anticompetitive harm are unavailing because the alleged acts are not actually anticompetitive, such as

settling the 152 case on favorable terms, or forcing 10X to innovate alternatives to Bio-Rad's patents.  See supra II.C.1.

### 1. Count III: Sherman Act Violation for Attempted Monopolization of Droplet Single-Cell Product Market

10X alleges that Bio-Rad engaged in anticompetitive conduct in violation of Section 2 of the Sherman Act through the following actions: "(a) Unlawfully acquiring RainDance and the RainDance patent portfolio.  (b) Refusing to license its patent portfolios at reasonable rates, or at all.  (c) Using that portfolio to file patent litigation against actual or potential competitors seeking to use technology for genetic analysis on a droplet platform."  Def.'s Counterclaims ¶ 123.

10X pleads that these actions are anti-competitive because the lawsuits have imposed great costs on the company, the lack of access to patents is hampering its ability to innovate, and, should the lawsuit be successful, it will be "excluded" from the market.  Id. ¶ 126.  It alleges Bio-Rad's specific intent to monopolize in reference to statements by Annette Tumolo, Bio-Rad's Executive Vice President and President, Life Science Group, indicating that Bio-Rad intended to use litigation as a means of forcing 10X's acquisition, and by reference to Bio-Rad announcing the litigation in a manner designed to sabotage 10X's initial public offering.  Id. ¶¶ 96, 99, 100, 124.  Finally, it pleads that Bio-Rad's actions have created a dangerous

probability of allowing it to achieve monopoly power.  Id.  ¶
126.

    10X's arguments fail on the first prong of the attempted
monopolization analysis.  First, 10X does not allege that Bio-
Rad had anything close to monopoly power (or even significant
market power) in the DSCP market at the time of its merger with
RainDance, see Pl.'s Reply 5, so the acquisition cannot be the
unlawful predicate act of monopolization for a Section 2
violation.  Cf. SCM Corp., 645 F.2d at 1205.  Second, refusal to
license to a rival is anticompetitive only when done by an
existing monopolist, which Bio-Rad is not.  CSU, L.L.C., 203
F.3d at 1329.  Third and finally, Bio-Rad's litigation campaign
cannot constitute the exclusionary act because it is protected
by the Noerr-Pennington doctrine.  Amphastar, 850 F.3d  at 57-
58.

    Regarding the specific intent requirement, 10X must allege
"a specific intent to destroy competition or build monopoly."
Times-Picayune, 345 U.S. at 626 (1953).  It has indeed alleged
sufficient facts to draw an inference that Bio-Rad's litigation
campaign may be taking place with the intent of driving 10X out
of business, see Def.'s Counterclaims ¶ 96, but absent
illegally-acquired market power, there is nothing
anticompetitive about this intent.

Regarding the showing of a dangerous probability of achieving monopoly power, the litigation itself cannot serve as the predicate anticompetitive harm under <u>Noerr-Pennington</u>, so any acquisition of market power that Bio-Rad achieved through litigation must be treated as "growth or development as a consequence of a superior product, business acumen, or historic accident." <u>Grinnell Corp.</u>, 384 U.S. at 570-71.

10X has not pleaded sufficient facts to indicate anticompetitive conduct in the DSCP market. Count III therefore does not survive.

### 2. Count IV: Sherman Act Violation for Monopolization or Attempted Monopolization of Genetic Analysis Technology Market

10X alleges that Bio-Rad has monopolized or attempted to monopolize the DGAT market in violation of Section 2 of the Sherman Act. Def.'s Counterclaims ¶¶ 128-133. It articulates two theories. First, that Bio-Rad's acquisition of RainDance constituted monopolization, maintenance of monopoly power, or attempted monopolization; and second, that Bio-Rad's enforcement of its RainDance patent also constitutes monopolization or attempted monopolization because it obtained these patents illegally. <u>Id.</u>

10X alleges, similar to its Clayton Act claims, that the acquisition of RainDance was unlawful because it consolidated monopoly power through acquisition, rather than "superior

[44]

products, business acumen, or historic accident." Def.'s
Counterclaims ¶¶ 129-130. It further alleges that Bio-Rad's
continued defense of its victory in the 152 case, and its
pressing of litigation in the case before this Court, represent
an unlawful attempt to consolidate this monopoly. Def.'s
Counterclaims ¶ 130. It alleges these actions are
anticompetitive for the same reasons as in Count III, as the
DGAT market is upstream from the DSCP market, so any
consolidation in the DGAT market will drive up prices and lead
to potential exclusion in the DSCP market. Id. ¶ 132.
Additionally, 10X alleges attempted monopolization because, if
the lawsuits are successful, Bio-Rad will effectively achieve
monopoly power by forcing 10X to pay excessive royalties or
forcing it out of the market. Id. ¶ 131.

