**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| BIO-RAD LABORATORIES, INC. and PRESIDENT AND FELLOWS OF HARVARD COLLEGE<br><br>        Plaintiffs,<br><br>  v.<br><br>10X GENOMICS, INC.,<br><br>        Defendant. | C.A. No. 1:19-cv-12533-WGY |
| 10X GENOMICS, INC.,<br><br>        Counterclaim Plaintiff,<br><br>  and<br><br>PRESIDENT AND FELLOWS OF HARVARD COLLEGE,<br><br>        Counterclaim Co-Plaintiff as to certain claims,<br><br>  v.<br><br>BIO-RAD LABORATORIES, INC.,<br><br>        Counterclaim Defendant,<br><br>  and<br><br>PRESIDENT AND FELLOWS OF HARVARD COLLEGE,<br><br>        Counterclaim Co-Defendant as to DJ counterclaims. | |

**MEMORANDUM IN SUPPORT OF 10X GENOMICS INC.'S MOTION TO MODIFY PROTECTIVE ORDER**

## TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................................ 1

II.   THERE IS GOOD CAUSE TO ALLOW CROSS-USE BECAUSE OF THE
RELATIONSHIP BETWEEN DISCOVERY IN THIS CASE AND ISSUES IN
DISPUTE IN THE DELAWARE POST-REMAND PROCEEDINGS............................ 3

III.   DISCOVERY IN THIS CASE CONTRADICTS KEY POSITIONS BIO-RAD
TOOK IN THE DELAWARE CASE AND PROVIDES AN INDEPENDENT
BASIS TO ALLOW CROSS-USE.................................................................................... 9

    A.   Bio-Rad's Prior Testimony Regarding The Reasonable Royalty Rate................ 11

    B.   Bio-Rad's Prior Testimony Regarding The Grant Thornton Analysis ................ 15

    C.   Bio-Rad's Prior Testimony On The Value Of The RainDance Patents.............. 16

    D.   Bio-Rad's Prior Testimony On RainDance's Supposed Competition With
10X........................................................................................................................ 17

    E.   Bio-Rad's Prior Testimony That 10X Harmed Bio-Rad .................................... 19

# TABLE OF AUTHORITIES

**Cases**

*Baker v. Liggett Grp., Inc.*,
  132 F.R.D. 123 (D. Mass. 1990) ................................................................. 5

*Foltz v. State Farm Mut. Auto. Ins. Co.*,
  331 F.3d 1122 (9th Cir. 2003) .................................................................. 6

*Hayes v. McGee*,
  No. 10-40095-TSH, 2014 U.S. Dist. LEXIS 3765 (D. Mass. Jan. 13, 2014) ........................... 4

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
  No. 03-md-01532, 2009 U.S. Dist. LEXIS 130579 (D. Me. Mar. 26, 2009) .................. 4, 5, 6

*Lumenis Ltd. v. Alma Lasers Ltd.*,
  No. 07 C 3622, 2013 U.S. Dist. LEXIS 56784 (N.D. Ill. Apr. 19, 2013) .............................. 10

*Pub. Citizen v. Liggett Grp., Inc.*,
  858 F.2d 775 (1st Cir. 1988) ..................................................................... 4

*Superior Graphite Co. v. Timcal SA*,
  No. 03 C 4904, 2006 U.S. Dist. LEXIS 110973, (N.D. Ill. Jan. 9, 2006) .......................... 4, 10

*Telcordia Techs., Inc. v. Cisco Sys., Inc.*,
  No. 1:04-cv-00876-GMS (D. Del. Apr. 14, 2014) .................................................. 7

*Vectura Limited v. Glaxosmithkline LLC*,
  No. 1:16-cv-00638-RGA (D. Del. Sep. 12, 2019) .................................................. 6

## I.      INTRODUCTION

10X hereby moves to modify the Protective Order to allow cross-use of discovery in this case in proceedings between Bio-Rad and 10X in the District of Delaware. Cross-use is justified because discovery in this case is relevant to issues that will be disputed in those proceedings. Cross-use will not burden Bio-Rad because the documents at issue are already produced and 10X merely needs permission to use them, requiring no further action. There is also no prejudice to Bio-Rad because the documents will remain subject to court orders protecting confidentiality.

In 2018, a Bio-Rad lawsuit against 10X went to trial before Judge Andrews in the District of Delaware, *Bio-Rad Laboratories, Inc. v. 10X Genomics, Inc.*, Case No. 1:15-cv-00152-RGA (the "Delaware Case"). 10X was accused of infringing patents licensed first to RainDance, and then to Bio-Rad after its acquisition of RainDance. Because the Delaware Case was initiated by RainDance and Bio-Rad acquired RainDance during the litigation, there was very limited discovery from Bio-Rad. At that trial (the "Delaware Trial"), Bio-Rad adduced argument and testimony in support of a 15% royalty and injunction based on Bio-Rad information that had not been the subject of meaningful discovery. The jury found for Bio-Rad, the Court entered an injunction, and the case went on appeal. While the Delaware Case was on appeal before the Federal Circuit, Bio-Rad filed the present case and discovery has proceeded. The Federal Circuit affirmed, reversed, and vacated portions of the district court decision in the Delaware Case and has now remanded. The post-remand proceedings will soon commence in the District of Delaware.

Modifying the Protective Order in this case to permit the efficient use of discovery in multiple cases to which it is relevant is well-supported in the law and follows the parties' past practice in multiple cases. Here, the good cause standard courts generally apply for modifying protective orders to allow cross-use is met for two separate reasons, each of which is sufficient to grant 10X's motion. First, discovery in the present case related to patent licensing, royalty rates,

the technology at issue, competition between Bio-Rad and 10X or lack thereof, and the RainDance acquisition, is highly relevant to the post-verdict damages that will be disputed in Delaware. Bio-Rad is even relying on the damages verdict in the Delaware Case to seek damages in this case. This subject-matter relatedness standing alone is sufficient reason to allow cross-use, and Bio-Rad should not be permitted to conceal new relevant evidence from the Delaware court.

