**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| BIO-RAD LABORATORIES, INC. and PRESIDENT AND FELLOWS OF HARVARD COLLEGE<br><br>        Plaintiffs,<br><br>  v.<br><br>10X GENOMICS, INC.,<br><br>        Defendant. | C.A. No. 1:19-cv-12533-WGY |
| 10X GENOMICS, INC.,<br><br>        Counterclaim Plaintiff,<br><br>  and<br><br>PRESIDENT AND FELLOWS OF HARVARD COLLEGE,<br><br>        Counterclaim Co-Plaintiff as to certain claims,<br>  v.<br><br>BIO-RAD LABORATORIES, INC.,<br><br>        Counterclaim Defendant,<br><br>  and<br><br>PRESIDENT AND FELLOWS OF HARVARD COLLEGE,<br><br>        Counterclaim Co-Defendant as to DJ counterclaims. | |

**10X GENOMICS, INC.'S BRIEF IN SUPPORT OF ITS MOTION TO STRIKE**
**MR. MALACKOWSKI'S DAMAGES OPINIONS**

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................1

II.     BACKGROUND ..................................................................................................2

        A.      The Patents-In-Suit And The Products At Issue.....................................2

        B.      Summary Of Mr. Malackowski's Opinions ............................................4

III.    LEGAL ARGUMENT .........................................................................................8

        A.      To Be Admissible, Plaintiffs Must Prove That Mr. Malackowski's Opinions
                Are Reliable and Relevant.......................................................................8

        B.      Mr. Malackowski's Reasonable Royalty Opinion Should Be Excluded................9

                1.      Mr. Malackowski's Reasonable Royalty Opinion Is Unreliable...............9

                2.      Mr. Malackowski's Opinions About Applera/Bio-Rad Settlement And
                        The License Itself Should Be Excluded ...................................................13

                3.      Mr. Malackowski's Use Of LES Study To Double The Rates On The
                        Asserted Patents Is Unreliable................................................................19

IV.     CONCLUSION ..................................................................................................20

# TABLE OF AUTHORITIES

**Cases**

*Accord Bowling v. Hasbro, Inc.*,
   No. 05-229S, 2008 U.S. Dist. LEXIS 30043 (D.R.I. Mar. 17, 2008) .....................................13

*Bio-Rad Lab., Inc. v. 10X Genomics, Inc.*,
   396 F. Supp. 3d 368 (D. Del. 2019) ..............................................................................2, 16

*Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*,
   C.A. No. 1:15-cv-00152-RGA, ECF No. 642 (D. Del. Jan. 29, 2021) .....................................2

*Commonwealth Sci. & Indus. Research Org. v. Cisco Sys., Inc.*,
   809 F.3d 1295 (Fed. Cir. 2015) ..................................................................................9

*Commonwealth Sci. & Indus. Research Org. v. Cisco Sys., Inc.*,
   No. 6:11-cv-343, 2014 U.S. Dist. LEXIS 107612 (E.D. Tex. July 23, 2014).........................9

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) ...............................................................................................9

*Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys., LLC*,
   927 F.3d 1292 (Fed. Cir. 2019) ................................................................................14

*Fenner Invs., Ltd. v. Hewlett-Packard Co.*,
   No. 6:08-cv-273, 2010 U.S. Dist. LEXIS 41514 (E.D. Tex. Apr. 28, 2010) .....................14, 19

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997) ...............................................................................................9

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
   318 F. Supp. 1116 (S.D.N.Y. 1970) ............................................................................18

*In re Paoli R.R. Yard PCB Litig.*,
   35 F.3d 717 (3d Cir. 1994) .....................................................................................13

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ...........................................................................................9, 10

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
   694 F.3d 51 (Fed. Cir. 2012) ...........................................................................passim

*Plexxikon Inc. v. Novartis Pharm. Corp*,
   No. 4:17-cv-04405-HSG, 2021 U.S. Dist. LEXIS 5996 (N.D. Cal. Jan. 12, 2021).......2, 16, 18

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
   711 F.3d 1348 (Fed. Cir. 2013) ..................................................................................8

*Prism Techs. LLC v. Sprint Spectrum L.P.*,
    849 F.3d 1360 (Fed. Cir. 2017) ............................................................16

*Rude v. Westcott*,
    130 U.S. 152 (1889) ............................................................................13

*Sentius, Int'l, LLC v. Microsoft Corp.*,
    No. 5:13-cv-00825-PSG, 2015 U.S. Dist. LEXIS 10423 (N.D. Cal. Jan. 27, 2015)...............19

*U.S. v. Ford*,
    481 F.3d 215 (3d Cir. 2007) ...................................................................9

*U.S. v. Monteiro*,
    407 F. Supp. 2d 351 (D. Mass. 2006)......................................................13

*Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*,
    860 F. Supp. 1448 (C.D. Cal. 1993).......................................................14

**Law Review Article**

L.S. Simard & W.G. Young, Daubert's Gatekeeper: The Role of the District Judge in Admitting
    Expert Testimony, 68 Tul. L. Rev. 1457, 1459-1460 (June 1994)....................................1, 2, 8

## I.  INTRODUCTION

Bio-Rad's damages expert, Mr. Malackowski, proposes to tell jurors that 10X would have agreed to pay a royalty of 15% on all 10X accused Next GEM products, including instruments, chips, and reagents. Ex. 1 (Malackowski Report) 72.[1] 10X moves to exclude Mr. Malackowski's opinions under Federal Rules of Evidence 702 and 403, as interpreted by *Daubert* and its progeny. The following observations are crucially important here:

> For a number of reasons, experts have an extraordinary opportunity to influence the jury. First, the expert's appearance of "apparent objectivity" carries "undue weight" in the eyes of the jury. Additionally, because the basis of an expert's opinion is beyond the common knowledge of the jury, the jury is less equipped to evaluate the merit of the expert's opinion. Thus, despite their renown ability for discerning credibility, jurors do not, by definition, have the substantive skills to separate the wheat from the chaff in trying to evaluate the reliability of expert testimony. As such, "trial courts must be wary lest the expert become nothing more than an advocate of policy before the jury."

