# EXHIBIT 3

## REDACTED
## PENDING MOTION TO SEAL

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF MASSACHUSETTS

 3        ----------------------------------------x

 4        BIO-RAD LABORATORIES, INC. and PRESIDENT

 5        AND FELLOWS OF HARVARD COLLEGE,        REPORTER CERTIFIED
                                                     TRANSCRIPT
 6                      Plaintiffs,

 7            vs.                             Civil Action No.

 8        10X GENOMICS, INC.,                 1:19-cv-12533-WGY

 9                      Defendant.

10        ***CAPTION CONTINUED***            CONFIDENTIAL

11        ----------------------------------------x

12              VIDEOTAPED STENOGRAPHIC DEPOSITION OF:
                         JAMES E. MALACKOWSKI
13                      Tuesday, April 6, 2021
                        11:02 a.m. - 7:09 p.m.
14           Reported Remotely through Videoconference
                         **CONFIDENTIAL**
15           **OUTSIDE ATTORNEYS' EYES ONLY INFORMATION**

16

17

18

19

20

21

22   Reported stenographically by:
     Richard Germosen, CA CSR No. 14391
23   RDR, CRR, CCR, CRCR, NYACR, NYRCR
     NCRA/NJ/NY/CA Certified Realtime Reporter
24   NCRA Realtime Systems Administrator
     Job No. 40704
25
```

CHASE
LITIGATION SERVICES

```
1    --------------------------------------x

2    ***CAPTION CONTINUED***

3    10X GENOMICS, INC.,

4                    Counterclaim Plaintiff,

5            -and-

6    PRESIDENT AND FELLOWS OF HARVARD COLLEGE,

7                    Counterclaim Co-Plaintiff

8                    as to certain claims,

9            vs.

10

11   BIO-RAD LABORATORIES, INC.,

12                   Counterclaim Defendant,

13           -and-

14   PRESIDENT AND FELLOWS OF HARVARD COLLEGE,

15                   Counterclaim Co-Defendant as to

16                   DJ counterclaims.

17   --------------------------------------x

18

19

20

21

22

23

24

25
```

1          VIDEOTAPED TELECONFERENCED STENOGRAPHIC

2     DEPOSITION of JAMES E. MALACKOWSKI, taken in the

3     above-entitled matter before RICHARD GERMOSEN, Certified

4     Court Reporter, (License No. 30XI00184700), Certified

5     Realtime Court Reporter-NJ, (License No. 30XR00016800),

6     California Certified Shorthand Reporter, (License No.

7     14391), NCRA/NY/CA Certified Realtime Reporter, NCRA

8     Registered Diplomate Reporter, New York Association

9     Certified Reporter, NCRA Realtime Systems Administrator,

10    taken remotely on Tuesday, April 6, 2021, commencing at

11    11:02 a.m.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**James Malackowski**                                    **Confidential**

1    A P P E A R A N C E S:

2

3

4    WEIL GOTSHAL & MANGES LLP

5    BY:  XIAOXI TU, ESQ.

6    767 5th Avenue

7    New York, New York 10153

8    (212) 310.8000

9    xiaoxi.tu@weil.com

10   Attorneys for Bio-Rad Laboratories, Inc.

11

12   TENSEGRITY LAW GROUP LLP

13   BY:  AZRA HADZIMEHMEDOVIC, ESQ.

14        -and-

15   BY:  AARON M. NATHAN, ESQ.

16   8260 Greensboro Drive

17   Suite 260

18   McLean, Virginia 22102-3848

19   (703) 940.5031

20   azra@tensegritylawgroup.com

21   aaron.nathan@tensegritylawgroup.com

22   Attorneys for 10X Genomics, Inc.

23

24

25

James Malackowski                                    Confidential

1  A P P E A R A N C E S:  (CONT'D.)

2

3

4  TENSEGRITY LAW GROUP LLP

5  BY:  GINA CREMONA, ESQ.

6  555 Twin Dolphin Drive

7  Suite 650

8  Redwood Shores, California 94065

9  (650) 802.6018

10  gina.cremona@tensegritylawgroup.com

11  Attorneys for 10X Genomics, Inc.

12

13  ALSO PRESENT:

14  DAVID MANZO, Legal Video Specialist

15  ASHLEY NELSON, Tensegrity Law Group LLP

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2    WITNESS                                    EXAMINATION

3    JAMES E. MALACKOWSKI

4      BY MS. HADZIMEHMEDOVIC                        9

5

6

7                        E X H I B I T S

8    EXHIBIT NO.      DESCRIPTION                    PAGE

9    Exhibit 1       document entitled Expert        12

10                   Report of James E.

11                   Malackowski, February 5, 2021

12

13   Exhibit 2       document entitled               81

14                   Georgia-Pacific Corp. v.

15                   United States Plywood Corp.

16

17   Exhibit 3       document entitled Videotaped    101

18                   Deposition of James E.

19                   Malackowski, October 26, 2017

20

21   Exhibit 4       amendment number two to the     133

22                   realtime PCR instrument

23                   license

24

25

```
 1                  E X H I B I T S  (CONT'D.)

 2    EXHIBIT NO.     DESCRIPTION                    PAGE

 3    Exhibit 5      trial transcript from the 152  147

 4                   trial

 5

 6    Exhibit 6      document entitled Videotaped   209

 7                   Deposition of John A. Luckey,

 8                   Ph.D., Friday, September 11,

 9                   2020

10    (exhibit index concluded)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1   ----------------------------------------------------

2                    P R O C E E D I N G S

3                         11:02 a.m.

