# EXHIBIT 4

*Harvard*   4.c
5.9

# Table of Contents

Section                                                                    Page

1     Definitions.................................................................     1
2     Title........................................................................     7
3     Patent Filing, Prosecution and Maintenance.........................     7
4     License Grant.............................................................     9
5     Developments and Commercialization.............................     13
6     Consideration for Grant of License...............................     14
7     Reports; Payments; Records.......................................     17
8     Enforcement of Patent Rights ....................................     19
9     Warranties; Limitation of Liability................................     21
10    Indemnification.........................................................     22
11    Terms and Termination...............................................     24
12    Miscellaneous...........................................................     25

Exhibit 1.3 - Development Milestones

Exhibit 1.4 – Development Plan

Exhibit 1.5 – Exclusive Harvard Patent Rights

Exhibit 1.7 – Harvard Case 2183 Patent Rights

Exhibit 1.8 – Harvard Case 2215 Patent Rights

Exhibit 1.9 – Harvard Case 2222 Patent Rights

Exhibit 1.10 – Harvard/MRC Patent Rights

Exhibit 1.17 – Non-Exclusive Harvard Patent Rights

Exhibit 6.2.1.2 – Raindance Capitalization Table

[10.11.1.12] [Harvard.pdf] [Page 1 of 40]

HIGHLY CONFIDENTIAL                                       BRL00078619

## LICENSE AGREEMENT

This License Agreement is entered into as of this 23rd day of February, 2006 (the "Effective Date"), by and between Raindance Technologies, Inc., a Delaware corporation, having a principle place of business at 530 Whitfield Street, Guilford CT 06437 ("Licensee") and President and Fellows of Harvard College, Holyoke Center, Suite 727, 1350 Massachusetts Ave., Cambridge, MA ("Harvard").

WHEREAS, Harvard is: (i) the owner of the Exclusive Harvard Patent Rights, Harvard Case 2222 Patent Rights and the Non-Exclusive Harvard Patent Rights (as such terms are defined below), (ii) a joint owner of the Case 2215 Patent Rights (as such term is defined below), with sole authority to grant licenses under such patent rights in accordance with an Invention Administration Agreement with University of Toronto Innovation Foundation, the agent for the University of Toronto (the co-owner of the patent rights); (iii) joint owner of the Harvard/MRC Patent Rights (as such term is defined below), with respect to which patent rights Harvard has not entered into an invention administration or similar agreement with the co-owner; and (iv) joint owner of the Case 2183 Patent Rights (as such term is defined below), with respect to which patent rights Harvard has not entered into an invention administration or similar agreement with the co-owner;

WHEREAS, Harvard desires to have products based on the Licensed Patent Rights (as defined below) developed and commercialized to benefit the public and is willing to grant a license under its rights in the Licensed Patent Rights;

WHEREAS, Licensee has represented to Harvard, in order to induce Harvard to enter into this Agreement, that Licensee shall commit itself to thorough, vigorous and diligent efforts to develop, obtain regulatory approval for (if needed) and commercialize products based on the Licensed Patent Rights; and

WHEREAS, Licensee wishes to obtain a license under the Licensed Patents Rights and Harvard wishes to grant Licensee a license under its interest in the Licensed Patent Rights, all in accordance with the terms and conditions of this Agreement.

**NOW, THEREFORE,** the parties hereto, intending to be legally bound, hereby agree as follows:

## 1. Definitions.

Whenever used in this Agreement with an initial capital letter, the terms defined in this Section 1, whether used in the singular or the plural, shall have the meanings specified below.

**1.1. "Affiliate"** shall mean, with respect to either party, any person, organization or

1

[10.11.1.12] [Harvard.pdf] [Page 2 of 40]

HIGHLY CONFIDENTIAL                                                                       BRL00078620

entity controlling, controlled by or under common control with, such party. For purposes of this definition only, "control" of another person, organization or entity shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the activities, management or policies of such person, organization or entity, whether through the ownership of voting securities, by contract or otherwise. Without limiting the foregoing, control shall be presumed to exist when a person, organization or entity (i) owns or directly controls twenty percent (20%) or more of the outstanding voting stock or other ownership interest of the other organization or entity, or (ii) possesses, directly or indirectly the power to elect or appoint twenty percent (20%) or more of the members of the governing body of the organization or other entity.

    **1.2. "Calendar Quarter"** shall mean the respective periods of three (3) consecutive calendar months ending on March 31, June 30, September 30 or December 31, for so long as this Agreement is in effect.

    **1.3 "Development Milestones"** shall mean the development milestones set forth in Exhibit 1.3 hereto.

    **1.4 "Development Plan"** shall mean the plan for the development of Licensed Products attached hereto as Exhibit 1.4, as such plan may be amended from time to time pursuant to Sections 5.2.

    **1.5. "Exclusive Harvard Patent Rights"** shall mean, in each case to the extent owned and controlled by Harvard: (a) the patent applications and patents listed in Exhibit 1.5; (b) any patent or patent application that claims priority to and is a divisional, continuation, reissue, renewal, reexamination, substitution or extension of at least one of the patents or patent applications identified in (a); (c) any patents issuing on any of the patent applications identified in (a) or (b); (d) any claim of a continuation-in-part application or patent, which claim is entitled to the priority date of, and is directed at subject matter described in, at least one of the patents or patent applications identified in (a), (b) or (c); and (e) any foreign counter-part of any of the patents or patent applications identified in (a), (b) or (c) or of the claims identified in (d).

    **1.6. "Field"** shall mean:

    **1.6.1.** with respect to all Licensed Patent Rights other than the Harvard Case 2222 Patent Rights and the Harvard Case 2183 Patent Rights, all uses covered by such Licensed Patent Rights (the "**Unlimited Field**");

    **1.6.2.** with respect to the Harvard Case 2222 Patent Rights, high throughput biochemical assays for drug discovery or biological research (the "**2222 Field**"); and

    **1.6.3.** with respect to the Harvard Case 2183 Patent Rights, all fields other than human or animal food and food packaging (the "**2183 Field**").

2

HIGHLY CONFIDENTIAL BRL00078621

**1.7. "Harvard Case 2183 Patent Rights"** shall mean, in each case to the extent owned and controlled by Harvard, Harvard's interest in: (a) the patent applications and patents listed in Exhibit 1.7; (b) any patent or patent application that claims priority to and is a divisional, continuation, reissue, renewal, reexamination, substitution or extension of at least one of the patents or patent applications identified in (a); (c) any patents issuing on any of the patent applications identified in (a) or (b); (d) any claim of a continuation-in-part application or patent, which claim is entitled to the priority date of, and is directed at subject matter described in, at least one of the patents or patent applications identified in (a), (b) or (c); and (e) any foreign counter-part of any of the patents or patent applications identified in (a), (b) or (c) or of the claims identified in (d).

**1.8. "Harvard Case 2215 Patent Rights"** shall mean, in each case to the extent owned (or co-owned) and controlled by Harvard: (a) the patent applications and patents listed in Exhibit 1.8; (b) any patent or patent application that claims priority to and is a divisional, continuation, reissue, renewal, reexamination, substitution or extension of at least one of the patents or patent applications identified in (a); (c) any patents issuing on any of the patent applications identified in (a) or (b); (d) any claim of a continuation-in-part application or patent, which claim is entitled to the priority date of, and is directed at subject matter described in, at least one of the patents or patent applications identified in (a), (b) or (c); and (e) any foreign counter-part of any of the patents or patent applications identified in (a), (b) or (c) or of the claims identified in (d).

**1.9. "Harvard Case 2222 Patent Rights"** shall mean, in each case to the extent owned and controlled by Harvard: (a) the patent applications and patents listed in Exhibit 1.9; (b) any patent or patent application that claims priority to and is a divisional, continuation, reissue, renewal, reexamination, substitution or extension of at least one of the patents or patent applications identified in (a); (c) any patents issuing on any of the patent applications identified in (a) or (b); (d) any claim of a continuation-in-part application or patent, which claim is entitled to the priority date of, and is directed at subject matter described in, at least one of the patents or patent applications identified in (a), (b) or (c); and (e) any foreign counter-part of any of the patents or patent applications identified in (a), (d) or (c) or of the claims identified in (d).

**1.10. "Harvard/MRC Patent Rights"** shall mean, in each case to the extent owned and controlled by Harvard, Harvard's interest in: (a) the patent applications and patents listed in Exhibit 1.10; (b) any patent or patent application that claims priority to and is a divisional, continuation, reissue, renewal, reexamination, substitution or extension of at least one of the patents or patent applications identified in (a); (c) any patents issuing on any of the patent applications identified in (a) or (b); (d) any claim of a continuation-in-part application or patent, which claim is entitled to the priority date of, and is directed at subject matter described in, at least one of the patents or patent applications identified in (a), (b) or (c); and (e) any foreign counter-part of any of the patents or patent applications identified in (a), (b) or (c) or of the claims identified in (d).

3

HIGHLY CONFIDENTIAL

**1.11.** "**Licensed Patent Rights**" shall mean Exclusive Harvard Patent Rights, the Non-Exclusive Harvard Patent Rights, Harvard Case 2222 Patent Rights, Harvard Case 2183 Patent Rights, Harvard Case 2215 Patent Rights and Harvard's interest in the Harvard/MRC Patent Rights.

**1.12.** "**Licensed Process**" shall mean any method or process for the controlled manipulation of microdroplets in a microfluidic system (including but not limited to microdroplet formation, coalescence, combination, compartmentalization, dilution, division, fusion, sorting and splitting, and the analysis thereof) that is claimed in Licensed Patent Rights and/or the use of same which would constitute, but for the grant of a license under Licensed Patent Rights within the Field, an infringement of a Valid Claim in the country in which such method is used or in the country in which the resulting products are sold.

**1.13.** "**Licensed Product**" shall mean any product that meets one of the following definitions:

**1.13.1.** "**Type A Product**" shall mean any instrument for the carrying out, performance and/or practicing of a Licensed Process that is not a Type B Product (for example, an instrument used for the control of the flow of liquid into or the manipulation of liquid on a Type B Product).

