# EXHIBIT 5

MRC

# EXCLUSIVE LICENSE AGREEMENT

This Exclusive License Agreement (this "Agreement") is made as of December 5, 2005 (the "Effective Date") by and between Medical Research Council, a UK publicly funded research organization, with a corporate address of 20 Park Crescent, London W1B 1AL ("MRC") and RainDance, a Delaware company with a corporate address of 530 Whitfield Street, Guilford, CT 06437 ("RainDance"). MRC and RainDance are each hereafter referred to individually as a "Party" and collectively as the "Parties".

WHEREAS, MRC would like MRC to grant to it on the terms set forth herein an exclusive, field limited license to certain of MRC's intellectual property; and

WHEREAS, MRC is willing to grant to RainDance such a license on the terms set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties hereby agree as follows:

1.   **Definitions.**

Whenever used in the Agreement with an initial capital letter, the terms defined in this Section 1 shall have the meanings specified and the singular shall include the plural and vice versa.

1.1   "Affiliate" shall mean any corporation, firm, limited liability company, partnership or other entity that directly controls or is controlled by or is under common control with a Party to this Agreement. For purposes of this Section 1.1, "control" means ownership, directly or indirectly through one or more Affiliates, of fifty percent (50%) or more of the shares of stock entitled to vote for the election of directors, in the case of a corporation, or fifty percent (50%) or more of the equity interests in the case of any other type of legal entity, status as a general partner in any partnership, or any other arrangement whereby a Party controls or has the right to control the Board of Directors or equivalent governing body of a corporation or other entity.

1.2   "Claim Areas" means method, process, system or kit for the controlled manipulation of microdroplets in a microfluidic system, including but not limited to microdroplet formation, coalescence, combination, compartmentalization, dilution, division, fusion, sorting and splitting, and the analysis thereof.

1.3   "Field" shall mean in the case of MRC Exclusive Patent Rights and MRC Joint Patent Rights all uses, and in the case of MRC Non-Exclusive Patent Rights all uses in small molecule drugs and microfluidics and all other uses except those uses licensed exclusively to another third party and identified as the "MRC Excluded Uses".

1.4   "Inventions" shall mean any enhancement, invention or discovery made under this

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION

RDTX00023699

Agreement.

1.5     "Licensed Patent Rights" shall mean any of the patents and patent applications
        described in the Patent Rights and any divisional, continuation, continuation-in-part
        (to the extent that the continuation-in-part is entitled to the priority date of an initial
        patent or patent application which is the subject of this Agreement), reissue,
        reexamination, confirmation, revalidation, registration, patent of addition, renewal,
        extension or substitute thereof, or any patent issuing therefrom or any
        supplementary protection certificates related thereto.

1.6     "Licensed Products" shall mean any product that meets one of the following
        definitions:

        (a)   "Type A Product" shall mean any system that comprises an automated, robotic
              and/or high throughput device or instrument covered by an issued Valid Claim
              for the carrying out, performance and/or practicing of the Licensed Process.

        (b)   "Type B Product" shall mean any Microfluidic Chip (as hereinafter defined),
              covered by an issued Valid Claim which is used in the carrying out,
              performance and/or practicing of the Licensed Process.

        (c)   "Type C Product" shall mean the performance of any Service (as hereinafter
              defined) that makes use of any Licensed Product in the carrying out,
              performance and/or practicing of the Licensed Process.

        (d)   "Type D Product" shall mean any other product that is manufactured or
              produced, in whole or in part, by RainDance, through the use of a Licensed
              Product that is not designed for use on a Type B Product.

        (e)   "Type E Product" shall mean any product that does not fall under Type A, B C
              or D Product for carrying out, performing and/or practicing of the Licensed
              Process

2

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION

RDTX00023700

1.7    "Licensed Process" shall mean any method or process for the controlled manipulation of microdroplets in a microfluidic system (including but not limited to microdroplet formation, coalescence, combination, compartmentalization, dilution, division, fusion, sorting and splitting, and the analysis thereof) that is claimed in Patent Rights and/or the use of same which would constitute, but for the grant of a license under Patent Rights within the Field, an infringement of an issued Valid Claim in the country in which such method is used or in the country in which the resulting products are sold.

1.8    "Microfluidic Chip" shall mean any device made by or for RainDance that consists of small channels that control fluids, both in single phases, and in multiphases, including any device that controls droplets, and/or any device that allows any or all of the following manipulations and processing of droplets: formation, filling, steering, coalescing, mixing, reacting, detecting, sorting and screening, and any use of such droplets to encapsulate chemicals, bio-agents or bio-materials, cells, and reagents of any kind.

1.9    "MRC Excluded Uses" shall mean those fields set out in Exhibit D which are exclusively licensed to third parties.

1.10   "MRC Exclusive Patent Rights" shall mean MRC's entire right, title and interest in the patent applications identified in Exhibit A attached hereto, including any continuation or divisional applications, any patent that issues on any patent application described therein including any patent of addition or reissue, or any re-examination certificate, and any claim of a continuation-in-part patent or patent application, which claim is directed at subject matter described in any patent(s) or patent application(s) described in Exhibit A and is entitled to the priority date of such patent(s) or patent application(s), all to the extent owned and controlled by MRC.