As an initial matter, 10X cannot succeed on its theories
that rely on Bio-Rad's litigation as the mechanism of either
monopolization or attempted monopolization because non-baseless
litigation is protected under Noerr-Pennington. This is true
even were this Court to find that the acquisition of RainDance
violated the Clayton Act by reducing competition in the DGAT
market, because that acquisition would be illegal only insofar
as it increased Bio-Rad's market power, and litigation is
protected conduct regardless of the plaintiff's market power.
Cf. P.R. Tel. Co., 874 F.3d at 773-75 (Barron, J., concurring)

(analyzing extent of protections afforded by the Noerr-Pennington doctrine to litigation brought by a "monopolist").

Even more fatal to its case, 10X has failed plausibly to allege that Bio-Rad is an actual monopolist in the DGAT market either now or at the time of the RainDance acquisition.  See Twombly, 550 U.S. 566.  As discussed supra, III.C.2, 10X has nudged its Clayton Acts claims in the DGAT market across the threshold of plausibility by alleging facts that may indicate market power.  It has not, however, alleged sufficient facts to indicate monopoly market power.  As 10X itself noted in its brief, the standard for alleging monopoly is higher than the standard for alleging the degree of market power sufficient to state a claim under the Clayton Act.  See Def.'s Opp'n 6 ("'Acquisition by a monopolist [of competing patents] . . . should presumptively be a § 2 'exclusionary practice'" and "'a patent is a productive asset [so] § 7 of the Clayton Act . . . may condemn such mergers even where the licensee is not a monopolist.'" (ellipses and alterations in original) (quoting Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law § 707 (4th ed. 2013-2018)).

In fact, the record of litigation between the parties and 10X's own statements make it implausible that Bio-Rad holds a monopoly in the market.  10X is a self-proclaimed "lead innovator" in the downstream DSCP sub-market and holds numerous

[46]

patents in that sub-market.  Def.'s Counterclaims ¶¶ 71, 76.
Furthermore, both parties have successfully enforced patents
against the other, and both parties have been unsuccessful in
the enforcement of other patents, indicating healthy
competition.  Compare the 1068 ITC Investigation (finding that
10X had infringed Bio-Rad's patent), with the 1100 ITC
investigation (finding that Bio-Rad had infringed 10X's
patents).  In this context, 10X's barebones allegations that
Bio-Rad reduced licenses and increased prices following the
RainDance acquisition are insufficient plausibly to allege
monopoly dominance.  Cf. Intellectual Ventures, 2013 U.S. Dist.
LEXIS 177836 at *19-20.  10X states that Bio-Rad "alleges that
it has broad rights . . . [that] if true, would mean that Bio-
Rad would be a monopolist in the market," Def.'s Counterclaims ¶
74, but this statement is merely an unsupported legal
conclusion.

10X has also failed to allege what percentage of the DGAT
market it believes Bio-Rad either currently controls or
controlled at the time of the RainDance acquisition.  See Dep't
of Justice, Competition and Monopoly: Single-Firm Conduct Under
Section 2 of the Sherman Act 21 (2015) (available at:
https://www.justice.gov/sites/default/files/atr/legacy/2008/09/1
2/236681_chapter2.pdf) (noting that courts typically require a
showing of at least 55-70% of the market to indicate the

presence of a monopoly, and that a share of the market below 50%
is likely inadequate as matter of law).  It also has failed to
allege that there are "significant" barriers to entry preventing
another firm from entering the market.  10X has not alleged
there is anything unusual about this market that creates
significant barriers to entry, as where one party controls a
technological standard.  Cf. Qualcomm Inc., 501 F.3d at 314.  It
does allege that Bio-Rad has created a "thicket of patents" that
"requires innovators to obtain costly licenses or face the task
of inventing newly designed products that are not alleged to be
infringing," Def.'s Counterclaims ¶ 87, but forcing competitors
either to pay for a license or innovate is the very purpose of
patents.  See Brullote v. Thys Co., 379 U.S. 29, 33 (1964) ("A
patent empowers the owner to exact royalties as high as he can
negotiate with the leverage of that monopoly."); Data Gen.
Corp., 36 F.3d at 1186.