Second, regardless of whether the related subject matter is found to allow cross-use, discovery in this case, which was unavailable in the Delaware Case, has revealed that the relief Bio-Rad obtained in the Delaware Case is based on a series of statements it made to the jury and the judge in that case that are flatly inconsistent with and contradicted by statements, positions, documents, and other evidence produced in discovery in the present case. Indeed, discovery in the present case has revealed that Bio-Rad's prior damages award was based on a series of materially false and misleading statements Bio-Rad and its witnesses made in the Delaware Case. 10X expects to use this evidence in both proceedings on post-verdict damages in the Delaware Case and proceedings under Federal Rule of Civil Procedure 60 either in the Delaware Case or in a separately filed action related to the outcome in the Delaware Case. 10X does not ask this Court to resolve the merits of any issue to which the discovery in question is relevant—only to allow 10X to provide the discovery to the Delaware court so that it can decide the merits for itself. Faced with analogous circumstances, courts have even found that the need to prevent a potential fraud in another tribunal justifies stripping materials produced subject to protective order of their confidential status. These circumstances therefore more than meet the requirements of good cause for cross-use where 10X does not seek to make public the discovery in this case but seeks only to make it available for use in the Delaware court under the same confidentiality provisions.

For these reasons, 10X requests modification of the following provision of the Protective

Order (ECF No. 66), as modified by the pending Joint Motion to Amend Protective Order (ECF

No. 152), to add the emphasized text:

> 7.1 <u>Basic Principles</u>. A Receiving Party may use Protected Material that is disclosed
> or produced by another Party or by a Non-Party in connection with this case only
> for **(a)** prosecuting, defending, or attempting to settle this Litigation and/or the
> Related Stilla Litigation **or (b) in Bio-Rad Laboratories, Inc. v. 10X Genomics,
> Inc., Case No. 1:15-cv-00152-RGA (District of Delaware) ("152 Case") or an
> independent action filed by 10X related to the outcome of the 152 Case
> ("Independent Action").** Such Protected Material may be disclosed only to the
> categories of persons and under the conditions described in this Order **or the
> corresponding entities in the 152 Case or Independent Action**. **Protected
> Materials used in the 152 Case or Independent Action remain subject to the terms
> of this order or such other order that is entered in the 152 Case or the
> Independent Action or rule applicable in those cases.**

The relief 10X seeks is appropriate under guiding authorities; and the Protective Order states that

"[n]othing in this Order abridges the right of any person to seek its modification by the court in

the future." ECF No. 66, ¶ 13.1.

## II.   THERE IS GOOD CAUSE TO ALLOW CROSS-USE BECAUSE OF THE RELATIONSHIP BETWEEN DISCOVERY IN THIS CASE AND ISSUES IN DISPUTE IN THE DELAWARE POST-REMAND PROCEEDINGS

The relationship between the discovery in the present case and the issues in dispute in post-

remand proceedings in Delaware meets the good cause standard courts apply to allow the cross-

use 10X is requesting. Bio-Rad has repeatedly requested and the parties have repeatedly agreed in

ITC and district court litigations to use discovery from prior cases in later pending cases between

the same parties, and in fact the discovery from the Delaware Case is available in this case as if

adduced through discovery in this case. *See* ECF No. 67 at 23. Despite this well-established history

of discovery cross-use in cases at various stages of litigation, Bio-Rad now takes the position that

discovery in this case cannot be used in the Delaware Case when it would give 10X access to the

discovery that undermines or contradicts the positions Bio-Rad has taken there. This is contrary to

Bio-Rad's longstanding reliance on cross-use, including when Bio-Rad successfully argued

*against* more discovery in this case on the grounds that it would be more efficient to rely on discovery that had already taken place in prior cases. ECF No. 67 at 10-12; *see also* Ex. 2, *Bio-Rad Laboratories Inc. v. 10X Genomics*, Case No. 1:18-cv-01679-RGA, Scheduling Conference, 10:7-11:22 (Bio-Rad raising the cross-use it sought). The reason is transparent: Bio-Rad is against cross-use when cross-use would efficiently provide 10X with the information it needs.

Bio-Rad's position is especially ill-taken when Bio-Rad is relying on the damages verdict in the Delaware Case as supposed support for its damages demand in this case. In its damages contentions in this case, Bio-Rad is specifically contending that "the 15% reasonable royalty rate used by the jury to calculate damages in [the Delaware Case] may be used to calculate a reasonable royalty." *See* Ex. 3 (Resp. to Interrog. No. 6) at 25. Bio-Rad cannot both ask this Court to allow damages based in part on the result of the Delaware Case and ask this Court to let Bio-Rad conceal from the Delaware court information relevant to showing that same damages award was not correct and/or should not be applied going forward, as detailed below.

Like the issuance of protective orders under Rule 26(c), courts have found that protective orders may be modified at a party's request based on "good cause." *See, e.g.*, *Superior Graphite Co. v. Timcal SA*, No. 03 C 4904, 2006 U.S. Dist. LEXIS 110973, *3 (N.D. Ill. Jan. 9, 2006) (granting motion to modify); *see also Hayes v. McGee*, No. 10-40095-TSH, 2014 U.S. Dist. LEXIS 3765, at *12-13 (D. Mass. Jan. 13, 2014) (explaining that the "good cause" standard applies to modifications of a protective order). The First Circuit rejected a higher "extraordinary circumstances standard" when there is "some relevant change in the circumstances," citing a case "suggesting that the good cause standard of Rule 26(c) governs modifications of protective orders." *Pub. Citizen v. Liggett Grp., Inc.*, 858 F.2d 775, 791-92 (1st Cir. 1988) (finding district court could modify a protective order); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,

2009 U.S. Dist. LEXIS 130579, at *39 (D. Me. Mar. 26, 2009) ("The First Circuit has rejected the extraordinary circumstances standard . . . ." (citing *Public Citizen*)).