L.S. Simard & W.G. Young, Daubert's Gatekeeper: The Role of the District Judge in Admitting Expert Testimony, 68 Tul. L. Rev. 1457, 1459-1460 (June 1994). The flaws in Mr. Malackowski's supposed economic analysis are numerous. He begins and ends with the highest possible royalty rate found in the record. He does not consider the actual value of the claimed inventions as he was required to do. He assigns the same 15% royalty he assigned to allegedly "foundational" intellectual property asserted against 10X in prior litigation even though Bio-Rad itself admits that the patents here are not foundational but merely "improvements." He brushes aside Bio-Rad's total failure to compete with 10X by the time of the hypothetical negotiation, disregards the absence of any lost sales—indeed disregards any sales information or comparisons—while endorsing a competitor rate from a license he chose that expressly requires proof of actual demonstrable impact

---

[1] Mr. Malackowski provided the initial report served on February 5, 2021 (Ex. 1), and a supplemental report on April 2, 2021, which will also be the subject of 10X's forthcoming motion to strike (the "Malackowski Supp.") (Ex. 2). Cited exhibits are attached to the Declaration of Gina Cremona filed contemporaneously herewith.  Emphasis added and internal citations and quotation marks omitted unless otherwise noted.

on sales. He completely disregards 16 other licenses with lower royalties and ignores Bio-Rad's and Harvard's own conclusions that much lower rates apply to Bio-Rad's asserted patents. Even the most vigorous cross examination cannot cure the unfair prejudice of allowing a witness whose presence is likely to "carr[y] 'undue weight' in the eyes of the jury" to present an arbitrary and fundamentally unsound and unreliable opinion in the guise of economic analysis. *See id*. Mr. Malackowski's opinions should be excluded because he acts as nothing more than an advocate for Bio-Rad and not as an expert who will assist the jury as the law requires.

10X moves to exclude the Applera/Bio-Rad License, because of the coercive settlement circumstances from which it arose. Mr. Malackowski's opinion regarding settlements was excluded only three months ago on similar grounds.[2] 10X also seeks to exclude a survey unrelated to the patented technology in this case, which Mr. Malackowski uses to more than double the rates that Harvard, MRC and RainDance (and now Bio-Rad) agreed apply to the patents-in-suit.

## II.   BACKGROUND

### A.   The Patents-In-Suit And The Products At Issue

Bio-Rad is the exclusive licensee from Harvard and from Medical Research Counsel ("MRC," now UKRI) to the two Bio-Rad asserted patents-in-suit, U.S. Patent Nos. 8,871,444 and 9,919,277 ("the Bio-Rad asserted patents") based on the licenses between Harvard and RainDance

---

[2] *Plexxikon Inc. v. Novartis Pharm. Corp*, No. 4:17-cv-04405-HSG, 2021 U.S. Dist. LEXIS 5996, at *18 (N.D. Cal. Jan. 12, 2021). Further,  in a prior litigation between 10X and Bio-Rad, the 152 Case, the jury awarded the 15% royalty, which Mr. Malackowski opined was appropriate. The district court excluded the same Applera/Bio-Rad License after trial, 396 F. Supp. 3d 368, 390, and the Federal Circuit affirmed the jury damages award on a single asserted patent, and reversed infringement findings on two other patents. (10X has a pending motion under Rule 60 to vacate the judgment in the 152 Case based on allegations that the judgment was procured by fraud that came to light through discovery in this case. C.A. No. 1:15-cv-00152-RGA, ECF 642.) The record in this case is different and 10X's challenges to Mr. Malackowski's opinions are specific to his opinions in this case.

and MRC and RainDance, the rights Bio-Rad procured after its acquisition of RainDance. Exs. 4, 5, 6; ECF No. 1 at 8, ¶ 31. The Bio-Rad asserted patents claim methods for detecting a product of an enzymatic reaction, which Bio-Rad contends add to the existing art "novel disclosures of at least pooling droplets such that they contact each other but do fuse due to the presence of a surfactant." Ex. 7 (BR's 5th Supp. Resp. to 10X's Interrog. No. 6), 48. Mr. Malackowski based his opinions on the same understanding of the alleged novelty of the Bio-Rad asserted patents. Ex. 1, 14 (relying on the same statement from Bio-Rad's interrogatory response). Moreover, Bio-Rad's own technical expert opined that the only limitation of the independent Claim 1 of the 444 Patent that is not disclosed in the prior art is the same limitation relating to "pooling the microcapsules into one or more common compartments such that a portion of the plurality of microcapsules contact each other but do not fuse with each other due to the presence of the surfactant." *See, e.g.*, Ex. 8 (Gale Reb. Report), ¶¶ 61-80; Ex. 10 (Gale Dep.) at 67:10-68:11.

10X's accused Next GEM products are the leading droplet sample preparation products for single cell and related forms of genetic analysis used for Next Generation Sequencing ("NGS") that 10X's customers—including Harvard itself—are using for cutting edge research in oncology, immunology and neuroscience, including COVID-related research. Bio-Rad's only instrument intended for droplet sample preparation for NGS sequencing is Bio-Rad's ddSEQ Single-Cell Isolator ("ddSEQ"), for which it has commercialized two assays. 10X's Next GEM products perform those two assays—with better specifications and much more success—and 10X has at least an additional five product lines and they each target applications that Bio-Rad has not even attempted to enable. Mr. Malackowski, however, erroneously concluded that Bio-Rad's ddSEQ competes with 10X "head-to-head," disregarding copious evidence of why that is not true ***in May 2019*** when the hypothetical negotiation occurs, and he also ignored 10X's five product lines with

applications where Bio-Rad has never even attempted to compete. Ex. 1, 51, 58, 71; Ex. 3 (Malackowski Dep.) at 152:6-10; 161:11-20; 162:20-163:12; 175:8-14; 175:25-176:11; 197:8-19.

### B.    Summary Of Mr. Malackowski's Opinions

Mr. Malackowski states that Bio-Rad is entitled to a reasonable royalty for the Bio-Rad asserted patents for all of 10X's accused Next GEM products—instruments, chips, and reagents. Ex. 1, 72. 10X's first commercial sale of Next GEM occurred in May 2019, *id*. at 28, which Mr. Malackowski uses as the date of the hypothetical negotiation between 10X and Bio-Rad. *Id*.