4   ----------------------------------------------------
```

1:02:13  5                 THE VIDEOGRAPHER:  Stand by, please.

1:02:42  6                 Good morning.  We are going on the

1:02:49  7   record.  The time on the screen is 11:02 a.m.

1:02:54  8   Eastern Standard Time.  Today's date is April 6,

1:02:59  9   2021.  We are located remotely via Zoom video

1:03:06 10   conferencing with all parties appearing remotely.

1:03:09 11                 This marks the beginning of media

1:03:11 12   unit number one of the deposition of James

1:03:14 13   Malackowski, testifying in the matter of Bio-Rad

1:03:19 14   Laboratories, Inc., versus 10X Genomics, et al., and

1:03:24 15   related cross-actions venued in the United States

1:03:29 16   District Court for the District of Massachusetts,

1:03:34 17   case number is 1:19-cv-12533-WGY.

1:03:45 18                 My name is David Manzo.  I'm a legal

1:03:48 19   video specialist here on behalf of Chase Litigation

1:03:49 20   Services.  The court reporter is Rich Germosen, also

1:03:55 21   here on behalf of Chase Litigation Services.

1:04:00 22                 Counsel, would you please identify

1:04:01 23   yourself and state whom you represent.

1:04:05 24                 MS. HADZIMEHMEDOVIC:  Azra

1:04:05 25   Hadzimehmedovic.  With me are Gina Cremona and

1:04:10  1   Ashley Nelson from Tensegrity Law Group here on

1:04:15  2   behalf of 10X Genomics, Inc.

1:04:19  3              MS. TU:  This is Xiaoxi Tu from Weil

1:04:21  4   Gotshal & Manges on behalf of Bio-Rad.

1:04:28  5              THE VIDEOGRAPHER:  Will the court

1:04:28  6   reporter please swear in the witness.

1:04:34  7              CERTIFIED STENOGRAPHER:  Good

1:04:34  8   morning.  My name is Rich Germosen.  I am a

1:04:34  9   certified stenographic reporter.  My license is

1:04:34 10   available for inspection.

1:04:34 11              Can I please have a stipulation from

1:04:34 12   all counsel present that you will not object to the

1:04:34 13   validity of this remote swearing now or in the

1:04:34 14   future?

1:04:56 15              MS. HADZIMEHMEDOVIC:  Yes.

1:04:57 16              MS. TU:  Yes.

        17              (Whereupon, the Certified Realtime

        18   Stenographer administered the oath to the witness.)

1:04:57 19

1:04:57 20   J A M E S   E.   M A L A C K O W S K I,

1:04:57 21   having been first duly sworn or affirmed, was

1:04:57 22   examined and testified as follows:

1:04:57 23   EXAMINATION BY MS. HADZIMEHMEDOVIC:

1:05:11 24   BY MS. HADZIMEHMEDOVIC:

1:05:12 25              Q.     Good morning, Mr. Malackowski.

1:05:14  1        A.      Good morning.

1:05:16  2        Q.      Please state your name.

1:05:18  3        A.      James Edward Malackowski.

1:05:21  4        Q.      What is the address from which you

1:05:23  5   are appearing today?

1:05:25   ████████████████████████████████████████

1:05:30   ██████████████████

1:05:35  8        Q.      You have been deposed many times

1:05:36  9   before; correct?

1:05:38 10        A.      Yes, ma'am.

1:05:40 11        Q.      Since the 10X Bio-Rad trial in

1:05:43 12   Delaware 152 case, have you testified at trial?

1:05:53 13        A.      Actually, would have to give that

1:05:55 14   some thought.  Nothing immediately comes to mind

1:05:57 15   largely because of the pandemic, but I suppose there

1:06:01 16   will be at least one or two matters because I have

1:06:04 17   given at least one video -- trial by video and at

1:06:09 18   least one trial in person during the pandemic.  So

1:06:13 19   the ones that I recall were by video, Centripetal

1:06:19 20   versus Cisco, and in-person, Security Point versus

1:06:29 21   the TSA.

1:06:33 22            I don't recall others though.  They

1:06:34 23   would all be listed on my CV.

1:06:38 24        Q.      Did you appear as an expert for

1:06:40 25   plaintiffs in those two cases?

1:06:45  1        A.      Yes.

1:06:49  2        Q.      You've had a chance to prepare with

1:06:50  3   counsel before your deposition today; correct?

1:06:54  4        A.      Yes, ma'am.

1:06:56  5        Q.      Was anyone else present aside from

1:06:59  6   counsel during your deposition presentation?

1:07:01  7        A.      Yes, ma'am.  Two of my colleagues

1:07:02  8   from Ocean Tomo, a Mr. Hess and Mr. Clemons.

1:07:06  9        Q.      Anyone else?

1:07:07 10        A.      No, ma'am.

1:07:11 11        Q.      Is there any reason why you couldn't

1:07:12 12   give your best and most truthful testimony today?

1:07:19 13        A.      I don't believe so, no, ma'am.

1:07:20 14        Q.      Is it correct that you were retained

1:07:22 15   by counsel for Bio-Rad in this case to offer

1:07:25 16   opinions on damages?

1:07:30 17        A.      Specifically Ocean Tomo was retained

1:07:32 18   by counsel for plaintiffs to offer opinions largely

1:07:35 19   related and focused on damages, yes.

1:07:40 20        Q.      Are you retained by counsel for

1:07:42 21   Bio-Rad only or by counsel for Bio-Rad and Harvard?

1:07:58 22        A.      As described on page five of my

1:08:00 23   report, Ocean Tomo was retained by counsel for

1:08:04 24   Bio-Rad Laboratories and the President and Fellows

1:08:05 25   of Harvard College collectively.

1:08:12  1          Q.       Do you recall when you were first

1:08:13  2   retained by counsel for plaintiffs to offer opinions

1:08:19  3   in this particular case, the Massachusetts 10X

1:08:23  4   Bio-Rad matter?

1:08:25  5          A.       I believe it was the summer of last

1:08:27  6   year, approximately June.

1:08:39  7          Q.       You have prepared an expert report

1:08:40  8   containing your opinions and the bases for those

1:08:43  9   opinions relating to the amount of damages 10X would

1:08:47 10   owe should Bio-Rad prove that 10X infringes

1:08:47 11   Bio-Rad's asserted patent; correct?

1:08:51 12          A.       More specifically, I prepared two

1:08:53 13   expert reports, an initial report that was produced

1:08:58 14   in February, on the 5th of February of this year,

1:09:01 15   and a recent supplemental report that was produced I

1:09:06 16   believe last week.

1:09:13 17                   MS. HADZIMEHMEDOVIC:  Ashley, if we

1:09:14 18   could please mark exhibit one and show it on the

1:09:30 19   screen for the witness.

1:09:35 20                   (Whereupon, document entitled Expert

1:09:35 21   Report of James E. Malackowski, February 5, 2021, is

1:09:35 22   received and marked as Exhibit 1 for

1:09:35 23   Identification.)

1:09:36 24   BY MS. HADZIMEHMEDOVIC:

1:09:37 25          Q.       Mr. Malackowski, we have exhibit one,

Confidential

1:44:21  1   matters which involve trade secrets.  In trade

1:44:25  2   secret cases, the burden for the plaintiffs in

1:44:29  3   assessing damages is relatively light.  Essentially

1:44:33  4   they need only prove the revenues of the defendant,

1:44:35  5   and the burden of the defendant is quite high.  They

1:44:38  6   have to show any deduction from revenues for

1:44:42  7   profitability, as well as any apportionment from

1:44:46  8   those profits to the trade secrets at issue, and

1:44:51  9   those matters can become very, very detailed and

1:44:55 10   involved and time-consuming, and I've worked, it

1:44:58 11   seems, like on a number of them in the past three

1:45:02 12   years.

1:45:15 13          Q.      Is it your experience that you

1:45:18 14   roughly spend the same amount of hours if the

1:45:23 15   matters are roughly the same, whether you're a

1:45:29 16   defense or a plaintiff's expert in a patent case?

1:45:34 17          A.      The number of hours in a patent case

1:45:37 18   is really not impacted by whether you're

1:45:40 19   representing the plaintiff or the defendant.  The

1:45:42 20   number of hours in any given case is impacted more

1:45:45 21   directly by the number of patents that are at issue

1:45:48 22   in the case, the financial amount at risk, the

1:45:55 23   extent of discovery.

1:46:03 24          Q.      In the reasonable royalty analysis in

1:46:05 25   this case, one of the approaches that you have used

1:46:09  1   is the so-called market approach; correct?

1:46:13  2          A.     I've considered the market approach

1:46:15  3   as a quantitative indicator for the Georgia-Pacific

1:46:20  4   analysis, that's true.

1:46:22  5          Q.     Would you please turn to page 71 of

1:46:23  6   your report?

1:46:36  7          A.     Yes, I have it.

1:46:37  8          Q.     And if you would turn to the first

1:46:39  9   bullet.  Is it fair to say that this first bullet on

1:46:49 10   page 71 of exhibit one includes a summary of the

1:46:54 11   result of your market approach analysis?

1:46:58 12          A.     At a high level, I think that is

1:46:59 13   fair.

1:47:04 14          Q.     It lists in the three separate

1:47:06 15   bullets the licenses you considered in the market

1:47:11 16   approach; correct?

1:47:13 17          A.     Yes, ma'am.

1:47:15 18          Q.     The first bullet lists

1:47:16 19   Caliper/RainDance, then Applied Biosystem/QuantaLife

1:47:22 20   license, and the Applera/Bio-Rad license; correct?

1:47:27 21          A.     Yes, and just to clarify, this is

1:47:29 22   more appropriately described as a list of the

1:47:31 23   licenses that I relied upon or focused on.  There

1:47:34 24   are other licenses that I have considered that are

1:47:36 25   not contained within these bullets because they were

1:47:39  1    deemed to be not comparable or relevant.

1:47:45  2             Q.      The second bullet lists the

1:47:48  3    MRC/RainDance license and the Harvard/RainDance

1:47:51  4    license that you relied upon; correct?

1:47:56  5             A.      Yes, ma'am.

1:47:56  6             Q.      And the third and last bullet lists

1:47:58  7    the ████████ license that you relied upon in your

1:48:01  8    market approach; correct?

1:48:04  9             A.      Yes, ma'am.

1:48:07 10             Q.      The stated rates for the licenses you

1:48:11 11    relied upon in the market approach are as low as

1:48:14 12    1 percent; correct?

1:48:18 13             A.      I believe that's true, though we

1:48:19 14    would have to refer back to each agreement because

1:48:20 15    they do vary.

1:48:24 16             Q.      And the highest stated royalty rate

1:48:26 17    in those agreements was 15 percent; correct?

1:48:31 18             A.      Yes, I believe that is true.

1:48:37 19             Q.      Based on your interpretation of the

1:48:39 20    licenses that you relied upon for the market

1:48:41 21    approach, you determined that the range is 4 percent

1:48:48 22    to 15 percent; correct?

1:48:52 23             A.      Yes.  Let me go back though and

1:48:55 24    correct my last answer.  I believe one of the

1:48:57 25    agreements through an amendment has a stated rate of

Confidential

1:50:48  1    page 34 of my report and it's actually

1:50:50  2    15.75 percent.

1:50:57  3         Q.      You're speaking about the amendment

1:51:02  4    to the Applera/Bio-Rad license; correct?

1:51:08  5         A.      Yes, ma'am.

1:51:11  6         Q.      You did not rely upon that rate in

1:51:19  7    your opinions in this case; is that fair?

1:51:21  8         A.      Yes, ma'am.

1:51:28  9         Q.      The market approach was an input that

1:51:32 10    you used and then you apply the Georgia-Pacific

1:51:37 11    factors as a qualitative assessment with the

1:51:40 12    starting point from the market approach?

1:51:48 13         A.      If that's a question, I would answer

1:51:49 14    yes, that's what I did.

1:51:54 15         Q.      You concluded that 10X and Bio-Rad

1:51:57 16    would agree to the high end of your market approach

1:52:01 17    determined rates; correct?

1:52:04 18         A.      Well, more specifically as described

1:52:05 19    within my report, I concluded they would agree to a

1:52:09 20    rate above the high end of the market approach, but

1:52:12 21    to be conservative, I have capped the royalty at the

1:52:16 22    15 percent rate.

1:52:48 23         Q.      You did also opine that as a result,

1:52:50 24    the hypothetical negotiation would result in a

1:52:52 25    reasonable royalty rate toward the high end of the

1:54:31  1    that was suitable for the facts of this case.  Then

1:54:35  2    I applied the Georgia-Pacific criteria.

1:54:41  3            Q.      The Georgia-Pacific factors provided

1:54:43  4    a qualitative adjustment to the market approach

1:54:48  5    conclusions; correct?

1:54:50  6            A.      Generally speaking, yes.

1:54:52  7            Q.      And it's fair to say that there is

1:54:53  8    really no explicit way to calculate the increment

1:55:00  9    provided through your Georgia-Pacific analysis to

1:55:04 10    the rate that you determined?

1:55:08 11            A.      Well, there is no formula for

1:55:10 12    Georgia-Pacific, if that's what you're asking, as in

1:55:14 13    start with X and add 10 percent for one factor,

1:55:17 14    subtract 5 percent for another.  That calculus does

1:55:22 15    not exist.  In this case, because I'm conservatively

1:55:27 16    capping the royalty within the range founded by

1:55:31 17    market approach, the question really doesn't have

1:55:34 18    necessity because there is no change from that

1:55:36 19    initial starting point in order to be conservative.

1:55:50 20                    (Stenographer clarification.)

1:55:53 21                    MS. TU:  Yeah.  Jim, if you could

1:55:54 22    just wait a couple of seconds or just one second

1:55:57 23    would be great.

1:56:05 24                    Yes, I did object to that question.

1:56:16 25            Q.      You concluded that Bio-Rad and 10X

1:56:20  1   would agree in the hypothetical negotiation to the

1:56:23  2   highest stated rate in any of the agreements that

1:56:27  3   you have relied upon in this case; correct?

1:56:34  4              MS. TU:  Objection.

1:56:37  5       A.      I have concluded they would agree to

1:56:40  6   a 15 percent rate, which is at the upper end of the

1:56:45  7   range that I relied upon, though lower than the

1:56:48  8   highest stated rate within the agreements considered

1:56:52  9   as we discussed.

1:57:03 10       Q.      The question was about agreement

1:57:05 11   relied upon, so I'll repeat it.

1:57:07 12              You have concluded that Bio-Rad and

1:57:09 13   10X would agree in the hypothetical negotiation to

1:57:13 14   the highest stated rate in any of the agreements

1:57:18 15   that you have relied upon in this case; correct?

1:57:22 16              MS. TU:  Objection.

1:57:25 17       A.      So I'm not sure how that question is

1:57:27 18   different, and I don't want to give the impression

1:57:29 19   that the conclusion of the negotiation was the

1:57:32 20   highest possible rate.  They weren't -- there wasn't

1:57:36 21   a conclusion saying, Let's first agree to what would

1:57:39 22   be highest, then let's figure out what that is.

1:57:41 23              The conclusion was a 15 percent rate

1:57:44 24   conservatively determined, but consistent with the

1:57:49 25   upper bound of the range of the agreements I relied

James Malackowski                                    Confidential

1:57:53   1    upon.

1:58:00   2         Q.        The rate that you concluded, the

1:58:02   3    15 percent rate that you opined Bio-Rad and 10X

1:58:06   4    would agree to in the hypothetical negotiation is,

1:58:10   5    indeed, the highest stated rate in any of the

1:58:14   6    agreements that you have relied upon in this case;

1:58:16   7    correct?

1:58:19   8              MS. TU:   Objection.

1:58:21   9         A.        Arithmetically speaking, it is equal

1:58:23   10   to the upper bound, that's true.

1:58:29   11        Q.        You agree that the textbooks approach

1:58:32   12   on the market analysis teaches that -- strike that.

1:58:38   13              You would agree that the textbook

1:58:41   14   approach on the market analysis approach teaches

1:58:43   15   that any market approach analysis would likely

1:58:48   16   require reasonable adjustments?

1:58:54   17              MS. TU:   Objection.

1:58:56   18        A.        I am not averse to that sentence.  I

1:59:00   19   don't know if you're reading from my report or a

1:59:01   20   textbook, but in most cases there would be

1:59:05   21   reasonable adjustment, and, indeed, in this case, I

1:59:11   22   believe one could apply a reasonable adjustment to

1:59:16   23   reach a conclusion that exceeds the bounds of the

1:59:20   24   existing agreements, meaning a royalty determination

1:59:23   25   in excess of 15 percent.  I have not done that.

1:59:30  1          Q.       One of your adjustments was to adjust

1:59:32  2     the rates of Harvard/RainDance and MRC/RainDance

1:59:36  3     licenses; correct?

1:59:43  4          A.       Within my report, I do show

1:59:44  5     adjustments to those rates to facilitate

1:59:48  6     comparability to the other agreements.  That is

1:59:49  7     true.

1:59:50  8          Q.       You adjust the rates of those two