**1.13.2.** "**Type B Product**" any Microfluidic Chip, the making, using or selling of which falls within the scope of a Valid Claim.

**1.13.3.** "**Type C Product**" shall mean the performance of any Service.

**1.13.4.** "**Type D Product**" shall mean any other product that is manufactured or produced, in whole or in part, by or on behalf of or in collaboration with Licensee or an Affiliate of Licensee, through the use of a Licensed Product, and is not designed and sold for use on a Type B Product.

**1.14.** "**Microfluidic Chip**" shall mean any device that (a) consists of small channels that control fluids, in single phases and/or in multiphases, including any device that controls droplets, and/or any device that allows any or all of the following manipulations and processing of droplets: formation, filling, steering, coalescing, mixing, reacting, detecting, sorting and screening, and any use of such droplets to encapsulate chemicals, bio-agents or bio-materials, cells, or reagents of any kind and (b) the making, using or selling of which falls within the scope of a Valid Claim .

**1.15.** "**MRC**" shall mean the UK Medical Research Council.

4

HIGHLY CONFIDENTIAL

BRL00078623

**1.16.** **"Net Sales"** shall mean all amounts billed, invoiced, or received (whichever first occurs) by Licesee, its Affiliates and/or any Sublicensee(s) for sales, leases, or other transfers of Licensed Product(s) (including, without limitation, all amounts billed, invoiced, or received (whichever first occurs) by Licensee, its affiliates and any Sublicensee(s) for performance or other provision of, or agreement to perform or otherwise provide, any Service), less:

(a) customary trade, quantity or cash discounts and non-affiliated brokers' or agents' commissions actually allowed and taken;

(b) refunds for goods rejected or returned and charge backs and rebates actually taken by customers that effectively reduce net revenue;

(c) to the extent separately stated on purchase orders, invoices or other documents of sale, taxes levied on- and/or other governmental charges made as to production, sale, transportation, delivery or use of such Licensed Products and paid by or on behalf of Licensee or any Sublicensee(s); and

(d) reasonable charges for delivery or transportation provided by third parties, if separately stated and actually paid by Licensee or any Sublicensee(s).

Net Sales also includes the fair market value of any non-cash consideration received by Licensee, any of its Affiliates and any Sublicensee(s) for the sale, lease or transfer of Licensed Product(s). Fair market value will be calculated as of the time of transfer of such non-cash consideration to Licensee, such Affiliate(s) or such Sublicensee(s). Transfer of a Licensed Product between Licensee and an Affiliate of Licensee or between Licensee and a Sublicensee for sale by the transferee shall not be considered Net Sales for purposes of ascertaining royalty charges, and Net Sales shall be determined based on the sales by the transferee.

**1.17.** **"Non-Exclusive Harvard Patent Rights"** shall mean, in each case to the extent owned and controlled by Harvard: (a) the patent applications and patents listed in Exhibit 1.17; (b) any patent or patent application that claims priority to and is a divisional, continuation, reissue, renewal, reexamination, substitution or extension of at least one of the patents or patent applications identified in (a); (c) any patents issuing on any of the patents or patent applications identifies in (a) or (b); (d) any claim of a continuation-in-part application or patent, which claim is entitled to the priority date of, and is directed at subject matter described in, at least one of the patents or patent applications identified in (a), (b) or (c); and (e) any foreign counter-part of any of the patents or patent applications identified in (a), (b) or (c) or of the claims identified in (d).

**1.18.** **"Non-Royalty Sublicense Income"** shall mean Sublicense issue fees, Sublicense maintenance fees, Sublicense milestone payments, and any other amounts, except for royalties on Net Sales, received by Licensee or any of its Affiliates on account of or in connection with Sublicense(s) (or an option to grant a Sublicense), excluding bona fide: (a) payments for

5

{10.11.1.12} [Harvard.pdf] [Page 6 of 40]

HIGHLY CONFIDENTIAL                                    BRL00078624

reimbursement of bona fide research and development or patent expenses, (b) milestone payments made due to Licensee's achievement of specific performance goals or product delivery dates and (c) payments made for the purchase of equity of Licensee by such Sublicensee(s). Non-Royalty Sublicense Income also includes the fair market value of any non-monetary consideration received by Licensee or any of its Affiliates in connection with a Sublicense, excluding royalties on Net Sales.

**1.19.** **"Service"** shall mean the use of a Type A Product and/or a Type B Product, and/or the carrying out or performance of a Licensed Process by Licensee and/or any Sublicensee(s) on a "for-fee" basis for any third party.

**1.20.** **"Sublicense"** shall mean a grant by Licensee to a third party of a sublicense or other grant of right to exercise, or have exercised by such party, some or all of the rights granted to Licensee in accordance with the terms of this Agreement (regardless of whether such grant of rights is referred to or is described as a sublicense).

**1.21.** **"Sublicensee"** shall mean any person or entity granted a Sublicense.

**1.22.** **"Third Party License"** shall mean a license obtained by Licensee from an unaffiliated third party to one or more valid and enforceable patents issued in the United States or any other jurisdiction, the claims of which cover one or more functional components that is essential for the efficacy of the Licensed Product, which Licensee is legally required to obtain in order to make, use or sell such Licensed Product in the country in which such Licensed Product is made, used or sold.

**1.23.** **"Third Party Proposed Product"** shall mean (a) an actual or potential Licensed Product, the making, using or sale of which would fall within the scope of Valid Claim of an Exclusive Harvard Patent Right and/or a Harvard/MRC Patent Right, that is aimed at an application for which no Licensed Product is being developed, manufactured, used, marketed or sold by Licensee or any Sublicensee or (b) an actual or potential Licensed Product, the making, using or sale of which would fall within the scope of Valid Claim of a Harvard Case 2222 Patent Right, that is aimed at an application within the 2222 Field for which no Licensed Product is being developed, manufactured, used, marketed or sold by Licensee or any Sublicensee.

**1.24.** **"Valid Claim"** shall mean (a) a pending claim of a patent application within the Licensed Patent Rights, which (i) has been asserted in good faith, and (ii) has not been abandoned or finally rejected without the possibility of appeal or refiling; or (b) a claim of an issued or granted and unexpired patent within the Licensed Patent Rights, which has not been held unenforceable, unpatentable or invalid by a decision of a court or governmental body of competent jurisdiction, unappealable or unappealed within the time allowed for appeal, which has not been rendered unenforceable through disclaimer or otherwise, which has not been abandoned, and which has not been lost through an interference proceeding.

6

[10.11.1.12] [Harvard.pdf] [Page 7 of 40]

HIGHLY CONFIDENTIAL

BRL00078625

**1.25. "2222 Licensed Product"** shall mean any Licensed Product (a) that has a single flow-focusing device capable of creating only one double emulsion droplet at a time and (b) the making, using or selling of which falls within the scope of a Valid Claim of Harvard Case 2222 Patent Rights.

**2. Title.**

Subject to the licenses granted to Licensee pursuant to Section 4 below, all rights, title and interest in and to (a) the Exclusive Harvard Patent Rights, the Non-Exclusive Patent Rights, the Harvard Case 2183 Patent Rights and the Harvard Case 2222 Patent Rights and Harvard's interest in the Harvard/MRC Patent Rights are and shall be owned solely and exclusively by Harvard (b) the Harvard Case 2215 Patent Rights are and shall be owned solely and exclusively by Harvard and the University of Toronto.

**3. Patent Filing, Prosecution and Maintenance.**

**3.1. Responsibility.** Harvard shall be responsible for the preparation, filing, prosecution, protection and maintenance of all Exclusive Harvard Patent Rights, Harvard Case 2183 Patent Rights, Harvard Case 2222 Patent Rights, Harvard Case 2215 Patent Rights and Non-Exclusive Harvard Patent Rights. Licensee recognizes that to date, MRC has been responsible for the preparation, filing, prosecution and maintenance of the Harvard/MRC Patent Rights in consultation with Harvard.

**3.2. Consultation with respect to Harvard Exclusive Patent Rights.** Harvard shall use patent counsel reasonably acceptable to Licensee for the preparation, filing, prosecution, protection and maintenance of all Exclusive Harvard Patent Rights. Harvard shall instruct such patent counsel to furnish Licensee with copies of all correspondence relating to the Exclusive Harvard Patent Rights from the United States Patent and Trademark Office and any other patent office as well as copies of all proposed responses to such correspondence in time for Licensee to review and comment on such response. Licensee shall have the right to provide comments on and make requests of Harvard and such patent counsel concerning the prosecution, filing and maintenance of Exclusive Harvard Patent Rights, and Harvard and such patent counsel shall consider such comments and requests in good faith.

**3.3. Expenses.**

7

[10.11.1.12] [Harvard.pdf] [Page 8 of 40]

HIGHLY CONFIDENTIAL

BRL00078626

**3.3.1.    Exclusively Licensed Patent Rights.** Subject to Section 3.4 below, Licensee shall reimburse Harvard for all documented patent-related expenses incurred by Harvard with respect to the preparation, filing, prosecution and maintenance of the Exclusive Harvard Patent Rights and/or Harvard/MRC Patent Rights within thirty (30) days after Harvard invoices Licensee. In addition, within ninety (90) days following the execution of this Agreement, Licensee shall reimburse Harvard for expenses incurred by Harvard prior to the execution of this Agreement with respect to the preparation, filing, prosecution and/or maintenance of the Exclusive Harvard Patent Rights and/or Harvard/MRC Patent Rights (estimated as of the Effective Date to be about $43,165 (forty-three thousand, one hundred and sixty-five US Dollars)).