1.11   "MRC Non-Exclusive Patent Rights" shall mean MRC's entire right, title and interest in the patent applications identified in Exhibit B attached hereto, including any continuation or divisional applications, any patent that issues on any patent application described therein including any patent of addition or reissue, or any re-examination certificate, and any claim of a continuation-in-part patent or patent application, which claim is directed at subject matter described in any patent(s) or patent application(s) described in Exhibit B and is entitled to the priority date of such patent(s) or patent application(s), all to the extent owned and controlled by MRC.

1.12   "MRC Joint Patent Rights" shall mean MRC's entire right, title and interest in the patent applications identified in Exhibit C attached hereto, including any continuation or divisional applications, any patent that issues on any patent application described therein including any patent of addition or reissue, or any re-examination certificate, and any claim of a continuation-in-part patent or patent application, which claim is directed at subject matter described in any patent(s) or patent application(s) described in Exhibit C and is entitled to the priority date of such patent(s) or patent application(s), all to the extent owned and controlled by MRC.

3

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION

RDTX00023701

1.13 "Net Sales" shall mean the amount billed, invoiced, or received (whichever first occurs) by RainDance and any Sublicensee(s) for sales, leases, or other transfers of Licensed Product(s) (including, without limitation, all amounts billed, invoiced, or received (whichever first occurs) by RainDance and any Sublicensee(s) for performance or other provision of, or agreement to perform or otherwise provide, any Service), less:

(a) customary trade, quantity or cash discounts and non-affiliated brokers' or agents' commissions actually allowed and taken;

(b) refunds for goods rejected or returned and charge backs and rebates actually taken by customers that effectively reduce net revenue;

(c) to the extent separately stated on purchase orders, invoices or other documents of sale, taxes levied on- and/or other governmental charges made as to production, sale, transportation, delivery or use of such Licensed Products and paid by or on behalf of RainDance or any Sublicensee(s); and

(d) reasonable charges for delivery or transportation provided by third parties, if separately stated and actually paid by RainDance or any Sublicensee(s).

Net Sales also includes the fair market value of any non-cash consideration received by RainDance and any Sublicensee(s) for the sale, lease or transfer of Licensed Product(s). Fair market value will be calculated as of the time of transfer of such non-cash consideration to RainDance or such Sublicensee(s). Transfer of a Licensed Product within RainDance or between RainDance and a Sublicensee for sale by the transferee shall not be considered Net Sales for purposes of ascertaining royalty charges.

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION

RDTX00023702

1.14   "Net Service Revenue" shall mean revenue received from a third party pursuant to a service agreement for services performed using the licensed products.

1.15   "Non-Royalty Sublicense Income" shall mean Sublicense issue fees, Sublicense maintenance fees, Sublicense milestone payments, and any other payments, except for (i) royalties on Net Sales, made by Sublicensee(s) to RainDance on account of Sublicense(s), or (ii) payments made for reimbursement of specific research and development collaborations or contract services to address defined research and development objectives, or (iii) patent expenses, or (iv)payments made for the purchase of equity of RainDance by such Sublicensee(s). To avoid doubt historic research and development costs or on going normal business (product) research and development costs are not deductible.

1.16   "Patent Rights" shall mean MRC Exclusive Patent Rights, MRC Non-Exclusive Patent Rights and MRC Joint Patent Rights.

1.17   "sale", "sold" and "sell" include, without limitation, (i) leases and other transfers and similar transactions and (ii) performance or other provision of, or agreement to perform or otherwise provide, any Service by RainDance and/or any Sublicensee(s).

1.18   "Service" shall mean the use of a Type A Product and/or a Type B Product, and/or the carrying out or performance of the Licensed Process by RainDance and/or any Sublicensee(s) of RainDance on a "for-fee" basis for any third party.

1.19   "Sublicense" shall mean a grant by RainDance to a third party (the "Sublicensee") of a sublicense to exercise, or have exercised by any party, some or all of the rights granted to RainDance in accordance with the terms of this Agreement.

1.20   "Territory" shall mean everywhere.

1.21   "Term" shall mean the period from the Effective Date until the earlier of the expiration of the last to expire of the Licensed Patent Rights or the termination of this Agreement as permitted herein.

1.22   "Third Party" shall mean any person or entity other than RainDance, MRC and their respective Affiliates.

1.23   "Valid Claim" shall mean (a) a pending claim of a patent application within Patent Rights, which (i) has been asserted in good faith and (ii) has not been abandoned or finally rejected without the possibility of appeal or refiling; or (b) a claim of an issued or granted and unexpired patent within Patent Rights, (i) which has not been held with finality to be unenforceable, unpatentable or invalid by a decision of a court or governmental body of competent jurisdiction, (ii) which has not been rendered unenforceable through disclaimer or otherwise, (iii) which has not been abandoned, and (iv) which has not been lost through an interference proceeding.

2.   **Grant of Rights.**

2.1   Grant of License.

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION                                    RDTX00023703

MRC hereby grants to RainDance a license under the Licensed Patent Rights on the terms set forth below. The Parties hereby acknowledge and agree that Third Party purchasers of the System from RainDance shall be entitled to use such products free and clear of any claim for a royalty, or other claim, of MRC based on or arising under RainDance's rights hereunder in the Licensed Patent Rights.

(a) Under MRC Exclusive Patent Rights, MRC hereby grants to RainDance an exclusive, royalty bearing license, including the right to grant sublicenses under the MRC Exclusive Patent Rights to make, use and sell Licensed Products in the Territory within the Field, subject to the terms and conditions of this Agreement.