    Finally, 10X's theories of attempted monopolization are
unavailing because nothing that Bio-Rad is alleged to have done
post-merger would constitute exclusionary conduct unless it was
already a monopolist.  The RainDance acquisition itself cannot
constitute attempted monopolization absent exclusionary conduct.
Spectrum Sports, 506 U.S. at 456.  Its refusal to license to a
rival (or charge whatever the market will bear) does not qualify
as such conduct unless it is already a monopolist.  Data Gen.

Corp., 36 F.3d at 1185.  If Bio-Rad is not a monopolist, its subjective intent in refusing to license or enforcing its patents is "immaterial."  CSU, L.L.C., 203 F.3d at 1327.

In conclusion, because it is not plausibly pleaded that Bio-Rad is a monopolist in the DGAT market, and because it has not taken any actions that -- lacking monopoly power -- would be exclusionary, the motion to dismiss as to Count IV is GRANTED.

### 3.   Count VI: Sherman Act Violation for Monopolization of ddPCR Market

10X alleges that Bio-Rad has monopolized the ddPCR market through its unlawful acquisition of RainDance.  Def.'s Counterclaims ¶¶ 138-142.  It further alleges that it has suffered anticompetitive harm in the market by being forced to pay supracompetitive prices for ddPCR devices and consumables, having to defend against lawsuits, and having its ability to innovate hampered.  Id. ¶ 141.

As with its Clayton Act claim, 10X has sufficiently alleged a Sherman Act Section 2 violation in the ddPCR market.  10X's allegation that Bio-Rad possesses a 90% market share at the time of the acquisition, and further increased its market share by acquiring RainDance, is sufficient to allege a Sherman Act violation because it indicates that a dominant competitor further entrenched its monopoly by consolidating its hold on the market.  SCM Corp., 645 F.2d at 1205, 1210.  The payment of

supracompetitive prices constitutes a valid antitrust injury for this claim, as well as Count V.  Bio-Rad's motion to dismiss as to Count VI is therefore DENIED.

### D.  Count VII: Unfair Competition in Violation of California's Business & Professions Code § 17200

10X alleges violations of the California Unfair Competition law, section 17200 et seq. of the California Business and Professions Code, on the same grounds as its previous counts.

Section 17200 prohibits a variety of unfair practices, including antitrust violations.  See Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co., 20 Cal. 4th 163, 186-87 (1999) (holding that the word "unfair" in section 17200 encompasses "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition").  The standard for a violation of section 17200 is similar to the federal standard.  Id. at 186.  Conduct that a court rules does not constitute a violation under the federal antitrust laws will not support a finding under section 17200 either.  LiveUniverse, Inc. v. MySpace, Inc., 304 Fed. Appx. 554, 557 (9th Cir. 2008).

Bio-Rad argues that, because 10X has failed to state a claim on any of its federal counts, this Court must also dismiss

the section 17200 claim.  Pl.'s Mem. 18.  Alternatively, Bio-Rad argues that 10X's arguments should be barred under California's anti-SLAPP provision, Cal. Civ. Proc. Code § 425.16., which guards First Amendment-covered activity including <u>Noerr-Pennington</u> protected patent petitioning.  Pl.'s Mem. 18 n.12.

Both of Bio-Rad's arguments are unavailing.  Because three of 10X's six counts survive the motion to dismiss, this court also DENIES the motion to dismiss as to Count VII.

## III. CONCLUSION

For the reasons given above, this Court GRANTS Bio-Rad's motion to dismiss, ECF No. 68, with respect to counterclaim Counts I and III, and IV, and DENIES the motion to dismiss with respect to counterclaim Counts II, V, VI, and VII.

**SO ORDERED.**

/s/ William G. Young
WILLIAM G. YOUNG
U.S. DISTRICT JUDGE