Protective Orders have permitted the use of information from one litigation in other litigations that present related issues. For example, a court in a tobacco tort case ordered cross-use among similar cases because defendants "have not shown good cause to preclude dissemination to litigants and lawyers in similar tobacco tort cases." *Baker v. Liggett Grp., Inc.*, 132 F.R.D. 123, 126 (D. Mass. 1990).[1] "[T]he sharing of information obtained in discovery with litigants in comparable cases is consistent with Fed. R. Civ. P. 1 which provides that the Rules are to 'be construed to secure the just, speedy, and inexpensive determination of every action.'" *Id.* The court concluded that it was "inappropriate" to require "every plaintiff in a tobacco tort case to go through a comparable, prolonged and expensive discovery process." *Id.* Protective orders have also been modified to permit cross-use in litigations that present related issues. For example, plaintiffs in an Ontario, Canada, action alleging that defendants engaged in conduct designed to prohibit the exportation of new cars from the United States to Canada sought to modify the protective order in United States litigation alleging that many of the same defendants entered agreements designed to prevent new cars purchased in Canada from entering the United States. *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, Case No. 03-md-01532, ECF No. 1001, 2009 U.S. Dist. LEXIS 130579, at *16-*20, (D. Me. Mar. 26, 2009). The court permitted "third-party access by collateral litigants" if the "collateral litigants are made subject to the provisions of the protective order." *Id.*, *16, *39. This "protect[ed] the Defendants (and third parties) who produced confidential discovery material in reliance on the [Master Protective Order] and simultaneously preserve[d] the efficiency interests of the [plaintiffs in the Ontario action] as well as the interest of judicial economy." *Id.*,

---

[1] Emphasis added and internal citations and quotation marks omitted unless otherwise noted.

*39-40, *report and recommendation adopted*, Case No. 03-md-01532, ECF No. 1009. In the present case, there is even less risk to maintaining confidences because the Delaware Case involves the same parties with the addition of Bio-Rad's co-plaintiff the University of Chicago, which is also a party in the *Stilla* case (No. 1:19-cv-11587-WGY) in this district. The parties already agreed and requested that all discovery in this case be cross-produced in the *Stilla* case (ECF No. 152), and so the University of Chicago poses no risk to maintaining confidences. The Delaware Court also permits filings of protected materials under seal, and so confidentiality will be maintained.

As the Ninth Circuit has explained, courts need only make a "rough estimate of relevance" to determine if modification of the protective order "will eliminate the potential for duplicative discovery." *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1132-3 (9th Cir. 2003). The "ultimate discoverability of specific materials . . . must be resolved by the collateral courts." *Id.* Any party's interest in secrecy can be accomplished by placing collateral litigants "under the same restrictions on use and disclosure contained in the original protective order." *Id.*

There is good cause to modify the Protective Order to permit the use of discovery from the present case in the Delaware proceedings. The discovery in this case is relevant to the post-remand proceedings in the Delaware Case, which will likely be focused on post-verdict damages. A post-remand damages determination involves a post-verdict hypothetical negotiation analysis. *Vectura Limited v. Glaxosmithkline LLC*, Case No. 1:16-cv-00638-RGA, ECF No. 362 at 13 (D. Del. Sep. 12, 2019) (J. Andrews, who presides over the Delaware Case). This analysis includes assessment of changed economic circumstances and any "other post-verdict factor that would impact what a hypothetical negotiation would look like after the prior infringement verdict." *Id*. At least the following discovery from this case, which was ***not available*** in the Delaware Case and much of which was created post-verdict, will bear on the changed circumstances and the appropriate rate

in that post-verdict hypothetical negotiation.

For example, the Delaware jury considered the hypothetical negotiation between RainDance and 10X, but the post-verdict hypothetical negotiation is between Bio-Rad and 10X, such that different and new evidence will need to be considered. In the Delaware Case, Bio-Rad obtained pre-verdict damages on several University of Chicago patents to which Bio-Rad acquired an exclusive license through the RainDance acquisition. Bio-Rad obtained a jury award based on a 15% so-called "competitor" royalty rate from a hypothetical negotiation between RainDance and 10X. The post-verdict hypothetical negotiation, however, is between Bio-Rad and 10X, and documents and testimony in this case show that the hypothetical negotiation between Bio-Rad and 10X would result in a royalty much lower than 15%. For example, Bio-Rad believed that the rate for licensing the entire RainDance portfolio of hundreds of patents, of which Chicago patents are only a small part, was ███, as described in greater detail in Sections III(A-B) below. Similarly, in this case Bio-Rad has produced licenses on similar technology, such as the licenses between 1CellBio and Bio-Rad that were entered into after the verdict in Delaware. The royalty rates in those licenses are ██████████ of the 15% royalty rate for pre-verdict sales. Such post-verdict licenses too are relevant to determining ongoing royalties. *Telcordia Techs., Inc. v. Cisco Sys., Inc.*, Case No. 1:04-cv-00876-GMS, ECF No. 439 at 6-9 (D. Del. Apr. 14, 2014). Further, if Bio-Rad seeks to rely upon the verdict or pre-verdict licenses for the ongoing royalty, then discovery in this case has revealed Bio-Rad's outside-the-litigation belief that the license it has argued to the jury is comparable, the Applera license, is not comparable, and that at least one license that Bio-Rad argued to the jury is not comparable, the Life Technologies license, is the real comparator. These licenses, and related testimony are addressed in greater detail in Section III(A) below.