Normally, the analysis would begin with "[a]ctual licenses to the patented technology," which are generally the most "highly probative as to what constitutes a reasonable royalty for those patent rights because such actual licenses most clearly reflect the economic value of the patented technology in the marketplace." *LaserDynamics, Inc. v. Quanta Computer, Inc*., 694 F.3d 51, 79 (Fed. Cir. 2012). Two such licenses exist in this case: the Harvard/RainDance license with █████, and the MRC/RainDance license with ████████████████████. Mr. Malackowski admitted that the Harvard/RainDance and MRC/RainDance licenses are the most technologically comparable licenses in the record. Ex. 1, 48; Ex. 3, 43:12-44:11. Both licenses purported to give RainDance and now Bio-Rad rights to a portfolio of patents, including exclusive rights to the Bio-Rad asserted patents. Ex. 4 (licensing 11 families of patents); Ex. 5 (licensing 9 families of patents). Both licenses include a royalty of 3% on chips and 2% on instruments, and indeed, roughly 50% less because of a royalty-stacking offset. Ex. 9 (BRL00080328-330); Ex. 6 (BRMA00127871-73). RainDance and Bio-Rad have paid ████████████████████████, but Mr. Malackowski admitted that he disregarded this ███████████. Exs. 30, 31; Ex. 3, 91:5-18; 92:3-21; 93:9-94:1. He also ignored Harvard's accounting that further significantly apportioned the rates on the Bio-Rad asserted patents to a small fraction of the stated rates. Ex. 32 (Gordon Dep. Ex. 6). And he considered these licenses not as economically comparable as other

agreements that had nothing to do with the Bio-Rad asserted patents, and he doubled the stated rates in the Harvard/RainDance and MRC/RainDance licenses based on an LES survey. Ex. 3, 41:1-42:1. Next, even after doubling the rates in the admittedly technologically most comparable licenses, Mr. Malackowski uses them to merely set a royalty floor based on those licenses. Ex. 3, 41:16-42:1; Ex. 1 at 42, 46.

The record reflected 19 licenses ranging from 0.25% to ██%, which  Mr. Malackowski swept away, and focused exclusively on 3 outliers. In his opinion, Bio-Rad would demand, and 10X would have agreed to pay, a 15% royalty on all of 10X's Next GEM sales, including instruments, chips and reagents—although Bio-Rad and RainDance ████████████████; and although this rate would be ██ times what Bio-Rad and RainDance paid and Harvard accepted on instruments and ██ times what Harvard accepted on chips. Ex. 32 (Gordon Ex. 6); Ex. 3, 91:5-18; 92:3-21; 93:9-94:1. His rationale was that patentees impose higher rates on "competitors" (Ex. 1, 39, 46), and the 19 other licenses were not between competitors, despite evidence to the contrary (Ex. 1, 48).

*Royalty Rate.* To determine the royalty rate, Mr. Malackowski purported to apply a combination of the "market approach" and the *Georgia-Pacific* factors. Ex. 3, 32:24-33:4. Of the 22 license agreements the parties produced in this case, he chose the three with the highest royalty rates (by a substantial amount) as the most "comparable." Ex. 3, 112:1-8, 38:25-40:10. He based this conclusion on two factors. First, relying on Bio-Rad's technical expert, Dr. Bruce Gale, he stated that the technology in these licenses was "comparable" to the patents-in-suit. Ex. 3, 42:2-14. However, Dr. Gale assessed only 6 licenses and did not assess the technology in 16 other license agreements produced in this case, and hence did not opine that the technology at issue in the three licenses Mr. Malackowski picked was more comparable than, or the only comparable

technology among, the 22 licenses. Ex. 10 (Gale Dep.) at 198:2-9, *see generally* 194:1-198:9; Ex. 11 (Gale Report) at §§ IX.A-F. Indeed, Mr. Malackowski understood Dr. Gale's analysis to mean that the Harvard/RainDance and MRC/RainDance licenses were the most technologically comparable. Ex. 1, 48; Ex. 3, 43:12-44:11. Next, Mr. Malackowski stated that the agreements that he chose were between two commercial entities, rather than a commercial entity and a university or research institution. Ex. 1, 29, 31, 32. But at least 5 agreements that he did not consider comparable—those with much lower royalty rates than the ones he chose—also were between two commercial entities with evidence of competition. Mr. Malackowski disregarded competitor licenses with low license rates without any explanation, and in every step, insisted that the resulting reasonable royalty rate is the highest rate stated in any of the agreements he relied upon—15%.

*Applera/Bio-Rad.* One of the agreements that Mr. Malackowski chose using his market approach was a February 9, 2006 Real-Time Instrument Patent License between Applera Corporation and Bio-Rad (the "Applera/Bio-Rad License"), in which Bio-Rad agreed to pay 15% of the net sales price of each "Licensed Real-Time Thermal Cyclers" as part of a multi-case legal settlement, and a contempt judgment with the finding of permanent injunction on, the Higuchi patent, the key enabling patent for real-time PCR, covered by this particular license. Ex. 1 at 32-35; Ex. 12 (152 Trial Tr.) at 154:15-24 (Tumolo). The negotiations that led to this settlement agreement were "complicated" and involved multiple parties. Ex. 12 at 659:16-25. Ms. Tumolo, Executive Vice President of Bio-Rad's Life Sciences Group, said in business discussions that the rates paid by Bio-Rad to Applera (now ThermoFisher) were "the very worst, highest royalty of any licensor in the business," and that "Bio-Rad had a virtual gun to its head" when agreeing to pay 15%. Ex. 13 (Tumolo Dep.) at 142:6-143:1, 146:17-22, 147:11-17; Ex. 29 at 2:9-11 (Tumolo Ex. 10, GT004182). The licensed products were real-time PCR instruments only, not the droplet

products. Ex. 3, 98:7-15. Nevertheless, Mr. Malackowski "[found] that the Applera/Bio-Rad License [was] indicative of a reasonable royalty rate in this case *in excess* of 15% of net sales." Ex. 1, 36.