1:59:52  9     licenses, Harvard/RainDance and MRC/RainDance,

1:59:54 10     upward by doubling them; correct?

1:59:59 11                   MS. TU:  Objection.

2:00:01 12          A.       I adjust them upward arithmetically

2:00:04 13     using a doubling factor based on the LES research

2:00:08 14     that I cite in my report and my general experience

2:00:13 15     on such an adjustment.

2:00:15 16          Q.       And your opinion is that even after

2:00:19 17     doubling the stated rates of the Harvard/RainDance

2:00:22 18     and the MRC/RainDance license, those rates doubled

2:00:27 19     are still just the floor on your analysis; correct?

2:00:31 20                   MS. TU:  Objection.

2:00:37 21          A.       Well, my report will describe them

2:00:39 22     specifically, but I believe that those rates, even

2:00:40 23     after adjustment, are not as economically comparable

2:00:44 24     to the other agreements that I rely upon, and so if

2:00:46 25     they were to be used or considered at all, they

2:00:49  1    would have to be considered as the floor.

2:00:52  2           Q.      These two licenses, Harvard/RainDance

2:00:55  3    and the MRC/RainDance license, you would agree with

2:00:59  4    me are the most technologically comparable licenses

2:01:03  5    in the record; correct?

2:01:04  6                   MS. TU:  Objection.

2:01:07  7           A.      I think that's really a better

2:01:08  8    question for Dr. Gale.  I do recognize that these

2:01:12  9    agreements include the prior patent filings that

2:01:18 10    ultimately matured to the two patents-in-suit.  So

2:01:23 11    that makes them technically comparable generally

2:01:26 12    speaking and I recognize that.  I don't draw an

2:01:30 13    opinion as to whether, therefore, that makes them

2:01:32 14    more technically comparable.

2:01:35 15                   I would limit such a qualitative

2:01:39 16    ranking of agreements to ones that only included the

2:01:43 17    patents-in-suit.

2:01:49 18           Q.      Mr. Malackowski, if you could please

2:01:50 19    turn to page 48 of exhibit one.  Your February 5

2:01:56 20    report.

2:02:02 21           A.      Yes, ma'am.

2:02:03 22           Q.      Section 12.1.7.

2:02:07 23           A.      Yes, ma'am.

2:02:08 24           Q.      And look at the very last sentence

2:02:13 25    starting -- paragraph starting with "however," which

2:02:16  1   is a single sentence.

2:02:18  2          A.      Yes, ma'am.

2:02:19  3          Q.      If you could read that and let me

2:02:20  4   know when you're done.

2:02:22  5          A.      I have.  I would simply note the

2:02:29  6   ending phrase of, quote, in the record.  Whereas,

2:02:31  7   your questions were speaking in the absolute sense.

2:02:35  8   So I certainly stand by my prior answer, as well as

2:02:37  9   the language within this report.

2:02:40 10          Q.      Well, we could reread my question,

2:02:43 11   but I'll ask it again.

2:02:49 12                  Those two licenses, Harvard/RainDance

2:02:52 13   and MRC/RainDance, are the two licenses that are the

2:02:58 14   most technically comparable licenses in the record;

2:03:01 15   correct?

2:03:04 16          A.      Well, not on their face.  Again, the

2:03:07 17   paragraph that you cite caveats that by saying

2:03:09 18   "along with certain quantitative adjustments."  So

2:03:14 19   with quantitative adjustments, limiting it to what's

2:03:19 20   in the record, then they would be the most

2:03:21 21   technically comparable.  In an absolute sense, just

2:03:24 22   from a licensing theory standpoint, the most

2:03:26 23   technically comparable agreements would be ones that

2:03:28 24   only address the patents-in-suit.

2:03:36 25          Q.      Are you standing by the clause in

2:03:37  1   this sentence that says:  Therefore, the most

2:03:41  2   technically comparable licenses in the record?

2:03:50  3        A.     Yes, in the context of the entire

2:03:51  4   sentence.

2:04:02  5        Q.     The reason they are the most

2:04:04  6   technically comparable licenses in the record is as

2:04:05  7   you said, because they include the rights to the two

2:04:09  8   patents-in-suit here, the '444 and '277; correct?

2:04:14  9        A.     That is the reason why I draw the

2:04:17 10   conclusion that I do in the paragraph that you cite,

2:04:21 11   that's true, because of that lineage.

2:04:33 12        Q.     Just for ease of reference, we can go

2:04:35 13   back to page 71 of exhibit one.  The stated rates in

2:04:48 14   the Applied Biosystems/QuantaLife license are in the

2:04:52 15   range of 10 percent to 15 percent; correct?

2:05:11 16        A.     That is correct.  Defer to my report

2:05:13 17   that describes that range in detail, but I believe

2:05:16 18   that's right.

2:05:17 19        Q.     You adjust that 10 to 15 percent rate

2:05:21 20   to 15 percent royalty rate; correct?

2:05:51 21        A.     My conclusion with respect to the

2:05:53 22   Applied Biosystems/QuantaLife license as shown on

2:05:56 23   page 32 is, quote:  Indicative of a reasonable

2:06:01 24   royalty rate in this case of between 10 percent and

2:06:04 25   15 percent of net sales, end quote.

2:06:07  1          So there is no specific adjustment of

2:06:09  2  that agreement to the high end or the low end of

2:06:13  3  that range.

2:06:24  4          Q.     The Caliper/RainDance license

2:06:26  5  included a -- sorry.  Strike that.

2:06:28  6          The Caliper/RainDance license

2:06:30  7  included a 2 percent royalty rate and a 15 percent

2:06:35  8  royalty rate; correct?

2:06:39  9          A.     Yes.  Largely driven upon whether or

2:06:42 10  not the products at issue would be considered

2:06:45 11  competitive.

2:06:47 12          Q.     15 percent rate applied to chips and

2:06:50 13  reagents, but not instruments?

2:06:56 14          A.     That is my general recollection, yes.

2:07:00 15          Q.     When applying the royalty rate in the

2:07:04 16  hypothetical negotiation to 10X's products, you

2:07:08 17  include not only chips and reagents, but instruments

2:07:11 18  as well; correct?

2:07:14 19          A.     Yes, I understand that the

2:07:17 20  instruments are also accused of infringing.

2:07:20 21          Q.     But not only are they accused of

2:07:22 22  infringing, you specifically include them in the

2:07:24 23  royalty base; correct?

2:07:28 24          A.     Yes, ma'am.

2:07:31 25          Q.     RainDance never paid the 15 percent

2:09:13  1   regarding the agreement, but you are correct, that

2:09:17  2   as far as the basis of the royalty rates that I

2:09:22  3   extract from the agreement, it's from the 2009

2:09:24  4   agreement itself.

2:09:29  5        Q.      You were not aware, were you, that

2:09:32  6   RainDance, in fact, considered this license to be

2:09:36  7   one where it had a 1 percent to 2 percent royalty

2:09:41  8   rate obligation; correct?

2:09:46  9                 MS. TU:  Objection.

2:09:48 10        A.      I believe you're referring to

2:09:52 11   correspondence regarding the license.  Obviously, I

2:09:55 12   do recognize that there are other payments that are

2:10:08 13   provided in the license, such as a 2 percent royalty

2:10:12 14   for nonscreening applications.  There are other fees

2:10:17 15   within the license that are stated milestone

2:10:21 16   payments less than 2 percent.

2:10:34 17        Q.      RainDance's internal documents

2:10:36 18   produced in this case, aside from the 2009 agreement

2:10:44 19   itself, do not reference the 15 percent rate; is

2:10:49 20   that right?

2:10:52 21                 MS. TU:  Objection.

2:10:53 22        A.      I could not speculate as to what all

2:10:57 23   of the other documents may or may not reference.  I

2:11:03 24   would suspect that within the total population of

2:11:07 25   trade negotiation documents are draft licenses.  I

2:37:40  1   opinion regarding the royalties 10X owes on two

2:37:43  2   patents-in-suit, the '444 and '277 patent; correct?

2:37:49  3          A.       Yes, ma'am.

2:37:52  4          Q.       You do not offer any opinion on

2:37:55  5   frequency of use of the claimed inventions in the

2:37:58  6   two asserted patents; correct?

2:38:04  7          A.       Correct, not as I understand your

2:38:05  8   question.  So the royalty base is revenues, not some

2:38:09  9   other use base metric and, therefore, there is no

2:38:13 10   such analysis in my report.

2:38:18 11          Q.       You also do not have an understanding

2:38:24 12   of whether the claims of the '444 and '277 patent

2:38:30 13   are or are not limited in a sense that only a subset

2:38:34 14   of droplets generated by means of 10X's chips as

2:38:39 15   opposed to all of the droplets generated are

2:38:43 16   practicing the claimed inventions?

2:38:46 17              MS. TU:  Objection.

2:38:50 18          A.       So that is a better question for the

2:38:52 19   technical expert, which addresses each claim element

2:38:56 20   against the products in suit.  I don't draw an

2:38:59 21   opinion that it is necessarily every droplet that

2:39:04 22   falls within the specific claims, but that generally

2:39:07 23   speaking, the patents-in-suit address the intended

2:39:12 24   purpose and functionality of the products at issue.

2:39:23 25          Q.       Assuming that the benefit of the

2:39:25  1   claimed inventions in the '444 and '277 applies only

2:39:30  2   to the subset of droplets and not all, you have not

2:39:34  3   made an adjustment to assess that possibility;

2:39:39  4   correct?

2:39:43  5          A.      Well, I understand that is a

2:39:44  6   possibility.  I talk within my report about how in

2:39:48  7   this industry companies use revenues to facilitate

2:39:53  8   accounting and that is considered within the license

2:39:58  9   agreements that I rely upon, and barring any

2:40:02 10   evidence to suggest that it would be a substantial

2:40:08 11   impact on the perceived benefits of negotiation, I

2:40:12 12   have not made a further adjustment to account for

2:40:17 13   the issue you raise.

2:40:31 14          Q.      You take as the base the full price

2:40:34 15   of 10X's instruments, 10X's chips, and 10X's gel

2:40:39 16   bead and other reagents and apply the royalty rate

2:40:44 17   that you have determined; correct?

2:41:05 18                  (Stenographer clarification.)

2:41:07 19          Q.      I'm a little bit far from the mic so

2:41:08 20   that I can have my papers in front of me.  So you

2:41:14 21   take as the royalty base the net revenue price of

2:41:23 22   10X's instruments, 10X's chips, and 10X's gel beads

2:41:30 23   and other reagents and apply the royalty rate that

2:41:34 24   you have determined to that royalty base; correct?

2:41:39 25          A.      Generally, yes, as I understand those

2:41:41  1    are the accused revenues.

2:41:48  2           Q.       Is it correct that you have not been

2:41:49  3    asked to consider the damages on a patent-by-patent

2:41:52  4    basis?

2:41:56  5           A.       That is true, though because of the

2:42:00  6    lineage of the patents-in-suit here, they generally

2:42:05  7    relate to similar functionality, and so I don't

2:42:08  8    believe the royalty would change if only a subset of

2:42:13  9    the asserted claims was found to infringe.

2:42:22 10           Q.       Your opinion is that neither the

2:42:24 11    royalty base nor the royalty rate would change if

2:42:30 12    only a subset of the asserted claims were found to

2:42:33 13    infringe; is that correct?

2:42:39 14           A.       More specifically, my opinion is the

2:42:41 15    royalty rate would not change, but to the extent

2:42:43 16    that there was a legal ruling that removed certain

2:42:48 17    claims from the accusations in this case and as a

2:42:52 18    result certain revenues were no longer considered

2:42:55 19    infringing, then I would remove the noninfringing

2:43:00 20    revenues from my analysis.

2:43:08 21           Q.       But your opinions in this case

2:43:09 22    presently do not provide that contingent analysis;

2:43:13 23    correct?  You have not said if this claim is out of

2:43:19 24    the case, then my base is reduced by this amount; is

2:43:23 25    that fair?

2:43:26  1        A.      It is fair in the sense that I'm not

2:43:28  2   aware of any data that would allow for that specific

2:43:32  3   base reduction.  That said, in the spirit of

2:43:35  4   disclosure, I recognize that Ms. Davis does make

2:43:42  5   certain deductions to the royalty base for legal or

2:43:45  6   apportionment reasons, and I do not dispute her

2:43:50  7   deductions.  So I would anticipate revising the

2:43:54  8   royalty base in my analysis to conform with hers.

2:44:16  9        Q.      How do you anticipate revising your

2:44:17 10   royalty base to conform with Ms. Davis' analysis?

2:44:23 11   Are you anticipating a supplement to your report?

2:44:30 12        A.      I have not discussed with counsel

2:44:31 13   whether a supplement would be necessary as

2:44:34 14   essentially it's simple math utilizing the royalty

2:44:38 15   base in the Ms. Davis report and simply multiplying

2:44:42 16   by the 15 percent royalty that I opined to.

2:45:01 17        Q.      I'm looking at the rough transcript,

2:45:02 18   so I just want to make sure that I understand what

2:45:06 19   you've said.  You said:  I recognize that Ms. Davis

2:45:10 20   does make certain deductions to the royalty base for

2:45:13 21   legal and apportionment reasons and I do not dispute

2:45:18 22   other deductions.

2:45:20 23              Did you say that you do not dispute

2:45:21 24   her deductions?

2:45:23 25        A.      Yes.

2:45:27 1        Q.      So you are agreeing with all of the

2:45:30 2    deductions that Ms. Davis made to the royalty base;

2:45:37 3    is that fair?

2:45:39 4        A.      More specifically, I would say I am

2:45:41 5    accepting her deductions.  Many of them are for

2:45:45 6    legal reasons, which are outside the scope of my

2:45:50 7    testimony, but in an effort to both remove

2:45:55 8    unnecessary dispute and to focus on the real issue,

2:45:59 9    which is the royalty rate, I believe Ms. Davis and I

2:46:03 10   will present the same royalty base to the jury.

2:46:43 11       Q.      You may say I've asked you the

2:46:44 12   question, but I really haven't asked it this

2:46:47 13   particular way, so bear with me.

2:46:51 14               Your opinion is the same whether 10X

2:46:56 15   infringes only the '444 patent, only the '277 patent

2:47:02 16   or both '444 and '277 patents; correct?

2:47:06 17       A.      The royalty rate is the same.  To the

2:47:09 18   extent there would be legal reasons to adjust the

2:47:11 19   base, I would certainly take that into account.  I'm

2:47:14 20   not aware of any such distinction.

2:47:29 21       Q.      If one of the patents drops out, your

2:47:32 22   opinion regarding the amount of damages does not

2:47:37 23   change; correct?

2:47:42 24       A.      To stick with my prior response,

2:47:43 25   barring any change in asserted infringing revenue,

James Malackowski                                    Confidential

2:47:48   1   the total would not change.

2:47:52   2          Q.      Your opinion is that the value is the

2:47:54   3   same when Bio-Rad is seeking royalties on 14 claims

2:48:01   4   of two patents and when Bio-Rad may be seeking

2:48:05   5   royalties on a single asserted claim of a single

2:48:08   6   patent; is that fair?

2:48:11   7          A.      Arithmetically, it is the same

2:48:13   8   answer, but it is because in part of industry

2:48:18   9   experience and the examples I'm relying upon, where

2:48:22  10   there are comparable agreements with multiple patent

2:48:24  11   rights, where the amount that's due under the

2:48:27  12   agreement does not bury if one or more of the

2:48:31  13   patents in many cases were found to later be invalid

2:48:34  14   or not utilized.

2:48:56  15          Q.      You have not segregated or identified

2:48:58  16   a particular value associated with any particular

2:49:03  17   single asserted claim; is that right?

2:49:07  18          A.      I have not specifically identified or

2:49:10  19   make a distinguishing calculation by claim as

2:49:14  20   distinct from the collection of asserted claims and

2:49:17  21   the assumption that the patents are valid and

2:49:20  22   infringed.

2:49:24  23          Q.      And although when assumed valid and

2:49:27  24   infringed, each claim is presumed to cover a

2:49:31  25   specific invention, you have not isolated the value

2:49:35  1   of any one specific claim; correct?

2:49:39  2        A.       Correct.  Both for the assumption

2:49:43  3   that I describe, as well as industry practice

2:49:45  4   consistent with the agreements I rely upon.

2:49:48  5        Q.       Would you please turn to page 15 of

2:49:50  6   exhibit one.

2:50:05  7        A.       I have it.