**3.3.2.    Other Harvard Patent Rights.** Subject to Section 3.4 below, Licensee shall reimburse Harvard for a pro-rata share (on a case-by-case basis based on the number of licensees of the relevant Licensed Patent Right participating in the reimbursement of patent expenses) of all documented patent-related expenses incurred by Harvard with respect to the preparation, filing, prosecution and maintenance of the Non-Exclusive Harvard Patent Rights, Harvard Case 2183 Patent Rights, Harvard Case 2222 Patent Rights and Harvard Case 2215 Patent Rights within thirty (30) days after Harvard invoices Licensee. In addition, within ninety (90) days following the execution of this Agreement, Licensee shall reimburse Harvard for the pro-rata share of expenses incurred by Harvard prior to the execution of this Agreement with respect to the preparation, filing, prosecution and/or maintenance of the Non-Exclusive Harvard Patent Rights, Harvard Case 2183 Patent Rights, Harvard Case 2222 Patent Rights and Harvard Case 2215 Patent Rights (estimated as of the Effective Date to be about $one hundred and four thousand, three hundred and thirty (104,330 US Dollars)).

**3.4.  Abandonment.** Should Licensee decide that it does not wish to pay for the filing, prosecution or maintenance of a patent application on any invention or claim included in the Licensed Patent Rights in any country (an "Abandoned Country"), Licensee shall provide Harvard with prompt written notice of such decision. Licensee shall be released from its obligations to reimburse Harvard for the expenses incurred by Harvard after the date of the receipt of such notice as to such Abandoned Country in conjunction with such Licensed Patent Right. In such event, any license by Harvard with respect to such Licensed Patent Right will terminate with respect to such Abandoned Country, and Licensee shall have no rights whatsoever to exploit such abandoned Licensed Patent Right in such Abandoned Country. Harvard shall then be free, without further notice or obligation to Licensee, to grant rights in and to such Licensed Patent Right with respect to such Abandoned Country to third parties.

**3.5.  No Warranty.** Nothing contained herein shall be deemed to be a warranty by Harvard that it can or will be able to obtain patents on patent applications included in the Licensed Patent Rights, or that any of the Licensed Patent Rights will afford adequate or commercially worthwhile protection.

8

HIGHLY CONFIDENTIAL                                                                    BRL00078627

**3.6. Small Entity Designation.** If Licensee, any Sublicensee and/or any holder of an option to obtain a Sublicense does not qualify, or at any point during the term of this Agreement ceases to qualify, as a "small entity" as provided by the United States Patent and Trademark Office (USPTO), Licensee shall so notify Harvard immediately, in order to enable Harvard to comply with USPTO regulations regarding payment of fees with respect to Licensed Patent Rights.

**4.     License Grant.**

    **4.1.     Licenses.**

        **4.1.1. Exclusive Licenses.**

            **4.1.1.1. Exclusive Harvard Patent Rights.** Subject to the terms and conditions set forth in this Agreement, Harvard hereby grants to Licensee an exclusive (except as set forth in Section 4.1.1.4 below), worldwide, royalty-bearing license under the Exclusive Harvard Patent Rights solely to develop, make, have made, use, market, offer for sale, sell and import Licensed Products in the Unlimited Field.

            **4.1.1.2. Harvard/MRC Patent Rights.** Subject to the terms and conditions set forth in this Agreement, Harvard hereby grants to Licensee an exclusive (except as set forth in Section 4.1.1.4 below), royalty-bearing license under Harvard's interest in the Harvard/MRC Patent Rights solely to develop, make, have made, use, market, offer for sale and sell Licensed Products in the Unlimited Field within the territory of the United States.

            **4.1.1.3. Harvard Case 2222 Patent Rights.** Subject to the terms and conditions set forth in this Agreement, Harvard hereby grants to Licensee an exclusive (except as set forth in Section 4.1.1.3 below), worldwide, royalty-bearing license under the Harvard Case 2222 Patent Rights solely to develop, make, have made, use, market, offer for sale, sell and import 2222 Licensed Products solely in the 2222 Field.

            **4.1.1.4. Limitations on Exclusivity.** The licenses granted under Sections 4.1.1.1, 4.1.1.2 and 4.1.1.3 are subject to the following limitations:

                **(a) Non-Commercial Research Purposes.** Harvard retains the right for itself, to practice the subject matter of any such exclusively Licensed Patent Rights within such exclusively licensed Field for Non-Commercial Research Purposes. As used herein, the term "Non-Commercial Research Purposes" means academic research or other not-for-profit or scholarly purposes that are undertaken at a non-profit or governmental institution that does not use such exclusively Licensed Patent Rights in the production or manufacture of products for sale or in the performance of services for a fee. For clarity, (a) "academic research and other not-for-profit or scholarly purposes" includes, in non-limiting fashion, research that leads, or may lead,

9

HIGHLY CONFIDENTIAL

BRL00078628

to patentable or unpatentable inventions that may be licensed or otherwise transferred, either directly or indirectly, to third parties and (b) neither (i) receipt of license revenues on account of such inventions or of reimbursements for the costs of preparation and shipping of samples of materials provided to third parties as a professional courtesy, in response to post-publication requests or otherwise in accordance with academic custom nor (ii) receipt of funding to cover the direct and/or indirect costs of research shall constitute sale of products or performance of service for a fee.

(b) **U.S. Government Rights.** The U.S. federal government retains rights in the Licensed Patent Rights pursuant to 35 USC §§200-212, 37 CFR §401 et seq. and applicable governmental implementing regulations, and any right granted in this Agreement greater than that permitted under 35 USC §§200-212 or 37 CFR §401 et seq. shall be subject to modification as may be required to conform to the provisions of those statutes.

### (c) Harvard March-In Rights.

(i) If, at any time following the first anniversary of this Agreement, a third party expresses an interest to Harvard in developing a Third Party Proposed Product and Harvard is interested in having such Third Party Proposed Product developed and commercialized, Harvard shall notify Licensee of such Third Party Proposed Product. Within ninety (90) days of the receipt of such notification from Harvard, Licensee shall notify Harvard whether it is interested in developing such Third Party Proposed Product.

(ii) If Licensee notifies Harvard within such ninety (90) day period that it is interested in developing such Third Party Proposed Product, the parties will agree upon a development plan with respect to such Third Party Proposed Product, which development plan shall be similar to the Development Plan with respect to other Licensed Products developed by Licensee, subject to necessary adjustments, and will include reasonable milestones. In such case, Licensee shall be obligated to develop and commercialize the Third Party Proposed Product in accordance with such new development plan and milestones with respect to the Third Party Proposed Product.

(iii) In the event Licensee fails to comply with any of such development and commercialization obligations, Harvard shall be entitled to terminate the license with respect to such Third Party Proposed Product and shall be free to grant a third party an exclusive or non-exclusive license under the relevant Licensed Patent Rights solely to develop, make, have made, use, market, offer for sale, sell, have sold and import such Third Party Proposed Product.

(iv) If Licensee states in its notification to Harvard that it is not interested in developing such Third Party Proposed Product, or if Licensee fails to notify Harvard of its intention to develop such Third Party Proposed Product within such ninety (90)

10

HIGHLY CONFIDENTIAL

BRL00078629

day period, Harvard shall be entitled to terminate the license with respect to such Third Party Proposed Product and shall be free to grant a third party an exclusive or non-exclusive license under the relevant exclusively licensed Licensed Patent Rights solely to develop, make, have made, use, market, offer for sale, sell, have sold and import such the Third Party Proposed Product.

(v) If Harvard exercises its rights to terminate the license with respect to such Third Party Proposed Product and to grant such a license to a third party, this Agreement shall be automatically amended to delete the Third Party Proposed Product from the definition of Licensed Products.

#### 4.1.2. Non-Exclusive Licenses.

**4.1.2.1. Non-Exclusive Harvard Patent Rights.** Subject to the terms and conditions set forth in this Agreement, Harvard hereby grants to Licensee a non-exclusive, worldwide, royalty-bearing license under the Non-Exclusive Harvard Patent Rights solely to develop, make, have made, use, market, offer for sale, sell and import Licensed Products in the Unlimited Field.

**4.1.2.2. Harvard Case 2183 Patent Rights.** Subject to the terms and conditions set forth in this Agreement, Harvard hereby grants to Licensee a non-exclusive, royalty-bearing license under the Harvard Case 2183 Patent Rights solely to develop, make, have made, use, market, offer for sale and sell Licensed Products in the 2183 Field solely within the territory of the United States. Harvard undertakes that in the event Harvard obtains an exclusive license under the co-owner's interests in the Harvard Case 2183 Patent Rights, it will notify Licensee and the parties will amend this Section 4.1.2.3 to make the license granted in this Section to exclusive within the 2183 Field, subject to Section 4.1.1.1 (except that instead of "Exclusive Harvard Patent Rights" the Section shall refer to Harvard Case 2183 Patent Rights) and Section 4.1.1.4.

#### 4.2 Sublicense.

**4.2.1. Sublicense Grant.** Licensee shall be entitled to grant Sublicenses to third parties under the license granted pursuant to Section 4.1 on terms and conditions in compliance with and not inconsistent with the terms of this Agreement. Such Sublicenses shall only be made for consideration and in bona-fide arm's length transactions.

**4.2.2. Sublicense Agreements.** Sublicenses shall only be granted pursuant to written agreements, which shall be subject and subordinate to the terms and conditions of this

11

HIGHLY CONFIDENTIAL

BRL00078630

Agreement. Such sublicense agreements shall contain, among other things, provisions to the following effect:

**4.2.2.1.** All provisions necessary to ensure Licensee's ability to perform its obligations under this Agreement, including without limitation its obligations under Sections 5, 7.1, 7.3, 7.4 and 12.1;

**4.2.2.2.** A clause substantially the same as the provisions of Section 10 (Indemnification) that shall also state that the Indemnitees (as defined in Section 10) (including in the case of a Sublicense under the Harvard Case 2215 Patent Rights, the U of T Beneficiaries) are intended third party beneficiaries of such Sublicense agreement for the purpose of enforcing such indemnification and insurance provisions.