(b) Under MRC Joint Patent Rights, MRC hereby grants to RainDance an exclusive (i.e. all of MRC's interest), royalty bearing license, including the right to grant sublicenses under the MRC Joint Patent Rights to make, use and sell Licensed Products in the Territory within the Field, subject to the terms and conditions of this Agreement.

(c) Under MRC Non-Exclusive Patent Rights, MRC hereby grants to RainDance an exclusive, royalty bearing license, including the right to grant sublicenses under the MRC Non-Exclusive Patent Rights to make, use and sell Licensed Products in the Territory within the fields of (i) small drug molecules of less than 100 daltons or peptides of less than ten amino acids residues, and (ii) use in microfluidic system where at least one channel with in the system has a cross-sectional dimension not exceed in 1,000 micro-meters, subject to the terms and conditions of this Agreement. For uses other than the foregoing or uses other than MRC Excluded Uses, MRC hereby grants to RainDance a non-exclusive, royalty bearing license, including the right to grant sublicenses under the MRC Non-Exclusive Patent Rights to make, use and sell Licensed Products in the Territory within the Field, subject to the terms and conditions of this Agreement.

2.2     Right to Sublicense. RainDance shall have the right to grant sublicenses to all or any portion of its rights under the license granted pursuant to this Section 2 without the prior written consent of MRC. For avoidance of doubt, sales through a Third Party distributor or wholesaler is hereby deemed not to be the grant of a sublicense of all or any portion of the rights licensed to RainDance hereunder provided that the sales to said distributor or wholesaler are arms length sales reflecting market prices not relying on any other favorable terms. In the event there are such sales to distributors or wholesalers at favorable terms or at significantly below market prices then the royalty due will be based upon said distributor or wholesaler sales to end user customer or upon an agreed transfer price.

2.3     Limitations on Sublicenses. Any Sublicensee shall be required to expressly acknowledge that its use of any Licensed Products shall be restricted to use within the Field and no rights are granted herein to Licensed Products for any MRC Excluded Uses under MRC Non-Exclusive Patent Rights.

2.4     MRC retains the right to use the Patent Rights for academic in-house research,

6

RDTX00023704

academic collaborations and teaching.

3. **Development and Commercialization of Licensed Products.**

   3.1   Development and Commercialization.

      (a) Cost. All activities relating to development and con
Products in the Field in the Territory under this Agr
at RainDance's sole cost and expense, except as othu ..
in this Agreement.

      (b) Due diligence. RainDance will exercise commercially reasonable efforts and
due diligence in the research, development and commercialization of Licensed
Products under this Agreement.

4. **Payments.**

   4.1   Initial Payment. Twenty-Five Thousand Dollars ($25,000) shall be due and
payable by RainDance to MRC within ten (10) days of the Effective Date.

   4.2   Annual License Maintenance Fee.

      (a) Twenty five thousand dollars ($25,000) due and payable by RainDance to MRC
within thirty (30) days following the issuance of the first Valid Claim to issue
of any patent under MRC Exclusive Patent Rights (the "Annual License
Maintenance Fee"); and for each year thereafter payable upon the anniversary
of the date such claim issues.

      (b) Each Annual License Maintenance Fee may be credited on a dollar-for-dollar
basis against royalties on Net Sales, made the same calendar year in which such
payment is due.

   4.3   Royalties. RainDance shall pay to MRC running royalties on Net Sales (as
hereinafter defined), on an issued Valid Claim on behalf of itself and/or its
affiliates and any Sublicensee(s), as follows:

      (a) For a Type A Product, Two-percent (2%) of Net Sales;

      (b) For a Type B Product, Three-percent (3%) of Net Sales;

      (c) For a Type C Product, Four-percent (4%) of Net Service Revenue;

      (d) For a Type D Product, One percent (1%) of Net Sales; and

      (e) For a Type E Product, a rate to be agreed upon by the Parties in the range of
two to three percent (2-3%) of Net Sales.

Provided that a license or sublicense from a third party is necessary for the
manufacture, sale or use of any Licensed Product, RainDance shall be entitled to
deduct from the royalties which would otherwise be due to MRC the amount of
royalties which RainDance must pay to such third parties for such license or

7

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION

sublicense, provided, however, that in no event shall the royalty due to MRC be reduced by more than fifty percent (50%). To avoid doubt, such deduction shall exclude any royalty or payment RainDance may pay to any third party for any license under MRC Non-Exclusive Patent Rights for MRC Excluded Uses.

4.4    Sublicense Income.  RainDance shall pay to MRC a percentage of Non-Royalty Sublicense Income as set forth herein.  RainDance shall pay to MRC:

(a) twenty percent (20%) of all Non-Royalty Sublicense Income received in connection with Sublicenses entered into prior to the second anniversary of the effective date of this Agreement;

(b) fifteen percent (15%) of all Non-Royalty Sublicense Income received in connection with Sublicenses entered into after the second anniversary of the Effective Date of this Agreement but prior to the fourth anniversary of the Effective Date of this Agreement; and

(c) ten percent (10%) of all Non-Royalty Sublicense Income received in connection with Sublicenses entered into after the fourth anniversary of the Effective Date of this Agreement.