Discovery from Bio-Rad's witnesses in this case shows that Bio-Rad and 10X do not

compete, as described in greater detail in Section III(E) below. However, in the Delaware Case, Bio-Rad's expert witnesses and counsel relied upon a license with a "15 percent" rate "when there's competition," and "when there was non-competition was 2 percent." Delaware Trial Tr. ("Trial Tr.," Ex. 1) 625:5-20, 1168:18-1169:24, 1499:17-21, 1501:7-21. If 10X and Bio-Rad are not competitors in the post-verdict hypothetical negotiation, Bio-Rad should no longer obtain the supposed competitor licensing rate that it obtained in Delaware. Discovery from Bio-Rad shows that 10X and Bio-Rad are not competitors. For example, Ms. Trauzzi, a Bio-Rad Director of Marketing Strategy, testified that "Bio-Rad to my knowledge has never had a significant presence in the single-cell NGS market" and has a market share "around 1 percent." Ex. 4, Trauzzi Dep., 84:8-15. Bio-Rad's witness on lost sales was "not aware of lost sales" to 10X. Ex. 5, Lebofsky Dep., 91:17-23, 93:4-7; Ex. 6 (Ex. 1 Lebofsky Dep.); Ex. 7 (Sep. 14, 2020, email from Sawyer).

While Bio-Rad relied pre-judgment in the Delaware Case on the planned 2019 release of a "next generation" product that allegedly was going to "leapfrog" 10X's technology, no such new product was released, only a single new assay was released, ███████████████████████

████████, and Bio-Rad is "falling short of what [they] were trying to achieve." [2] *Compare* Delaware Case, ECF No. 516, ¶¶ 3-7; Trial Tr., 134:18-135:15; *see also id.*, 1494:10-20, 1494:24-1495:1; *with* Ex. 5, Lebofsky Dep., 38:8-39:13, 147:10-13, 149:4-7; 149:15-150:15.

10X should be allowed to rely on the above discovery and discovery in similar categories in post-remand proceedings in Delaware without the need to expend additional resources to seek and obtain duplicative discovery. Instead, the parties should be permitted, in the interest of a just,

---

[2] While Ms. Trauzzi testified in this case that Bio-Rad would ███████████████████ ███████████████████████████████████████████████ Ex. 4, Trauzzi Dep., 60:9-19, 63:6-64:20, 104:7-18. The project ███████████████████ and Bio-Rad did not ████████████████████ ████████. *Id.*

inexpensive, and efficient proceeding, to use the discovery already provided in this case to the extent permitted by the District of Delaware. Bio-Rad will have an opportunity to argue regarding relevance and admissibility of this discovery in the Delaware Court, and 10X merely asks this Court to remove the protective order as a bar to using that discovery and the potentially expensive and inefficient process of seeking the same discovery again in Delaware. Any interest of confidentiality will be met because the protections of the Protective Order will be maintained.

Further, some of the information in question was produced by third parties in this litigation, including particularly Grant Thornton whose production is especially relevant. Grant Thornton is the firm Bio-Rad engaged to perform the fair value analysis of certain assets acquired by Bio-Rad from RainDance. *See* Ex. 8, DTX-1481. Grant Thornton has already agreed that the material may be used in the Delaware action if the receiving parties sign separate agreements to comply with the terms of the Protective Order in this case. That is a non-issue once the Court enters the modified protective order because the same parties subject to this Protective Order are litigating the Delaware Case. Other third parties are represented by the same counsel as Bio-Rad and most of the allegedly confidential information they provided belongs to Bio-Rad because it is the information of former employees or board members of Bio-Rad or RainDance (Bio-Rad's predecessor in interest, meaning that any RainDance confidential information now belongs to Bio-Rad). Thus, allowing cross-use of materials originating from third parties in this case is equally proper and their confidentiality will be maintained.

## III.  DISCOVERY IN THIS CASE CONTRADICTS KEY POSITIONS BIO-RAD TOOK IN THE DELAWARE CASE AND PROVIDES AN INDEPENDENT BASIS TO ALLOW CROSS-USE

The law further supports finding good cause to modify a protective order to allow cross-use because discovery in the present case revealed that false evidence was provided in the Delaware Trial. Modification of a protective order has been allowed following an allegation that

the disclosure of the materials was necessary "to prevent a potential fraud" in another tribunal. *Superior*, 2006 U.S. Dist. LEXIS 110973, *3. In *Superior*, the defendants sought to declassify evidence that was undisputedly "properly classified as confidential" under the protective order to use in a public proceeding before the European Patent Office (EPO). *Id.*, *2-4, *10. The court found "good cause to modify the protective order"—with "good cause" implying "changed circumstances or new situations"—when the position plaintiff took in the EPO "appears to directly contradict the deposition testimony given in this case." *Id.*, *4, *8-10; s*ee also Lumenis Ltd. v. Alma Lasers Ltd.*, No. 07 C 3622, 2013 U.S. Dist. LEXIS 56784, *9 (N.D. Ill. Apr. 19, 2013) (not foreseeable when plaintiff agreed to the protective order that a witness would submit an affidavit plaintiff contended contradicted a deposition). The *Superior* defendants needed the information: "the EPO would not know to ask for or order such testimony to be produced . . . without knowing first that it existed. And, the EPO would not have such knowledge unless [defendants] were permitted to disclose its existence." *Superior*, 2006 U.S. Dist. LEXIS 110973, *9-10.