*Caliper/RainDance.* The second agreement that Mr. Malackowski chose was a September 8, 2009 license agreement between Caliper Life Sciences, Inc. and RainDance (the "Caliper/RainDance License"), pursuant to which RainDance licensed from Caliper over 550 patents. Ex. 14; Ex. 12 at 139:19-140:4 (Tumolo). This license had two different royalty rates: a 2% royalty rate for "Non-Screening Applications;" and a 15% royalty rate for RainDance products used for "Screening Applications," applicable only if RainDance's products "directly and demonstrably impact sales" of certain named Caliper products. Ex. 14, §§ 3.4.1(a)-(b); 1.15; Ex. 3, 47:5-16; 187:21-188:5. RainDance paid Caliper a 2% rate. Ex. 12 at 140:9-19 (Tumolo). Mr. Malackowski admits that RainDance never actually paid a 15% royalty to Caliper and never manufactured competing products. *Id*. at 1169:21-24. This agreement did not cover instruments, but only reagents and chips. Ex. 3, 45:12-14. Nevertheless, Mr. Malackowski concluded that this agreement "is indicative of a reasonable royalty rate in this case of 15% of net revenues" and applied that rate to instruments as well as chips and reagents. Ex. 1, 31; Ex. 3, 112:9-17.

*AppliedBio/QuantaLife.* The third agreement that Mr. Malackowski selected was a license agreement from Applied BioSystems to QuantaLife, dated December 30, 2010 ("AppliedBio/QuantaLife License"), for 20 patents relating to TaqMan assays, which were used for enzymatic reactions as part of PCR analysis. Ex. 15. In the agreement, QuantaLife agreed to pay running royalties on the sale of consumables or kits—not the PCR instruments that used them—based on the greater of 10% of net sales or 8¢ per kit to 15% of net sales or 15¢ per kit, depending on circumstances. *Id*. § 3.3. As the alternative royalty structure indicates, the parties

anticipated that each of the kits would sell for around $1.00, far below the $125,000 sales price for 10X's accused instruments. *See* Ex. 1, 32; Ex. 12 at 1164:9-10. Bio-Rad's former General Counsel testified that a company ████████████████████████████████. Ex. 19 (Wadler Dep.) at 42:9-15. Without proof of similar, let alone equivalent importance of the Bio-Rad asserted patents, Mr. Malackowski "[found] that the Applied BioSystems/QuantaLife License [was] indicative of a reasonable royalty rate in this case of between 10% and 15% of net sales" of all 10X's products, including its instruments. Ex. 1, 32.

Based on these three licenses, Mr. Malackowski concluded that 10X and Bio-Rad would have agreed to a royalty rate of 15%. Almost every other license agreement that the parties produced has a royalty rate of between 1% and 3%, including agreements between commercial entities that are competitors.

***Royalty Base.*** Mr. Malackowski concluded that the royalty base was the entire market value of 10X's accused products, applying the rate to the unapportioned base, i.e., the full net revenue of 10X's accused instruments, reagents, and chips. Ex. 3, 57:19-58:1. However, in his deposition, Mr. Malackowski rejected his own unapportioned base in favor of the base that 10X's damages expert set forth. Ex. 3, 58:21-60:10; 80:2-13; 62:20-63:8.

## III.   LEGAL ARGUMENT

### A.   To Be Admissible, Plaintiffs Must Prove That Mr. Malackowski's Opinions Are Reliable and Relevant

"[F]ederal judges have a gatekeeping function pursuant to which they 'must ensure' that expert testimony is both relevant and reliable before it is admitted in evidence." 68 Tul. L. Rev. 1457, 1465 (June 1994). To be admissible, expert testimony first must "be the product of reliable principles and methods applied to sufficient facts or data." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1373 (Fed. Cir. 2013). In addition, courts should apply

common sense and consider whether the expert's testimony holds together logically, or if there are inconsistencies, important questions left unanswered, or insufficient consideration of alternative explanations. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153-55 (1999). The proffered testimony must "fit" the facts such that it will assist the trier of fact. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 152 (1997). This standard involves a higher threshold than ordinary relevance. *U.S. v. Ford*, 481 F.3d 215, 216 n.6 (3d Cir. 2007).  Here, Plaintiffs bear the burden of proving that Mr. Malackowski's testimony is admissible. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 582 n.10 (1993).

Mr. Malackowski's opinions have been rejected previously as "arbitrary, capricious, and supported by no sound economic methodology." *Commonwealth Sci. & Indus. Research Org. v. Cisco Sys., Inc.*, No. 6:11-cv-343, 2014 U.S. Dist. LEXIS 107612, at *26 (E.D. Tex. July 23, 2014), *rev'd on other grounds*, 809 F.3d 1295 (Fed. Cir. 2015). That characterization aptly describes Mr. Malackowski's opinions in this case, and the Court should exclude them.

### B.    Mr. Malackowski's Reasonable Royalty Opinion Should Be Excluded

### 1.    Mr. Malackowski's Reasonable Royalty Opinion Is Unreliable

First, Mr. Malackowski arbitrarily ignores all the evidence that does not appear to support his conclusion, a hallmark of unreliability at the *Daubert* stage. He claims to choose his "comparable" licenses because they were between commercial parties while failing to explain his refusal to include at least five other licenses—Life Tech/Bio-Rad, Caliper/Bio-Rad, 1CellBio/Bio-Rad Cross License, 1CellBio/Bio-Rad Sublicense 1, and 1CellBio/Bio-Rad Sublicense 2—that are also between commercial entities with which Bio-Rad admits it competes. Exs. 19 at 57:21-58:17; 26 (Schwartz Paladin Dep.), 269:24-270:16; 27 (1/5/21 BR's 6th Supp. Resp. to 10X's Interrog. Nos. 2-5) at Appx. A, p. 1. Mr. Malackowski failed to address Ms. Tumolo pronouncing on *a recorded call*, that the Life Tech/Bio-Rad license was the best comparator and that the Applera