2:50:06  8        Q.       On page 15 of your report in exhibit

2:50:08  9   one, you list what you understood at the time to be

2:50:13 10   claims asserted against 10X in this case, '444 and

2:50:19 11   '277 patent; correct?

2:50:22 12        A.       Yes, ma'am.

2:50:25 13        Q.       And in opining in coming up with your

2:50:33 14   conclusions in this case, you assumed that the

2:50:38 15   claims one, two, four, eight and nine of '444 patent

2:50:43 16   were asserted and you assume that claims one to six,

2:50:46 17   eight, nine, 11, 13 and 14 of the '277 patent were

2:50:50 18   asserted; correct?

2:50:53 19        A.       Yes, ma'am.

2:51:00 20        Q.       Now, Dr. Gale did not offer any

2:51:08 21   opinions about 10X's infringement of claim nine of

2:51:13 22   '444 patent or claim 13 of '277 patent.  Is that

2:51:18 23   your present understanding?

2:51:21 24        A.       I don't recall from memory sitting

2:51:23 25   here such narrowing of Dr. Gale's report.  I would

2:51:32  1    have to go back and understand or confirm if that's

2:51:36  2    the case, and then also I noted that Ms. Davis made

2:51:39  3    certain royalty based deductions for reasons related

2:51:43  4    to Dr. Gale's proof, and so I would also want to

2:51:50  5    confirm if these were coincident issues, meaning

2:51:53  6    that the claims you just identified form the basis

2:51:56  7    for Ms. Davis' asserted deductions, which I am not

2:52:00  8    disputing.

2:52:05  9         Q.      If we could just for the purposes of

2:52:06 10    this examination assume that Ms. Davis' deductions

2:52:10 11    did not have anything to do with claim nine or claim

2:52:14 12    13 not being asserted in the case anymore.  So

2:52:17 13    assume that for the moment, and assume that it is

2:52:21 14    correct that Bio-Rad is no longer asserting claim

2:52:24 15    nine of the '444 patent and claim '277 of the --

2:52:30 16    sorry, claim 13 of the '277 patent.  With those

2:52:37 17    assumptions, is it still your opinion that the

2:52:41 18    amount of damages does not change by means of

2:52:49 19    Bio-Rad no longer asserting claims nine of the '444

2:52:53 20    patent and claim 13 of the '277 patent?

2:53:01 21         A.      Yes, under those assumptions, for the

2:53:02 22    reasons I described, there would be no change in the

2:53:04 23    final damages.

2:53:11 24         Q.      You are aware that claim one of the

2:53:14 25    '444 patent includes a detection step that is not

2:53:18  1   part of the claim one of the '277 patent?

2:53:25  2        A.      I can see that as a distinguishing

2:53:28  3   characteristic of the two claims, yes, ma'am.

2:53:34  4        Q.      It is your opinion though that the

2:53:36  5   value of claim one of the '444 patent is the same as

2:53:40  6   the value of the claim one of the '277 patent

2:53:44  7   despite the detection requirement of claim one of

2:53:49  8   the '444 patent not being a requirement in the claim

2:53:53  9   one of the '277 patent; correct?

2:53:57 10        A.      No, I don't think that's fair because

2:54:00 11   I don't do a comparative claim-by-claim value

2:54:03 12   assessment.  That was not my assignment.  My

2:54:07 13   assignment was to determine the royalty that would

2:54:09 14   be appropriate if the patents are valid and if the

2:54:14 15   products infringe.  Not a claim-by-claim

2:54:18 16   calculation.

2:54:20 17        Q.      But isn't it fair to say that the

2:54:23 18   import of your analysis is that if there is a single

2:54:26 19   claim standing after trial, the amount of damages

2:54:31 20   you calculate is the same; correct?

2:54:36 21                MS. TU:  Objection.

2:54:37 22        A.      If that single claim addresses the

2:54:39 23   same set of products, then yes, all of those

2:54:43 24   products would be infringing.  All of those products

2:54:48 25   would benefit from the claim.

01:12:04  1    foundational and two as improvements in the Stilla

01:12:06  2    case; correct?

01:12:10  3            A.      Generally speaking, yes.

01:12:15  4            Q.      That insight comes to you from the

01:12:17  5    technical experts in the Stilla case; correct?

01:12:25  6            A.      It does, although I believe the legal

01:12:27  7    pleadings also make reference to the same

01:12:29  8    distinction.

01:12:35  9            Q.      In the 10X case for the '444 patent,

01:12:37 10    Bio-Rad expert, Dr. Gale, opined that the '444

01:12:40 11    patent is an improvement over the foundational

01:12:45 12    intellectual property in this space?

01:12:50 13            A.      Correct, and I believe that is

01:12:51 14    consistent with the treatment of the '444 patent in

01:12:54 15    the Stilla case, which is the one patent that

01:12:56 16    overlaps both matters.

01:13:04 17            Q.      Now, Dr. Gale did opine -- strike

01:13:07 18    that.

01:13:07 19                    Your understanding is that Dr. Gale

01:13:12 20    did opine that the '444 patent in our case is an

01:13:18 21    improvement over the foundational intellectual

01:13:20 22    property, but he did not identify in the 10X case

01:13:27 23    which foundational intellectual property he was

01:13:30 24    referring to; is that right?

01:13:33 25            A.      From memory, I could not speak to

01:13:36  1   whether he provided an answer in deposition or his

01:13:40  2   report to that question.  I would defer to him.

01:13:47  3   That distinction is not necessary for my work.

01:13:53  4        Q.      Is it your opinion that it is not

01:13:57  5   necessary for you to understand what foundational

01:14:01  6   intellectual property the '444 and '277 may have

01:14:07  7   improved upon?

01:14:09  8                MS. TU:  Objection.

01:14:10  9        A.      As it relates to my work in the 10X

01:14:13 10   case, which we're discussing today, Dr. Gale's

01:14:19 11   specific reference to prior foundational technology

01:14:23 12   for the '444 or the '277 does not impact my analysis

01:14:31 13   because of the further work that he did where he was

01:14:35 14   able to assess the relative contribution of the

01:14:39 15   patents-in-suit to the benchmark agreements in the

01:14:43 16   patents that were licensed there, and that's what I

01:14:46 17   primarily rely upon from his work.

01:15:06 18        Q.      Is it fair to say that it's really

01:15:07 19   not the increment in value that the '444 and '277

01:15:12 20   provide over some foundational intellectual property

01:15:17 21   that is critical to your analysis, but instead it is

01:15:22 22   the assessment of the relative contributions of the

01:15:25 23   patents-in-suit to 10X's products versus the

01:15:29 24   benchmark agreements where you have licensed

01:15:33 25   products and licensed patents?

01:17:36  1   case to know if I specifically referenced that.  I

01:17:41  2   would certainly stand by whatever I said in that

01:17:43  3   report or that testimony.

01:18:08  4            Q.      It is correct, isn't it, that you

01:18:09  5   have not included a definition of the term

01:18:14  6   "improvement" as it applies to the '444 and '277

01:18:23  7   patents?

01:18:26  8            A.      Correct.  I don't believe I

01:18:28  9   specifically define that term.  I use that language

01:18:31 10   in relaying what I understand the description of the

01:18:35 11   technology to be from the technical expert and the

01:18:38 12   other pleadings in the case.

01:18:49 13            Q.      It is correct, isn't it, that you did

01:18:51 14   not opine that the '444 and '277 patents give 10X's

01:18:58 15   product -- products their essential marketability;

01:19:03 16   correct?

01:19:05 17                    MS. TU:  Objection.

01:19:08 18            A.      I don't recall if my report uses

01:19:11 19   those words, but as it relates to their Next GEM

01:19:17 20   product, that would be consistent with my

01:19:19 21   understanding that these patents do provide them

01:19:23 22   with the technology needed for their marketability,

01:19:27 23   confirmed by Ms. Davis' opinion that she does not

01:19:31 24   know of an alternative solution.

01:19:53 25            Q.      You did not state an opinion that the

01:21:24  1    deposition.

01:21:28  2            Q.      You do -- well, maybe you don't

01:21:33  3    anymore.  I have a question that may actually be

01:21:38  4    affected now by your agreeing to Ms. Davis' royalty

01:21:42  5    base.  That's not a question.

01:21:45  6            A.      I'm hoping that's an observation the

01:21:47  7    deposition will now be shorter.

01:21:53  8            Q.      This is sort of off the record, on

01:21:55  9    the record, it was a pleasant surprise that we have

01:21:57 10    agreement on the royalty base so.

01:22:02 11                    I'll move on to another topic.  And

01:22:08 12    perhaps although I'm sure you have this memorized,

01:22:12 13    we can just go to page 25 of exhibit one.

01:22:23 14            A.      I have it.

01:22:25 15            Q.      I'm sorry.  That's the wrong page.

01:22:29 16    If we could go, please, to page 71, Georgia-Pacific

01:22:36 17    factor 15.

01:22:37 18            A.      I have it.

01:22:49 19            Q.      On page 71, you state the language of

01:22:54 20    the factor 15 of the Georgia-Pacific analysis;

01:22:58 21    correct?

01:23:00 22            A.      I do.

01:23:02 23            Q.      And this really sets forth that the

01:23:09 24    hypothetical negotiators are negotiating over an

01:23:12 25    amount that the licensor, who is willing, would

1    Identification.)

01:24:44   2    BY MS. HADZIMEHMEDOVIC:

01:24:58   3         Q.      Mr. Malackowski, do you see exhibit

01:24:59   4    two on the screen?

01:25:01   5         A.      Yes, it looks like a copy of the

01:25:03   6    original Georgia-Pacific versus U.S. Plywood case

01:25:07   7    from the 1970s.

01:25:11   8         Q.      And this is the seminal case that

01:25:14   9    actually did set forth the 15 Georgia-Pacific

01:25:16   10   factors that you apply in your analysis; correct?

01:25:21   11        A.      Yes, ma'am.

01:25:24   12               MS. HADZIMEHMEDOVIC:  Ashley, can we

01:25:25   13   please turn to PDF page seven?

01:25:39   14        Q.      Mr. Malackowski, do you see that on

01:25:40   15   that page, we have a paragraph that is citing a case

01:25:48   16   and it states the following:  In fixing damages on a

01:25:51   17   royalty basis against an infringer, the sum allowed

01:25:55   18   should be reasonable and that which would be

01:25:58   19   accepted by a prudent licensee who wished to obtain

01:26:01   20   a license, but was not so compelled, and a prudent

01:26:05   21   patentee who wished to grant a license, but was not

01:26:08   22   so compelled.

01:26:10   23               Do you see that?

01:26:11   24        A.      I do.

01:26:13   25        Q.      Is this a principle that you have

Confidential

01:26:14  1  applied in your analysis?

01:26:19  2          A.      Well, the language that you cite is

01:26:22  3  by admission of this case one of several different

01:26:26  4  phrasing that set forth a more general tool, which

01:26:32  5  is described starting at head note six.

01:26:38  6                  So I don't disagree that some cases

01:26:41  7  have used that language, but I don't think that

01:26:43  8  language is used in every case.

01:26:48  9          Q.      In your implication of the

01:26:49 10  Georgia-Pacific analysis, are you placing the

01:26:53 11  licensee under compulsion to take a license?

01:26:59 12          A.      I don't use the word "compulsion."

01:27:04 13  So I would say no.  I don't say they are compelled.

01:27:11 14  The only time that word would have meaning to me is

01:27:13 15  if it was some sort of a holdup license where you

01:27:20 16  were compelling someone to take a license at a time

01:27:25 17  that was economically irrational for them or you

01:27:29 18  imputed a royalty that reflected more than the

01:27:31 19  footprint to the invention, and I'm not doing that.

01:27:37 20          Q.      So you do agree that, A,

01:27:42 21  Georgia-Pacific analysis does not allow the concept

01:27:48 22  of the licensee in the hypothetical negotiation

01:27:53 23  being under compulsion and it also does not allow

01:27:57 24  you to apply a holdup value in the hypothetical

01:28:00 25  negotiation.  Both of those are correct; true?

01:28:04  1            MS. TU:  Objection.

01:28:06  2       A.      I need to review this case and the

01:28:09  3   language around it to answer that question.  So

01:28:11  4   maybe you can just give me a minute.

01:28:24  5       Q.      I don't mind giving you a minute.  I

01:28:26  6   am asking about your understanding you applied when

01:28:29  7   you wrote your report.

01:28:31  8       A.      But you're using this term

01:28:32  9   "compulsion," which you're bring forward from this

01:28:37 10   case which by its face talks about variant uses of

01:28:40 11   the phrase.  So I just want to make sure I'm using

01:28:44 12   it in a way that's consistent with the genesis of

01:28:47 13   your question.

01:28:50 14       Q.      How do you understand the word

01:28:51 15   "compulsion"?

01:28:53 16       A.      I don't use the word "compulsion" in

01:28:55 17   my analysis.  The way I would understand it would be

01:29:04 18   similar to a holdup license, as I described for you

01:29:06 19   before, which would be a negotiation that extracted

01:29:08 20   a payment greater than would be justified by the

01:29:13 21   footprint of the invention, and I'm not doing that

01:29:19 22   here, so to that extent, I'm not assuming anyone's

01:29:24 23   under some compulsion.

01:29:31 24       Q.      Is it your understanding too that the

01:29:33 25   hypothetical negotiators are not negotiating under a

James Malackowski                                    Confidential

1:39:29  1    then taking advantage of the discounts, but

1:39:31  2    regardless, I would have to go back to the records

1:39:35  3    to match the payments to the terms.  That was not

1:39:40  4    necessary for my work.

1:39:44  5           Q.      You don't disagree that there are

1:39:48  6    records in this case that show RainDance and later

1:39:51  7    Bio-Rad paying half the stated rates in the Harvard

1:39:56  8    and MRC licenses and that is one-half percent for

1:40:01  9    chips and 1 percent for instruments?

1:40:04 10                  MS. TU:  Objection.

1:40:06 11           A.      I don't offer those opinions in my

1:40:08 12    report.  I can accept that for purposes of the

1:40:10 13    deposition today.  Generally speaking, I do believe

1:40:14 14    that there were certain discounts available for

1:40:18 15    third-party royalties, and that Bio-Rad took

1:40:21 16    advantage of those when they were available, but

1:40:25 17    from memory, I couldn't tell you what the specifics

1:40:28 18    are.  It's not relevant to the analysis.

1:40:32 19           Q.      The reason that RainDance and later

1:40:34 20    Bio-Rad could have the stated rate is what's called

1:40:39 21    the stacking provision in Harvard/RainDance and the

1:40:43 22    stacking provision in the MRC/RainDance license.  Is

1:40:47 23    that your understanding?

1:40:51 24           A.      Yes, generally, that that is a reason

1:40:53 25    why a licensee would pay a discounted rate, and I

James Malackowski                                    Confidential

01:40:58 1  believe that both those agreements do contain what

01:41:02 2  you're referring to as a stacking provision.

01:41:06 3      Q.      And a stacking provision is basically

01:41:08 4  where you have a paid -- where a licensee is paying

01:41:15 5  a licensor A and then can deduct a portion of the

01:41:21 6  royalties paid, usually about 50 percent against the

01:41:26 7  royalties that licensee is paying to licensor B; is

01:41:31 8  that fair?

01:41:34 9      A.      Generally speaking, that's right.

01:41:40 10     Q.      RainDance and then later on Bio-Rad

01:41:42 11 took advantage of the stacking provisions in both of

01:41:46 12 the agreements, in the agreement with Harvard and in

01:41:49 13 the agreement with MRC; correct?

01:41:53 14             MS. TU:  Objection.

01:41:54 15     A.      That's a question you asked me a

01:41:56 16 couple of times already.  So I would refer you to my

01:41:58 17 last answer.  I don't recall specifically without

01:42:01 18 mapping the payments to the agreement terms, but

01:42:03 19 generally speaking, I do believe that when

01:42:07 20 available, they did take advantage of stacking

01:42:09 21 discounts.

01:42:10 22     Q.      And that was completely proper;

01:42:11 23 right?  That's not having your cake and eating it

01:42:13 24 too; right?

01:42:18 25     A.      I don't allege that it isn't proper.

01:42:21  1   The phrase "having your cake and eating it too"

01:42:23  2   harkens back to analysis that I did in the prior

01:42:27  3   case where I opine that adding a stacking provision