**4.2.2.3.** In the event of termination of the license (in whole or in part – e.g. termination in a particular country) set forth in Section 4.1 above, any existing agreements that contain a Sublicense of Licensed Patent Rights shall terminate to the extent of such Sublicense; provided, however, that, for each Sublicensee, upon termination of the Sublicense agreement with such Sublicensee, if the Sublicensee is not then in breach of its Sublicense agreement with Licensee such that Licensee would have the right to terminate such Sublicense, such Sublicensee shall have the right to seek a license from Harvard. Harvard agrees to negotiate such licenses in good faith under reasonable terms and conditions, which shall not impose any representations, warranties, obligations or liabilities on Harvard which are not included in this Agreement;

**4.2.2.4.** The Sublicensee shall not be entitled to sublicense its rights under such Sublicense agreement; and

**4.2.2.5.** The Sublicense agreement may not be assigned by Sublicensee without the prior written consent of Harvard, except that Sublicensee may assign the Sublicense agreement to an Affiliate or to a successor in connection with the merger, consolidation, or sale of all or substantially all of its assets or that portion of its business to which the Sublicense agreement relates; provided that any such assignee agrees in writing in a manner reasonably satisfactory to Harvard to be bound by the terms of such Sublicense agreement.

**4.2.3. Delivery of Sublicense Agreement.** Licensee shall furnish Harvard with a fully executed copy of any such Sublicense agreement, promptly after its execution. Harvard shall keep any such copies of Sublicense agreements in its confidential files and shall use them solely for the purpose of monitoring Licensee's and Sublicensees' compliance with their obligations hereunder and enforcing Harvard's rights under this Agreement.

**4.2.4. Breach by Sublicensee.** Any act or omission by a Sublicensee, which would have constituted a breach of this Agreement had it been an act or omission by Licensee, shall constitute a breach of this Agreement. Licensee shall indemnify Harvard for, and hold it

12

HIGHLY CONFIDENTIAL BRL00078631

harmless from, any and all damages or losses caused to Harvard as a result of any such breach by a Sublicensee.

**4.3.     No Other Grant of Rights.** Nothing in this Agreement shall be construed to confer any rights upon Licensee by implication, estoppel, or otherwise as to any technology or patent rights of Harvard or any other entity other than the Licensed Patent Rights, regardless of whether such technology or patent rights shall be dominant, subordinate or otherwise related to any Licensed Patent Rights.

## 5.     Development and Commercialization.

**5.1.     Diligence.** Licensee shall use its best efforts, and/or shall cause its Affiliates or Sublicensees to use their best efforts: (i) to develop Licensed Products in accordance with the Development Plan, (ii) to introduce Licensed Products into the commercial market and (iii) to market Licensed Products following such introduction into the market. In addition, Licensee, by itself or through Affiliates or Sublicensees, shall meet each of the Development Milestones within the time periods set forth therein.

**5.2.     Development Plan.** Licensee shall be entitled, from time to time, to make such adjustments to the then applicable Development Plan as Licensee believes, in its good faith judgment, are needed in order to improve Licensee's ability to meet the Development Milestones.

**5.3.     Reporting.** Within sixty (60) days after the end of each calendar year, Licensee shall furnish Harvard with a written report on the progress of its, its Affiliates' and Sublicensees' efforts during the prior year to develop and commercialize Licensed Products, including without limitation research and development efforts and marketing efforts. The report shall also contain a discussion of intended efforts for the then current year.

**5.4.     Failure.** If Licensee breaches any of its obligations under Section 5.1, Harvard shall notify Licensee in writing of Licensee's failure and shall allow Licensee ninety (90) days to cure or to demonstrate that it has begun to cure its failure. Licensee's failure to cure or demonstrate that it has begun to cure such delay to Harvard's reasonable satisfaction within such 90-day period shall constitute a material breach of this Agreement and Harvard shall have the right to terminate this Agreement forthwith.

## 6.     Consideration for Grant of License

**6.1.     License Fee.** In partial consideration for the licenses granted to Licensee pursuant to Section 4 above, Licensee shall pay Harvard a non-refundable license issuance fee of eighty thousand US Dollars ($80,000) within thirty (30) business days after the Effective Date.

**6.2.     Shares.**

13

HIGHLY CONFIDENTIAL                                                    BRL00078632

### 6.2.1. Issuance.

**6.2.1.1** As partial consideration for the licenses granted hereunder, within thirty (30) days of the execution of this Agreement, Licensee shall issue Harvard 550,000 shares of Licensee Common Stock (constituting approximately 5 percent of the outstanding capital stock of Licensee as of the Effective Date, on a fully-diluted basis) (the "Shares").

**6.2.1.2.** Licensee hereby represents as follows:

(a)   The capitalization table attached hereto as Exhibit 6.2.1.2 (the "Cap Table") sets forth all of the outstanding capital stock of Licensee on a fully-diluted basis as of the Effective Date.

(b)   Other than as set forth in the Cap Table, as of the Effective Date, there are no outstanding shares of capital stock, convertible securities, outstanding warrants, options or other rights to subscribe for, purchase or acquire from Licensee any capital stock of Licensee and there are no contracts or binding commitments providing for the issuance of, or the granting of rights to acquire, any capital stock of Licensee or under which Licensee is, or may become, obligated to issue any of its securities; and

(c)   The Shares, when issued pursuant to the terms hereof, shall, upon such issuance, be duly authorized, validly issued, fully paid and nonassessable.

### 6.2.2. Anti-Dilution Protection.

**6.2.2.1.** Although the Shares shall be issued for no consideration, other than the rights and licenses granted herein, for purposes of this Section 6.2.2, the Shares shall be deemed to have been issued at a per share price of $0.315 (thirty one and half cents) for an aggregate deemed purchase price of $173,250 (one hundred and seventy three thousand, two hundred and fifty Dollars) ("Deemed Investment").

**6.2.2.2.** If, at any time prior to the attainment of the Investment Threshold, Licensee issues Additional Securities (as defined below) at a per share price that is lower than the then current Deemed Per Share Price (the "Lower Price") or enters into a contract or binding commitment providing for such an issuance at a Lower Price, Licensee shall issue Harvard such number of additional shares of Common Stock as are necessary to make the aggregate number of Shares equal the number arrived at by dividing the Deemed Investment amount by such Lower Price (for example, if the current Deemed Per Share Price is $0.315 and Licensee issues Additional Securities at a per share price of $0.20, Licensee shall issue Harvard 316,250 additional shares of Common Stock – i.e. 173,250/0.20 = 866,250 and 866,250 – 550,00 = 316,250). Upon such issuance, the Deemed Per Share Price shall be adjusted to equal such

14

HIGHLY CONFIDENTIAL                                                                 BRL00078633

Lower Price (thus, in the example set forth in the previous sentence, following the issuance of the 316,250 shares of Common Stock, the Deemed Per Share Price would be adjusted to $0.20 per share). For clarity, the anti-dilution protection shall apply to all investments in Licensee up to attainment of the Investment Threshold and Harvard will not have such protection with respect to sums invested thereafter.

**6.2.2.3.** For purposes of this Section 6.2.2:

(a) "Additional Securities" shall mean shares of capital stock, convertible securities, warrants, options or other rights to subscribe for, purchase or acquire from Licensee any capital stock of Licensee, provided however that "Additional Securities" shall not include issuances under employee stock option plans (to persons other than affiliates of The Rothberg Institute For Childhood Diseases) or pursuant to license, lease or bank secured debt financing transactions; and

(b) "Deemed Per Share Price" shall initially mean $0.315. The Deemed Per Share Price shall be adjusted in the case of a recapitalization event (e.g. stock split, reverse stock split, etc.). In addition, the Deemed Per Share Price shall be adjusted in the case of an issuance of Additional Securities at a Lower Price pursuant to Section 6.2.2.2.

(c) "Investment Threshold" shall mean a total investment of $5,000,000 in Licensee's share capital (whether in a single transaction or a series or combination of related transactions) in addition to the $2,000,000 already invested in Licensee.

**6.3. Maintenance Fee.** Upon the issuance of the first patent within the Licensed Patent Rights to issue in any country, and on each anniversary of the date of such issuance, Licensee shall pay to Harvard a license maintenance fee in the amount of fifty thousand US Dollars ($50,000). Each payment made under this Section 6.2 shall be creditable against amounts paid under Section 6.4 below for sales of Licensed Products made in the same calendar year of such payment.

**6.4. Net Sales.**

**6.4.1.** Licensee shall pay Harvard the following royalties on Net Sales:

(a) An amount equal to two percent (2%) of all Net Sales of Type A Products;

(b) An amount equal to three percent (3%) of all Net Sales of Type B Products;

15

HIGHLY CONFIDENTIAL

BRL00078634

(c)     An amount equal to four percent (4%) of all Net Sales of Type C

Products; and

(d)     An amount equal to one percent (1%) of all Net Sales of Type D

Products.

6.4.2. With respect to each Type A Product, Type B Product and Type C Product, royalties will be payable on a country-by-country basis, so long as the making, using or selling of the Licensed Product is covered by a Valid Claim in the country in which such Licensed Product is made, used or sold. With respect to each Type D Product, royalties will be payable on a country-by-country basis for a period of fifteen (15) years following the first commercial sale of such product in such country.

6.4.3. Notwithstanding the foregoing, in the event that Licensee or an Affiliate of Licensee is required to make royalty payments, at fair market terms after arms' length negotiations, under a Third Party License as a result of the sale of a Licensed Product in a certain country, Licensee may offset such third-party payments with respect to such sale of such Licensed Product against the royalty payments that are due to Harvard pursuant to Section 6.4.1 with respect to sales of such Licensed Product in such country; provided however that in no event, shall the royalty payments to Harvard under Section 6.4.1 with respect to such Licensed Product be reduced by more than 50% of the amount otherwise due with respect to such Licensed Product.