In the event that a Sublicense includes a grant of rights under intellectual property rights owned by RainDance or in-licensed by RainDance from a third party (RainDance and such other third parties are, under such circumstances, cumulatively "Other IP Owners"), then the applicable foregoing percentage shall be reduced by dividing the applicable foregoing percentage by the number of Other IP Owners; provided, however, that in no event will the applicable foregoing percentage be reduced by more than two-thirds.

4.5    Equity.  In partial consideration for MRC entering into this Agreement with RainDance, RainDance shall issue to MRC Two Hundred Thousand (200,000) shares of the Common Stock of RainDance, representing approximately 2% of the founding stock of RainDance. RainDance shall issue the aforesaid shares to MRC within 30 days of the execution of this Agreement.  The Parties acknowledge that as of the Effective Date, RainDance has arranged for initial equity capital in the amount of Two Million dollars ($2,000,000).

4.6    Payment Terms.

(a) Overdue Payments. Subject to the other terms of this Agreement, any past due amounts payable to MRC shall be subject to monthly interest charges of the greater of one percent (1%) of the overdue amount or Two Hundred and Fifty dollars ($250).

(b) Accounting.  All payments hereunder shall be made in United States dollars.

(c) Withholding and Assistance in Recovery.  All payments hereunder shall be made free and clear of any taxes, duties, levies, fees and charges.  Should RainDance be required by a governmental authority to withhold any amount in connection with its payments to MRC hereunder, RainDance shall pay the

8

RDTX00023706

amount due and payable hereunder to MRC without setoff, RainDance shall pay the applicable withholding amount to such governmental authority and MRC shall provide all reasonable assistance to RainDance in recovering such amounts from the applicable governmental authority.

4.7 Royalty Reports. Within sixty (60) days of the end of RainDance's trading year RainDance shall deliver to MRC a royalty report setting forth for the preceding year the amount of Net Sales, Net Service Revenue and Non-Royalty Sublicense Income and the amount of royalty and other license fees accordingly due to MRC. MRC will then prepare an invoice for the amount due for payment within thirty (30) days.

4.8 Independent Auditor. RainDance shall permit an independent auditor acting on behalf of and at the expense of MRC upon reasonable notice and reasonable times such access to those accounts records and vouchers of RainDance necessary to verify the royalty obligations of RainDance under this Agreement and shall provide such information and explanations as such auditor shall require to verify the statements rendered under the terms of this Agreement and shall also permit such auditor to take copies of and extracts from the said accounts necessary for the purposes of verification. Such accounts records and vouchers of RainDance to be kept confidential and to be retained in accordance with UK statutory requirements.

5. **Confidential Information.**

5.1 Confidential Information. "Confidential Information" shall mean with respect to a Party (the "Receiving Party"), all information which is disclosed by the other Party (the "Disclosing Party") to the Receiving Party hereunder or to any of its employees, consultants, Affiliates, Licensees or Sublicensees, except to the extent that the Receiving Party can demonstrate by written record or other suitable physical evidence that such information: (a) as of the date of disclosure is demonstrably known to the Receiving Party or its Affiliates other than by virtue of a prior confidential disclosure to such Party or its Affiliates; (b) as of the date of disclosure is in, or subsequently enters, the public domain, through no fault or omission of the Receiving Party; (c) is obtained from a Third Party having a lawful right to make such disclosure free from any obligation of confidentiality to the Disclosing Party; or (d) is independently developed by or for the Receiving Party without reference to or reliance upon any Confidential Information of the Disclosing Party.

5.2 Confidential Obligations. MRC and RainDance each recognize that the other Party's Confidential Information constitutes highly valuable and proprietary confidential information. MRC and RainDance each agree that during the Term and for five (5) years thereafter, it will keep confidential, and will cause its employees, consultants, Affiliates and Sublicensees to keep confidential, all Confidential Information of the other Party. Neither MRC nor RainDance nor any of their respective employees, consultants, Affiliates or Sublicensees shall use Confidential Information of the other Party for any purpose whatsoever other than exercising any rights granted to it or reserved by it hereunder or fulfilling its obligations. Without limiting the foregoing, each Party may disclose information

9

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION

RDTX00023707

to the extent such disclosure is reasonably necessary to (a) file and prosecute patent applications and/or maintain patents which are filed or prosecuted in accordance with the provisions of this Agreement or (b) file, prosecute or defend litigation in accordance with the provisions of this Agreement or (c) comply with applicable laws, regulations or court orders.

5.3   Publicity.  Neither Party may publicly disclose the existence or terms or any other matter of fact regarding this Agreement without the prior written consent of the other Party, which consent shall not be unreasonably withheld or delayed; provided, however, that either Party may make such a disclosure (a) to the extent required by law or by the requirements of any nationally recognized securities exchange, quotation system or over-the-counter market on which such Party has its securities listed or traded or (b) to any investors, prospective investors, lenders and other potential financing sources who are obligated to keep such information confidential.  The Parties, upon the execution of this Agreement, will mutually agree to a press release with respect to this transaction for publication.

5.4   Use of Name.  Neither Party shall employ or use the name of the other Party in any promotional materials or advertising without the prior express written permission of the other Party.

## 6.   Intellectual Property Rights.

6.1   Patent Prosecution and Maintenance.

(a) Prosecution and Maintenance of MRC Exclusive Patent Rights and MRC Joint Patent Rights.  RainDance shall, at its own expense, be responsible for the worldwide preparation, filing, prosecution and maintenance, at its sole discretion and acting through patent attorneys or agents of its choice, of all patent applications and patents claiming MRC Exclusive Patent Rights and MRC Joint Patent Rights worldwide.