The following sections provide numerous examples of contradictions between what Bio-Rad adduced in the Delaware Trial and the discovery in the present case, establishing the same good cause as in *Superior* to modify the Protective Order. Additional examples can be provided at the Court's request. 10X seeks a lesser remedy than that in *Superior*: use of the discovery from this case in Delaware under the Protective Order in this case—not public disclosure. The good cause based on inconsistencies and the absence of harm thus supports cross-use. This Court need not decide if the discovery in this case is relevant in Delaware. *Superior* left it to "the EPO to decide relevancy." *Id.*, *9. 10X only asks this Court to permit the Delaware Court to do the same and consider the relevance of evidence it would otherwise not know existed. 10X is not requesting the public disclosure authorized in *Superior* and will use the evidence subject to confidentiality.

10

## A.      Bio-Rad's Prior Testimony Regarding The Reasonable Royalty Rate

In the Delaware Trial, Bio-Rad repeatedly claimed that a 15% royalty was the right rate for the handful of patents asserted in that case.[3] But that was not true. Discovery in this case shows that Bio-Rad actually concluded that the royalty rate for the entire RainDance patent portfolio is only about ***about***    , which is ***less than***    the rate Bio-Rad requested for a handful of RainDance patents and thus implying an even lower rate for just the patents asserted in the Delaware Case. Indeed, when confronted in the Delaware Trial with the Grant Thornton fair value analysis of certain assets Bio-Rad acquired from RainDance, *see* Ex. 8, DTX-1481, Bio-Rad's Executive Vice President, Ms. Tumolo, testified under oath in Delaware that the real gross royalty rate on which that analysis was based was actually much higher than the 4% rate it stated—namely, 10%. Trial Tr. 178:16-180:17. Discovery in this case proved that testimony was false and that this was just one of multiple false statements by Bio-Rad witnesses about the reasonable royalty rate.

In this case, Grant Thornton has produced recordings of its communications with Bio-Rad. In one such recording made before the Delaware Trial, Ms. Tumolo stated in a conversation with Grant Thornton that the ▇▇▇ applied to Bio-Rad's licensing of the RainDance portfolio: ▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Ex. 9, Tr. of GT004182, 50:7-17. In the same recording, Ms. Tumolo confirmed ▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇." *Id.*, 50:7-51:6; *see also id.*, 42:17-19 ("▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇");

---

[3] Trial Tr., 611:18-612:14 (expert: "the right royalty rates [sic] is 15% for competitors"), 613:23-615:5, 640:21-641:8, 1499:17-21 (closing: reiterating the 15% rate for competitors), 1501:7-20; *see also id.*, 181:9-18 ("hoping" a rate would "have gone to, you know, 15 or 20 percent").

Ex. 10, Tumolo Dep., 148:20-149:10 ████████████████████████████████████).[4]

Other Bio-Rad witnesses confirmed that rates over ████████████████. Ex. 11, Stark Dep., 11:5-13, 80:8-23 (Bio-Rad's former Controller confirming '█████████████████████████████████████████████████████████████████████████████████████████████████████████████████"); Ex. 12, Ross Dep., 121:25-122:24 ('█████████████████████████████████████████████████████████████████"); Ex. 13, Goetz Dep., 7:11-12, 84:1-85:4 (Bio-Rad's former Chief Operating Officer expressing '██████" that an ████████████████████████████████████████).

Ms. Tumolo specifically testified in Delaware that "when I'm licensing from a competitor that I'm paying a double digit royalty, for sure." Trial Tr. 140:9-141:1, *see also id.*, 679:13-680:9 ("15 to 20 percent or more between competitors is common"). But evidence in this case shows Ms. Tumolo told Grant Thornton ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████" Ex. 9, Tr. of GT004182, 42:12-19, 48:4-6. Ms. Tumolo believed that Bio-Rad and RainDance patents were ████████████████. *Id.*, 48:8-9. Bio-Rad's claim that a handful of patents should command 15% was inconsistent with its statements to Grant Thornton that predated the Delaware Trial but were not disclosed in the Delaware Case.

---

[4] Discovery in this case showed that the Grant Thornton rates were based on Bio-Rad's "high confidence that they would win" in litigation, confirms the analysis is highly relevant to the hypothetical negotiation at issue in Delaware that assumes the patents at issue were valid and infringed. Ex. 19, DiPanfilo Dep., 121:12-19, 125:24-126:5; Ex. 18 (Ex. 7 DiPanfilo Dep.); Ex. 11, Stark Dep., 93:20-95:8, 97:6-99:8 ('████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.") Ex. 15 (Ex. 9 Stark Dep., tab '████████████").

Bio-Rad based its damages in the Delaware Case on allegations about which licenses were comparable and which licenses were not comparable for the purpose of determining the correct royalty rate that applied to the RainDance patents. Bio-Rad told the jury in the Delaware Trial the opposite of what it told Grant Thornton about the comparability of the same licenses. In the Delaware Trial, Bio-Rad's experts testified under oath that the Applera license for 15% was comparable and involved "nucleic acid reactions" (PCR) "similar" to the patents-at-issue in the Delaware Case. Trial Tr. 442:24-443:12, 622:13-623:1. Bio-Rad's expert also testified in the Delaware Case that a 3% Life Technologies license was not comparable. *Id.*, 621:14-622:12, 634:17-635:8. Similarly, Ms. Tumolo testified under oath in Delaware that the patent licensed from Applera was necessary to "realtime PCR" and distinguished the 3% Life license because the royalty value was allegedly "shift[ed]" to an "upfront payment" resulting in a "double-digit royalty" for the remaining short life of the patent. *Id.*, 154:15-24, 158:19-160:5. Discovery in this case shows that Ms. Tumolo told Grant Thornton the opposite on a recorded call: Applera "████ ████████████████████"[5] Ex. 9, Tr. of GT004182, 44:10-20. Applera was a "████ ████████████████████████████████████████████████ ████████████." *Id.*, 39:2-40:4; *see also id.*, 42:20-25 ("████ ████████████████████████████████████"). Ms. Tumolo and others argued to Grant Thornton in support of ████████████████████████ ████████████████████████████████ Ex. 9, Tr. of GT004182, 44:21-45:13. Despite testifying in Delaware that Grant Thornton considered both licenses, Ms. Tumolo omitted