license and a 15% rate were simply the wrong comparator. Exs. 33 (Tumolo Ex. 10), 3:4-5. Mr. Malackowski likewise ignored Bio-Rad's management arriving at the detailed conclusion that roughly a ████████████████████████████████████████████████████ ████████████████████████████████████████—based expressly on Bio-Rad's belief ███████████████████████████████████████████████████. Exs. 34 (Chia Dep.) at 12:7-14:14 and 42:15-22; 35 (Chia Ex. 2); 36 (DiPanfilo Ex. 7) at BRLITC-0162911. He also ignored the competitor rate of ██████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████. Exs. 37 (Ross Dep.) at 109:11-111:17; 38 (Ross Ex. 10, GT 004175). Mr. Malackowski's refusal to provide any meaningful analysis or explanation of key evidence proves the arbitrary and capricious nature of his testimony. This is a case where "important questions [are] left unanswered, [and] there is insufficient consideration of alternative explanations." *Kumho Tire Co.*, 526 U.S. at 153-55. 10X should not be forced to use its limited trial time to conduct a mini trial on the material facts he failed to consider that render his opinion unreliable.

Second, the key premise of Mr. Malackowski's analysis is that the hypothetical negotiators Bio-Rad and 10X were direct "head-to-head competitors" in May 2019, at the time of the hypothetical, and in particular that 10X's products compete directly with Bio-Rad's ddSEQ product. Ex. 1, 51; Ex. 3, 170:1-7. Based on that alleged competitor relationship, Mr. Malackowski applied the highest rates in the record. He opines: "Licenses to competitors generally contain a ***higher royalty rate*** to compensate for ***the risk of potential lost sales and/or market share***." Ex. 1 at 51. But he admits that he actually "did not impute into [his] royalty calculation a risk of lost sales or lost profits by Bio-Rad," and he did not assess "the business impact to Bio-Rad from the license vis-à-vis the sales level that could be achieved with or without the license due to

competition." Ex. 3, 164:24-165:22, 169:15-25. He admitted to disregarding Bio-Rad's own testimony that Bio-Rad's ddSEQ market share would never have edged over 1%, disregarded Bio-Rad's corporate testimony that it "was not aware of lost sales" to 10X, and ignored Bio-Rad's testimony that it is discontinuing ddSEQ. *Id*. at 171:5-13, 152:6-10; Ex. 39 91:17-23, 93:4-7. He did not consider Bio-Rad's sales, did not compare them to 10X's sales, did not address Bio-Rad's own statements that its product was an inferior failure and not because of competition from 10X. Ex. 3, 159:1-13; 175:8-14. He applied the same highest competitor rate to all accused products, including many where he does not dispute that Bio-Rad has never even attempted to compete. Ex. 3, 176:21-177:5; 178:18-179:5; 180:2-11; 185:9-21; 186:21-187:13. He admitted to divorcing competition from sales, and he assumed that it is a "binary decision, that these companies do compete." *Id.* at 161:21-162:12. He said his opinion is based on the parties' "perception" that they are competitors and is a "forward-looking assessment." *Id.* at 173:13-174:7.

In addition, the only one of his three benchmark licenses that defines competition, Caliper/RainDance License, requires proof that the licensee's product "directly and demonstrably impact[s] sales" of the licensor's products or else the high competitor rate does not apply and a lower rate applies instead. Ex. 14, 3; Ex. 3, 187:14-188:5. Mr. Malackowski did not apply that definition. He failed to identify a single piece of evidence that shows direct and demonstrable impact by 10X's accused Next GEM sales on Bio-Rad's ddSEQ sales. *Id.* at 165:23-166:21. Instead, he "simply looked to whether or not the parties at the negotiations would consider themselves competitors" in an arbitrary and unmethodical look into the "perceptions," which is not what Caliper/RainDance License allows. *Id*. at 189:25-190:13. This consequentialist approach is a clear reason why the Court should exercise its gatekeeping power: first, Mr. Malackowski picks a license that he calls comparable that assigns a high rate to competitors, which the license

defines in a very specific fact-based way; then he cherry picks the rate while ignoring the extensive record evidence showing that the definition of competitor in the license he relies on cannot possibly be met. He does not have support in the record to apply the competitor rate from the license he picked; and he does not explain or justify his departure from what the license he picked unambiguously requires him to do.

Third, Mr. Malackowski's overall application of the *Georgia-Pacific* factors is unreliable because it was manifestly uninfluenced by and unresponsive to the facts. After starting from the highest rate in the record, 15% (Ex. 3, 33:14-34:18), he then purported to run that rate through his *Georgia-Pacific* factors in an exercise that showed time after time how he refused to let the facts that *Georgia-Pacific* required him to consider influence the result he decided on in advance. He insisted that the 15% rate applies no matter the circumstances, including for example whether a single claim of one patent is asserted or 14 claims of two patents are asserted; whether unasserted claims are considered or not; whatever the frequency of use; whatever the distinguishing limitations between the asserted claims. *Id.* at 36:9-14; 38:3-19; 40:2-10; 56:4-57:13; 60:14-62:4; 63:24-64:16. He claimed that "[it] was not [his] assignment" to value the asserted claims as separate inventions or do a claim-by-claim analysis. *Id.* at 64:4-16. Mr. Malackowski repeated the bulk of his same opinions from the prior 152 Case but with key facts that were opposite of those he applied before. Despite crucial differences in the input, the output was exactly the same. A key example: Bio-Rad insisted that the "patented droplet technology" in the 152 Case—the patents acquired from the University of Chicago (not these Harvard patents)—are the "***foundation*** of 10X's droplet products" and the 15% rate in that case is the "***15% competitor royalty*** for [University of Chicago] ***foundational technology***." Ex. 24 (BR's Br.) at 4. In this case Mr. Malackowski claimed to be assessing the ***incremental*** value of the Bio-Rad asserted patents to

10X's products, which patents he admitted are mere "improvements over the foundational intellectual property in this space," not fundamental or enabling. Ex. 3, 75:9-16. He does not know, nor did he inquire into what the "foundational intellectual property" is that the Bio-Rad asserted patents improve upon. Ex. 3, 75:9-76:17 (no identification of foundational intellectual property that 444/277 patent allegedly improve upon); *id.* at 78:4-12 (no definition offered for "improvement" as applied to the 444/277 patents). Yet without explanation he assigned equal value to the mere improvement as he assigned to the purported foundation that it improved upon. This renders Mr. Malackowski's analysis in this case "untethered from the patented technology at issue … and, as such, [is] arbitrary and speculative." *LaserDynamics, Inc.*, 694 F.3d at 81.