01:42:32  4   in the hypothetical, in addition to a stacking

01:42:36  5   provision in an ongoing agreement, is in my opinion

01:42:40  6   having your cake and eating it too.  So I don't

01:42:43  7   think a stacking provision is appropriate for the

01:42:45  8   hypothetical.

01:42:48  9          Q.      You do not think that Bio-Rad was

01:42:50 10   having its cake and eating it too when it applied a

01:42:54 11   stacking provision in one agreement, Harvard

01:42:59 12   agreement, and applied a stacking provision in

01:43:02 13   another agreement, MRC agreement; correct?

01:43:06 14          A.      I don't draw --

01:43:08 15                  MS. TU:  Objection.

01:43:08 16          A.      I don't draw or offer an opinion in

01:43:10 17   that regard.

01:43:13 18          Q.      And, in fact, Bio-Rad applied

01:43:17 19   additional stacking provisions or took benefit of

01:43:20 20   additional stacking provisions on the same products

01:43:25 21   under different agreements, correct, in addition to

01:43:29 22   these two?

01:43:30 23                  MS. TU:  Objection.

01:43:35 24          A.      I don't draw an opinion to that for

01:43:36 25   the reasons I described earlier.  I would have to go

James Malackowski                                        **Confidential**

01:43:40  1  back and map in the records against the terms.

01:43:44  2          Q.      Now, for your comparable analysis,

01:43:44  3  you relied upon six agreements; correct?  I'll ask a

01:43:59  4  more specific question.

01:44:04  5                  In the comparable market approach

01:44:07  6  analysis you performed in this case, you

01:44:10  7  specifically relied upon six agreements?

01:44:15  8          A.      I specifically relied upon in

01:44:18  9  Georgia-Pacific 15 the six agreements we talked

01:44:20  10  about earlier that are identified on page 71 of my

01:44:22  11  report.

01:44:24  12          Q.      And it is true, isn't it, that five

01:44:26  13  of those six agreements includes stacking

01:44:29  14  provisions?

01:44:34  15          A.      I believe so, but I would go back to

01:44:35  16  confirm.

01:44:49  17          Q.      Bio-Rad's droplet products are the

01:44:52  18  Droplet Digital PCR or ddPCR products and the ddSEQ

01:44:58  19  product; right?

01:44:58  20          A.      Yes, ma'am.

01:45:00  21          Q.      With respect to its droplet products,

01:45:03  22  Bio-Rad or RainDance has never paid a 15 percent

01:45:09  23  royalty rate; correct?

01:45:11  24          A.      I believe that's correct.

01:45:14  25          Q.      The highest royalty rate paid to any

01:48:26  1        A.        I haven't made that calculation.  I

01:48:27  2   would have to go back and consider both the stated

01:48:29  3   rates, as well as the other elements of

01:48:32  4   consideration, and then even still I don't think

01:48:37  5   that would necessarily be relevant to my analysis in

01:48:39  6   this case.

01:48:42  7        Q.        Bio-Rad did not pay royalties under

01:48:44  8   the Applera license for its droplet products ddPCR

01:48:49  9   or ddSEQ; correct?

01:48:53 10        A.        It did not pay the competitive rate

01:48:57 11   of 15 percent.  We've talked about that earlier.

01:49:01 12        Q.        It didn't pay any royalties under the

01:49:03 13   Applera license for the ddSEQ and ddPCR; correct?

01:49:09 14        A.        I believe that's true, though there

01:49:13 15   were certain upfront payments that were later made

01:49:16 16   in the amendment, so we would have to take that into

01:49:18 17   account, and other terms within the agreement, but I

01:49:21 18   don't believe there were running royalty payments.

01:49:26 19        Q.        I want to make sure that we're on the

01:49:28 20   same page.  I'm speaking about the Applera realtime

01:49:31 21   instrument license.  Do you recall that as being one

01:49:35 22   of the three licenses that you rely upon that has

01:49:41 23   the stated rate of 15 percent?

01:49:50 24        A.        It does, but it also has a

01:49:53 25   nonrefundable upfront fee of $7 million not credited

01:49:56  1    against royalties and an additional $3 million not

01:50:00  2    credited related to back royalties.  So here again,

01:50:04  3    there are other terms in addition to the stated

01:50:09  4    rate, and this is the agreement that was later

01:50:13  5    amended increasing the stated rate and adding

01:50:16  6    another 5 million-dollar license fee.

01:50:22  7            Q.      The licensed product under the

01:50:25  8    realtime instrument license were realtime thermal

01:50:32  9    cyclers; correct?

01:50:49 10            A.      It was specific to having or making

01:50:54 11    and selling realtime thermal cyclers, yes.

01:50:58 12            Q.      Bio-Rad's droplets product, such as

01:51:00 13    the ddPCR and ddSEQ, are not realtime thermal

01:51:04 14    cyclers; correct?

01:51:07 15            A.      That is my understanding.

01:51:09 16            Q.      So back to the question:  Bio-Rad did

01:51:13 17    not pay royalties under the Applera realtime

01:51:17 18    instrument license for its ddPCR or ddSEQ products?

01:51:25 19                    MS. TU:  Objection.

01:52:42 20            A.      I would have to go back to the

01:52:43 21    agreement to read the specific terms.  In the

01:52:46 22    amendment, for example, it does expand the field of

01:52:48 23    use.  I would need to confirm that that didn't

01:52:52 24    include products that you just cited.  I don't

01:52:55 25    specifically in my report cite to payments on the

01:52:59  1    droplet products.

01:53:02  2            Q.      And it's also true, isn't it, that

01:53:04  3    Bio-Rad did not pay royalties for its ddSEQ product

01:53:09  4    under the Applied Biosystems/QuantaLife license you

01:53:13  5    rely upon?

01:53:14  6            MS. TU:  Objection.

01:53:26  7            A.      I believe the Applied

01:53:27  8    Biosystems/QuantaLife license was not focused on

01:53:34  9    equipment, but rather consumables.

01:53:40 10            Q.      DdSEQ includes equipment and

01:53:42 11    consumables; correct?

01:53:43 12            A.      It does.

01:53:44 13            Q.      So Bio-Rad did not pay royalties on

01:53:48 14    ddSEQ instruments or consumables under its Applied

01:53:52 15    Biosystems/QuantaLife license?

01:54:11 16            A.      I don't cite that they do in my

01:54:12 17    report, though I would want to go back to the actual

01:54:15 18    agreement to confirm the scope of licensed products.

01:54:28 19            Q.      Sitting here today, there is no

01:54:33 20    information in your report suggesting that Bio-Rad

01:54:36 21    ever paid license fees under the ABI/QuantaLife

01:54:42 22    license for its DD -- sorry, ddSEQ products?

01:54:49 23            A.      I believe that's correct.  I don't

01:54:51 24    state such in my report.

01:54:54 25            Q.      And you also know that Bio-Rad did

03:02:51  1          Q.       We spoke earlier about the licenses

03:02:54  2     that you determined in your opinion are most

03:02:58  3     comparable in this case, those being the

03:03:02  4     Applera/Bio-Rad agreement, Caliper/RainDance

03:03:05  5     agreement, and the Applied Biosystems/QuantaLife

03:03:08  6     agreement; correct?

03:03:10  7          A.       Yes, we did speak about those at some

03:03:12  8     length.

03:03:23  9          Q.       As to the Applera/Bio-Rad license,

03:03:25 10     you found that this agreement was indicative of a

03:03:28 11     reasonable royalty rate in this case in excess of

03:03:30 12     15 percent of net sales; correct?

03:03:36 13          A.       From memory, that seems to be an

03:03:38 14     exact quotation from my report.  I'm happy to turn

03:03:41 15     to that section and confirm if that language is

03:03:45 16     critical to you, but I think that's generally

03:03:47 17     correct.

03:04:10 18          Q.       Would you agree that Bio-Rad's

03:04:11 19     Droplet Digital PCR product does not compete at all

03:04:15 20     with 10X's 10X Genomics products that are accused in

03:04:21 21     this case?  I'll reask it.

03:04:27 22               You agree, don't you, that Bio-Rad's

03:04:32 23     ddPCR product do not compete with 10X's accused

03:04:35 24     products in this case?

03:04:37 25               MS. TU:  Objection.

James Malackowski                                          **Confidential**

03:11:55  1          Q.       You have not considered 10X's

03:11:59  2     citation to specific evidence that 10X believes was

03:12:04  3     fraudulently offered to the jury?

03:12:07  4                    MS. TU:  Objection.

03:12:09  5          A.       No, I have not.

03:12:22  6          Q.       Bio-Rad -- strike that.

03:12:23  7                    The asserted '444/'277 patents do not

03:12:28  8     claim any instrumentation for thermal cycling; do

03:12:31  9     they?

03:12:35 10          A.       So that's a general question that

03:12:37 11     would require review of the patents themselves,

03:12:41 12     claims, and the specification that describes them

03:12:44 13     and is really a technical question.  So I would

03:12:48 14     defer first to Dr. Gale to respond on that.  I don't

03:12:51 15     draw opinions in that regard in my report.

03:12:58 16          Q.       You did not take as an assumption in

03:13:01 17     your analysis that the '277 and '444 patents claim

03:13:09 18     thermal cycler instrumentation?

03:13:15 19          A.       I offer no opinion on that issue

03:13:17 20     either way.

03:13:20 21          Q.       You relied on Dr. Gale's report

03:13:22 22     regarding the comparability between one of the

03:13:26 23     licensed patents in the Applera license, the Haguchi

03:13:30 24     patent, with the '444 and '277 patents; is that

03:13:32 25     right?

13:13:34   1          A.      My recollection is that he does call

13:13:36   2    out specific patents when making that comparison and

13:13:39   3    I do rely upon his work in that regard, yes.

13:13:43   4          Q.      You also relied on Dr. Gale's review

13:13:45   5    of the thermal cyclers that were licensed in the

13:13:50   6    Applera license in its comparison with 10X's

13:13:57   7    products; correct?

13:13:57   8          A.      I do rely upon Dr. Gale's assessment

13:14:03   9    of product comparisons.  I from memory believe that

13:14:09  10    it is as you describe, though I wouldn't want to

13:14:12  11    speculate without a review of his report as to the

13:14:16  12    specific products that he used to support his

13:14:19  13    opinions.

13:14:21  14          Q.      Now, separate from Dr. Gale's input

13:14:24  15    on this case, is it correct that as a licensing

13:14:31  16    professional, you are aware generally that the value

13:14:36  17    of the technology represented by the Haguchi patents

13:14:39  18    is acknowledged worldwide to be extremely large and

13:14:43  19    that it has been licensed all over the world for a

13:14:46  20    lot of money?

13:14:50  21          A.      Well, I'm not sure how my credential

13:14:53  22    or experience as a licensing professional would

13:14:56  23    weigh on the notion that it's been licensed

13:15:00  24    frequently for a lot of money.  Those don't sound

13:15:04  25    like factual issues.

03:15:06  1          I am aware generally of promotional

03:15:09  2   statements describing the use of the patent.  As to

03:15:15  3   whether or not it contains the specific phrases you

03:15:18  4   mentioned, I would need to go back to the documents

03:15:20  5   that describe that to confirm.

03:15:26  6          Q.    Mr. Malackowski, did you in forming

03:15:27  7   opinions in this case have any understanding that

03:15:30  8   the Haguchi patent is acknowledged worldwide to be

03:15:37  9   very valuable and that it has been licensed around

03:15:41 10   the world for significant amount of money?

03:15:45 11              MS. TU:   Objection.

03:15:47 12          A.    I don't believe that that's stated

03:15:49 13   within my report as a basis for my opinions.  To the

03:15:54 14   extent that that is contained within Dr. Gale's

03:15:58 15   report to support the conclusions that I draw from

03:16:00 16   him, then I certainly would acknowledge it as an

03:16:05 17   indirect basis, but I don't recall that specifically

03:16:09 18   within his report as I sit here.

03:16:16 19          Q.    The Applera/Bio-Rad agreement was

03:16:18 20   negotiated and signed in 2005; is that correct?

03:16:35 21          A.    Did you say the Applera/Bio-Rad

03:16:37 22   agreement?

03:16:39 23          Q.    Yes.

03:16:39 24          A.    I note on page 32 of my report that

03:16:45 25   that was signed in 2006.

13:16:54   1        Q.       That is 13 years before the date of

13:16:56   2   the hypothetical negotiation in this case?

13:17:02   3        A.       Approximately.

13:17:06   4        Q.       One factor that goes to how

13:17:08   5   comparable license agreement is is how close in time

13:17:11   6   it is to the hypothetical negotiation.   That's fair;

13:17:13   7   right?

13:17:17   8        A.       Generally, that's fair.   There is

13:17:18   9   further consideration such that agreements that come

13:17:24 10   after the negotiation are often discounted because

13:17:26 11   they would not be known or knowable at the

13:17:29 12   negotiation, and for agreements before the

13:17:33 13   negotiation, consideration is given to develop into

13:17:38 14   the market between the date of the agreement and the

13:17:41 15   negotiation.

13:17:42 16           So, for example, in this case, if the

13:17:45 17   market actually became larger, more successful, more

13:17:50 18   robust, all else being equal, that would suggest

13:17:54 19   that the earlier agreement would understate the

13:17:58 20   royalty.

13:18:35 21        Q.       You are aware there was extensive

13:18:39 22   litigation in Connecticut against a company called

13:18:41 23   MJ?

13:18:43 24        A.       I am aware of that.   That was

13:18:45 25   something that was discussed in more detail in a

03:18:48  1   prior Delaware case as it related to the background

03:18:53  2   of the licenses at issue.

03:18:56  3        Q.     MJ was found in that litigation to

03:19:00  4   infringe the asserted patents that belonged to

03:19:04  5   Applera; correct?

03:19:08  6        A.     That's consistent with my memory,

03:19:09  7   though I don't discuss that within my report here.

03:19:14  8   So I have not refreshed on those specific disputes

03:19:17  9   and resolution for some time.  So without going back

03:19:20 10   to the document, I would simply accept your

03:19:24 11   representation for purposes of your questions.

03:19:27 12        Q.     Bio-Rad bought MJ that had already

03:19:31 13   been found to infringe; correct?

03:19:34 14        A.     I'm sorry, did you say Bio-Rad bought

03:19:36 15   or purchased MJ?

03:19:38 16        Q.     Correct.  I'll restate it.

03:19:42 17               Bio-Rad bought MJ that had already

03:19:44 18   been found to infringe; correct?

03:19:48 19               MS. TU:  Objection.

03:19:50 20        A.     Generally, that is consistent with my

03:19:53 21   understanding.

03:20:03 22        Q.     And there were at least three

03:20:08 23   different agreements all signed at the same time

03:20:11 24   between Bio-Rad and Applera referencing each other

03:20:16 25   as being all related; correct?

13:20:22  1        A.       I do recall the multiple agreements

13:20:26  2   and their interrelationships, that was discussed

13:20:28  3   within my report in the Delaware case.  So my memory

13:20:32  4   is consistent with your question.  I have not gone

13:20:36  5   back and refreshed on those various agreements for

13:20:39  6   my work here.  So I really don't recall the details.

13:20:43  7        Q.       And one of those agreements is the

13:20:45  8   realtime instrument, Applera/Bio-Rad agreement, that

13:20:49  9   you are relying upon in this case; correct?

13:20:55 10        A.       That is my recollection, that it was

13:20:56 11   one of the three.

13:20:59 12        Q.       And you are aware that at the time

13:21:01 13   Bio-Rad signed the agreement you're relying on, the

13:21:06 14   Court was going to have a hearing on whether Bio-Rad

13:21:09 15   was in contempt of an injunction at that time?

13:21:15 16                 MS. TU:   Objection.

13:21:18 17        A.       I do recall and make reference to the

13:21:22 18   fact of the pending injunction within both my first

13:21:26 19   report and my second report.  So I am familiar with

13:21:29 20   that, yes.

13:21:41 21        Q.       By "pending," you mean there was an

13:21:43 22   injunction that was actually entered and now there

13:21:47 23   was a pending hearing on the contempt of that

13:21:50 24   injunction because Bio-Rad was being accused of not

13:21:54 25   following the injunction order; correct?