**6.5.     Non-Royalty Income.**

6.5.1. In addition, Licensee shall pay Harvard an amount equal to 20% of all Non-Royalty Sublicense Income.

6.5.2. Notwithstanding Section 6.5.1:

(a)     if the Sublicense for which Non-Royalty Sublicense Income is received includes the grant of rights under the Harvard/MRC Patent Rights, and Licensee is required to pay MRC royalties with respect to such Non-Royalty Sublicense Income as a result of the grant of such Sublicense under the Harvard/MRC Patent Rights, Licensee shall be entitled to deduct from the amounts due Harvard on account of such Non-Royalty Sublicense Income an amount equal to 50% of the amounts paid to MRC on account of such Non-Royalty Sublicense Income as a result of the sublicense of the Harvard/MRC Patent Rights, provided that in no event, shall Harvard's share of the such Non-Royalty Sublicense Income fall below ten percent 10%; and

(b)     if a Sublicense includes a grant of rights under patents in-licensed by Licensee from an unaffiliated third party other than MRC, at fair market terms after arms'

16

HIGHLY CONFIDENTIAL

BRL00078635

length negotiations, and such patents are necessary for the manufacture, sale or use of any Licensed Products for which the Sublicense is being granted, Licensee shall be entitled to deduct from the royalties which would otherwise be due to Harvard under Sections 6.5.1 or 6.5.2(a) (as applicable) the amount of royalties which Licensee must pay to such third parties on account of such Sublicense, provided, however, that in no event shall the royalty due to Harvard be reduced by more than fifty percent (50%) of the amounts set forth in Section 6.5.1 or 6.5.2(a) (as applicable).

7.     Reports; Payments; Records.

7.1.   Reports and Payments.

7.1.1   Reports.  Within thirty (30) days after the conclusion of each Calendar Quarter commencing with the first Calendar Quarter in which Net Sales are generated, Licensee shall deliver to Harvard a report containing the following information:

(a)     the number of units of Licensed Products sold by Licensee, its Affiliates and Sublicensees for the applicable Calendar Quarter, with a breakdown by type (i.e. Type A Product, Type B Product, Type C Product or Type D Product);

(b)     the gross amount billed for License Products sold by Licensee, its Affiliates and Sublicensees during the applicable Calendar Quarter, with a breakdown by type;

(c)     a calculation of Net Sales for the applicable Calendar Quarter, including an itemized listing of applicable deductions;

(d)     the total amount payable to Harvard in U.S. dollars on Net Sales for the applicable Calendar Quarter, together with the exchange rates used for conversion.

If no amounts are due to Harvard for any Calendar Quarter, the report shall so state.

7.1.2.   Payment for Net Sales.  Within 30 days of end of each Calendar Quarter, Licensee shall pay Harvard all amounts due with respect to Net Sales for the applicable Calendar Quarter.

7.1.3.   Payment for Non-Royalty Sublicense Income.  In addition to the reports delivered pursuant to Section 7.1.1, Licensee shall notify Harvard in writing within fifteen (15) days of the receipt of any Non-Royalty Sublicense Income. Licensee shall pay Harvard all amounts due with respect to such Non-Royalty Sublicense Income within thirty (30) of the receipt of such Non-Royalty Sublicense Income by Licensee or its Affiliates.

17

HIGHLY CONFIDENTIAL                                    BRL00078636

**7.2.** **Payment Currency.** All payments due under this Agreement shall be payable in United States dollars. Conversion of foreign currency to U.S. dollars shall be made at the conversion rate existing in the United States (as reported in the Wall Street Journal) on the last working day of the applicable Calendar Quarter. Such payments shall be without deduction of exchange, collection, or other charges.

**7.3.** **Records.** Licensee shall maintain, and shall cause its Affiliates and Sublicensees to maintain, complete and accurate records of Licensed Products that are made, used or sold under this Agreement, any amounts payable to Harvard in relation to such Licensed Products and all Non-Royalty Sublicense Income received by Licensee and its Affiliates, which records shall contain sufficient information to permit Harvard to confirm the accuracy of any reports or notifications delivered to Harvard under Section 7.1. The relevant party shall retain such records relating to a given Calendar Quarter for at least three (3) years after the conclusion of that Calendar Quarter, during which time Harvard shall have the right, at its expense, to cause an independent, certified public accountant to inspect such records during normal business hours for the sole purpose of verifying any reports and payments delivered under this Agreement. Such accountant shall not disclose to Harvard any information other than information relating to the accuracy of reports and payments delivered under this Agreement. The parties shall reconcile any underpayment or overpayment within thirty (30) days after the accountant delivers the results of the audit. In the event that any audit performed under this Section 7.3 reveals an underpayment in excess of five percent (5%) in any calendar year, the audited party shall bear the full cost of such audit. Harvard may exercise its rights under this Section 7.3 only once every year per audited party and only with reasonable prior notice to the audited party.

**7.4.** **Audited Report.** Licensee shall furnish Harvard, and shall cause its Affiliates and Sublicensees to furnish Harvard, within ninety (90) days after the end of each calendar year, commencing at the end of the calendar year in which Net Sales are first generated or or in which Non-Royalty Sublicense Income is first received, with a report, certified by an independent certified public accountant, relating to royalties and other payments due to Harvard pursuant to this Agreement in respect to the previous calendar year and containing the same details as those specified in Section 7.1 above in respect to the previous calendar year.

**7.5.** **Late Payments.** Any payments by Licensee that are not paid on or before the date such payments are due under this Agreement shall bear interest at the lower of (a) one and one half percent (1 1/2%) per month and (b) the maximum rate allowed by law. Interest shall accrue beginning on the first day following the due date for payment and shall be compounded quarterly. Payment of such interest by Licensee shall not limit, in any way, Harvard's right to exercise any other remedies Harvard may have as a consequence of the lateness of any payment.

**7.7.** **Payment Method.** Each payment due to Harvard under this Agreement shall be paid by check or wire transfer of funds to Harvard's account in accordance with written instructions provided by Harvard. If made by wire transfer, such payments shall be marked so as

18

HIGHLY CONFIDENTIAL

BRL00078637

to refer to this Agreement.

**7.8.    Withholding and Similar Taxes.**  All amounts to be paid to Harvard pursuant to this Agreement shall be without deduction of exchange, collection, or other charges, and, specifically, without deduction of withholding or similar taxes or other government imposed fees or taxes, except as permitted in the definition of Net Sales.

## 8.    Enforcement of Patent Rights.

**8.1.    Notice.**  In the event either party becomes aware of any possible or actual infringement of any (a) Exclusive Harvard Patent Rights relating to Licensed Products in the Unlimited Field, (b) Harvard/MRC Patent Rights within the United States relating to Licensed Product in the unlimited Field, or (c) Harvard Case 2222 Patent Rights relating to 2222 Licensed Products in the 2222 Field, (each of the possible or actual infringements described in (a), (b) or (c) shall be referred to as an "Infringement"), that party shall promptly notify the other party and provide it with details regarding such Infringement

**8.2.    Suit by Licensee.**  Licensee shall have the right, but not the obligation, to take action in the prosecution, prevention, or termination of any Infringement. Before Licensee commences an action with respect to any Infringement, Licensee shall consider in good faith the views of Harvard and potential effects on the public interest in making its decision whether to sue. Should Licensee elect to bring suit against an infringer, Licensee shall keep Harvard reasonably informed of the progress of the action and shall give Harvard a reasonable opportunity in advance to consult with Licensee and offer its views about major decision affecting the litigation. Licensee shall give careful consideration to those views, but shall have the right to control the action, provided, however, that if Licensee fails to defend in good faith the validity and/or enforceability of the Licensed Patent Rights in the action or, or if Licensee's license to a Valid Claim in suit terminates, Harvard may elect to take control of the action pursuant to Section 8.3. Should Licensee elect to bring suit against an infringer and Harvard is joined as party plaintiff in any such suit, Harvard shall have the right to approve the counsel selected by Licensee to represent Licensee and Harvard, such approval not to be unreasonably withheld. The expenses of such suit or suits that Licensee elects to bring, including any expenses of Harvard incurred in conjunction with the prosecution of such suits or the settlement thereof, shall be paid for entirely by Licensee and Licensee shall hold Harvard free, clear and harmless from and against any and all costs of such litigation, including attorney's fees. Licensee shall not compromise or settle such litigation without the prior written consent of Harvard, which consent shall not be unreasonably withheld or delayed. In the event Licensee exercises its right to sue pursuant to this Section 8.2, it shall first reimburse itself out of any sums recovered in such suit or in settlement thereof for all costs and expenses of every kind and character, including reasonable attorney's fees, necessarily involved in the prosecution of any such suit. If, after such reimbursement, any funds shall remain from said recovery, then Harvard shall receive an amount equal to 20% of such funds and the remaining 80% of such funds shall be retained by Licensee.

19

[10.11.1.12] [Harvard.pdf] [Page 20 of 40]

HIGHLY CONFIDENTIAL

BRL00078638

**8.3.    Suit by Harvard.** If Licensee does not take action in the prosecution, prevention, or termination of any Infringement pursuant to Section 8.2 above, and has not commenced negotiations with the infringer for the discontinuance of said Infringement to Harvard's reasonable satisfaction, within ninety (90) days after receipt of notice to Licensee by Harvard of the existence of an Infringement, Harvard may elect to do so. Should Harvard elect to bring suit against an infringer and Licensee is joined as party plaintiff in any such suit, Licensee shall have the right to approve the counsel selected by Harvard to represent Harvard, such approval not to be unreasonably withheld. The expenses of such suit or suits that Harvard elects to bring, including any expenses of Licensee incurred in conjunction with the prosecution of such suits or the settlement thereof, shall be paid for entirely by Harvard and Harvard shall hold Licensee free, clear and harmless from and against any and all costs of such litigation, including attorney's fees. Harvard shall not compromise or settle such litigation without the prior written consent of Licensee, which consent shall not be unreasonably withheld or delayed. In the event Harvard exercises its right to sue pursuant to this Section 8.3, it shall first reimburse itself out of any sums recovered in such suit or in settlement thereof for all costs and expenses of every kind and character, including reasonable attorney's fees, necessarily involved in the prosecution of any such suit. If, after such reimbursement, any funds shall remain from said recovery, then Licensee shall receive an amount equal to 20% of such funds and the remaining 80% of such funds shall be retained by Harvard.

**8.4.    Own Counsel.** Each party shall always have the right to be represented by counsel of its own selection and at its own expense in any suit instituted under this Section 8 by the other party for Infringement.