(b) Diligence. RainDance agrees to diligently prosecute MRC Exclusive Patent Rights and MRC Joint Patent Rights.  RainDance shall not make any material changes to the MRC Exclusive Patent Rights or MRC Joint Patent Rights, such that any patent application or patent is abandoned in any territory or any claim or divisional  is deleted or modified without the prior written consent of MRC.

(c) Prior Patent Costs MRC Exclusive Patent Rights and MRC Joint Patent Rights.  Upon execution of this Agreement, RainDance shall reimburse MRC for all expenses incurred up to the execution date by MRC in the preparation, filing, prosecution and maintenance of MRC Exclusive Patent Rights and MRC Joint Patent Rights before the term of this Agreement in an amount not to exceed £175,000.

(d) Prosecution of MRC Non-Exclusive Patent Rights. MRC shall be responsible for the worldwide preparation, filing, prosecution and maintenance, at its sole discretion and acting through patent attorneys or agents of its choice, of all patent applications and patents claiming MRC Non-Exclusive Patent Rights worldwide. During the Term of this Agreement, RainDance shall reimburse

10

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION

RDTX00023708

MRC 20% of all costs associated with patent preparation, filing, prosecution, and maintenance, and 20% of all costs associated with any patent proceedings related to MRC Non-Exclusive Patent Rights and incurred during the term of the license agreement, upon receipt of invoices from MRC.

(e) Continuing Applications under MRC Exclusive Patent Rights and MRC Joint Patent Rights.

(i) RainDance shall, at its own expense, be responsible for the worldwide preparation, filing, prosecution and maintenance, at its sole discretion and acting through patent attorneys or agents of its choice, of all future (ie after Effective Date) continuation or divisional or continuation-in-part patent applications and patents under MRC Exclusive Patent Rights and MRC Joint Patent Rights with claims reciting subject matter that is relevant to the Field. RainDance agrees that the foregoing patent applications shall be in the name of MRC in the case of MRC Exclusive Patent Rights and in the joint names of MRC and Harvard in the case of MRC Joint Patent Rights. RainDance shall prepare and file patent applications under MRC Exclusive Patent Rights and MRC Joint Patent Rights with claims reciting subject matter that is relevant to the Field after execution of this Agreement and shall timely report all filings and subsequent prosecution to MRC.

(ii) Any action relating to the filing and prosecution of the continuing applications must be notified to MRC at least 30 days (or the maximum possible if at least 30 days notice are available to RainDance) prior to any submission to any patent office for MRC's review. In the Event that MRC has a concern regarding the submission, the Parties will discuss to mutually resolve any potential conflict or material impact to the parent patent applications in Licensed Patent Rights.

(f) Existing RainDance Patent Rights. RainDance shall have the right, at its own expense, to use data and information obtained pursuant to this Agreement, to support prosecution of any RainDance-controlled patent applications that exist as of the Effective Date of this Agreement.

(g) Information and Cooperation. Each Party shall reasonably cooperate and assist the other Party in the filing, prosecuting, obtaining and maintaining patents or patent applications described in this Agreement as necessary, at the filing Party's expense.

6.2   Infringement. If, during the term of this Agreement, License Term, either Party learns of any actual, alleged or threatened infringement by a Third Party of any Licensed Patent Rights, such Party shall promptly notify the other Party and shall provide such other Party with available evidence of such infringement. MRC shall have the right (but not the obligation), at its own expense and with legal counsel of its own choice, to bring suit (or take other appropriate legal action) against any actual, alleged or threatened infringement of the MRC Non-Exclusive Patent Rights, except for infringement of continuing applications under MRC Non-Exclusive Patent Rights with claims directed to Claim Areas relevant in the Field.

11

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION

RDTX00023709

RainDance shall have the right (but not the obligation), at its own expense and with legal counsel of its own choice, to bring suit (or take other appropriate legal action) against any actual, alleged or threatened infringement of continuing applications under MRC Exclusive Patent Rights, MRC Joint Patent Rights and MRC Non-Exclusive Patent Rights with claims relevant in the Field. Any damages, monetary awards or other amounts recovered, whether by judgment or settlement, pursuant to any suit, proceeding or other legal action taken under this Section shall be to the account of the Party bringing and prosecuting the same. If a Party brings any such action or proceeding hereunder, the other Party agrees to be joined as party plaintiff if necessary to prosecute such action or proceeding, and to give the Party bringing such action or proceeding reasonable assistance and authority to file and prosecute the suit; provided, however, that neither Party shall be required to transfer any right, title or interest in or to any property to the other Party or any Third Party to confer standing on a Party hereunder.

7.   **Representations, Warranties and Certain Covenants.**

7.1   MRC and RainDance each represents, warrants and covenants to the other Party that:

(a)   it has the right to enter into this Agreement and that it is not and will not be party to any other agreement that would limit its performance hereunder; and

(b)   the terms of this Agreement do not conflict with, and would not result in the breach under any agreement to which it is or will be a party that would have a material adverse effect on its ability to perform its obligations under this Agreement.

7.2   MRC represents and warrants it has, and will continue to have during the Term, the right to grant RainDance the rights it grants to RainDance hereunder.

7.3   RainDance represents and warrants that it complies with, and will continue to comply with, all applicable laws, rules, and regulations applicable to its exercise of the rights granted to it hereunder.