---

[5] Ms. Tumolo referred to this license at trial as "Applera" and with Grant Thornton as "Applied Biosystems," but it is the same license entered in 2006 with "Applera . . . through its Applied Biosystems Group." Ex. 28, (PTX128 Delaware Trial) at 1; *see also* Ex. 10, Tumolo Dep., 136:14-17 (████████████████████████████████████████████████ ████████████████████.").

that Bio-Rad told Grant Thornton the exact opposite of what it told the judge and jury in Delaware on the comparable licenses, a key issue in dispute. Trial Tr., 184:4-17, 184:18-22, 186:10-12; Ex. 9, Tr. of GT004182, 45:22-46:6.

The discovery in this case shows that Bio-Rad actually resolved its own pre-acquisition use of RainDance patents at a substantially lower royalty rate, ████████████████, of the 15% Bio-Rad requested, and its expectation to settle with 10X for even less confirms that the 15% royalty rate sought in Delaware was not correct. Ex. 9, Tr. of GT004182, 46:7-23; Ex. 10, Tumolo Dep., 10:14-19. Mr. Ross, the principal at Grant Thornton responsible for the fair value analysis, explained that a $10 million "pre-existing condition" in the Grant Thornton analysis was in fact ██████████████████████████████████████████ Ex. 12, Ross Dep., 17:24-18:2, 107:2-109:9; Ex. 8, DTX-1481.0007. The royalty for ████████████████████████████ Ex. 12, Ross Dep., 107:2-109:9; Ex. 14 (Ross Dep. Ex. 10). Ms. Tumolo confirmed in Delaware that RainDance and Bio-Rad "were competing," and so ████████████████████████████ ██████████████████████. Trial Tr. 123:5-20. Grant Thornton also applied a 2% royalty to an anticipated settlement with 10X. Ex. 8, DTX-1481.0054. Mr. Ross stated in this case that Grant Thornton relied on what "████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████." Ex. 12, Ross Dep., 139:22-140:25. Bio-Rad got a windfall at trial by misrepresenting what it knew to be the assessed fair value of the patents in question.

As referenced above, Ms. Tumolo also testified in the Delaware Trial that a 4% **_net_** out-licensing rate in the Grant Thornton analysis would be "probably closer to a ten-percent rate" with "all of the license royalty fees we had to pay to other companies," which "was at least 50 percent." Trial Tr. 178:16-180:17; *see also id.*, 182:14-183:15 (the $10.2 million "fair value of all of the

intellectual property" would "minimally . . . have to double" with Bio-Rad having "to pay four percent or six percent stacked"); Ex. 8, DTX-1481.0056. Bio-Rad did not provide further information in the Delaware Case on how to interpret the "net" rates in the Grant Thornton analysis. The evidence in this case shows that is not an accurate description of the "net" rates in the Grant Thornton analysis, and in fact the gross rates were ███████████████████████████

███. Bio-Rad's Director of Business Development Ms. Chia testified in this case that the gross royalty rate for out-licensing would be a mere ████ for *all* RainDance patents. Ex. 16, Chia Dep., 45:5-13; *see also id.*, 8:21-9:11, 12:13-14:2, 14:4-14 (based on ██████████████████████

████████████████████████████████████████████████████

██████████████████████████████"); Exs. 17 and 8 (Chia Dep. Exs. 2 and 3 at DTX-1481.0057); Ex. 16, Chia Dep. at 14:22-15:12, 33:2-18, 37:14-20, 40:3-24, 45:5-13.

## B.    Bio-Rad's Prior Testimony Regarding The Grant Thornton Analysis

Discovery in this case is directly contradictory to testimony in the Delaware Trial minimizing the Grant Thornton analysis as taking "a conservative point of view because this is an accounting exercise." Trial Tr. 180:2-3; *see also id.*, 176:18-22. The discovery in this case reveals that the Grant Thornton analysis reflects Bio-Rad's beliefs regarding the appropriate royalties for licenses to all RainDance patents. In this case, Ms. Tumolo confirmed that "██████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████." Ex. 10, Tumolo Dep., 133:23-134:21. Bio-Rad's Digital Biology Group Controller, Mr. DiPanfilo, also confirmed in this case that the Grant Thornton analysis "is part of our financials that are reported to the SEC" and IRS and that Bio-Rad would have attempted to provide complete, accurate, and truthful information. Ex. 19, DiPanfilo Dep., 9:6-11:23, 13:4-8, 18:12-19:11, 38:9-39:11. Mr. Stark confirmed in this case that the information provided was not "false or misleading" and that

the "business function of the company was very involved in providing substantive information to Grant Thornton." Ex. 11, Stark Dep., 17:17-18:23; *see also* Ex. 12, Ross Dep., 20:16-21:23 ("Bio-Rad was contractually obliged, I believe, . . . to provide us accurate and complete information . . . ."). Evidence herein showing Bio-Rad providing Grant Thornton information confirms that the analysis reflected Bio-Rad's views. *See* Ex. 9, Tr. of GT004182, 49:3-5 ("[W]e prefer the number to accurately reflect our thinking. And we're trying to explain that to you."). Discovery in this case also shows John Cassingham, Bio-Rad's in-house counsel, was consulted as an "expert" to determine if royalties were "reasonable." Ex. 19, DiPanfilo Dep., 117:1-11.

Similarly, Bio-Rad tried to diminish the importance of the Grant Thornton analysis by claiming that because of its nature as an accounting exercise the value it placed on the RainDance patents was artificially limited. Trial Tr. 180:2-3; *see also id.*, 172:15-23, 181:19-182:4. Mr. Ross's testimony confirmed repeatedly that this was simply not the case. Ex. 12, Ross Dep., 9:19-21, 10:16-11:6, 17:13-20, 22:11-24:14, 24:25-25:21.