Mr. Malackowski's analysis is results-driven, and no matter the inputs, he ends up charging 10X the highest stated rate in any agreement. In other words, "the Georgia-Pacific factors are superficially analyzed in order to reason backwards to [Mr. Malackowski's] pre-ordained conclusion." *Accord Bowling v. Hasbro, Inc.*, No. 05-229S, 2008 U.S. Dist. LEXIS 30043, at *20, 23 (D.R.I. Mar. 17, 2008) (excluding damages expert where the expert "drafted a report specifically intended to superficially justify a royalty rate that would maximize damages.") "[A]ny step that renders the analysis unreliable" results in inadmissibility, "whether the step completely changes a reliable methodology or merely misapplies that methodology." *U.S. v. Monteiro*, 407 F. Supp. 2d 351, 374 (D. Mass. 2006) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994)). Here, multiple key steps in Mr. Malackowski's analysis are unreliable and his opinions should be deemed inadmissible.

### 2.     Mr. Malackowski's Opinions About Applera/Bio-Rad Settlement And The License Itself Should Be Excluded

The prohibition on the use of settlement agreements dates to *Rude v. Westcott*, 130 U.S. 152, 164 (1889), and until recently was a categorical prohibition. *E.g. Wang Labs., Inc. v.*

*Mitsubishi Elecs. Am.*, *Inc.*, 860 F. Supp. 1448, 1452 (C.D. Cal. 1993) ("It is a century-old rule that royalties paid to avoid litigation are not a reliable indicator of the value of a patent, and should therefore be disregarded when determining reasonable royalty rates. This is because royalties paid under threat of suit may reflect the licensee's desire to avoid the risk and expense of litigation"). In recent years, the Federal Circuit has allowed the use of the settlement agreements where they were the most reliable licenses in the case, e.g., *LaserDynamics*, 694 F.3d at 77, and if not, required that "relevant circumstances—such as similarities and differences in technologies and market conditions and the state of the earlier litigation when settled—must be carefully considered" to determine whether to use the settlement agreement at all, and if so, how to make the appropriate adjustments. *Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys., LLC*, 927 F.3d 1292, 1299 (Fed. Cir. 2019). With respect to Rule 403, "[d]istrict courts routinely exclude settlement licenses because the potential prejudice and jury confusion substantially outweigh whatever probative value they may have." *Fenner Invs., Ltd. v. Hewlett-Packard Co.*, No. 6:08-cv-273, 2010 U.S. Dist. LEXIS 41514, at *6-8 (E.D. Tex. Apr. 28, 2010) (collecting cases).

The Applera/Bio-Rad License should be excluded under Rules 403 and 702 because Mr. Malackowski's unsound methodology exacerbates the prejudice otherwise inherent in the use of settlement agreements. The circumstances that precipitated the Applera/Bio-Rad License could not be more coercive. The Applera/Bio-Rad License was one of a package of agreements entered into to settle the parties' multi-front disputes (Ex. 16, BRL00079211, -232, -276, -294), after a jury found willful infringement, (Ex. 17, BIOR00013541), and the district court permanently enjoined Bio-Rad. (Ex. 16, BRL00079212). After the permanent injunction, Applera alleged that Bio-Rad was in contempt of the injunction and a Bio-Rad employee wrote to the court under the

pseudonym Elmer Futterbuck suggesting that Bio-Rad was indeed violating the injunction.[3] The

court granted the motion for discovery into Bio-Rad's contempt of the injunction.[4]  Bio-Rad then

settled on the eve of contempt proceedings, while also facing the entry of a permanent injunction

on the Higuchi patent, covered by this license. Ex. 3, 118:14-119:5, 120:21-122:20, 127:2-128:8.

As Ms. Tumolo reported, the rates paid by Bio-Rad to Applera (now ThermoFisher) were "the

very worst, highest royalty of anyone in the business," and that "Bio-Rad had a virtual gun to its

head" when agreeing to pay 15%. Exs. 13 at 142:6-143:1, 146:17-22, 147:11-17; 29 at 2:9-11.

Bio-Rad's former General Counsel and lead negotiator for Bio-Rad, Mr. Wadler, testified that the

royalty rate was ███████████████████████." Ex. 19 at 35:25-36:11. ████████████

████████████████████████████████████████████████████████████

█████████. *Id*. at 30:5-9; 40:15-41:4.

The licensed technology in the Applera/Bio-Rad License is also not technologically

comparable,  It does not involve the Bio-Rad asserted patents or any of the parties' droplet products.

Bio-Rad has not paid royalties under the Applera/Bio-Rad License for its droplet ddSEQ or ddPCR

products. Ex. 3, 97:7-11. 10X does not make real-time thermal cyclers and 10X's accused products

do not perform real-time PCR. The Higuchi patent enabled real-time PCR, Ex. 12 at 154:15-24

(Tumolo), and Bio-Rad touts the asserted patents for the "novel disclosures of at least pooling

droplets such that they contact each other but do fuse due to the presence of a surfactant." Ex. 1,

---

[3] Ex. 18) (Elmer Futterbuck Letter), 483 ("I am an employee at Bio-Rad New England. I am
concerned that Bio-Rad has not carried out the terms of this injunction and they may be placing
me in a position of violating the injunction to my detriment. As of this date they have yet to provide
written notice to the employees of the injunction, even after the employees have asked
management why they haven't complied with the injunction to do so. They also continue to
manufacture the same devices that they are enjoined from manufacturing.").
[4] Order on Applera's Mot. for Immediate Recon. Re: Applera's Mot. for Leave to Take Disc.,
*Applera Corp., v. MJ Research, Inc*, Case No. 3:98-cv-01201-JBA (D. Conn.), 12/06/2005
(Ex. 25).