13:21:58  1            MS. TU:  Objection.

13:21:59  2       A.      I don't think I used the word

13:22:00  3  "pending."  I think that was your language, but

13:22:03  4  putting that aside, again, at a general level, the

13:22:08  5  premise of your question is consistent with my

13:22:11  6  recollection of the facts.

13:22:14  7       Q.      And the pending hearing on the

13:22:16  8  contempt of the injunction was prompted by Applera's

13:22:22  9  complaint that Bio-Rad was not complying with the

13:22:27 10  Court's injunction.  You recall that?

13:22:33 11       A.      I recall the issue of various

13:22:36 12  anonymous or other employee complaints, though I

13:22:40 13  don't, as I sit here, recall it relating to the

13:22:42 14  injunction as much as the royalty payments.  So I

13:22:48 15  can accept that for purposes of your question.  The

13:22:50 16  facts will speak for itself.  I actually don't

13:22:53 17  recall if that was due to some sort of employee

13:22:56 18  complaint.

13:23:04 19       Q.      Is it your testimony you don't recall

13:23:05 20  that Applera had submitted briefing to the Court

13:23:11 21  separate from any Bio-Rad employee that complained

13:23:15 22  of Bio-Rad's violation of the injunction?

13:23:21 23            MS. TU:  Objection.

13:23:22 24       A.      Although I discuss the issue of the

13:23:24 25  injunction within my two reports, I don't discuss

13:23:29 1    the various pleadings that were filed by whom and

13:23:32 2    what their content was.  So I would be speculating.

13:23:36 3    I can't deny that that is what happened from memory,

13:23:39 4    but it's not something that's been the focus of my

13:23:42 5    work.

13:23:49 6          Q.      And is it your recollection that the

13:23:51 7    Bio-Rad employee who submitted a letter to the Court

13:23:56 8    called himself Elmer Futterbuck?

13:24:00 9                  MS. TU:  Objection.

13:24:04 10         A.      So a moment ago, I told you I don't

13:24:07 11   recall the specific pleadings or documents related

13:24:11 12   to this issue and I still don't.  That said, the

13:24:17 13   persona Elmer Futterbuck is one that I have memory

13:24:23 14   of from my review of the record.  It's something

13:24:26 15   that you tend not to forget.

13:24:31 16         Q.      Now, it is true, isn't it, that you

13:24:33 17   did not discuss Mr. Futterbuck's letter in the

13:24:39 18   report in this case; correct?

13:24:45 19         A.      Correct.  I do not.

13:24:46 20         Q.      It is also true that you did not

13:24:48 21   discuss any internal Bio-Rad documentation that

13:24:53 22   confirms Mr. Futterbuck's statements to the Court?

13:24:57 23                 MS. TU:  Objection.

13:25:02 24         A.      I don't specifically discuss

13:25:04 25   responsive commentary to such statement.

13:25:24  1          Q.      I want to make sure I understand your

13:25:26  2   answer.  It is true, isn't it, that in your report,

13:25:29  3   you did not discuss any internal Bio-Rad

13:25:34  4   documentation or communication that, indeed, confirm

13:25:39  5   that Mr. Futterbuck's statements to the Court were

13:25:42  6   correct?

13:25:45  7                  MS. TU:  Objection.

13:25:47  8          A.      So to be clear, I do discuss various

13:25:51  9   evidence related to this issue, specifically on

13:25:54  10  pages 34 and 35 of my report, but I don't call out a

13:26:00  11  response to the persona Elmer Futterbuck.  I don't

13:26:06  12  specifically discuss that.

13:26:13  13         Q.      You also do not discuss the contempt

13:26:16  14  proceedings against Bio-Rad for potentially

13:26:19  15  violating the injunction.  That's fair; right?

13:26:25  16         A.      My report will speak for itself.  I

13:26:27  17  don't recall referencing contempt proceedings

13:26:30  18  specifically, just the issue of the injunction.

13:26:37  19         Q.      You would agree with me that a party

13:26:40  20  that has to go to court when it has been charged

13:26:44  21  with being in contempt of an injunction doesn't have

13:26:47  22  a lot of negotiating leverage in that discussion; is

13:26:51  23  that fair?

13:26:53  24                  MS. TU:  Objection.

13:26:54  25         A.      No, I don't think you can make that

James Malackowski                                      **Confidential**

13:28:30  1   that testimony so we can talk about it.

13:28:40  2         Q.      With respect to the realtime

13:28:44  3   instrument license, Bio-Rad also had a consent

13:28:57  4   judgment entered on the very same patent, the

13:29:01  5   Haguchi patent, by which Bio-Rad is found to

13:29:07  6   infringe and it's permanently enjoined from

13:29:10  7   infringing the Haguchi patent; is that true?

13:29:17  8                MS. TU:   Objection.

13:29:18  9         A.      My -- my report is not so specific to

13:29:20 10   the patent at issue or the terms of the injunction,

13:29:24 11   only to discuss generally that Bio-Rad was facing an

13:29:27 12   injunction.  So I would have to go back and refresh

13:29:32 13   on the documents.  That's not something that is

13:29:35 14   addressed within my report.

13:29:37 15         Q.      Sitting here today, you don't know

13:29:42 16   one way or the other whether with respect to the

13:29:46 17   very patent at issue in the license you rely upon,

13:29:50 18   the Haguchi patent, there was a consent judgment of

13:29:55 19   infringement validity and permanent injunction

13:29:59 20   against Bio-Rad for the Haguchi patent?

13:30:11 21         A.      All that I rely upon is that Bio-Rad

13:30:14 22   was facing an injunction during these negotiations.

13:30:20 23   The background of and leading to that injunction is

13:30:24 24   not discussed with my report, and I don't think it's

13:30:29 25   particularly relevant.  Though I do recognize that

13:30:31  1    in the prior case, there was more detail presented

13:30:34  2    on that issue, I simply don't recall as I sit here

13:30:39  3    the facts to be responsive to your question.

13:30:42  4                   That said, there is nothing in your

13:30:44  5    question that my memory suggests is inaccurate.  So

13:30:47  6    I'm happy to presume that for purposes of any

13:30:51  7    substantial question you have related to my opinions

13:30:53  8    in this case.

13:31:17  9         Q.     Applera/Bio-Rad license applied the

13:31:21 10    royalty rate of 15 percent to net sales of licensed

13:31:26 11    realtime thermal cyclers; correct?

13:31:29 12         A.     Yes, you and I spoke about that at

13:31:32 13    some length before the break.

13:31:35 14         Q.     And those would qualify as

13:31:36 15    instruments; correct?

13:31:41 16         A.     I believe that they would be

13:31:42 17    generally regarded as instruments.

13:31:45 18         Q.     In this case you are applying the

13:31:47 19    15 percent royalty to instruments, reagents, and

13:31:50 20    chips?

13:31:51 21         A.     Yes, as we've discussed, based upon

13:31:53 22    the diversity of the licenses within the benchmark

13:31:57 23    group, as well as the other factors cited in

13:32:01 24    Georgia-Pacific.

13:32:03 25         Q.     If you could, please, look on page

03:32:05  1    33.

03:32:16  2            A.        Yes.

03:32:16  3            Q.        And if you'd, please, look at the

03:32:21  4    third full paragraph on page 33 starting with "I

03:32:24  5    understand."

03:32:28  6            A.        Yes.

03:32:28  7            Q.        I understand that so long as the

03:32:29  8    licensee remained a licensee under the separate

03:32:32  9    amended and restated thermal cycler supplier

03:32:34 10    agreement, royalties paid under that supplier

03:32:37 11    agreement for a given royalty-bearing item would be

03:32:40 12    fully deductible from the running royalties due on

03:32:42 13    the same item under this license.

03:32:45 14                      Do you see that?

03:32:48 15            A.        Yes, ma'am.

03:32:50 16            Q.        So the Applera license had a setoff

03:32:55 17    that worked as a stacking provision; correct?

03:33:00 18            A.        Well, it's different than the

03:33:01 19    stacking provision concept that we spoke about

03:33:05 20    earlier, which is generally related to licenses paid

03:33:08 21    to third parties on third-party IP.  This is really

03:33:15 22    to avoid a double recovery or a double counting of

03:33:19 23    issues, meaning double payment of royalties by the

03:33:22 24    same licensee to the same licensor.

03:33:27 25            Q.        So if Bio-Rad paid Applera 7 percent

13:37:01  1    were exactly.

13:37:10  2            Q.      If we look on top of page 34 on

13:37:15  3    exhibit one of your report, in the second full

13:37:19  4    sentence you address the 2007 amendment that

13:37:23  5    increased the running royalty to 15.75 percent;

13:37:26  6    correct?

13:37:29  7            A.      Yes, ma'am.

13:37:31  8            Q.      And for the 2008 amendment, all you

13:37:35  9    say is that it expanded the field of use among other

13:37:37 10    provisions; correct?

13:37:42 11            A.      Yes, ma'am.

13:37:45 12            Q.      You do not consider that, in fact,

13:37:49 13    that amendment, the 2008 amendment, provided for the

13:37:55 14    rate in the realtime instrument license to go down

13:37:59 15    upon the expiration of the Haguchi patent?

13:38:07 16            A.      I do not cite or include such detail

13:38:10 17    within my report, though as we've just discussed, I

13:38:13 18    am familiar with that.  I don't believe that that is

13:38:19 19    relevant to my consideration.

13:38:23 20            Q.      The parties agree in 2008 that the

13:38:27 21    ongoing royalty in the realtime instrument license

13:38:29 22    would, in fact, be 7.75 percent upon the expiry of

13:38:34 23    the Haguchi patent; correct?

13:38:36 24                    MS. TU:  Objection.

13:38:39 25            A.      I don't recall the percent -- precise

James Malackowski                                    Confidential

14:26:38  1    success of that product would in part depend upon

14:26:43  2    the results of the negotiation.  So I think they

14:26:45  3    went to the discussion -- would go to the discussion

14:26:49  4    assuming there is a competitive relationship with

14:26:51  5    the parties.

14:27:07  6         Q.       You did not rely upon or discuss the

14:27:08  7    testimony of Bio-Rad's witnesses who confirmed that

14:27:11  8    ddSEQ is being discontinued?

14:27:16  9         A.       That's not cited within my report for

14:27:18 10    the reasons I just described.

14:27:41 11         Q.       Is it correct, Mr. Malackowski, that

14:27:43 12    generally lower royalty rates apply when the

14:27:46 13    licensee is required to make significant additional

14:27:49 14    investments in the technology in the market?

14:27:54 15         A.       I think it depends upon the context

14:27:56 16    that you're considering.  Typically, that's -- in

14:28:00 17    addition that's related to inventor/promoter

14:28:02 18    agreements.  And one of the reasons, for example,

14:28:05 19    that university licensor agreements tend to be at

14:28:08 20    lower rates than competitor agreements because the

14:28:12 21    university seeks the investment of the licensee to

14:28:16 22    commercialize the product.

14:28:38 23         Q.       Wouldn't you agree though that even

14:28:42 24    outside that, the inventor/promoter scenario, just

14:28:55 25    how much work still needed to be done in order to

14:38:50  1          Q.       Mr. Malackowski, it is true, isn't

14:38:51  2   it, that in your report, and we can specifically

14:38:58  3   look at GP5, but even more general, in your report,

14:39:02  4   you do not rely upon Bio-Rad's sales of the ddSEQ,

14:39:09  5   and by that I mean, revenue on the ddSEQ sales?

14:39:17  6          A.       Generally speaking, that's correct.

14:39:20  7   I do not call out the specific revenues of ddSEQ in

14:39:27  8   forming my opinion of the use and benefit of the

14:39:32  9   patents-in-suit to 10X.

14:39:35 10          Q.       And you do not compare ddSEQ sales to

14:39:40 11   the sales of 10X's products; correct?

14:39:47 12          A.       Correct, I don't believe that is

14:39:49 13   necessary, nor informative of the negotiation.

14:39:56 14          Q.       Well, let's talk about it.  Before

14:40:01 15   the hypothetical, let's say quarter four of 2018,

14:40:07 16   Bio-Rad sold a single one ddSEQ instrument.  You did

14:40:12 17   not consider that; correct?

14:40:13 18          A.       I am aware of that fact.  I believe

14:40:18 19   it's not only within the record generally, but it's

14:40:20 20   cited by Ms. Davis, but I have not taken into

14:40:23 21   account the negative impact on Bio-Rad from the

14:40:29 22   infringement by 10X.  To do so would, A, increase

14:40:32 23   the royalty rate, and, B, I have concern that it

14:40:36 24   would extend the analysis of the royalty to beyond

14:40:39 25   the footprint of the invention that's used by 10X to

14:42:00  1   stated another way, an extension of the basis beyond

14:42:05  2   the simple use or footnote of the invention to 10X,

14:42:09  3   and I did not believe it would be appropriate to do

14:42:13  4   so and I feel it's conservative not to and so I have

14:42:17  5   not.

14:42:27  6          Q.      By "infringement in the current

14:42:28  7   action," you're speaking about 10X's infringement of

14:42:32  8   the '444 and '277 that you have to presume in the

14:42:37  9   hypothetical negotiation?

14:42:40 10          A.      Correct.

14:43:01 11          Q.      In Q4 2018 and Q1 2019 combined, so

14:43:08 12   before the hypothetical negotiation, before 10X is

14:43:12 13   selling Next GEM, ███████████████████████████

14:43:16 14   ███████████████████  You did not rely on that fact?

14:43:22 15          A.      I'm aware of that fact.  I believe

14:43:24 16   that's cited in Ms. Davis' deposition or report, but

14:43:27 17   I don't believe it should be imported into the

14:43:31 18   negotiation because to do so would only increase the

14:43:34 19   royalty rate and, therefore, its conservative to

14:43:38 20   not.

14:43:44 21          Q.      The last Bio-Rad competes with 10X

14:43:48 22   means that rate goes higher.  Do I understand that

14:43:52 23   correctly?

14:43:53 24          A.      No, but you're using in your question

14:43:56 25   "compete" in sort of a relative sales way, as does

Confidential

14:44:03  1    Ms. Davis.  I disagree.  I think that "compete" is

14:44:05  2    more of a binary decision, that these companies do

14:44:08  3    compete, and there is a competitive threat or there

14:44:10  4    is not, and the fact that a hypothetical licensor

14:44:15  5    has relatively low success in the market compared to

14:44:21  6    a hypothetical competitive licensee that has

14:44:25  7    relatively high success, analyzing the low

14:44:29  8    performance of the licensor is in this case I

14:44:32  9    believe only going to further the demand of the

14:44:35 10    licensor to seek consideration for what is

14:44:39 11    effectively a lost profits claim, and I'm not making

14:44:43 12    such a claim.

14:44:44 13         Q.     You're not making such a claim

14:44:45 14    because you have not identified a single lost sale

14:44:48 15    by Bio-Rad because of 10X; correct?

14:44:53 16                MS. TU:  Objection.

14:44:55 17         A.     I'm not making a lost profits claim.

14:44:58 18    I am seeking to not impute a lost profits element

14:45:03 19    within the Georgia-Pacific royalty framework.

14:45:08 20         Q.     That does not exist here because of

14:45:11 21    Bio-Rad's own testimony that you did not rely upon?

14:45:19 22         A.     You'd have to refresh my recollection

14:45:20 23    as to which particular testimony you're referring

14:45:22 24    to.

14:45:25 25         Q.     Nowhere in your report do you address

14:45:28   1   the testimony of Bio-Rad's corporate witness who

14:45:31   2   said that there was not a single lost sale by

14:45:37   3   Bio-Rad based on 10X?

14:45:42   4                  MS. TU:  Objection.

14:45:45   5          A.      I --

14:45:46   6          Q.      You did not rely upon that testimony?

14:45:48   7          A.      I do recall reviewing that testimony.

14:45:51   8   My recollection is that it is not as explicit as

14:45:54   9   your question suggests and was more a response from

14:45:59  10   the executive that they couldn't identify a

14:46:02  11   particular client or customer, not that they didn't

14:46:06  12   think there was competitive harm.

14:46:09  13          Q.      You've been in, I don't know,

14:46:10  14   hundreds of litigations.  You know what a corporate

14:46:14  15   representative is.  You do know that,

14:46:16  16   Mr. Malackowski?

14:46:18  17          A.      I believe so, yes.

14:46:20  18          Q.      And you do know that he was supposed