**8.5.    Cooperation.** Each party agrees to cooperate fully in any action under this Section 8 which is controlled by the other party, provided that the controlling party reimburses the cooperating party promptly for any costs and expenses incurred by the cooperating party in connection with providing such assistance.

**8.6.    Standing.** If a party lacks standing and the other party has standing to bring any such suit, action or proceeding, then such other party shall do so at the request of and at the expense of the requesting party. If either party determines that it is necessary or desirable for another party to join any such suit, action or proceeding, the other party shall execute all papers and perform such other acts as may be reasonably required in the circumstances.

**8.7.    Declaratory Judgment.** If a declaratory judgment action is brought naming Licensee and/or any of its Affiliates or Sublicensees as a defendant and alleging invalidity or unenforceability of any claims within the Licensed Patent Rights (including as part of proceedings described in Section 8.2), Licensee shall promptly notify Harvard in writing and Harvard may elect, upon written notice to Licensee within thirty (30) days after Harvard receives

20

HIGHLY CONFIDENTIAL                                                      BRL00078639

notice of the commencement of such action, to take over the sole defense of the invalidity or unenforceability aspect of the action at its own expense.

## 9. Warranties; Limitation of Liability.

**9.1. Compliance with Law.** Licensee warrants that it will comply, and ensure that its Affiliates and Sublicensees comply, with, all local, state, and international laws and regulations relating to the development, manufacture, use, and sale of Licensed Products. Without limiting the foregoing, Licensee represents and warrants that it shall, and shall ensure that its Affiliates and Sublicensees shall, comply with all United States export control laws and regulations with respect to Licensed Products.

### 9.2. No Warranty.

**9.2.1.** Harvard makes no warranties whatsoever as to the commercial or scientific value of the Licensed Patent Rights or the inventions disclosed therein. Harvard makes no representation that the practice of the Licensed Patent Rights or the manufacture, use or sale of any Licensed Product, or any element thereof, will not infringe the patent or proprietary rights of any third party.

**9.2.2.** Except as otherwise expressly provided in this Agreement, no party makes any warranty with respect to any technology, patents, goods, services, rights or other subject matter of this Agreement and hereby disclaims warranties of merchantability, fitness for a particular purpose and noninfringement with respect to any and all of the foregoing.

### 9.3. Limitation of Liability.

**9.3.1.** Subject to Section 10, neither party will be liable to the other with respect to any subject matter of this Agreement under any contract, negligence, strict liability or other legal or equitable theory for (i) any indirect, incidental, consequential or punitive damages or lost profits or (ii) cost of procurement of substitute goods, technology or services.

**9.3.2.** Harvard's aggregate liability for all damages of any kind arising out of or relating to this Agreement or its subject matter shall not exceed the amounts paid to Harvard under this Agreement.

## 10. Indemnification.

### 10.1. Indemnity.

21

[10.11.1.12] [Harvard.pdf] [Page 22 of 40]

HIGHLY CONFIDENTIAL

BRL00078640

**10.1.1.** Licensee shall indemnify, defend and hold harmless Harvard and its current or former directors, governing board members, trustees, officers, faculty, medical and professional staff, employees, students, and agents and their respective successors, heirs and assigns (collectively, the "Indemnitees") from and against any claim, liability, cost, expense, damage, deficiency, loss or obligation or any kind or nature (including, without limitation, reasonable attorney's fees and other costs and expenses of litigation) (collectively, "Claims"), based upon, arising out of, or otherwise relating to this Agreement, including without limitation any cause of action relating to product liability concerning any product, process, or service made, used or sold pursuant to any right or license granted under this Agreement. Neither Licensee nor Harvard shall settle any Claim without the prior written consent of the other, which consent shall not be unreasonably withheld.

**10.1.2.** Licensee shall, at its own expense, provide attorneys reasonably acceptable to Harvard to defend against any actions brought or filed against any Indemnitee hereunder with respect to the subject of indemnity contained herein, whether or not such actions are rightfully brought.

**10.2. Insurance.**

**10.2.1.** Beginning at the time any such product, process or service is being commercially distributed or sold (other than for the purpose of obtaining regulatory approvals) by Licensee, or by an Affiliate, Sublicensee or agent of Licensee, Licensee shall, at its sole cost and expense, procure and maintain commercial general liability insurance in amounts not less than $5,000,000 per incident and $5,000,000 annual aggregate and naming the Indemnitees as additional insureds. During clinical trials of any such product, process or service, Licensee shall, at its sole cost and expense, procure and maintain commercial general liability insurance in such equal or lesser amount as Harvard shall require, naming the Indemnitees as additional insureds. Such commercial general liability insurance shall provide: (a) product liability coverage and (b) broad form contractual liability coverage for Company's indemnification under this Agreement.

**10.2.2.** If Licensee elects to self-insure all or part of the limits described above in Section 10.2.1 (including deductibles or retentions which are in excess of $250,000 annual aggregate) such self-insurance program must be acceptable to Harvard and the Risk Management Foundation of the Harvard Medical Institutions, Inc. in their sole discretion. The minimum amounts of insurance coverage required shall not be construed to create a limit of Licensee's liability with respect to its indemnification under this Agreement.

**10.2.3.** Licensee shall provide Harvard with written evidence of such insurance upon request of Harvard. Licensee shall provide Harvard with written notice at least fifteen (15) days prior to the cancellation, non-renewal or material change in such insurance; if Licensee does not obtain replacement insurance providing comparable coverage within such fifteen (15) day

22

HIGHLY CONFIDENTIAL                                                                 BRL00078641

period, Licensee shall have the right to terminate this Agreement effective at the end of such fifteen (15) day period without notice or any additional waiting periods.

10.2.4. Licensee shall maintain such commercial general liability insurance beyond the expiration or termination of this Agreement during: (a) the period that any product, process, or service, relating to, or developed pursuant to, this Agreement is being commercially distributed or sold by Licensee, or an Affiliate, Sublicensee or agent of Licensee; and (b) a reasonable period after the period referred to in (a) above which in no event shall be less than fifteen (15) years.

**10.3    Additional Indemnitees.**

10.3.1. With respect to any Claim (as defined in Section 10.1.1. arising out of any acts or failure to act by or out of any use of, or the practice of any rights granted under, the 2215 Patent Rights by Licensee, or by an Affiliate, Sublicensensee or agent of Licensee, the definition of "Indemnitees" in Section 10.1.1 shall also include the U of T Beneficiaries. For purposes of this Section 10.3, "U of T Beneficiaries" shall mean Eugenia Kumacheva, her successors and assigns, and University of Toronto Innovations Foundation, University of Toronto and their respective current, former and future trustees, board members, officers, employees, appointees, faculty, professional staff, consultants, affiliated corporations and agents and their respective heirs, successors and assigns.

10.3.2. Licensee acknowledges and agrees that, in executing this Agreement, Harvard is contracting on its own behalf and as agent for the U of T Beneficiaries. Harvard shall hold the rights granted under this Section 10 (as they relate to the U of T Beneficiaries) in trust for the benefit of the U of T Beneficiaries, as applicable, and may assign such rights to each of the U of T Beneficiaries insofar as the U of T Beneficiaries are contemplated to have rights arising under this Section 10. The parties acknowledge that the U of T Beneficiaries shall be treated as having rights under this Section 10.3 as if they were parties to this Agreement.

23

[10.11.1.12] [Harvard.pdf] [Page 24 of 40]

HIGHLY CONFIDENTIAL

BRL00078642

**11.    Term and Termination.**

**11.1.    Term.** The term of this Agreement shall commence on the Effective Date and, unless earlier terminated as provided in this Section 11, shall continue in full force and effect on a Licensed Product-by-Licensed Product and country-by-country basis until the expiration of all payment obligations pursuant to Section 6 for such Licensed Product.

**11.2.    Termination.**

**11.2.1. Termination Without Cause.** Licensee may terminate this Agreement upon sixty (60) days prior written notice to Harvard.

**11.2.2. Termination for Default.**

**11.2.2.1.** In the event that either party commits a material breach of its obligations under this Agreement and fails to cure that breach within ninety (90) days after receiving written notice thereof, the other party may terminate this Agreement immediately upon written notice to the party in breach.

**11.2.2.2.** If Licensee defaults in its obligations under Section 10.2 to procure and maintain insurance or, if Licensee has in any event failed to comply with the notice requirements contained therein, then Harvard may terminate this Agreement immediately without notice or additional waiting period.

**11.2.3. Bankruptcy.** Harvard may terminate this Agreement upon notice to Licensee if Licensee becomes insolvent, is adjudged bankrupt, applies for judicial or extra-judicial settlement with its creditors, makes an assignment for the benefit of its creditors, voluntarily files for bankruptcy or has a receiver or trustee (or the like) in bankruptcy appointed by reason of its insolvency, or in the event an involuntary bankruptcy action is filed against Licensee and not dismissed within ninety (90) days, or if the other party becomes the subject of liquidation or dissolution proceedings or otherwise discontinues business.

**11.3.    Effect of Termination.**

**11.3.1. Termination of Rights.** Upon termination of this Agreement by either party pursuant to any of the provisions of Sections 5.4 or 11.2: (a) the rights and licenses granted to Licensee under Section 4 shall terminate and all rights in and to and under the Licensed Patent Rights shall revert to Harvard; and (b) any existing agreements that contain a Sublicense shall terminate to the extent of such Sublicense.

**11.3.2. Accruing Obligations.** Termination of this Agreement shall not relieve

24

HIGHLY CONFIDENTIAL                                                                      BRL00078643

the parties of obligations occurring prior to such termination, including obligations to pay amounts accruing hereunder up to the date of termination.

**11.4. Survival.** The parties' respective rights, obligations and duties under Sections 7.3, 7.5, 9.1, 9.3, 10, 11.3, 12.3 and 12.6, as well as any rights, obligations and duties which by their nature extend beyond the expiration or termination of this Agreement, shall survive any expiration or termination of this Agreement. In addition, Licensee's obligations under Sections 6.4.1(d) and 7 with respect to Type D Licensed Products shall survive termination.