7.4   **MRC MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING WITH RESPECT TO THE LICENSED PATENT RIGHTS, AND HEREBY DISCLAIMS ANY AND ALL SUCH WARRANTIES, INCLUDING WITHOUT LIMITATION WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT, VALUE, RELIABILITY, ACCURACY, SUITABILITY AND FITNESS FOR A PARTICULAR PURPOSE, OR AS TO THE VALIDITY OR SCOPE OF THE LICENSED PATENT RIGHTS.**

8.   **Indemnification.**

8.1   RainDance shall indemnify, defend and hold harmless MRC, its Affiliates and their respective directors, officers, employees, stockholders and agents and their respective successors, heirs and assigns (the "MRC Indemnitees") from and against any liability, damage, loss or expense (including reasonable attorneys' fees and

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION                    RDTX00023710

expenses of litigation) incurred by or imposed upon such MRC Indemnitees, or any of them, in connection with any Third Party claims, suits, actions, demands or judgments, to the extent arising out of (a) the development, testing, production, manufacture, supply, promotion, import, sale or use by any person of any Licensed Product (or any component thereof) manufactured or sold by RainDance or its Affiliates or its Sublicensees or its distributors or its wholesalers under this Agreement, (b) any material breach of this Agreement by RainDance or (c) gross negligence or willful misconduct on the part of any RainDance Indemnitee, as defined below.

8.2    MRC shall indemnify, defend and hold harmless RainDance, its Affiliates and their respective directors, officers, employees, stockholders and agents and their respective successors, heirs and assigns (the "RainDance Indemnitees") from and against any liability, damage, loss or expense (including reasonable attorneys' fees and expenses of litigation) incurred by or imposed upon such RainDance Indemnitees, or any of them, in connection with any Third Party claims, suits, actions, demands or judgments to the extent arising out of (a) any material breach of this Agreement by MRC or (b) gross negligence or willful misconduct on the part of MRC Indemnitee.

9.    **Term, Termination; Survival of Terms.**

9.1    Term. Unless earlier terminated as provided in this Section 9, this Agreement shall come into force on the date first set forth above or the date of signature of the RainDance/Harvard license (including Harvard's rights in the patents listed in Exhibit C) whichever is the later, or on February 28th, 2006 and shall continue until the expiry of the last to expire of the patents listed on Exhibit A.

9.2    Termination for Breach. Subject to the other terms of this Agreement, this Agreement may be terminated by a Party upon unremedied material breach by the other Party of any obligation or condition, effective thirty (30) days after giving written notice to the breaching Party of such material breach in the case of nonpayment of monies due and payable and sixty (60) days after giving written notice to the breaching Party of the material breach in the case of any other breach, which notice shall describe such material breach in reasonable detail.

9.3    Effects of Termination. Upon any termination of this Agreement by MRC under Section 9.2, all proprietary MRC materials or MRC Confidential Information shall be promptly returned to MRC. All proprietary RainDance materials or RainDance Confidential Information shall be promptly returned to RainDance. In the event of termination of the Agreement between MRC and Raindance the sub-licences granted hereunder by the Raindance shall continue in effect, on a case-by-case basis, if such sublicensees provide MRC with written notice of their agreement to be bound by all the terms of this Agreement. In such event, the sublicence shall continue as if it was a licence agreement directly between MRC and the sublicensee.

10.    Notices. All notices, requests and other communications hereunder shall be in writing, shall be addressed to the receiving Party's address set forth below or to such other address

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION                    RDTX00023711

as a Party may designate by notice hereunder, and shall be either (i) delivered by hand, (ii) sent by facsimile transmission (to be followed with written confirmation forwarded by regular mail), (iii) sent by private courier service providing evidence of receipt, or (iv) sent by registered or certified mail, return receipt requested, postage prepaid. The addresses and other contact information for the Parties are as follows:

| | |
|---|---|
| If to MRC: | MRC Technology<br>20 Park Crescent<br>London, W1B 1A7<br>Phone: +44 208 906 7100<br>Fax: +44 207 291 5325<br><br>Attn: Director of Licensing and Agreement Division |
| With a copy to | Address as above<br>Attn: Director of Intellectual Property Division |
| If to RainDance: | RainDance Technologies, Inc.<br>530 Whitfield Street<br>Guilford, CT 06437<br>United States of America<br><br>Phone: (203) 458-7100<br>Fax: (203) 458-2514<br><br>Attn: Jonathan Rothberg, Ph.D. |
| With a copy to: | Mintz Levin Cohn Ferris Glvsky and Popeo, P.C.<br>One Financial Center<br>Boston , MA 02111<br>Phone: (617) 542-6000<br>Fax: (617) 542-2241<br><br>Attn: Ivor Elrifi, Esq. |

All notices, requests and other communications hereunder shall be deemed to have been delivered upon receipt.

11.  **Miscellaneous.**

11.1   No Agency or Joint Venture.  RainDance is not an agent, joint venture or partner of MRC, and the Parties do not intend to create an agency, joint venture or partner relationship.

11.2   Assignment.  Neither this Agreement nor any right or obligation hereunder may be assigned, delegated or otherwise transferred, in whole or part, by either Party without the prior express written consent of the other, which consent shall not be unreasonably withheld, provided however, that either Party may assign this

14

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION

RDTX00023712

Agreement without prior written consent to an Affiliate of such Party or to a Party which acquires all or substantially all of that Party's business, whether by merger, sale of assets or otherwise.