### C.   Bio-Rad's Prior Testimony On The Value Of The RainDance Patents

Bio-Rad took contradictory positions defending against 10X antitrust claims in this case and attempting to bolster the value of the patents acquired from RainDance in the Delaware Trial as part of Bio-Rad's damages case. In the Delaware Trial, Ms. Tumolo testified under oath that the "whole acquisition we viewed as an intellectual property acquisition" and "the value of the IP was $87 million." Trial Tr. 138:3-12, 165:19-166:3, 179:17-180:17; *see also id.*, 1502:13 (closing). Bio-Rad's counsel in the Delaware Trial also stated that it was already Ms. Tumolo's intent prior to the acquisition to discontinue the RainDance products: the RainDance products "didn't do well and Ms. Tumolo, when she was looking at the company, she said the products aren't very good, but they have very important intellectual property." Trial Tr. 49:4-25. Bio-Rad's counsel in the Delaware Trial—the same counsel Bio-Rad has in this case—in opening represented Ms. Tumolo

16

as saying "we're going to buy RainDance" and "***we're going to disable the products*** or whatever you do, you know, to stop selling them." *Id.* Ms. Tumolo allegedly "***went to the CEO, I assume, and probably the board and otherwise and said okay, we're going to make a big purchase and the products aren't very good***." *Id.* Discovery in this case shows the opposite: Ms. Tumolo testified that it was not her "███████████████████████████████████████████

███████████████████████████████████████████████████████████████ Ex. 10, Tumolo Dep., 80:7-24; *see also id.*, 79:2-12. Ms. Tumolo's testimony in this case was also that the decision to "phase out" the products "***was not a decision that was made prior to acquisition***," contradicting prior testimony that the patents were the sole value of the RainDance acquisition. *Id.*, 83:1-84:23.

Ms. Tumolo also testified in Delaware that "you can't practically do single cell without using droplets," which Bio-Rad alleged the asserted patents covered. Trial Tr. at 133:25-134:17. Testimony in this case was the opposite: Mr. Lebofsky, Bio-Rad's Associate Director of Advanced Research, testified that "there are practical ways to do single-cell WTA 3' analysis without droplets." Ex. 5, Lebofsky Dep., 9:19-21, 54:10-19; *see also* Ex. 4, Trauzzi Dep., 99:8-100:6, 101:9-15 ("there have been practical ways to do single-cell without droplets"); Ex. 16, Chia Dep., 95:19-24 ("[T]here are practical ways that don't use droplets to do library prep for single-cells.").

### D.   Bio-Rad's Prior Testimony On RainDance's Supposed Competition With 10X

Bio-Rad's position in the Delaware Case that RainDance would be a "perceived" competitor based on plans to enter the market[6] is inconsistent with the discovery in this case showing RainDance had no ████ way to execute on any possible interest in entering the market

---

[6] RainDance's competitor status was relevant to damages in Delaware because the hypothetical negotiation was with RainDance and Bio-Rad, and the licensing rate was specifically a purported competitor licensing rate. *See, e.g.*, Trial Tr. 611:18-612:14.

and did not know if it would ever enter the market. Trial Tr., 650:7-651:13 ("I wouldn't use the word competitors, I would use[] ***perceived competitors***, because they weren't in the market at the time"). While it was admitted in Delaware that RainDance had no "single cell products and no long read products" like 10X's products, Bio-Rad relied upon RainDance's plan to "bring[] them and showed they planned on doing it in competition." *Id.*, 651:14-652:19; *see also id.*, 636:18-25 (describing "direct competition" or that "RainDance ***was going to enter***"), 677:10-21, 1500:19-25 (closing). Ms. Tumolo confirmed that RainDance "hadn't launched" a single cell or linked read product, but "had a large R&D program." *Id.*, 167:22-25, 168:7-21. By contrast, in this case, the evidence shows that RainDance had ███████████████, and would not have been considered a competitor to 10X. RainDance's Vice President of Product Development Mr. Luckey testified in this case that both linked-read and single-cell projects were in ████████████ ██████████████ and at ██████████████████████████████ ████████ Ex. 20, Luckey Dep., 12:12-14, 51:23-52:1, 65:13-19. *Id.* A project was "████████ ████████████████████████████." *Id.* 51:9-22. Even at its acquisition, RainDance was "a long way off from launching any Linked-Read" or "single cell product." *Id.*, 24:24-25:19. Without a ████████████████, RainDance was not a perceived 10X competitor.

Moreover, testimony in the Delaware Case that RainDance would have sought high royalties as a competitor is not consistent with discovery in this case that ████████████ ████████████████████████████████. Documents produced by Mr. Hunkapiller, who was on RainDance's Board of Directors, show that if RainDance was not ██████████████████████████████ ████ Ex. 29,  Hunkapiller-10XMA00000283  at  288;  Ex. 30,  Hunkapiller-10XMA00000368



(discussing "███████████"); Ex. 31, Hunkapiller-10XMA00000363 (discussing "███████

███████████████████████"). RainDance did not settle with 10X because

"███████████████████████████████." Ex. 31, Hunkapiller-10XMA00000363;

*see also* Ex. 32, Hunkapiller-10XMA00000274 (Bio-Rad ██████████████████

███████████████).

### E.     Bio-Rad's Prior Testimony That 10X Harmed Bio-Rad

Bio-Rad sought an injunction in the Delaware Case based on Ms. Tumolo's declaration

that 10X, particularly 10X's early market entry, irreparably harmed Bio-Rad. Delaware Case, ECF

No. 516, ¶¶ 3-7. But the discovery in this case shows that was not true. The evidence from this

case shows that Bio-Rad's product failed because of Bio-Rad's own shortcomings, Bio-Rad's lack

of investment in its products, and the inferiority of its product, not because of 10X.