14, 61. Thus the licensed technology in Applera/Bio-Rad License is different from the Bio-Rad asserted patents; and the Delaware court excluded the Applera/Bio-Rad License as not technologically comparable to the Ismagilov patents that allegedly enabled performing reactions in droplets. *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, 396 F. Supp. 3d 368, 390 (D. Del. 2019).

The Applera lawsuits included not only risk but actual enhanced damages and the entry of a permanent injunction on related patents **and** the Higuchi patent that was part of the license. The Federal Circuit has recognized that such factors squarely put the earlier settlement as too high. *See Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1369-1370 (Fed. Cir. 2017).[5] Bio-Rad was also facing potential harsh sanctions from violating the injunction, and settled on the eve of those proceedings. *See LaserDynamics*, 694 F.3d at 78 (discussing "desire to avoid further litigation under the circumstances," including "the numerous harsh sanctions imposed" on the settling defendant in the earlier suit). These facts alone skew the license amount far away from proper patent valuation. *See Plexxikon*, 2021 U.S. Dist. LEXIS 5996, at *18. Mr. Wadler's testimony makes it clear that the ████████████████████████████████ ████████████████████████ the dominant factor in the license value. *See id.*, at *19.

Mr. Malackowski's report acknowledged some of the related circumstances, but he disregarded the most critical ones—the ones that had the most profound coercive effect on the settlement—and made no adjustment to his conclusions based on significant differences between

---

[5] Mr. Malackowski relies on *Prism* to defend his use of the Applera/Bio-Rad License. Ex. 1, 34. In *Prism*, the prior settlement agreement was contemporaneous, and involved the same patentee and the same patented technology at issue in the later case, *Prism*, at 1370-71, which was why that settlement license was informative, when others would not be, *id.* at 1369 (settlement license may be probative "if that value" was at issue in the later case). Mr. Malackowski admits that those factors are not present here. Ex. 3, 97:7-18; 98:7-99:1; 117:7-119:18; 119:19-120:3.

the circumstances of the "virtual gun-to-the-head" negotiation with Applera and the hypothetical

negotiation with 10X. Mr. Malackowski did not consider: the contempt judgment that included the

injunction on the Higuchi licensed patent, the willful infringement finding, the pending contempt

proceedings, the Elmer Futterbuck allegations, or Bio-Rad's related communications. Ex. 3,

127:2-128:8, 123:19-125:18. He did not consider Ms. Tumolo's statements that Applera is simply

"the wrong comparator," or that Bio-Rad had a "virtual gun to its head." Exs. 33 at 3:4-5; 13 at

146:17-22, 147:11-17. He disregarded Mr. Stark's testimony that Bio-Rad could not have been

under any more duress when it signed the license. Ex. 28 (Stark Dep.) at 145:20-146:7. Mr.

Malackowski disregards that the Higuchi licensed patent is by itself "enabling" and key technology

for real-time PCR whereas Bio-Rad believes that the Bio-Rad asserted patents are mere

improvements over the foundational droplet technology. Ex. 12 at 154:15-24; Ex. 3, 75:9-16. He

does not even know or inquire into what the "foundational droplet technology" is that the Bio-Rad

asserted patents improve upon. Ex. 3, 75:9-76:17, 78:4-12. He also did not address the 2008 license

amendment that confirmed that the value of the Higuchi patent is at most half of the 15% rate.

Ex. 20, PTX672-003; Ex. 3, 132:2-19. Nevertheless, Mr. Malackowski made no downward

adjustments to the rate and instead "[found] that the Applera/Bio-Rad License [was] indicative of

a reasonable royalty rate in this case in excess of 15% of net sales." Ex. 1, 36.

He simply did not address the extraordinary facts **nor** adjust the rates to account for these

economic circumstances. His analysis is akin to that of the BenQ agreement in *LaserDynamics*,

that was executed shortly before a trial where BenQ would have been at a severe legal and

procedural disadvantage due to harsh court sanctions and whose amount was six times larger than

the next highest amount paid for a license to the patent-in-suit. 694 F.3d at 77-78. And even though

BenQ included the rights to the patents-in-suit, which Applera/Bio-Rad License certainly does not,

it was abuse of discretion to admit it. *Id*. at 78.

Mr. Malackowski's similar testimony on settlement agreements was recently excluded in *Plexxikon*. In that case, although Mr. Malackowski "purport[ed] to opine on the comparability of the license terms, products, patents, and negotiation positions, much of that evidence is superficial or insufficient to show comparability." *Plexxikon* at *20. The reasons to exclude the Applera/Bio-Rad License in this case are even stronger. *Plexxikon* did not involve any executives' admissions that the threat of contempt of the injunction and the state of duress forced the license execution.

Further, in Mr. Malackowski's supplemental report, Bio-Rad is using Bio-Rad/Applera License as a pretext for introducing the prior verdict and injunction against 10X products that are not accused here. Ex. 2, 4-5. 10X is separately moving to exclude Mr. Malackowski's report as untimely and expects to file a motion *in limine* to prevent the prejudicial and inflammatory use of the prior case verdict and injunction. Suffice it to say here, Bio-Rad's belated spin on the Applera/Bio-Rad License only compounds the prejudice whereby Bio-Rad seeks to tell the jury that 10X was under the same gun that Bio-Rad was under where Bio-Rad faced the injunction on the same patent it was licensing and the contempt proceedings for violating an injunction— circumstances neither present here nor legally admissible for their improper intended purpose because the willing licensee and willing licensor in the hypothetical negotiation cannot be placed under compulsion and instead the premise of the hypothetical negotiation is that it is a voluntary agreement between a willing licensor and a willing licensee.[6] *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970); Ex. 3, 82:3-24; 83:9-19; 84:14-23

---

[6] Mr. Malackowski also separately contradicted his supplemental report and admitted that "typically other litigation proceedings are not addressed within the hypothetical. For example, I do not specifically account for the prior Delaware case in the hypothetical in this case. I've dealt with this case uniquely and separately." Ex. 3, 200:12-20.