14:46:23  19   to be -- that he was prepared to address the issue

14:46:27  20   of any lost sales?

14:46:30  21                  MS. TU:  Objection.

14:46:31  22          Q.      Did you know that in reviewing

14:46:32  23   your -- in reviewing Mr. Lebofski's testimony?

14:46:42  24   L-e-b-o-f-s-k-i.  I'll repeat the question.

14:47:00  25                  Did you know in reviewing

14:47:02  1   Mr. Lebofski's testimony, that he was Bio-Rad's

14:47:06  2   corporate representative regarding any potential

14:47:11  3   lost sales?

14:47:24  4          A.       In reviewing any of the depositions

14:47:27  5   of the party witnesses I do pay attention to whether

14:47:30  6   or not they're 30(b)(6) designee and have both

14:47:34  7   corporate and personal testimony.  That said, I do

14:47:39  8   not recall what particular categories Mr. Lebofski

14:47:45  9   was designated to address.  Certainly not from

14:47:48 10   memory.  The deposition may have made that clear,

14:47:51 11   but as I sit here today, I don't recall.

14:47:55 12          Q.       And it's a fair assessment of his

14:47:57 13   testimony that he, as Bio-Rad's representative,

14:48:00 14   could not identify a single sale that Bio-Rad had

14:48:10 15   lost to 10X?

14:48:13 16                    MS. TU:  Objection.  Misstates

14:48:13 17   testimony.

14:48:16 18          A.       Well, the record will speak for

14:48:18 19   itself.  Again, my recollection from reviewing the

14:48:20 20   testimony was that he could not identify a lost sale

14:48:25 21   by name, but that did not mean that there was

14:48:30 22   competitive harm in a loss of sales.  So to be more

14:48:33 23   specific, I would have to go back to the transcript.

14:48:40 24          Q.       Your opinion is that Bio-Rad and 10X

14:48:42 25   are competitors -- sorry.  You claim that Bio-Rad

14:48:46  1   and 10X are competitors and that does not turn in

14:48:52  2   any way on whether 10X has directly and demonstrably

14:48:59  3   impacted Bio-Rad sales of the ddSEQ product?

14:49:02  4            MS. TU:  Objection.

14:49:06  5       A.       So that's a complicated question

14:49:08  6   because there is multiple parts to it.  I do believe

14:49:11  7   the companies are competitors and that the

14:49:14  8   competitive element would be recognized in the

14:49:17  9   hypothetical negotiation.  I do believe that first

14:49:20 10   and foremost as a result, the parties would focus

14:49:24 11   their attention under the market approach to other

14:49:28 12   license agreements that reflect a competitive

14:49:31 13   relationship not otherwise distorted by

14:49:35 14   cross-licenses or research limitations or

14:49:40 15   development cooperation, but true arm's length

14:49:43 16   third-party commercial agreements, and that finally

14:49:47 17   that, I did not impute into my royalty calculation a

14:49:51 18   risk of lost sales or lost profits by Bio-Rad.  That

14:49:56 19   is a reasonable thing to consider, but if one were

14:50:00 20   to add that to the equation, all else being equal,

14:50:05 21   it would only increase the damages and so to leave

14:50:08 22   it out was conservative.

14:50:18 23       Q.       The testimony of Bio-Rad's own

14:50:20 24   witnesses and their records show no direct and

14:50:24 25   demonstrable impact on Bio-Rad's ddSEQ sales.

James Malackowski                                    Confidential

14:50:28  1  That's correct?

14:50:32  2              MS. TU:  Objection.

14:50:32  3       A.      I can't answer that question.  It's

14:50:33  4  so broad as to the context of the testimony, I

14:50:37  5  haven't read all of the testimony as we've

14:50:40  6  discussed.  So I would be speculating.

14:50:44  7       Q.      You haven't identified any piece of

14:50:46  8  evidence that shows direct and demonstrable impact

14:50:50  9  by 10X's Next GEM sales on the ddSEQ sales?

14:50:55 10              MS. TU:  Objection.

14:50:55 11       Q.      Not a single one?

14:50:58 12              MS. TU:  Objection.

14:50:59 13       A.      I don't agree with that.  I think the

14:51:01 14  discussion of competition is relevant, does show

14:51:06 15  impact and is consistent with a royalty analysis as

14:51:11 16  distinct from a lost profits analysis.  I am not

14:51:15 17  proposing a lost profits claim that identifies

14:51:18 18  specific lost sales that would have been made by

14:51:21 19  Bio-Rad, for example, under the Panduit test.  That

14:51:25 20  could have been done.  That would have increased

14:51:27 21  damages, but I haven't done it.

14:51:31 22       Q.      At the time of the hypothetical,

14:51:32 23  Bio-Rad had to be open and not lie to 10X; correct?

14:51:40 24       A.      Correct.  You asked me that exact

14:51:43 25  question before or substantially that question.

14:55:46  1    that is actually able to sell?

14:55:49  2                    MS. TU:  Objection.

14:55:53  3        A.        As a hypothetical, that may be true

14:55:55  4    in certain circumstances.  I don't think that's

14:55:58  5    relevant to the context here, but I don't dispute

14:56:04  6    that that could happen.

14:56:46  7        Q.        You have not explained in your report

14:56:49  8    why that principle does not apply here given that

14:56:51  9    Bio-Rad has Virtually no sales of a competing

14:56:54 10    product?

14:56:57 11                    MS. TU:  Objection.

14:56:59 12        A.        I think it is a true statement that I

14:57:01 13    do not discuss that principle in this report largely

14:57:04 14    for the reasons which I discussed.

14:57:09 15        Q.        I'll repeat it.  I mean, I said you

14:57:10 16    have not explained in your report why the principle

14:57:13 17    you address does not apply here given that Bio-Rad

14:57:18 18    has virtually no sales of a competing product before

14:57:22 19    the time of the hypothetical?

14:57:25 20                    MS. TU:  Objection.

14:57:28 21        A.        I have not within my report provided

14:57:30 22    an opinion on the business impact to Bio-Rad from

14:57:36 23    the license vis-à-vis the sales level that could be

14:57:42 24    achieved with or without the license due to

14:57:46 25    competition.  That's true.  I have not done that.

14:58:19   1          Q.       The product you had opined is a

14:58:21   2   direct head-to-head competitor with 10X is the ddSEQ

14:58:24   3   product; right?

14:58:30   4          A.       Is there a particular conclusion in

14:58:31   5   my report you want me to refer to?  But other than

14:58:34   6   that, generally speaking, yes, those are the

14:58:36   7   products that I viewed as directly competitive.

14:58:41   8          Q.       You did not address in your report

14:58:44   9   that around the time of the hypothetical, Bio-Rad

14:58:47  10   knew that it was years away from even having a me

14:58:50  11   too product in the single cell market?

14:58:54  12                   MS. TU:  Objection.

14:58:55  13          A.       I don't know that that's

14:58:58  14   substantively true, and I do not draw such a

14:59:02  15   conclusion or refer to such a statement in my

14:59:05  16   report.

14:59:08  17          Q.       If Bio-Rad's own documents stated

14:59:12  18   what I just said, then you would agree with

14:59:15  19   Bio-Rad's own internal documentation and

14:59:21  20   representations about it not having and being years

14:59:24  21   away from having even a me too product in the single

14:59:27  22   cell market?

14:59:31  23                   MS. TU:  Objection.

14:59:32  24          A.       I would have to look at the document

14:59:33  25   you're referring to understand how and why it was

14:59:36  1   prepared and what its context is, and then given the

14:59:39  2   work I'm doing in this case, I would want to

14:59:42  3   understand to what extent the infringement factored

14:59:45  4   into the me too conclusion.

14:59:52  5          Q.      You didn't explain in your report how

14:59:56  6   your opinions can square with Ms. Trauzzi's

14:59:59  7   testimony that Bio-Rad's ddSEQ market share would

15:00:02  8   never have edged over 1 percent?

15:00:06  9                  MS. TU:  Objection.

15:00:14 10                  MS. HADZIMEHMEDOVIC:  T-r-a-u-z-z-i,

15:00:15 11   Trauzzi.

15:00:20 12          A.      Correct, I do not address her

15:00:21 13   testimony in my report.

15:00:30 14          Q.      If we assume that it is true, that at

15:00:33 15   the time of the hypothetical, Bio-Rad was years away

15:00:39 16   from having any product capable of meeting customer

15:00:42 17   expectations in the market, would that or would that

15:00:48 18   not alter your opinion regarding the reasonable

15:00:52 19   royalty in this case?

15:00:56 20          A.      So first to my last answer, just to

15:00:58 21   clarify, I did not address her testimony on that

15:01:00 22   issue.  She is otherwise addressed in my report.

15:01:04 23                  To your current question, it would

15:01:06 24   not affect my opinion in this case because I have

15:01:08 25   been careful to not interject that issue into the

15:03:10  1    made that consideration.  I've simply concluded they

15:03:13  2    are competitors.  As a result, the license should be

15:03:19  3    commensurate with a commercial competitive license

15:03:21  4    as opposed to an inventor/promoter license.

15:03:24  5         Q.    You concluded they're competitors

15:03:26  6    without considering Bio-Rad's sales and considering

15:03:29  7    that they sold two instruments in the two quarters

15:03:33  8    preceding the hypothetical negotiation.  I think

15:03:35  9    that's fair.

15:03:36 10              MS. TU:  Objection.

15:03:40 11         A.    I don't think that's a question.

15:03:46 12         Q.    Your opinion -- strike that.

15:03:47 13              You concluded in your opinions in

15:03:52 14    this case that Bio-Rad's ddSEQ is a competitor to

15:03:58 15    10X's products and made that conclusion without

15:04:05 16    considering Bio-Rad's sales and the fact that they

15:04:10 17    sold near two instruments in the two quarters

15:04:14 18    preceding the hypothetical negotiation?

15:04:16 19              MS. TU:  Objection.

15:06:06 20         A.    It is correct that in my report, in

15:06:08 21    Georgia-Pacific factor number five discussing

15:06:11 22    commercial relationships, I do not specifically

15:06:13 23    identify the quantity of units that Bio-Rad has sold

15:06:16 24    as of the date of the hypothetical.  I focus on the

15:06:19 25    fact that the companies perceive each other as

15:06:22   1   competitors and look to what is expected in the

15:06:26   2   future in that it would be within a period of time

15:06:31   3   that Bio-Rad would have products directed to the

15:06:34   4   same applications as 10X.  So it is a

15:06:37   5   forward-looking assessment, but I do agree I don't

15:06:41   6   specifically cite the two units or the one unit the

15:06:45   7   year before.

15:06:50   8            Q.       Is it your understanding that 10X in

15:06:52   9   real life does not know that Bio-Rad sold 10

15:06:58  10   instruments in two quarters preceding the

15:07:00  11   hypothetical negotiation?

15:07:03  12                     MS. TU:  Objection.

15:07:05  13            A.       I can't speak to that.  I don't know

15:07:08  14   what 10X in real life would know or not know,

15:07:11  15   especially given the extensive litigation between

15:07:15  16   the parties and the public trial.

15:07:18  17            Q.       Bio-Rad has maintained the sales

15:07:21  18   information confidential; correct?

15:07:24  19                     MS. TU:  Objection.

15:07:25  20            Q.       In real life?

15:07:28  21                     MS. TU:  Objection.

15:07:29  22            A.       I haven't studied Bio-Rad's

15:07:31  23   confidentiality provisions regarding its sales

15:07:34  24   information, who they share it with, to the extent

15:07:36  25   to which they disclose it, whether they share it

05:07:38  1    with market research firms, I don't know.

05:07:49  2             Q.     Your testimony is that your

05:07:52  3    reasonable royalty analysis does not include a plus

05:07:55  4    factor to the rate to compensate for the risk of

05:07:59  5    potential lost sales or market share; correct?

05:08:08  6             A.     Generally.

05:08:09  7                    (Stenographer clarification.)

05:08:13  8             Q.     You did not address in your report

05:08:14  9    that Bio-Rad's ddSEQ product has not been broadly

05:08:19 10    adopted due to inferior product specs and inferior

05:08:24 11    manual of options?

05:08:26 12             A.     Correct, I don't necessarily believe

05:08:28 13    that that is true, but I have not addressed that

05:08:32 14    issue in my report.

05:08:50 15             Q.     We'll let the jury decide.

05:08:51 16                    You did not address in your report

05:08:53 17    that Bio-Rad's sales channel is not even willing to

05:08:56 18    pick up ddSEQ?

05:09:00 19                    MS. TU:  Objection.

05:09:01 20             A.     I'm not sure I know what that means.

05:09:04 21    It sounds like you're referring to a particular

05:09:06 22    document or testimony.  That's not a passage that

05:09:10 23    comes to mind.  So we'd have to refresh my

05:09:13 24    recollection.

05:09:19 25             Q.     You did not consider in your report

15:09:23  1    that Bio-Rad's sales personnel refused or do not

15:09:30  2    even want to pick up selling ddSEQ because it's such

15:09:35  3    a failure?

15:09:37  4                  MS. TU:   Objection.

15:09:39  5         A.       I don't know that that's a true

15:09:40  6    statement, A.  B, I don't know that if it is true,

15:09:43  7    if that's based upon the environment of the

15:09:47  8    infringement and past infringement, which frustrated

15:09:51  9    those salespeople, but C, I don't specifically

15:09:53 10    comment on those quotes, documents, or testimony

15:10:00 11    that you're generally referring to in my report.

15:10:02 12         Q.       10X offers several lines of single

15:10:20 13    cell products; correct?

15:10:22 14         A.       Yes, ma'am.

15:10:25 15         Q.       It offers Multiome product that

15:10:28 16    performs ATAC-seq and gene expression.  It offers

15:10:32 17    immune profiling products, five prime gene

15:10:35 18    expression products, targeted gene expression

15:10:35 19    products.

15:10:42 20                  (Stenographer clarification.)

15:10:48 21         Q.       10X offers Multiome products that

15:10:52 22    perform ATAC-seq and gene expression; immune

15:10:56 23    profiling products; five prime gene expression

15:11:01 24    products; targeted gene expression products;

15:11:04 25    products for crisper-related assays with single cell

Confidential

05:11:09  1    NGS; products for assays on cell service proteins

05:11:13  2    with single cell sequencing analysis.

05:11:16  3             Is that your understanding,

05:11:18  4    Mr. Malackowski?

05:11:22  5         A.      Generally, yes.

05:11:24  6         Q.      Bio-Rad does not offer these products

05:11:26  7    at all?

05:11:29  8             MS. TU:  Objection.

05:11:32  9         A.      I have not done a product to product

05:11:34 10    comparison.  I believe there are differences in the

05:11:41 11    product applications that are offered, and I

05:11:43 12    recognize that within my report, specifically page

05:11:51 13    58 where I note that the initial products of

05:11:55 14    RainDance and 10X focused on different applications.

05:11:58 15             I further talk about the fact that

05:12:02 16    that does not dispel the notion of a competitor

05:12:06 17    commercial relationships in a hypothetical and that

05:12:09 18    Bio-Rad had an intention of bringing products to

05:12:14 19    market directed to the same applications of 10X.

05:12:20 20         Q.      You do not cite any evidence in your

05:12:21 21    report that shows that Bio-Rad intended to develop

05:12:29 22    the six product lines that I read into the record?

05:12:35 23             MS. TU:  Objection.

05:12:37 24         A.      I do not by product line call out the

05:12:43 25    specific Bio-Rad competitive response.  I have a

05:12:46  1   more general discussion because its the more general

05:12:49  2   discussion that's relevant to my work, which is

05:12:53  3   ultimately related to the selection of the

05:12:56  4   comparable agreements.

05:13:21  5                  MS. TU:  Counsel, if it's a good time

05:13:23  6   to break, just whenever you're ready.  It's been a

05:13:26  7   little bit over an hour.

05:13:29  8                  MS. HADZIMEHMEDOVIC:  Sure.  This is

05:13:29  9   a fine time to break.

05:13:34  10                 THE VIDEOGRAPHER:  Okay.  We're going

05:13:34  11  off the record at 5:13 p.m.

05:13:36  12                 (Whereupon, a recess is taken.