## 12. Miscellaneous.

**12.1. Preference for United States Industry.** During the period of exclusivity of this license in the United States, Licensee shall cause any Licensed Product produced for sale in the United States to be manufactured substantially in the United States.

**12.2. No Security Interest.** Licensee shall not enter into any agreement under which Licensee grants to or otherwise creates in any third party a security interest in this Agreement or any of the rights granted to Licensee herein. Any grant or creation of a security interest purported or attempted to be made in violation of the terms of this Section 12.2 shall be null and void and of no legal effect.

**12.3. Use of Name.** Licensee shall not, and shall ensure that its Affiliates and Sublicensees shall not, use the name or insignia of Harvard or the name of any of Harvard officers, faculty, other researchers or students, or any adaptation of such names, in any advertising, promotional or sales literature, including without limitation any press release or any document employed to obtain funds, without the prior written approval of Harvard. This restriction shall not apply to any information required by law to be disclosed to any governmental entity.

**12.4. Entire Agreement.** This Agreement is the sole agreement with respect to the subject matter hereof and except as expressly set forth herein, supersedes all other agreements and understandings between the parties with respect to the same.

**12.5. Notices.** Unless otherwise specifically provided, all notices required or permitted by this Agreement shall be in writing and may be delivered personally, or may be sent by facsimile or certified mail, return receipt requested, to the following addresses, unless the parties are subsequently notified of any change of address in accordance with this Section 12.5:

If to Licensee:     Raindance Technologies, Inc.
                    530 Whitfield Street
                    Guilford CT 06437

25

HIGHLY CONFIDENTIAL

BRL00078644

Attn.: Jonathan Rothberg

If to Harvard:          Office of Technology Development
                        Harvard University
                        Holyoke Center 727
                        1350 Massachusetts Avenue
                        Cambridge, Massachusetts 02138

                        Attn.:  Chief Technology Development Officer

Any notice shall be deemed to have been received as follows: (i) by personal delivery,
upon receipt; (ii) by facsimile, one business day after transmission or dispatch; (iii) by airmail,
seven (7) business days after delivery to the postal authorities by the party serving notice. If
notice is sent by facsimile, a confirming copy of the same shall be sent by mail to the same
address.

**12.6.  Governing Law and Jurisdiction.**  This Agreement will be governed by, and
construed in accordance with, the substantive laws of the Commonwealth of Massachusetts,
without giving effect to any choice or conflict of law provision, except that questions affecting
the construction and effect of any patent shall be determined by the law of the country in which
the patent shall have been granted. Any dispute will be resolved by the state courts of the
Commonwealth of Massachusetts or the federal courts of the District of Massachusetts, without
restricting any right of appeal.

**12.7.  Binding Effect.**  This Agreement shall be binding upon and inure to the benefit of
the parties and their respective legal representatives, successors and permitted assigns.

**12.8.  Headings.**  Section and subsection headings are inserted for convenience of
reference only and do not form a part of this Agreement.

**12.9.  Counterparts.**  This Agreement may be executed simultaneously in two or more
counterparts, each of which shall be deemed an original.

**12.10.  Amendment; Waiver.**  This Agreement may be amended, modified, superseded
or canceled, and any of the terms may be waived, only by a written instrument executed by each
party or, in the case of waiver, by the party waiving compliance. The delay or failure of any party
at any time or times to require performance of any provisions hereof shall in no manner affect the
rights at a later time to enforce the same. No waiver by either party of any condition or of the
breach of any term contained in this Agreement, whether by conduct, or otherwise, in any one or
more instances, shall be deemed to be, or considered as, a further or continuing waiver of any

26

[10.11.1.12] [Harvard.pdf] [Page 27 of 40]

HIGHLY CONFIDENTIAL

BRL00078645

such condition or of the breach of such term or any other term of this Agreement.

**12.11. No Agency or Partnership.** Nothing contained in this Agreement shall give any party the right to bind another, or be deemed to constitute either parties as agents for each other or as partners with each other or any third party.

**12.12. Assignment and Successors.** This Agreement may not be assigned by either party without the consent of the other, which consent shall not be unreasonably withheld, except that each party may, without such consent, assign this Agreement and the rights, obligations and interests of such party to any of its Affiliates, to any purchaser of all or substantially all of its assets or research to which the subject matter of this Agreement relates, or to any successor corporation resulting from any merger or consolidation of such party with or into such corporation.

**12.13. Force Majeure.** Neither party will be responsible for delays resulting from causes beyond the reasonable control of such party, including without limitation fire, explosion, flood, war, strike, or riot, provided that the nonperforming party uses commercially reasonable efforts to avoid or remove such causes of nonperformance and continues performance under this Agreement with reasonable dispatch whenever such causes are removed.

**12.14. Interpretation.** The parties hereto acknowledge and agree that: (i) each Party and its counsel reviewed and negotiated the terms and provisions of this Agreement and have contributed to its revision; (ii) the rule of construction to the effect that any ambiguities are resolved against the drafting party shall not be employed in the interpretation of this Agreement; and (iii) the terms and provisions of this Agreement shall be construed fairly as to both parties hereto and not in favor of or against either party, regardless of which party was generally responsible for the preparation of this Agreement.

**12.15. Severability.** If any provision of this Agreement is or becomes invalid or is ruled invalid by any court of competent jurisdiction or is deemed unenforceable, it is the intention of the parties that the remainder of this Agreement shall not be affected.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

- 27

[10.11.1.12] [Harvard.pdf] [Page 28 of 40]

HIGHLY CONFIDENTIAL

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.



President and Fellows of Harvard College

By:

Isaac T. Kohlberg, Senior Associate Provost
Chief Technology Development Officer
Office of Technology Development
Harvard University
Title:

Raindance Technologies, Inc.

By:

Name: Jonathan M. Rothe,

Title: Chairman of the board

28

[D:1[.1.12] [Harvard.pdf] [Page 29 of 40]

HIGHLY CONFIDENTIAL                                          BRL00078647



Exhibit 1.3

Development Milestones

RainDance Technologies – Personal Laboratory System

*PLS* v1.0

| Working prototype | Q4 2006 |
|-------------------|---------|
| Beta test | Q4 2007 |
| Commercial sales | Q4 2008 |

HIGHLY CONFIDENTIAL                                                BRL00078648

## Exhibit 1.4

Development Plan

RainDance Technologies – Personal Laboratory System

RainDance Technologies is developing a laboratory instrument, the PLS v1.0 for commercial sales in Q4 2008. The PLS v1.0 is being developed to the following specifications to meet commercialization milestones.

*PLS* v1.0 – commercialization milestones

| Working prototype | Q4 2006 |
|-------------------|---------|
| Beta test | Q4 2007 |
| Commercial sales | Q4 2008 |

**Intended use**

### 1.1  Instrument functionality

| The PLS Instrument Shall be designed to perform multiple applications, using individual droplets suspended in an oil matrix. |
|---|

**General requirements**

### 1.2  Target markets and locations

| The *PLS* prototype instrument is one that is only suitable for use internally and in the founder's laboratories |
|---|
| The Beta *PLS* Instrument will be suitable for placement in early-adopter laboratories |
| The *PLS* v1.0 is ready for broad distribution. |
| *The PLS v1.0 instrument is not intended for use as a medical diagnostic device.* |

### 1.3  Operating environment

| The Prototype, Beta, and *PLS* v1.0 Shall operate in normal laboratory conditions. |
|---|

### 1.4  Physical attributes

| The Beta *PLS* Instrument Shall be suitable for installation on the bench-top. |
|---|
| The *PLS* v1.0 Instrument Should consist of: |
| a single unit containing the liquid handling, electronics & optics |
| and external PC for control and data management. |

[0-11.1.12] [Harvard.pdf] [Page 31 of 40]

HIGHLY CONFIDENTIAL                                                              BRL00078649

**Functional requirements**

### 1.5   Optical detection

| |
|---|
| The Beta Instrument Shall have a single optical detection point. |
| The detection point Shall allow two modes of operation in detecting the assay signal:<br><br>  –  fluorescence detection, or<br><br>  –  ratio metric polarizing detection<br><br>*There is no requirement for both measurement modes to be used during the same Run.* |
| When the assay signal is set up for fluorescence detection, the Instrument Shall be capable of measuring 2 wavelengths simultaneously. |
| When the assay signal is set up for ratio metric polarizing detection, the Instrument Shall be capable of simultaneously measuring 2 polarization states of 1 wavelength. |
| The Beta Instrument Shall deliver a laser power between 10-50 mW.<br><br>*This range is set by a minimum required for excitation and a maximum defined by the heating limit of the biochemical material.* |

### 1.6   Reagent handling

| |
|---|
| The Beta Instrument Shall have a minimum of three independent reagent channels. |
| The Reagent channels Shall be capable of delivering flow rates in the range of 25 µl/hr to 500 µl/hr. |

### 1.7   Throughput and timing

| |
|---|
| The Beta Instrument Shall be designed to use a single Chip at any one time. |
| The Beta Instrument Shall be capable of operating Chip with a minimum nominal droplet frequency of 1kHz. |

**Disposables requirements**

### 1.8   Sample input and waste

| |
|---|
| The Beta Instrument Shall allow at least 3 application reagents to be used in an application Run. |
| The Beta Instrument Shall be configured to allow for collection in a Waste. |

[0.13.1.12] [Harvard.pdf] [Page 32 of 40]

HIGHLY CONFIDENTIAL        BRL00078650

**Chip interface requirements** .

### 1.9 Standardization

| |
|---|
| The Beta Instrument Shall have a standard interface with all Chips. |
| *This includes location of fluid ports, location and material of electrical connections, location of chip identification markers, and location of chip orientation markers.* |

**User requirements**

### 1.10 Documentation

| |
|---|
| The Beta Instrument Shall be supplied with an Operator Manual. |

### 1.11 User access

| |
|---|
| The Beta Instrument Shall have one or more access points at which reagents can be delivered by the Operator |
| The Beta Instrument Shall have access points at which the Store and Waste are accessed by the Operator |
| The Beta Instrument Shall have an access point for Chip insertion and removal. |