11.3   Force Majeure.  Neither Party shall be liable for failure of or delay in performing obligations set forth in this Agreement, and neither shall be deemed in breach of its obligations, if such failure or delay is due to natural disasters or any causes beyond the reasonable control of such Party.  In event of such force majeure, the Party affected thereby shall use reasonable efforts to cure or overcome the same and resume performance of its obligations hereunder.

11.4   Governing Law.  This Agreement shall be governed by the English law.  The parties agree to submit to the exclusive jurisdiction of the English courts, in connection with any suit or proceeding arising under or in connection with this Agreement.

11.5   Severability.  Whenever possible, each provision of this Agreement will be interpreted in such a manner as to be effective and valid under Laws, but, if any provision of this Agreement will be held to be prohibited or invalid in any jurisdiction, such provision will be deemed to be restated to reflect as nearly as possible the original intentions of the Parties in accordance with laws.  The remaining provisions of this Agreement will remain in full force and effect and the prohibited or invalid provision will remain in effect in any jurisdiction in which it is not prohibited or invalid.

11.6   Entirety of Contract; Amendment.  This Agreement, the annexed Exhibits and any amendments hereto or thereto constitute the entire contract between the Parties with respect to the subject matter hereof and thereof, and supersede all proposals, oral or written, all previous negotiations, and all other communications between the Parties with respect to the subject matter hereof.  No modifications, alterations or waivers of any provisions herein contained will be binding on the Parties hereto unless evidenced in writing signed by duly authorized representatives of both Parties. This Agreement may be executed by one or more of the Parties on any number of separate counterparts, and all of said counterparts taken together will be deemed to constitute one and the same instrument.

11.7   Continuing Obligations; Survival.  Termination of this Agreement for any reason will not relieve either Party of any obligation that expressly or by implication survives termination nor relieve either Party of any obligations or liabilities for loss or damage to the other Party arising out of or caused by acts or omissions of such Party prior to the effectiveness of such termination.

11.8   Dispute Resolution.  Any controversy or claim arising out of or relating to this Agreement or the breach thereof shall be referred to a designated manager (having authority to settle the dispute) of each Party for resolution.  If the claim or controversy is not resolved within thirty (30) days thereafter, such controversy or claim shall be settled by binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA") as modified hereby.  The location of the arbitration shall be New York, New York.  Judgment

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION

RDTX00023713

upon the award rendered by the arbitrators may be enforced in any court having jurisdiction thereof. The arbitration shall be conducted by a panel of three neutral arbitrators who are independent and disinterested with respect to the Parties, this Agreement, and the outcome of the arbitration. Each Party shall appoint one neutral arbitrator, and these two arbitrators so selected by the Parties shall then select the third arbitrator. The arbitrators may grant any legal or equitable remedy or relief that the arbitrators deem just and equitable to the same extent that remedies or relief could be granted by a court. The decision of any two of the three arbitrators appointed shall be binding upon the Parties. The expenses of the arbitration, including the arbitrators' fees, expert witness fees, and attorney's fees, may be awarded to the prevailing Party, in the discretion of the arbitrators, or may be apportioned between the Parties in any manner deemed appropriate by the arbitrators.

\*   \*   \*   \*   \*   \*   \*   \*

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION

RDTX00023714

IN WITNESS THEREOF, MRC and RainDance have caused this Exclusive License Agreement to be executed by their duly authorized representatives as of the date hereof.

MEDICAL RESEARCH COUNCIL

Martin R Wood PhD
Authorised signatory on behalf of
Medical Research Council

By:
Title:

RAINDANCE TECHNOLOGIES, INC.

By:
Title: Chair man

17

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION

RDTX00023715

## MRC EXCLUSIVE PATENT RIGHTS
## LICENSES OF INTEREST

### SELECTION BY COMPARTMENTALISED SCREENING

PCT/GB04/001362; filed on 31 March 2004, claiming priority from 31 March 2003. Publication No WO 04/088314

Licensor; MRC

Abstract

The invention describes a method for the identification of compounds which bind to a target component of a biochemical system or modulate the activity of the target, comprising the steps of: a) compartmentalising the compounds into microcapsules together with the target, such that only a subset of the repertoire is represented in multiple copies in any one microcapsule; and b) identifying the compound which binds to or modulates the activity of the target. The invention enables the screening of large repertoires of molecules which can serve as leads for drug development.

### SELECTIVE GENE AMPLIFICATION

PCT/GB02/02802; filed on 18 June 2002, claiming priority from 18 June 2001. Publication No WO 02/103011

Licensor; MRC

Abstract

A method is provided for selecting nucleic acids encoding gene products in which the nucleic acid encoding the gene product is selectively and quantitatively amplified depending on the activity of the gene itself or the gene product. The method may, for example, be used in selecting gene products arising from *in vitro* evolution of molecular libraries.

### METHOD OF SYNTHESIS AND TESTING OF COMBINATORIAL LIBRARIES USING MICROCAPSULES

PCT/GB04/001352; filed on 31 March 2004, claiming priority from 31 March 2003. Publication No WO 04/087308

Licensor; MRC

Abstract

The invention describes a method for the synthesis of compounds comprising the steps of: (a) compartmentalising two or more sets of primary compounds into microcapsules; such that a proportion of the microcapsules contains two or more compounds; and (b) forming secondary compounds in the microcapsules by chemical reactions between primary compounds from different sets. The invention further allows for the identification of compounds which bind to a target component of a biochemical system or modulate the activity of the target, and which is co-compartmentalised into the microcapsules.