First, Ms. Tumolo's declaration in the Delaware Case provided a false description of Bio-

Rad's success in the market by stating that "Bio-Rad has placed many single cell systems ***with***

***hundreds*** of 'single cell' customers" and that Bio-Rad was harmed due to 10X's early entry into

the market. *Id.* In this case, however, nearly two years after Ms. Tumolo's sworn declaration, Bio-

Rad admitted that including through this time period "***fewer than 100*** distinct entities have

purchased ddSEQ instruments," which are Bio-Rad's single cell instruments. Ex. 22 (Response to

Request for Admission No. 2); Ex. 4, Trauzzi Dep., 84:8-15 (Bio-Rad's "total install base of 104

systems at the end of last year," nearly one year after Ms. Tumolo declared Bio-Rad had hundreds

of customers); *see also* Section II (showing Bio-Rad and 10X are not competing).

Second, discovery in this case shows Bio-Rad was not harmed by 10X, but rather that Bio-

Rad's failure was of its own making. Bio-Rad's witness on lost sales was "not aware of lost sales"

and testified that Bio-Rad did not "need 10X to stop selling its WTA 3' product in order to compete

in the market." Ex. 5, Lebofsky Dep., 91:17-23, 93:4-7; Ex. 6 (Ex. 1 Lebofsky Dep.); Ex. 7 (Sep.

14, 2020, email). Mr. Lebofsky also testified that he "did not feel that we were staffing for success" when ten people were on projects requiring thirty in November 2017. Ex. 5, Lebofsky Dep., 105:24-108:1, 140:12-141:18, 145:3-147:24, 151:17-24; Ex. 23, (Ex. 2 Lebofsky Dep.). The former Bio-Rad vice president in charge of ddSEQ, Mr. Agresti, was frustrated about "not setting the ddSEQ project up to succeed" and that Ms. Tumolo "wasn't allocating enough resources." Ex. 24, Agresti Dep., 7:13-18, 8:24-9:6, 80:13-81:5, 87:6-88:4, 90:11-21, 94:7-23, 99:1-25; Exs. 25-26, (Exs. 8-9 Agresti Dep.). Mr. Agresti stated ███████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████ Ex. 26 (Ex. 9 Agresti Dep.).

Discovery in this case shows that Bio-Rad did not make "a massive investment into the roadmap for ddSEQ." Ex. 4, Trauzzi Dep., 18:24-19:4. By contrast, in this case Ms. Trauzzi testified that 10X is "continually announcing and investing in new products. . . . [T]hey are putting a massive amount of money into -- into R&D." *Id.*, 20:21-21:20. A Bio-Rad document confirms:

███████████████████████████████████████████████████

███████████████████████████████████████████████████

Ex. 27 at BRMA00099259 (Ex. 9 Trauzzi Dep.); Ex. 4, Trauzzi Dep., 82:25-83:13, 86:11-88:21. Bio-Rad's product has been unable to compete generally, not just against 10X's product. In this case, Ms. Trauzzi's "best guess" was that BD's Rhapsody "has been more widely adopted than the ddSEQ platform." *Id.*, 59:2-5. Evidence produced in this case shows that Bio-Rad's claims of irreparable harm were fabricated for purposes of litigation and never reflected reality, and critical information on this point was concealed from 10X and the Delaware court.

      For the foregoing reasons, 10X respectfully requests that the Court grant 10X's motion.

Date: December 8, 2020


Respectfully submitted,


/s/  Matthew D. Powers

Matthew D. Powers (*pro hac vice*)
Paul T. Ehrlich (*pro hac vice*)
Stefani C. Smith (*pro hac vice*)
Robert L. Gerrity (*pro hac vice*)
Jennifer K. Robinson (*pro hac vice*)
Natasha M. Saputo (*pro hac vice*)
Gina Cremona (*pro hac vice*)
Utsav Gupta (*pro hac vice*)
Daniel Radke (*pro hac vice*)
TENSEGRITY LAW GROUP, LLP
555 Twin Dolphin Drive, Suite 650
Redwood Shores, CA 94065
Telephone:     (650) 802-6000
Facsimile:     (650) 802-6001
10x_BR_MA_Service@tensegritylawgroup.com

Azra M. Hadzimehmedovic (*pro hac vice*)
Aaron M. Nathan (*pro hac vice*)
Samantha A. Jameson (*pro hac vice*)
Kiley White (*pro hac vice*)
TENSEGRITY LAW GROUP, LLP
8260 Greensboro Drive, Suite 260
McLean, VA 22102
Telephone:     (703) 940-5033
Facsimile:     (650) 802-6001
10x_BR_MA_Service@tensegritylawgroup.com

Sarah Chapin Columbia (BBO #550155)
Katrina Rogachevsky (BBO #691373)
Annabel Rodriguez (BBO #696001)
MCDERMOTT WILL & EMERY LLP
200 Clarendon Street, Floor 58
Boston, Massachusetts 02116-5021
Telephone:     (617) 535-4000
Facsimile:     (617) 535-3800
10X-BR-MWE@mwe.com

Leah Brannon (*pro hac vice*)
Kenneth Reinker (*pro hac vice*)
CLEARY GOTTLIEB
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone:     (202) 974-1500
Facsimile:     (202) 974-1999
Team-10x-Genomics-Litigation-CGSHOnly@cgsh.com

*Counsel for 10X Genomics, Inc.*

**CERTIFICATE OF SERVICE**

The undersigned certifies that on December 8, 2020, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which will issue an electronic notification of filing to all counsel of record.

/s/  Matthew D. Powers
Matthew D. Powers