(confirming that placing willing licensor and licensee under compulsion would impute a royalty that reflected more than the footprint of the invention). To admit the Applera/Bio-Rad settlement is to invite a mini-trial on factual similarities and differences between this case and the settled claims. *Fenner*, at *6. "Such a diversion would cause unfair prejudice, confuse the issues, and waste time." *Fenner*, at *11; *see also Sentius, Int'l, LLC v. Microsoft Corp.,* No. 5:13-cv-00825-PSG, 2015 U.S. Dist. LEXIS 10423, *23-24 (N.D. Cal. Jan. 27, 2015). Any arguably probative value of this license is limited and outweighed by the risk of undue prejudice from skewed damages horizons before the jury and Bio-Rad's transparent attempt to paint 10X as a serial infringer.

### 3.    Mr. Malackowski's Use Of LES Study To Double The Rates On The Asserted Patents Is Unreliable

Mr. Malackowski relies on a survey by the Licensing Executives Society, titled "Global 'Life Sciences' Royalty Rates & Deal Terms Survey – 2016" (the "LES Survey") to justify doubling the royalty rates for the Bio-Rad asserted patents in the MRC/RainDance and Harvard/RainDance licenses. Ex. 1, 40-42, 46. Specifically, Mr. Malackowski states that based on the LES Survey, "that licenses executed near the launch of the licensed product customarily result in royalty rates that are twice (or more) as large as licenses executed prior to proof of concept, within the life sciences industry." *Id*. at 40-41. Mr. Malackowski has failed to show how the licenses in the LES Survey are comparable to the Bio-Rad asserted patented technology. The general field of "life sciences" is much too broad to justify reliance on the LES Survey, especially because there are multiple real-world licenses that include the Bio-Rad asserted patents. Mr. Malackowski states that "[t]he deals included in the LES Survey covered a wide variety of asset types, including: new chemical entity, existing branded product, drug/device combination product, platform, in vitro diagnostics, in vivo diagnostics, drug use, drug delivery, and others." Ex. 1, 40. The licenses covered in the LES Survey are clearly for clinical and diagnostic applications, and

19

are different from technology to facilitate biomedical research, which is the technology of the 10X accused products. Bio-Rad has previously insisted that 10X is not in the clinical market. Ex. 21 (ITC 1068 Hearing Tr.) at 43:23-44:8. Mr. Malackowski also testified that the LES survey relates to the pharmaceutical industry, which has unique factors, such as regulatory approval, that are not applicable to the hypothetical negotiation. Ex. 22 at 166:9-22. The LES survey states that "51% of deals were related to Injectable products, and 24% small molecules" and "84% of deals were categorized as exclusive." Ex. 23 (LES Survey) at 7, 8. These deals are not relevant to the hypothetical negotiation for a non-exclusive license for droplet NGS sample preparation.

In *LaserDynamics*, the Federal Circuit held that the district court erroneously allowed an expert to rely on another LES survey because comparability between the survey and a hypothetical license to the asserted patent was absent. 694 F.3d at 80. The Federal Circuit held that the license survey was "further removed from the patented technology" and that "[r]eying on this irrelevant evidence to the exclusion of the many licenses expressly for the [asserted patent] served no purpose other than to increase the reasonable royalty rate above the rates more clearly linked to the economic demand for the claimed technology." *Id*. Similarly, Mr. Malackowski does not show how the clinical diagnostic technologies are comparable to the patented technology or how practices in that industry necessarily match or compare to the trends in biomedical research. Mr. Malackowski is only using the LES Survey to justify arbitrarily doubling the royalty rates in the licenses on the Bio-Rad asserted patents, which the Federal Circuit has rejected.

## IV.    CONCLUSION

For the foregoing reasons, 10X respectfully requests that the Court exclude Mr. Malackowski's opinions because they are fundamentally flawed and are not best left for the jury to sort wheat from the chaff based on cross-examination. These are methodological and reliability flaws that the Court can best assess and exclude in its role as a gatekeeper.

Date: April 14, 2021

Respectfully submitted,

/s/        *Azra M. Hadzimehmedovic*

Matthew D. Powers (*pro hac vice*)
Paul T. Ehrlich (*pro hac vice*)
Stefani C. Smith (*pro hac vice*)
Robert L. Gerrity (*pro hac vice*)
Jennifer K. Robinson (*pro hac vice*)
Natasha M. Saputo (*pro hac vice*)
Gina Cremona (*pro hac vice*)
Daniel Radke (*pro hac vice*)
TENSEGRITY LAW GROUP, LLP
555 Twin Dolphin Drive, Suite 650
Redwood Shores, CA 94065
Telephone:     (650) 802-6000
Facsimile:     (650) 802-6001
10x_BR_MA_Service@tensegritylawgroup.com

Azra M. Hadzimehmedovic (*pro hac vice*)
Aaron M. Nathan (*pro hac vice*)
Samantha A. Jameson (*pro hac vice*)
Kiley White (*pro hac vice*)
TENSEGRITY LAW GROUP, LLP
8260 Greensboro Drive, Suite 260
McLean, VA 22102
Telephone:     (703) 940-5033
Facsimile:     (650) 802-6001
10x_BR_MA_Service@tensegritylawgroup.com

*Counsel for 10X Genomics, Inc.*

Sarah Chapin Columbia (BBO #550155)
Annabel Rodriguez (BBO #696001)
MCDERMOTT WILL & EMERY LLP
200 Clarendon Street, Floor 58
Boston, Massachusetts 02116-5021
Telephone:     (617) 535-4000
Facsimile:     (617) 535-3800
10X-BR-MWE@mwe.com

Leah Brannon (*pro hac vice*)
Kenneth Reinker (*pro hac vice*)
CLEARY GOTTLIEB
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone:     (202) 974-1500
Facsimile:     (202) 974-1999
Team-10x-Genomics-Litigation-CGSHOnly@cgsh.com

## CERTIFICATION OF COMPLIANCE WITH LOCAL RULE 7.1

I hereby state that on April 14, 2021, before filing this Motion, counsel for 10X telephonically met and conferred with Bio-Rad's counsel and attempted in good faith to resolve or narrow the issues in accordance with the requirements of Local Rule 7.1 but were unsuccessful.

## CERTIFICATE OF SERVICE

The undersigned certifies that on April 14, 2021, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which will issue an electronic notification of filing to all counsel of record.

*/s/ Azra Hadzimehmedovic*
Azra  Hadzimehmedovic