05:34:03  13                 THE VIDEOGRAPHER:  Stand by, please.

05:34:03  14                 We are back on the record at

05:34:10  15  5:34 p.m. marking the start of media unit number

05:34:14  16  five.

05:34:15  17  BY MS. HADZIMEHMEDOVIC:

05:34:17  18      Q.      Mr. Malackowski, before the break, I

05:34:24  19  identified six 10X Next GEM product lines that

05:34:29  20  Bio-Rad does not offer equivalent products for.  So

05:34:36  21  for the six product lines that 10X offers Multiome,

05:34:44  22  immune profiling, five prime gene expression,

05:34:49  23  targeted gene expression, crisper and cell surface

05:34:55  24  protein products, you do not offer an opinion that

05:35:00  25  Bio-Rad has ever lost any money due to 10X selling

15:35:04  1    those particular assays that Bio-Rad doesn't offer?

15:35:14  2          A.      Assuming your question is do I agree,

15:35:18  3    correct.  I do not do a lost profits calculation or

15:35:23  4    specific quantification of lost profits in general

15:35:25  5    or by product line.

15:35:33  6          Q.      Aside from the legal determination of

15:35:35  7    lost profits, you don't do an even more rudimentary

15:35:47  8    analysis even attempting to assess any money Bio-Rad

15:35:57  9    lost due to 10X offering those six product lines

15:36:03 10    that Bio-Rad does not offer?

15:36:05 11               MS. TU:  Objection.

15:36:10 12          A.      As far as what I would consider a

15:36:13 13    rudimentary analysis, that would be a general

15:36:17 14    competitive assessment, which I think I do offer,

15:36:21 15    but I do not if you mean by rudimentary analysis

15:36:23 16    make a back of the envelope calculation of lost

15:36:26 17    profits or something at such a high level.

15:36:30 18               I have certainly considered that

15:36:31 19    issue.  I recognize that injecting such into a

15:36:37 20    hypothetical would only increase the result and,

15:36:39 21    therefore, its conservative not to further that

15:36:43 22    discussion here and I've chosen not to.

15:36:47 23          Q.      You have not opined that any loss of

15:36:53 24    sales or any revenue on those product lines by those

15:36:58 25    product lines has happened to Bio-Rad; correct?

James Malackowski                                    Confidential

05:37:06   1          A.        Correct.

05:37:47   2          Q.        You have not opined that any of those

05:37:50   3    six Next GEM assays I named competes against Bio-Rad

05:37:56   4    ddSEQ 3 prime RNA-Seq product?

05:38:05   5                    (Stenographer clarification.)

05:38:06   6                    MS. HADZIMEHMEDOVIC:   RNA-Seq, S-e-q.

05:38:16   7          A.        Correct, in that I have not done a

05:38:17   8    product line to product line competitive assessment.

05:38:22   9    The purpose of my competitive analysis was more

05:38:24  10    related to the Georgia-Pacific criterion as opposed

05:38:27  11    to a lost profits analysis.

05:38:42  12          Q.        You offer no opinion that any of

05:38:43  13    those six Next GEM assays competes against Bio-Rad's

05:38:50  14    attack seek product.

05:38:54  15          A.        Same answer.

05:38:59  16          Q.        You do not explain anywhere in your

05:39:01  17    report how any of those six product lines either

05:39:08  18    lost sales or lost market share to Bio-Rad; correct?

05:39:15  19          A.        The same answer.

05:39:35  20          Q.        Is your testimony to the jury going

05:39:38  21    to be that when the parties are sitting at the table

05:39:44  22    with basically perfect knowledge of each other's

05:39:47  23    information, they will think of competition as

05:39:51  24    something different than what they would think of

05:39:55  25    competition in real life?

15:47:49  1   prime gene expression, targeted gene expression,

15:47:52  2   crisper, or cell surface proteins; correct?

15:47:56  3              MS. TU:  Objection.

15:47:57  4        A.      I don't know that I can agree with

15:47:58  5   that because my analysis did not go into that

15:48:02  6   application level of detail because it was not

15:48:04  7   necessary.  So I couldn't foreclose what Bio-Rad

15:48:09  8   might say in response to that question.

15:48:13  9        Q.      But you're not aware, sitting here

15:48:15 10   today, of any document that suggests that Bio-Rad

15:48:18 11   was planning and was capable of delivering these six

15:48:24 12   product lines in --

15:48:27 13              MS. TU:  Same objection.

15:48:28 14        Q.      -- Q2 2019?

15:48:31 15              MS. TU:  Objection.

15:48:32 16        A.      So I was going to say that's the

15:48:34 17   question you've asked me many times before, but

15:48:37 18   you've interjected the ability to deliver in

15:48:39 19   Q2 2019.  That I don't know, but again, not relevant

15:48:44 20   to my analysis for the reasons upon which I rely for

15:48:48 21   a competitive relationship.

15:48:52 22        Q.      You do not identify any evidence in

15:48:53 23   your expert report that Bio-Rad, as of the date of

15:48:57 24   the hypothetical negotiation, expected ddSEQ to ever

15:49:00 25   be able to compete with or without 10X?

05:49:06  1                    MS. TU:   Objection.

05:49:09  2          A.       Well, I would agree with that.   I

05:49:10  3  think, for example, the June 2025-year plan that I

05:49:15  4  referenced to you in figure 20 confirms that they

05:49:17  5  did intend to compete with 10X.

05:49:35  6          Q.       It says nothing.   This document says

05:49:37  7  nothing about their true ability to compete with 10X

05:49:43  8  in the market or without 10X in the market --

05:49:48  9                    MS. TU:   Objection.

05:49:49 10          Q.       -- for ddSEQ?

05:49:50 11                    MS. TU:   Objection.

05:49:52 12          A.       Well, turning to figure 21, there is

05:49:55 13  an assessment of their ability to compete with 10X.

05:50:00 14  It talks about the strengths and weaknesses of 10X,

05:50:03 15  as well as other competitors.   I will agree with you

05:50:05 16  I do not have documents where Bio-Rad is

05:50:10 17  contemplating their level of success without 10X in

05:50:15 18  the market, because I don't believe that in normal

05:50:20 19  course they're presupposing that 10X would exit the

05:50:24 20  business.

05:50:39 21          Q.       You do not offer any opinion or

05:50:41 22  explanation in your report as to why Bio-Rad would

05:50:44 23  be incentivized to seek a royalty on assays it does

05:50:47 24  not offer, but is just as high as the royalty you

05:50:53 25  say Bio-Rad will seek on assays that it says it

05:50:56  1    offers?

05:50:58  2                    MS. TU:  Objection.

05:51:00  3         A.        I disagree with that.  I think that

05:51:01  4    the Georgia-Pacific analysis is just that Bio-Rad

05:51:05  5    would seek to have a royalty consistent with the

05:51:10  6    Georgia-Pacific framework relying because of the

05:51:12  7    record of this case primarily upon the market

05:51:15  8    approach as a starting point and the market approach

05:51:21  9    does not vary the rate based upon a given

05:51:26 10    competitive dynamic on a product basis.  It varies

05:51:28 11    the rate based generally upon the competitive

05:51:32 12    relationship between the parties broadly, and I

05:51:35 13    think my conclusion is consistent with that.

05:51:40 14         Q.        Well, the Caliper license contradicts

05:51:44 15    your statement because it specifically defines

05:51:47 16    competition as direct and demonstrable impact on the

05:51:52 17    other side's sales; correct?

05:51:57 18                    MS. TU:  Objection.

05:51:59 19         A.        Perhaps you can point me to the

05:52:01 20    language that you're referring to.

05:52:28 21         Q.        If you'll look on page 30, second

05:52:37 22    paragraph:  Running royalty of 15 percent on

05:52:47 23    screening applications, and screening applications

05:52:52 24    were defined in part as those that compete directly

05:52:55 25    with Caliper LapChip EZ Reader or Profiler Pro

James Malackowski                                                    Confidential

15:53:00  1    products to directly and demonstrably impact sales

15:53:04  2    of Caliper's LabChip EZ Reader and Profiler Pro

15:53:08  3    products.

15:53:09  4              Do you see that?

15:53:09  5         A.    I do.

15:53:14  6         Q.    So there is evidence in the licenses

15:53:16  7    you relied upon of a specific definition of

15:53:19  8    competition, which requires direct and demonstrable

15:53:22  9    impact on the other side's sales, and you use that

15:53:25 10    license as one of your most comparable licenses;

15:53:27 11    correct?

15:53:30 12         A.    I do use that --

15:53:31 13              MS. TU:  Objection.

15:53:31 14         A.    I do use that license.  I do make the

15:53:34 15    distinction between competitive and noncompetitive

15:53:38 16    products.  I don't believe that the language of the

15:53:43 17    license would suggest that somehow the licensor has

15:53:48 18    to prove on a product-by-product basis that there

15:53:52 19    was an impact on sales in order to get the higher

15:53:56 20    rate.  I believe what the license shows is two

15:53:59 21    classifications of products and essentially a

15:54:01 22    presumption that certain products will have

15:54:04 23    competitive effect where others won't.

15:54:09 24         Q.    Are you reading that particular

15:54:10 25    language out of the Caliper/RainDance license in

05:54:13  1    considering that license, one of your most

05:54:16  2    comparable licenses, and reading the 15 percent rate

05:54:18  3    as the appropriate one?

05:54:24  4              MS. TU:  Objection.

05:54:24  5         A.      I didn't understand that question.

05:54:39  6         Q.      The license says there has to be

05:54:41  7    direct and demonstrable impact on the sales of the

05:54:45  8    other side for the 15 percent rate to apply;

05:54:50  9    correct?

05:54:55 10         A.      Well, so let's look at what it says.

05:54:56 11    So it's talking about a situation where the

05:55:09 12    application is using a RainDance chip reagent for

05:55:11 13    other noninstrument product that competes with

05:55:17 14    Caliper's products to directly and demonstrably

05:55:23 15    impact sales of Caliper's products.  I don't read

05:55:27 16    that to say there is an expectation that RainDance,

05:55:32 17    when committing its royalty report, can say, Well,

05:55:35 18    we sold a competitive product, but we don't think

05:55:37 19    you would have made the sale.  Therefore, we don't

05:55:39 20    have to pay the higher rate.  I think what the

05:55:40 21    agreement is doing is generally defining the

05:55:44 22    category of competition and presuming that within

05:55:46 23    that category of competition, there is an impact on

05:55:49 24    sales.

05:55:58 25         Q.      Is it correct that your analysis of

05:56:01  1    competitive rates did not assume the same definition

05:56:10  2    that the RainDance/Caliper license provides for the

05:56:14  3    competitive rate?

05:56:17  4              MS. TU:   Objection.

05:56:18  5         A.       Well, of course, because the

05:56:22  6    RainDance/Caliper specific terms are specific to,

05:56:25  7    for example, Caliper products.  So as a comparator,

05:56:31  8    I simply looked to whether or not the parties at the

05:56:38  9    negotiation would consider themselves competitors,

05:56:40 10    and I concluded that they do consider themselves

05:56:45 11    competitors and I find concurrents on that

05:56:49 12    conclusion from Ms. Davis.  So I take comfort in my

05:56:55 13    work.

05:56:58 14         Q.       Your work did not assume or determine

05:57:03 15    that there was direct and demonstrable impact on the

05:57:08 16    sales of the licensor by the company you're calling

05:57:14 17    the competitor and the licensee in the hypothetical

05:57:19 18    negotiation?

05:57:20 19              MS. TU:   Objection.

05:57:21 20         A.       I disagree with that.  I think the

05:57:23 21    body of record in this case that I've reviewed

05:57:26 22    suggests that there is direct excessive impact,

05:57:28 23    though I have not specifically done a

05:57:31 24    product-by-product lost sales analysis.  I think the

05:57:35 25    evidence at trial will show direct competition and

16:10:38   1   over a dozen million dollars; is that what you're

16:10:41   2   referring to?

16:10:44   3             MS. TU:  Objection.

16:10:45   4        A.       I don't know what the cost was, but

16:10:47   5   it's my understanding that it was 10X's position

16:10:50   6   that they had alternatives to the patents at issue

16:10:53   7   in the prior case.

16:10:56   8        Q.       And Bio-Rad obtained the injunction

16:10:57   9   by representing to the Federal Circuit that 10X was

16:11:02  10   free to sell Next GEM; correct?

16:11:06  11             MS. TU:  Objection.

16:11:09  12        A.       That I don't know.  I've not reviewed

16:11:11  13   the arguments in front of the Federal Circuit.

16:11:17  14        Q.       You did not rely upon or consider

16:11:19  15   that in forming your opinions in this case; correct?

16:11:22  16             MS. TU:  Objection.

16:11:24  17        A.       Correct, to the extent I haven't

16:11:25  18   reviewed it, I could not have relied upon it or

16:11:28  19   considered it.

16:11:30  20             MS. HADZIMEHMEDOVIC:  Could we please

16:11:31  21   take a short break?

16:11:34  22             THE VIDEOGRAPHER:  Five minutes.

16:11:39  23             MS. HADZIMEHMEDOVIC:  Let's maybe do

16:11:40  24   10 minutes, if that's okay.

16:11:42  25             THE VIDEOGRAPHER:  Okay.  We're going

James Malackowski                                                    Confidential

16:32:33  1   the United States the infringing articles?

16:32:39  2          A.      I don't disagree with that.

16:32:47  3          Q.      And your opinion is that the ITC's

16:32:53  4   injunction against Bio-Rad on the ddSEQ product has

16:32:58  5   no impact on the hypothetical negotiation in this

16:33:01  6   case?

16:33:03  7                MS. TU:  Objection.

16:33:04  8          A.      More specifically I have not

16:33:06  9   considered the injunction as part of my work.  So I

16:33:11 10   can't give an opinion either way.  I don't have

16:33:14 11   enough facts to assess.

16:33:17 12          Q.      Were you instructed by Bio-Rad's

16:33:18 13   counsel not to consider it?

16:33:21 14                MS. TU:  Objection.

16:33:23 15          A.      No, but typically other litigation

16:33:27 16   proceedings are not addressed within the

16:33:33 17   hypothetical.  For example, I do not specifically

16:33:36 18   account for the prior Delaware case in the

16:33:41 19   hypothetical in this case.  I've dealt with this

16:33:44 20   case uniquely and separately.

16:33:53 21          Q.      You did not offer any opinion in your

16:33:57 22   report regarding whether Becton Dickinson and

16:34:00 23   Bio-Rad -- strike that.

16:34:06 24              You did not offer any opinion in your

16:34:08 25   report regarding whether Becton Dickinson or Bio-Rad

James Malackowski                                    Confidential

1                    C E R T I F I C A T E
                  I, RICHARD GERMOSEN, CCR No.
2   30XI00184700, a New Jersey Certified Court Reporter,
    New Jersey Certified Realtime Court Reporter,
3   California Certified Shorthand Reporter License No.
    14391, California Certified Realtime Reporter, NCRA
4   Certified Realtime Reporter and NCRA Registered
    Diplomate Reporter, do hereby certify:
5                    That the foregoing proceedings were
    taken before me at the time and place therein set
6   forth; at which time the witness declared under
    penalty of perjury; that the testimony of the witness
7   and all objections made at the time of examination
    were recorded stenographically by me and were
8   thereafter transcribed under my direction,
    supervision; that the foregoing is a full, true and
9   complete transcript of my shorthand notes so taken
    and of the testimony so given;
10                   That before completion of the
    deposition, review of the transcript was not
11  requested; ( ) that the witness has failed or refused
    to approve the transcript.  I further certify that I
12  am not financially interested in the action, and I am
    not a relative or employee of any attorney of the
13  parties, nor of any of the parties.          I
    declare under penalty of perjury under the laws of
14  California that the foregoing is true and correct.
    Dated this 7th  day of April, 2021.

15

16

17  _____

18  RICHARD GERMOSEN,
    RDR/CCR/CCR-NJ/CRCR/CSR-CA/CCRR-CA/NYACR/NYRCR
19  LICENSE NO. 30XI00184700
    LICENSE NO. 30XR00016800
20  California CSR No. 14391
    California CRR No. 198

21

22

23

24

25