### 1.12 Data logging

| |
|---|
| The Beta Instrument Shall create a log file of specified data for each Run. |

[12] [Harvard.pdf] [Page 33 of 40]

HIGHLY CONFIDENTIAL                                                      BRL00078651

**Exhibit 1.5**
**Exclusive Harvard Patent Rights**

| Harvard Case | Title | Application Date | Application No. | Country |
|---|---|---|---|---|
| 2221 | Electronic Control of Fluidic Species | 08/27/03 | 60/498,091 | U.S. Provisional |
| 2221 | Electronic Control of Fluidic Species | 08/27/04 | PCT/US2004/027912 | International |
| 2630 | Fluidic Droplet Coalescence | 01/27/06 | To be assigned by the USPTO. | U.S. Provisional |



[Harvard.pdf] [Page 34 of 40]

HIGHLY CONFIDENTIAL

**Exhibit 1.7**
**Harvard Case 2183 Patent Rights**

| Harvard Case | Title | Application Date | Application No. | Country |
|---|---|---|---|---|
| 2183 | Formation and Control of Fluidic Species | 04/10/03 | 60/461,954 | U.S. Provisional |
| 2183 | Formation and Control of Fluidic Species | 04/09/04 | PCT/US2004/010903 | International |



[10.11.1.12] [Harvard.pdf] [Page 35 of 40]

HIGHLY CONFIDENTIAL                                                  BRL00078653

**Exhibit 1.8**
**Harvard Case 2215 Patent Rights**

| 2215 | Method and Apparatus for Fluid Dispersion | 06/30/03 | PCT/US03/20542 | International |
|------|-------------------------------------------|----------|----------------|---------------|
| 2215 | Method and Apparatus for Fluid Dispersion | 12/28/04 | 11/024,228 | U.S. |
| 2215 | Method and Apparatus for Fluid Dispersion | 06/30/03 | 2003253751 | Australia |
| 2215 | Method and Apparatus for Fluid Dispersion | 06/30/03 | 2,491,564 | Canada |
| 2215 | Method and Apparatus for Fluid Dispersion | 06/30/03 | 03820494.0 | China |
| 2215 | Method and Apparatus for Fluid Dispersion | 06/30/03 | 2004-549845 | Japan |
| 2215 | Method and Apparatus for Fluid Dispersion | 06/30/03 | 05106492.5 | Hong Kong |
| 2215 | Method and Apparatus for Fluid Dispersion | 06/30/03 | 537478 | New Zealand |
| 2215 | Method and Apparatus for Fluid Dispersion | 06/30/03 | 03762228.9 | EPO |



[D:11.1.12] [Harvard.pdf] [Page 36 of 40]

HIGHLY CONFIDENTIAL

### Exhibit 1.9
### Harvard Case 2222 Patent Rights

| Harvard Case | Title | Application Date | Application No. | Country |
|---|---|---|---|---|
| 2222 | Method and Apparatus for Forming Multiple Emulsions | 03/04/05 | 60/659,045 | U.S. Provisional |



[10.11.1.12] [Harvard.pdf] [Page 37 of 40]

HIGHLY CONFIDENTIAL

**Exhibit 1.10**
**Harvard/MRC Patent Rights**

| Harvard Case | Title | Application Date | Application No. | Country |
|---|---|---|---|---|
| 2407 | In Vitro Evolution in Microfluidic Systems | 10/08/04 | 10/961,695 | U.S. Utility |
| 2408 | Compartmentalised Screening by Microfluidic Control | 10/12/04 | 10/963,044 | U.S. Utility |
| 2409 | Compartmentalised Combinatorial Chemistry by Microfluidic Control | 10/12/04 | 10/962,952 | U.S. Utility |

12] [Harvard.pdf] [Page 38 of 40]

**Exhibit 1.17**
**Non-Exclusive Harvard Patent Rights**

| Harvard Case | Title | Application Date | Application No. | Country |
|---|---|---|---|---|
| 2064 | Method and Apparatus for Fluid Dispersion | 11/05/02 | 60/424,042 | U.S. Provisional |
| 2065 | Multiphase Microfluidic System and Method | 06/28/02 | 60/392,195 | U.S. Provisional |



[12] [Harvard.pdf] [Page 39 of 40]

HIGHLY CONFIDENTIAL

BRL00078657

Exhibit 6.2.1.2
Raindance Capitalization Table

| | A | B | C | D |
|---|---|---|---|---|
| 1 | **Raindance Technologies Capitalization Table** | | | Feb. 22, 2006 |
| 2 | | | | |
| 3 | Entity | Shares | % Ownership | Fully Diluted (3) |
| 4 | Founders(1) | 2,526,304 | 26.27% | 22.96% |
| 5 | TRI (2) | 6,342,120 | 65.94% | 57.63% |
| 6 | Institutions | 750,000 | 7.80% | 6.81% |
| 7 | Total Shares | 9,618,424 | | 11,005,424 |
| 8 | | | | |
| 9 | Notes: | | | |
| 10 | (1) Founders stock requires 12 full time days for RDT per year for next 3 years & additional employement requirements for D.Link. | | | |
| 11 | (2) Shares issued to TRI for their $2,000,000 investment | | | |
| 12 | (3) Includes options granted but NOT yet vested to Employees, SAB, and BOD: | | | 1,387,000 |
| 13 | | | | |
| 14 | | | | |
| 15 | Institutions | | | |
| 16 | Name | Shares | % Ownership | Fully Diluted |
| 17 | MRC | 200,000 | 2.079342728 | 1.817285731 |
| 18 | Harvard University | 550,000 | 5.718192502 | 4.997535761 |
| 19 | Total: | 750,000 | 7.79753523 | 6.814821492 |
| 20 | | | | |
| 21 | Founders | | | |
| 22 | Name | Shares | % Ownership | Fully Diluted |
| 23 | Andrew Griffiths, PhD. | 421,051 | 4.377546675 | 3.825849872 |
| 24 | David Weitz, Ph.D. | 842,101 | 8.755082953 | 7.651690857 |
| 25 | Darren Link, Ph.D.# | 842,101 | 8.755082953 | 7.651690857 |
| 26 | Jerome Bibette, Ph.D. | 421,051 | 4.377546675 | 3.825849872 |
| 27 | Total: | 2,526,304 | 26.26525926 | 22.95508106 |
| 28 | Note: Requires 12 full time days at RDT per year for 3 years | | | |
| 29 | # Additional requirements: 4 years of full time employement, 210,525 for year 2, and 105,263 for years 3 and 4. | | | |
| 30 | | | | |
| 31 | | | | |
| 32 | **OPTIONS** | | | |
| 33 | Options granted to employees | | | |
| 34 | Name | Title | Start Date | Options |
| 35 | Jeffrey Branciforte | Eng Associate | 12/6/2004 | 20,000 |
| 36 | Yves Charles | Eng Associate | 12/6/2004 | 20,000 |
| 37 | Gilbert Feke, PhD | Senior Engineer | 11/1/2004 | 33,000 |
| 38 | John Q Lu, PhD | Senior Engineer | 12/6/2004 | 25,000 |
| 39 | Dave Marran, PhD | Senior Engineer | 11/15/2004 | 45,000 |
| 40 | Yue Suo, PhD | Senior Engineer | 12/6/2004 | 40,000 |
| 41 | Ahmadali Tabatabai, PhD | Senior Engineer | 12/15/2004 | 33,000 |
| 42 | Mariusz Twardowski, PhDE | Senior Engineer | 1/3/2005 | 33,000 |
| 43 | Wolfgang Hinz, PhD | Chemist | 11/1/2004 | 15,000 |
| 44 | Janet Verney | Dir of Operations | 11/1/2004 | 12,000 |
| 45 | Melissa Sullivan | Operations | 11/1/2004 | 6,000 |
| 46 | Julie Gribbons | Operations | 11/1/2004 | 6,000 |
| 47 | Charles Becklus | Operations | 11/1/2004 | 6,000 |
| 48 | Darren Link, PhD* | V.P. Engineering | 8/16/2004 | 400,000 |
| 49 | Michael Weiner, PhD** | V.P. Molecular Biology | 8/16/2004 | 200,000 |
| 50 | Robert Cunningham*** | COO | 8/22/2005 | 400,000 |
| 51 | Total: | | | 1,294,000 |
| 52 | Notes: Vesting is 1/3 per year of service over a 3 year period. | | | |
| 53 | * 4 year vesting schedule 50%,25%,15%,10% for years 1 through 4 | | | |
| 54 | ** Additional requirements: Requires 100 Days of work per year. 100,000 for first year, and 50,000 for years 2 and 3. | | | |
| 55 | *** 4 year vesting, 25% per year | | | |
| 56 | | | | |
| 57 | Options granted to RDT SAB members | | | |
| 58 | Name | Comment | Start Date | Options (1) |
| 59 | Dr. Jean-Marie Lehn | Nobel Prize in Chemistry, 1987 | 12/15/2004 | 12,000 |
| 60 | Dr. Richard J. Roberts | Nobel Prize in Medicine, 1993 | 12/15/2004 | 12,000 |
| 61 | Sir Gregory Winter CBE FRS | | 12/15/2004 | 12,000 |
| 62 | Sir Aaron Klug OM FRS | Nobel Prize in Chemistry, 1982 | 12/15/2004 | 12,000 |
| 63 | | | | |
| 64 | Total: | | | 48,000 |
| 65 | Notes: Vesting requires 4 full time days per year for 3 years | | | |
| 66 | | | | |
| 67 | Options granted to RDT Board of Directors | | | |
| 68 | Name | Options | Start Date | Options (1) |
| 69 | Dan Seligson, PhD | Board Member | 8/16/2004 | 45,000 |
| 70 | | | | |
| 71 | Total: | | | 45,000 |
| 72 | Notes: 15,000 vested at election, and 15,000 vest at the beginning of years 2 and 3 of service on the BOD | | | |

HIGHLY CONFIDENTIAL

BRL00078658