### SINGLE-MOLECULE IN VITRO EVOLUTION

PCT/GB03/003924; filed on 10 September 2003, claiming priority from 11 September 2002. Publication No WO 04/024917

Licensor; MRC

Abstract

The invention relates to a method for isolating one or more genetic elements encoding a gene product having a desired activity, comprising the steps of a) providing a population of genetic elements and expressing the genetic elements to produce their respective gene product(s), such that each molecule of gene product is linked to the genetic element encoding it at a ratio of one molecule of gene product per genetic element or less; b) compartmentalising the genetic elements into microcapsules; and c) sorting the genetic elements according to the activity of the gene product.

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION

RDTX00023716

### MRC NON-EXCLUSIVE PATENT RIGHTS
### LICENSES OF INTEREST

**IN VITRO SORTING METHOD**
PCT/GB98/01889; filed on 29 June 1998, claiming priority from 29 June 1997. Publication No WO 99/02671
Licensor; MRC
Abstract
The invention describes a method for isolating one or more genetic elements encoding a gene product having a desired activity, comprising the steps of: (a) compartmentalising genetic elements into microcapsules; (b) expressing the genetic elements to produce their respective gene products within the microcapsules; (c) sorting the genetic elements which produce the gene product having a desired activity. The invention enables the *in vitro* evolution of nucleic acids by repeated mutagenesis and iterative applications of the method of the invention.

**OPTICAL SORTING METHOD**
PCT/GB00/00030; filed on 6 January 2000, claiming priority from 7 January 1999. Publication No WO 00/40712
Licensor; MRC
Abstract
The invention describes a method for isolating one or more genetic elements encoding a gene product having a desired activity, comprising the steps of: (a) compartmentalising genetic elements into microcapsules; (b) expressing the genetic elements to produce their respective gene products within the microcapsules; (c) sorting the genetic elements which produce the gene product having the desired activity using a change in the optical properties of the genetic elements. The invention enables the *in vitro* evolution of nucleic acids and proteins by repeated mutagenesis and iterative applications of the method of the invention.

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION

RDTX00023717

EXHIBIT C

## MRC JOINT PATENT RIGHTS
## LICENSES OF INTEREST

Harvard/MRC (Jointly);

**COMPARTMENTALISED SCREENING BY MICROFLUIDIC CONTROL.**
PCT/GB05/003924; filed on 12 October 2005, claiming priority from 12 October 2004
Licensor; Harvard and MRC.  Harvard Case No. 2407 unpublished.
**ABSTRACT**

The invention describes a method for the identification of compounds which bind to a target component of a biochemical system or modulate the activity of the target, comprising the steps of: a) compartmentalizing the compounds into microcapsules together with the target, such that only a subset of the repertoire is represented in multiple copies in any one microcapsule; and b) identifying the compound which binds to or modulates the activity of the target; wherein at least one step is performed under microfluidic control. The invention enables the screening of large repertoires of molecules which can serve as leads for drug development.

**IN VITRO EVOLUTION IN MICROFLUIDIC SYSTEMS.**
PCT/GB05/003889; filed 10 October 2005, claiming priority from 8 October 2004
Licensor; Harvard and MRC
**ABSTRACT**

The invention describes a method for isolating one or more genetic elements encoding a gene product having a desired activity, comprising the steps of: (a) compartmentalising genetic elements into microcapsules; and (b) sorting the genetic elements which express the gene product having the desired activity; wherein at least one step is under microfluidic control.  The invention enables the *in vitro* evolution of nucleic acids and proteins by repeated mutagenesis and iterative applications of the method of the invention.

**COMPARTMENTALISED COMBINATORIAL CHEMISTRY BY MICROFLUIDIC CONTROL.**
PCT/GB05/003927; filed on 12 October 2005, claiming priority from 12 October 2004
Licensor; Harvard and MRC
**ABSTRACT**

The invention describes a method for the synthesis of compounds comprising the steps of: (a) compartmentalising two or more sets of primary compounds into microcapsules; such that a proportion of the microcapsules contains two or more compounds; and (b) forming secondary compounds in the microcapsules by chemical reactions between primary compounds from different sets; wherein one or both of steps (a) and (b) is performed under microfluidic control; preferably electronic microfluidic control The invention further allows for the identification of compounds which bind to a target component of a biochemical system or modulate the activity of the target, and  which is co-compartmentalised into the microcapsules.

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION                    RDTX00023718

<u>**EXHIBIT D**</u>

**FIELD OF USE EXCLUSIONS**
**UNDER APPENDIX B PATENT RIGHTS**

The licenses and rights under MRC Non-Exclusive Patent Rights granted herein shall exclude use in the following fields:

1    Antibodies and antibody fragments.

2    T cell receptors and T cell receptor fragments.

3    Polymerases.

4    Luciferases.

5    Nucleic Acids.

To avoid doubt no such restriction shall apply to MRC Exclusive Patent Rights or MRC Joint Patent Rights or to (i) small molecule dugs or (ii) microfluidics in MRC non-Exclusive Patent Rights.

21

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION                      RDTX00023719